26-2473

# In the United States Court of Appeals
## FOR THE SEVENTH CIRCUIT

---

AFTERSCHOOL FOR CHILDREN AND TEENS (ACT NOW) and METROPOLITAN FAMILY SERVICES,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES DEPARTMENT OF EDUCATION and LINDA MCMAHON,

*Defendants-Appellees*.

---

On Appeal from the United States District Court for the Northern District of Illinois
No. 1:25-cv-15704 (Honorable Martha M. Pacold)

---

## APPELLANTS' OPENING BRIEF

---

Jocelyn (Josie) E. Skinner
(*application for admission pending*)
Emily K. Merolli
(*admission for application pending*)
SLIGO LAW GROUP, PLLC
1717 K St. NW, Suite 900
Washington, DC 20006
Telephone: (202) 888-2084

Scott C. Solberg (No. 6204487)
Elizabeth M. Hady (No. 6316542)
EIMER STAHL LLP
224 S. Michigan Ave., Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718

Aneel L. Chablani (No. 6242658)
Michael R. Ortega (No. 6339469)
CHICAGO LAWYERS' COMMITTEE FOR
CIVIL RIGHTS
25 E. Washington St., Suite 1300
Chicago, IL 60602
Telephone: (312) 630-9744
Fax: (312) 630-1127

*Attorneys for Plaintiffs-Appellants*
*Afterschool for Children and Teens (ACT)*
*Now and Metropolitan Family Services*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>26-2473</u>

Short Caption: <u>ACT Now Coalition, et al v. EDUC, et al</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>AFTERSCHOOL FOR CHILDREN AND TEENS NOW (ACT NOW) COALITION and METROPOLITAN FAMILY</u>

<u>SERVICES</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>EIMER STAHL LLP, SLIGO LAW GROUP, PLLC, CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: <u>/s/ Scott C. Solberg</u>    Date: <u>07/15/2026</u>

Attorney's Printed Name: <u>Scott C. Solberg</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☑ No ☐

Address: <u>224 S. Michigan Ave., Suite 1100</u>

<u>Chicago, IL 60604</u>

Phone Number: <u>(312) 660-7600</u>    Fax Number: <u>(312) 692-1718</u>

E-Mail Address: <u>ssolberg@eimerstahl.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>26-2473</u>

Short Caption: <u>ACT Now Coalition, et al v. EDUC, et al</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>AFTERSCHOOL FOR CHILDREN AND TEENS NOW (ACT NOW) COALITION and METROPOLITAN FAMILY</u>

<u>SERVICES</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>EIMER STAHL LLP, SLIGO LAW GROUP, PLLC, CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)      Identify all its parent corporations, if any; and

    ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

---

Attorney's Signature: <u>/s/ Elizabeth M. Hady</u>    Date: <u>07/16/2026</u>

Attorney's Printed Name: <u>Elizabeth M. Hady</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑   No ☐

Address: <u>224 S. Michigan Ave., Suite 1100</u>

    <u>Chicago, IL 60604</u>

Phone Number: <u>(312) 660-7600</u>      Fax Number: <u>(312) 692-1718</u>

E-Mail Address: <u>ehady@eimerstahl.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-2473

Short Caption: ACT Now Coalition, et al v. EDUC, et al

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

   AFTERSCHOOL FOR CHILDREN AND TEENS NOW (ACT NOW) COALITION and METROPOLITAN FAMILY

   SERVICES

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   EIMER STAHL LLP, SLIGO LAW GROUP, PLLC, CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS

(3)   If the party, amicus or intervenor is a corporation:

   i)      Identify all its parent corporations, if any; and

   ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

---

Attorney's Signature: /s/ Aneel L. Chablani          Date: 07/16/2026

Attorney's Printed Name: Aneel L. Chablani

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [✓]  No [ ]

Address: 25 E. Washington St., Suite 1300

   Chicago, IL 60602

Phone Number: (312) 202-3658          Fax Number: (312) 630-1127

E-Mail Address: achablani@clccrul.org

rev. 12/19 AK

Case: 26-2473   Document: 1   Filed: 08/06/2026   Pages: 59

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>26-2473</u>

Short Caption: <u>ACT Now Coalition, et al v. EDUC, et al</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>AFTERSCHOOL FOR CHILDREN AND TEENS NOW (ACT NOW) COALITION and METROPOLITAN FAMILY</u>

<u>SERVICES</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>EIMER STAHL LLP, SLIGO LAW GROUP, PLLC, CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: _____      Date: <u>7/17/2026</u>

Attorney's Printed Name: <u>Jocelyn E. Skinner</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☑  No ☐

Address: <u>Sligo Law Group PLLC, 1717 K St. NW, Suite 900, Washington, DC 20006</u>

Phone Number: <u>202-888-2084</u>      Fax Number: _____

E-Mail Address: <u>josie@sligolawgroup.com</u>

rev. 12/19 AK

# TABLE OF CONTENTS

I.    Jurisdictional Statement ........................................................................................ 1

II.   Introduction ............................................................................................................ 2

III.  Questions Presented ............................................................................................. 3

IV.   Statement of the Case ........................................................................................... 3

    A.    Congress Created a Grant Program to Fund Full-Service Community Schools Infrastructure in "High-Poverty" Areas ........................................................ 3

    B.    In 2023, ACT Now Applied for and Was Awarded Two FSCS Grants To Scale the "Community Schools" Model Across Illinois ................................................. 6

    C.    In 2025, the Department Non-Continued ACT Now's Grants as Contrary to Its New Anti-DEI Priorities ..................................................................................... 9

    D.    Plaintiffs' Complaint and Motion for Temporary Restraining Order .......................... 12

    E.    Plaintiffs' Motion for Preliminary Injunction ............................................... 12

V.    Summary of Argument .......................................................................................... 13

VI.   Standard of Review ............................................................................................... 14

VII.  Argument ............................................................................................................... 15

    A.    The District Court Erred by Concluding that Plaintiffs Are Unlikely to Succeed on Their First Amendment Claims ...................................................................... 15

        1.    Plaintiffs are likely to succeed on their retaliation claim. ........................ 15

        2.    Plaintiffs are likely to succeed on their unconstitutional conditions claim. ........... 18

        3.    The district court's errors require reversal. .............................................. 20

        a. The district court erred in finding that the Department discontinued ACT Now's funding because of programming provided by ACT Now. ................................... 20

        b. The district court erred by interpreting *Rust* and its progeny to allow the Department (as opposed to Congress) to discriminate against disfavored viewpoints in making funding decisions. .............................................. 22

        c. The district court erred in concluding that the selective subsidy cases permit the Department's non-continuations ........................................................ 25

    B.    The district court abused its discretion by failing to consider Plaintiffs' irreparable harm. ......................................................................................................... 29

VIII. Conclusion ............................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. Alliance for Open Society Int'l, Inc.*, 570 U.S. 205 (2013)... 19, 22, 23, 25

*Albert v. Trans Union Corp.*, 346 U.S. 734 (7th Cir. 2003) .............................................. 1

*Am. Acad. of Pediatrics v. U.S. Dep't of Health and Human Servs.*, 816 F. Supp. 3d 27 (D.D.C. 2026) ...................................................................................................................... 16

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) ............................................. 14

*Brown-Bey v. United States*, 720 F.2d 467 (7th Cir. 1983) ............................................ 30

*Camelot Banquet Rooms, Inc. v. United States SBA*, 24 F.4th 640 (7th Cir. 2022) ...................... 23

*Chi. Headline Club v. Noem*, No. 25-3023, 2025 LX 683672 (7th Cir. Nov. 19, 2025) .............. 23

*City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020) ................................................... 25

*Courthouse News Serv. v. Brown*, 908 F.3d 1063 (7th Cir. 2018) ............................... 15, 29

*Doe v. Univ. of S. Ind.*, 43 F.4th 784 (7th Cir. 2022) ...................................................... 14

*Dolin v. GlaxoSmithKline LLC*, 951 F.3d 882 (7th Cir. 2020) ........................................ 30

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) .................................................. 29

*FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574 (7th Cir. 2021) .............................................. 15

*Holmes v. Fisher*, 854 F.2d 229 (7th Cir. 1988) .............................................................. 1

*Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life. Ins. Co.*, 582 F.3d 721 (7th Cir. 2009) ...................................................................................................................... 29

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ................................................... 23

*Maher v. Roe*, 432 U.S. 464 (1977) ............................................................................... 23

*Mays v. Dart*, 974 F.3d 810 (7th Cir. 2020) .............................................................. 15, 29

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ................................... passim

*Nieves v. Bartlett*, 587 U.S. 391 (2019) ........................................................................ 15

*OPM v. Richmond*, 496, U.S. 414 (1990) ...................................................................... 23

*Perry v. Sindermann*, 408 U.S. 593 (1972) ......................................................... 16, 19, 20

*Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*, 699 F.3d 962 (7th Cir. 2012) ................................................................................................................. 18

*Regan v. Taxation with Representation*, 461 U.S. 540 (1983) ....................................................... 23

*Rust v. Sullivan*, 500 U.S. 173 (1991) ................................................................ 14, 22, 23, 24

*Schukar v. Kenosha Cnty.*, -- F.4th --, No. 25-2935, 2026 WL 2097220 (7th Cir. July 21, 2026)15, 17

*Speech First, Inc. v. Killeen*, 968 F.3d 628 (7th Cir. 2020) ..................................................... 15, 29

*Speiser v. Randall*, 357 U.S. 513 (1958) ..................................................................................... 23

*Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................................ 29

*Wisconsinites for Alternatives to Smoking & Tobacco, Inc. v. Casey*, 172 F.4th 976 (7th Cir. 2026) ................................................................................................................................ 30

**Statutes**

20 U.S.C. § 1221 et seq. ................................................................................................................ 5

20 U.S.C. § 1221-1 ....................................................................................................................... 4

20 U.S.C. § 1228a(b) ..................................................................................................................... 5

20 U.S.C. § 1232 ......................................................................................................................... 26

20 U.S.C. § 7271 ..................................................................................................................... 4, 25

20 U.S.C. § 7272 ..................................................................................................................... 5, 25

20 U.S.C. § 7273 ................................................................................................................ 4, 25, 26

20 U.S.C. § 7275 ..................................................................................................................... 5, 25

20 U.S.C. §§ 7271–75 .................................................................................................................... 4

28 U.S.C. § 1292(a)(1) ................................................................................................................... 1

28 U.S.C. § 1331 ........................................................................................................................... 1

5 U.S.C. §§ 701–06 ....................................................................................................................... 1

**Rules**

Fed. R. App. P. 4(a)(1)(B)(ii) ................................................................................... 1

**Regulations**

34 C.F.R. § 75.105 ............................................................................................. 26

34 C.F.R. § 75.118 ............................................................................................... 5

34 C.F.R. § 75.253 .......................................................................................5, 11, 17

34 C.F.R. §§ 75.250–51 ....................................................................................... 5

Notice Inviting Applications for New Awards, 88 Fed. Reg. 37222 (June 7, 2023) .................. 4, 6

**Other Authorities**

Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025)....................................... 9, 17

Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025)........................................... 9

Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025) .................................... 10, 18

M. Lieberman, Educator Layoffs Loom as Canceled Community School Grants Remain in
    Limbo, Education Week (Jan. 6, 2026)............................................................. 10

U.S. Dep't of Educ., Department of Education Takes Action to Eliminate DEI, Press Release
    (Jan. 23, 2025).................................................................................... 9, 18

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 8...................................................................................... 22

I.      **Jurisdictional Statement**

Plaintiffs-Appellants filed an eight-count complaint in the district court on December 29, 2025. The district court had federal question jurisdiction under 28 U.S.C. § 1331 over all eight counts because those claims arise under the First Amendment, Fifth Amendment, and Spending Clause of the United States Constitution and the laws of the United States, including the Administrative Procedure Act, 5 U.S.C. §§ 701–06, and other federal statutes and regulations governing the administration of federal Education grants. Defendants-Appellees moved to dismiss all eight counts, and Plaintiffs-Appellants moved for a preliminary injunction on all eight counts.

On June 26, 2026, the district court issued two orders: (1) an order granting in part Defendants-Appellees' motion, dismissing all but Plaintiffs-Appellants' First Amendment claims; and (2) an order denying Plaintiffs-Appellants' motion for a preliminary injunction. (Dkt. 60, 62.) This is an appeal of the denial of the preliminary injunction only.[1]

Appellants timely filed their Notice of Appeal on July 13, 2026. See Fed. R. App. P. 4(a)(1)(B)(ii). This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1) because this is an appeal challenging the district court's refusal to issue a preliminary injunction on the sole surviving claims. *Albert v. Trans Union Corp.*, 346 U.S. 734 (7th Cir. 2003), citing *Holmes v. Fisher*, 854 F.2d 229 (7th Cir. 1988) (appeal under § 1292(a)(1) upon "total denial of all injunctive relief" in district court).

---

[1]Appellants expressly reserve their right to appeal the district court's ruling on the motion to dismiss when it becomes appealable.

## II.    Introduction

For two years, ACT Now did exactly what Congress asked. With Full-Service Community Schools grants administered through the Department of Education, it turned public schools in Illinois' poorest communities into hubs for food, health care, tutoring, and family support, reaching 19,000 students across 16 districts. Its results were exemplary: chronic absenteeism fell faster than the statewide average, and one school cut major behavioral referrals by 68%. The Department identified no performance problem and renewed both grants for a second year.

Then, abruptly, in December 2025, the Department cut ACT Now off, discontinuing its funding for the remaining three years of the program—not for anything it did, but for something it said. Two years earlier, its applications had used words the new Administration disfavors: that ACT Now's "mission has equity and racial justice at its core," and that "equity is intentionally and sustainably integrated into all that we do." Carrying out executive orders to purge "DEI" from federal grants, the Department plucked those sentences from more than 200 pages, branded them "not in the best interest of the Federal Government," and sent boilerplate notices of "non-continuation" to ACT Now and seventeen other grantees. It never claimed ACT Now spent a dollar on the purported "DEI" projects the Department imagined—because, undisputedly, ACT Now never did.

ACT Now challenged these actions and moved for preliminary relief to preserve critical services while it litigated its claims. The district court denied ACT Now's request for a preliminary injunction based on a chain of errors. It found that ACT Now "proposed" DEI-related projects, a finding the record refutes and the Department itself never made. It misinterpreted *Rust* and the selective-subsidy cases to let the Executive unconstitutionally discriminate by viewpoint. And the court said *nothing* about the overwhelming, unrebutted evidence that losing these grants would

2

shutter ACT Now's programs and strip services from thousands of children, harm no damages can undo.

The First Amendment forbids defunding an organization because of its viewpoint. This Court should vacate the district court's order.

## III.     Questions Presented

1. The First Amendment bars the government from denying a discretionary benefit to punish a recipient's viewpoint and forbids leveraging a subsidy to regulate views held outside the funded program. Implementing Executive Orders targeting "DEI," the Department "non-continued" ACT Now's grants based solely on application statements supporting equity, citing no performance deficiency and no funds spent on disfavored projects. Did the district court err in holding ACT Now unlikely to succeed on its First Amendment claims?

2. A court weighing preliminary relief must consider the movant's irreparable harm, which is presumed in First Amendment cases. ACT Now offered five uncontradicted witnesses and twenty-one sworn declarations that losing its grants would shutter its programs and cut services to 19,000 students—harm that future damages cannot fully redress. The Department disputed none of it. Did the court abuse its discretion by denying relief without ever addressing that harm?

## IV.     Statement of the Case

### A.  Congress Created a Grant Program to Fund Full-Service Community Schools Infrastructure in "High-Poverty" Areas

Congress declared equal access to education a national priority:

Recognizing that the Nation's economic, political, and social security require a well-educated citizenry, the Congress (1) reaffirms, as a matter of high priority, the Nation's goal of equal educational opportunity, and (2) declares it to be the policy of the United States of America that every citizen is entitled to an education to meet his or her full potential without financial barriers.

3

20 U.S.C. § 1221-1.

To advance that policy priority, Congress established the Full-Service Community Schools (FSCS) Grant Program. 20 U.S.C. §§ 7271–75. The FSCS program promotes the "Community Schools" model of public education, where public schools transform into resource hubs providing children, families, and communities year-round support that keeps kids healthy, safe, and engaged in school. (PI Hr'g Tr. at 7:22–8:13.) The services and programs the grants support are "hyper-local" and tailored to the needs of individual districts and schools: "all services have to be based on data-driven needs assessments that are conducted at the local level." (*Id.* at 8:17-20.)

The grants help districts and schools by building the infrastructure and local capacity necessary to deliver these life-changing services after the grant ends. A Full-Service Community School "meet[s] the needs of the whole child … [and] the unique needs of the neighborhoods they serve by leveraging local nonprofit, private sector, and public partnerships to bring wraparound services into school buildings." *See* Notice Inviting Applications for New Awards, 88 Fed. Reg. 37222 (June 7, 2023). Cafeterias run food pantries so students and their families do not go hungry. (PI Hr'g Tr. at 56:4–8.) Career days for kids double as job fairs for parents. (*Id.* at 40:6–12.) Mobile health clinics park on campus and offer both medical appointments and job training for students. (*Id.* at 68:16–21.) All these services and more are coordinated and integrated into a "community-based continuum of high-quality services" delivered to "children living in the most distressed communities of the United States." 20 U.S.C. § 7271.

Congress delegated to the Department of Education the authority to execute the program. The authorizing statute requires the Secretary to award at least 95% of appropriated funds through competitive grants, to assist public schools "to function as full-service community schools." *Id.* at § 7273(a)(1)(B). The initial grants must be "of sufficient size and scope" to allow the grantee to

4

carry out the hyper-local assessment, design, and implementation necessary to meet the program's statutory purpose. *Id*. at § 7273(a)(2). Grants may be awarded for up to five years, *id.* at § 7273(b), but are only funded for at most 12 months, 34 C.F.R. §§ 75.250–51. Multi-year grantees do not compete again for continued funding; instead, they submit a performance report, and the Department considers their progress towards performance objectives and whether continuing that progress is in the best interest of the government. 34 C.F.R. §§ 75.118, 75.253(a)(1)–(5), (b).

Congress further specified what those seeking FSCS grants must include in their applications. The Secretary "shall require" applicants to describe their capacity to coordinate needs- and assets-assessments of individual schools and provide the services the assessments reveal are needed in a particular community. 20 U.S.C §§ 7275(a)(1), (3). The Secretary must require a "comprehensive plan" describing the communities to be served, an assessment of the communities' needs, and "annual measurable performance objectives and outcomes. . . in order to ensure that children are prepared for kindergarten; achieving academically; and safe, healthy, and supported by engaging parents." *Id.* at § 7275(a)(4). Congress also required applicants to speak to the specific "pipeline services" applicants can offer, which range from early childhood education programs to professional development for educators. *See id*. at § 7272(3).

These program-specific requirements supplement the General Education Provisions Act (GEPA), under which Congress established general requirements for all Education programs. *See* 20 U.S.C. § 1221, *et seq*. GEPA directs the Secretary to require each applicant for Education funds to propose steps that "ensure equitable access to, and equitable participation in" their proposed programs "by addressing the special needs of . . . program beneficiaries" to overcome barriers to such participation, "including barriers based on gender, race, color, national origin, disability, and age." 20 U.S.C. § 1228a(b).

5

**B. In 2023, ACT Now Applied for and Was Awarded Two FSCS Grants To Scale the "Community Schools" Model Across Illinois**

In 2023, the Department published a Notice Inviting Applications for a new suite of Full-Service Community Schools grants. 88 Fed. Reg. 37222 (June 7, 2023). Consistent with its "high priority" of ensuring equal opportunity, 20 U.S.C. § 1221-1, the Department described the funding opportunity as supporting evidence-based strategies "that advance educational equity and excellence for all students." 88 Fed. Reg. at 37224.

Through the Notice, the Department defined the contours of the grant program. The Notice identified specific funding to scale Community Schools statewide in both rural and urban areas, among other "Absolute Priorities." *Id*. The Notice also included a list of "Competitive Preference Priorities" that included projects "designed to improve students' social, emotional, academic, and career development" through "education or work-based settings that are supportive, positive, identity-safe, and inclusive with regard to race, ethnicity, culture, language, and disability status." *Id*. at 37224–25.

Pursuant to the Notice, Metropolitan Family Services (ACT Now's fiscal sponsor) and ACT Now applied for two grants, one urban and one rural. The applications, which were each over 100 pages, described ACT Now and the need for Community-School services in Illinois to address post-pandemic learning loss and unmet basic needs like healthcare and housing. (*See* Dkt. 3-4.) ACT Now also proposed seven annual performance objectives and outcomes tailored to the FSCS Program's statutory purpose. (*See* Dkt. 3-4 at 19–23, 81–84, 89–91, 123–26, 171–73, 187–90, 195–97.)

In both applications, ACT Now addressed the Department's "Competitive Preference Priority" for projects that are "inclusive with regard to race, ethnicity, culture, language, and disability" by, among other things, expressing its mission and values. For example, ACT Now

6

stated that its "mission has equity and racial justice at its core" and that "[w]e are driven to ensuring that all youth are prepared for success in school, career, and life, through participation in high-quality community schools programs." (Dkt. 3-4 at 39, 143–44.) ACT Now further described its equity-centric values in terms consonant with the FSCS Program's goals, the Department's mission, and GEPA:

> As we move forward to actively ensure that equity is intentionally and sustainably integrated into all that we do, the following values will be at the core of our work: advocate for funding to reach the youth most in need, ensure providers have the skills and resources necessary to execute programming with an equity mindset, and incorporate diverse voices into our leadership and feedback on our work.

(Dkt. 3-4 at 39, 144.)

ACT Now described its capabilities and experience in offering the wide array of services Full-Service Community Schools may require. For example, when describing its ability to create learning and work environments that were "inclusive, positive, and identity-safe"—part of the Department's Competitive Preference Priorities, 88 Fed. Reg. at 37225—ACT Now described itself as a "statewide leader in providing trainings on gender and sexuality" and the host of "a variety of trainings for educators focused on trauma-informed care and racial equity." (Dkt. 3-4 at 39, 145.) ACT Now also noted it "has access to a variety of partners and content experts that develop curriculum focused on inclusion, such as the 1619 project." (*Id.*) The bulk of ACT Now's applications described their unique ability to marshal "diverse resources and support applicable to the youth development field at large," as well as more localized support capacity specific to each "pipeline service area" defined in the statute. (*Id.* at 47, 151.)

The Department selected both applications for funding. (Dkt. 3-5.) For each, it approved a project period of five years and awarded Plaintiffs an initial year of funding with non-competing continuation awards to be determined separately in each of the following four years pursuant to the Department's regulations at 34 C.F.R. § 75.253. (*Id.*) Those regulations provide that multi-year

7

grantees must meet requirements concerning (1) grant performance, (2) financial reporting, (3) continued eligibility, and (4) financial and administrative management requirements, 34 C.F.R. and § 75.253(a)(1)–(4), and the Secretary must determine that continuing the project is "in the best interest of the Federal Government," *id.* at § 75.253(a)(5); *see also* 34 C.F.R. § 75.118. To determine whether those five factors are met, the Secretary "may consider any relevant information regarding grantee performance." *Id.* at § 75.253(b). This typically involves comparing the grantee's application with its Annual Progress Report. (Dkt. 3-3 at ¶ 26.)

Although continuation awards are not guaranteed, historically, they have been uniformly granted absent serious performance issues. During the previous 45 years—and throughout six administrations—non-continuations have been "exceedingly rare" and "only tied to significant concerns related to project performance." (*Id.* at ¶¶ 28–29.)

ACT Now has met or exceeded its performance-based metrics to date, expanding Illinois's Community School infrastructure across 16 districts, 32 schools, and 19,000 students, with strong outcomes already emerging. (Dkt. 58 at 12:6–25.) For example, ACT Now's Community School partners saw more children in school—more than doubling the statewide reduction rate in chronic absenteeism—and more families engaged. Schools served by ACT Now "were decreasing chronic absenteeism faster than the statewide average and faster than peer schools" and improving in areas like family engagement and school climate faster than the statewide average and peer schools as well, which "are some of the biggest indicators that will lead to long-term academic success." (*Id.* at 16:3–9; *see also* Dkt. 49-1 at ¶¶ 27, 31–32; Dkt. 49-2, at ¶ 12; Dkt. 49-4 at ¶¶ 5–8, 13; Dkt. 49-6 at ¶¶ 11–12.) For example, two East St. Louis schools reduced chronic absenteeism by 28% and 33% in just one year, which they attributed to ACT Now's support. (*Id.* at 85:15-22; *see also* Dkt.

49-17 at ¶ 16.) Another school supported by ACT Now reduced major behavioral referrals by 68%, and yet another improved chronic absenteeism by 10%. (Dkt. 58 at 58:4–24.)

On the strength of this performance, the Department continued both of ACT Now's grants for a second year. (Dkt. 3-6.) ACT Now received "a lot of positive feedback" in calls with the Department. (Dkt. 58 at 16:10–18.) Neither then nor since has the Department raised any concerns or complaints regarding ACT Now's performance, compliance, or results. (*Id*. at 16:19–22.)

### C.  In 2025, the Department Non-Continued ACT Now's Grants as Contrary to Its New Anti-DEI Priorities

Starting in early 2025, the new Administration began targeting public and private efforts to advance what it characterized as "diversity, equity, and inclusion" or "DEI." Through Executive Orders, the President ordered agencies to terminate "illegal DEI" programs throughout the Federal Government, declared such programs "dangerous, demeaning, and immoral," and asserted that they "undermine our national unity" and "the traditional American values of hard work, excellence, and individual achievement. . ." Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025); *see also* Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025). The Department trumpeted its compliance with these anti-DEI directives. Within days of the President's Orders, the Department announced that it had begun "tak[ing] action to eliminate harmful [DEI] initiatives" and "review[ing] all agency programs and services . . . that may be advancing a divisive DEI agenda. . ." U.S. Dep't of Educ., *Department of Education Takes Action to Eliminate DEI,* Press Release (Jan. 23, 2025).[2] In February 2025, the Department issued an internal directive on Department Grant Priorities instructing Department personnel to "ensur[e] that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and

---

[2] https://www.ed.gov/about/news/press-release/us-department-of-education-takes-action-eliminate-dei

inclusion" and ordered a review of new and existing grants awarded to ensure alignment with "the Department's policy objectives…" (Dkt. 49-22.)

In August 2025, citing "problematic" grants funding "diversity, equity, and inclusion and other far-left initiatives," the President issued another Executive Order requiring all agencies to "review discretionary grants to ensure that they are consistent with agency priorities and the national interest." Exec. Order No. 14332, 90 Fed. Reg. 38929, 3829–30 (Aug. 7, 2025). And, on December 12, 2025, less than three weeks before the end of the 2025 budget period, the Department issued Notices of Non-Continuation to nineteen Full-Service Community School grantees, including ACT Now. *See* M. Lieberman, *Educator Layoffs Loom as Canceled Community School Grants Remain in Limbo*, Education Week (Jan. 6, 2026).[3] (*See also* Dkt. 3-7.) In the Notices issued to ACT Now, the Department based its decision to terminate vital services to 19,000 Illinois students solely on quoted sentences plucked, without context, from Plaintiffs' 2023 applications, including:

- ACT Now's equity-centric mission and values, "intentionally and sustainability integrated into all that we do;"

- ACT Now's work pre-dating the grant to provide professional development training that might assist in creating engaging and inclusive school environments, based on the needs assessments of individual schools and communities; and

- ACT Now's consideration, mandated by GEPA, of any barriers to "equitable access to, and equitable participation in" Full-Service Community Schools, including "barriers based on gender, race, color, national origin, disability and age."

(Dkt. 3-7 at 2, 5–6.)

---

[3]  https://www.edweek.org/policy-politics/educator-layoffs-loom-as-canceled-community-schools-grants-remain-in-limbo/2026/01

The Notices did not describe any concerns with ACT Now's performance; indeed, they did not mention ACT Now's performance at all. Instead, the Department quoted these statements and concluded, without further explanation, that they "proposed project activities that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education." (*Id.* at 2, 5.) The Notices of Non-Continuation issued to the eighteen other grantees on that same day similarly failed to cite any issues with program performance, instead relying solely on excerpts from the grantee applications containing language around diversity, equity, and inclusion. (*See* Dkt. 49-24–49-45.)

Under the Department's regulations, 34 C.F.R. § 75.253(f)(1), Plaintiffs immediately requested reconsideration. Plaintiffs clarified that the application language the Department cited did not represent any actual or proposed grant activities. Plaintiffs explained that the specific language the Department flagged described Plaintiffs' mission and values, experience and capabilities, and statutorily mandated statements demonstrating a commitment to equitably implementing Education programs. Plaintiffs' requests for reconsideration also disputed any conflict between their grant activities and merit, fairness, or excellence. (Dkt. 3-8.) Plaintiffs further assured the Department that they remained committed to operating consistently with current Administration priorities and federal law. (*Id.* at 7, 14.)

On December 29, 2025, just two days before funding expired, the Department denied both requests. The Department's Denial Letters did not address any of the specific points and explanations with respect to the statements from Plaintiffs' grant applications upon which the Department's non-continuations were based. They simply asserted without explanation that "the information in your request for reconsideration was not sufficient" to refute the Department's earlier "findings." (Dkt. 3-23.) The Department also included in its Denial Letters new excerpts from Plaintiffs' applications that it claimed supported its position but did not give Plaintiffs the

11

opportunity to respond or provide additional evidence addressing these excerpts. The Department simultaneously issued similar boilerplate denials of requests for reconsideration to the seventeen other non-continued grantees, also failing to address evidence and flagging new excerpts from the original grant applications. (*Id.* at 2–3, 5–6; Dkt 49-25–49-45.)

### D.  Plaintiffs' Complaint and Motion for Temporary Restraining Order

On December 29, 2025, the same day Defendants denied Plaintiffs' requests for reconsideration, Plaintiffs filed their complaint and moved for a temporary restraining order enjoining the non-continuations. (Dkt. 1, 5.) The district court held a hearing on Plaintiffs' motion two days later, on New Year's Eve. During the TRO hearing, Defendants offered to reconsider whether Plaintiffs could maintain "some" access to their carryover funds while litigation was pending, which would thereby allow some level of program services to continue. (TRO Hr'g Tr. at 42:6–11, 50:21–51:4, 51:17–52:1.) Based on this representation, the court denied Plaintiffs' motion for a temporary restraining order without entering any written opinion. (Dkt. 13.)

Plaintiffs entered into the negotiations with Defendants suggested by the court, which resulted in Defendants' agreement to allow Plaintiffs to use some unused "carryover" funding from the first two years of the grants to continue providing services and programs pending the litigation. In March 2026, the Defendants agreed to allow ACT Now to access some of its carryover funding through June 30, 2026, in exchange for Plaintiffs' agreement to not move for a preliminary injunction until after the Department's forthcoming motion to dismiss was fully briefed. (*See* Dkt. 26.) Briefing on the motion to dismiss was completed and argument was held on April 13, 2026, and Plaintiffs moved for a preliminary injunction on April 30, 2026. (Dkt. 28, 30, 31, 46.)

### E.  Plaintiffs' Motion for Preliminary Injunction

Following briefing on Plaintiffs' motion for a preliminary injunction, the district court held an evidentiary hearing on June 8, 2026. (Dkt. 54.) At that hearing, Plaintiffs presented five

witnesses and sixteen supporting declarations testifying, without contradiction, to the concrete and mounting harm a funding lapse would cause. (PI Hr'g Tr. at 4:9–11; Dkt. 49-2–49-14, 49-16, 49-18, 49-19.) Defendants did not cross-examine any of these witnesses or offer any contrary evidence of their own. (PI Hr'g Tr. at 4:21–23, 34:22–23, 50:13–14, 65:2, 75:13, 90:22–23.)

On June 26, the district court issued simultaneous rulings on the Motion to Dismiss and Motion for Preliminary Injunction. (Dkt. 60, 62.) In the order on Defendants' Motion to Dismiss, the court dismissed all but Plaintiffs' First Amendment claims on jurisdictional grounds. (Dkt. 62 at 3.) The order on Plaintiffs' Motion for Preliminary Injunction then proceeded to deny preliminary injunctive relief solely on the merits of those First Amendment claims. (*Id*. at 1.) The court's fifteen-page opinion did not address the uncontroverted testimony and other undisputed evidence of irreparable harm presented by Plaintiffs. (*Id*. at 5–15.)

## V.     Summary of Argument

In denying Plaintiffs' motion for a preliminary injunction on the two First Amendment claims, the district court committed reversible error. Plaintiffs established a likelihood of success on the merits of their First Amendment viewpoint discrimination claims for retaliation and unconstitutional conditions; and the district court erred in finding no likelihood of success and in failing to take account of the overwhelming and uncontested evidence of severe irreparable harm to Plaintiffs and the impoverished children, families and communities they serve. The district court's fundamental error—which infects its entire analysis—was finding that the DEI-related statements made in ACT Now's grant applications were statements about "DEI-related projects" that ACT Now intended to enact using grant funds. That finding is against the weight of the undisputed evidence that ACT Now never engaged in any FSCS grant-funded "DEI-related projects."

13

Building on that false premise, the district court's application of *Rust v. Sullivan*, 500 U.S. 173 (1991), and the other cases involving government-subsidized speech reached the wrong conclusion. Those cases all involve Congress selectively favoring a particular viewpoint by choosing to fund one *activity* at the exclusion of other disfavored *activities*. That is not this case. In this case, ACT Now's grants were discontinued because it had expressed views supportive of diversity, equity, and inclusion in its applications (as it was required to do by Congress); not because it ever performed (or proposed to perform) any DEI-related activities or programs using FSCS grant funds.

Finally, because ACT Now established some likelihood of success on the merits, the district court erred by failing to assess and weigh the risk of irreparable harm—evidence of which was overwhelming and unrebutted. This Court applies a sliding scale approach to injunctive relief where the likelihood of success required varies depending on the risk and severity of irreparable harm in the absence of relief. Here, the district court turned a blind eye to the evidence of irreparable harm, making no mention of it. This, too, was reversible error.

## VI.    Standard of Review

This court applies a hybrid standard when reviewing the denial of a preliminary injunction. The court "review[s] the district court's findings of fact for clear error, its legal conclusions *de novo*, and its balancing of the factors for a preliminary injunction for abuse of discretion." *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023) (quoting *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022)).

14

**VII.    Argument**

    **A.  The District Court Erred by Concluding that Plaintiffs Are Unlikely to Succeed on Their First Amendment Claims.**

To obtain a preliminary injunction, the plaintiff must show that: "'(1) without this relief, it will suffer irreparable harm; (2) traditional legal remedies would be inadequate; and (3) it has some likelihood of prevailing on the merits of its claims.'" *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (quoting *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020)). Second, the court "proceeds to a balancing analysis, where the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Id.* (citing *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018)). Plaintiffs satisfied each of these requirements here, and the district court erred in denying their motion for a preliminary injunction.

    **1.  Plaintiffs are likely to succeed on their retaliation claim.**

"The First Amendment prohibits government officials from retaliating against individuals for engaging in protected activity." *Schukar v. Kenosha Cnty.*, -- F.4th --, No. 25-2935, 2026 WL 2097220, at *2 (7th Cir. July 21, 2026) (citing *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)). To establish a prima facie case of retaliation, the plaintiff must show that "(1) he engaged in protected First Amendment activity, (2) he suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity was 'at least a motivating factor in the [defendant's] decision to take the retaliatory action.'" *Id.* (quoting *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 585 (7th Cir. 2021)). Once a plaintiff establishes a prima facie case, the burden shifts to the government to identify non-retaliatory grounds sufficient to justify its actions, and if it does, the burden shifts back to the plaintiff to show pretext. *Id.* at *3.

15

ACT Now has established its prima facie case. First, the statements ACT Now made in its grant applications are protected from retaliation under the First Amendment. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Second, the discontinuation of ACT Now's grant funding resulted in immediate and devastating consequences such that any person of ordinary firmness would likely be deterred from making such statements again. *See Am. Acad. of Pediatrics v. U.S. Dep't of Health and Human Servs.*, 816 F. Supp. 3d 27, 47–48 (D.D.C. 2026) (concluding that such harms as "shutter[ing] projects, lay[ing] off staff, and break[ing] commitments to partner organizations" are "more than enough" to establish a prima facie retaliation claim). ACT Now receives 96% of its funding through these grants and losing this funding materially and directly harmed ACT Now's operations: students lost access to nutrition and health services, all but two of ACT Now's staff members were laid off, and ACT Now stopped performing any grant-related operations. Seventeen other grantees met a similar fate. (Dkt. 48 at 7 (collecting record cites).) No reasonable grantee would make statements the Department disfavors if doing so risked the loss of its entire operation.

And third, there is no doubt that ACT Now's speech was a motivating factor in the Department's decision to discontinue funding. Indeed, the Notices themselves provide direct evidence of retaliatory motive. The sole basis identified by the Department for discontinuing ACT Now's grants is its determination that "[a]s a result of the information identified above," "the project would be in conflict with agency policy and priorities, and so is not in the best interest of the Federal Government." (Dkt. 3-7 at 2, 6.) The only "information" the Department identified as "not in the best interest of the Federal Government" are ACT Now's statements in its grant application supporting diversity, equity, and inclusion in education regardless of race, ethnicity, poverty, or disability. (*Id*.)

16

The Department's regulations are clear that "[i]n determining whether the grantee has met the requirements [for receiving a continuation award], the Secretary may consider any relevant information regarding grantee performance." 34 C.F.R. § 75.253(b). This determination may be based on performance reports and demonstrated success in meeting the grantee's performance goals and objectives as well as on financial reports. *Id.* The application is not re-reviewed at this stage—after the grant has been approved and implemented—because the continuation review process is based on the grantee's progress in implementation of the grant. (Dkt. 3-3 at ¶ 10.)

The words in Plaintiffs' applications for funding were just that: words. Plaintiffs have been clear that none of the language relied upon in the Department's decision to discontinue Plaintiffs' grants reflected any actual grant activities. These references were either statements of Plaintiffs' values or of their organizational capabilities, and any actual grant activities were required to be based on the subsequent assessments of the needs of individual schools. Those subsequent assessments did not identify any need for the "projects" that the Department found to be in conflict with its policies and priorities. The Department's decision to discontinue was therefore based only on Plaintiffs' speech in support of DEI values, not on any grant activity.

Even if the direct evidence in the Notices themselves was not sufficient (it was), circumstantial evidence (which can also be used to establish a prima facie case, *Schukar*, 2026 WL 2097220, at *2) further established the ACT Now's funding was discontinued solely because of its prior speech. The uncontroverted circumstantial evidence includes: Executive Order No. 14151, which ordered agencies to terminate "illegal DEI" programs throughout the Federal Government," 90 Fed. Reg. 8339 (Jan. 20, 2025); Executive Order No. 14332, which directed agencies to "review discretionary grants to ensure that they are consistent with agency priorities and the national interest," citing "problematic" grants funding "diversity, equity, and inclusion and other far-left

17

initiatives," 90 Fed. Reg. 38929 (Aug. 7, 2025); and the Department's announcement that it was "tak[ing] action to eliminate harmful [DEI] initiatives" and "review[ing] all agency programs and services…that may be advancing a divisive DEI agenda…." U.S. Dep't of Educ., *U.S. Department of Education Takes Action to Eliminate DEI*, Press Release (Jan. 23, 2025). The Notices to ACT Now and seventeen other grantees complied with these directives, and the evidence was uncontroverted that the Department had never before discontinued grants on these grounds. (Dkt. 3-3 at ¶ 28.)

Nor did Defendants identify any non-retaliatory grounds for their actions in their briefing or at the hearing. (*See* Dkt. 51 at 17.) For example, there is no evidence that the Department discontinued ACT Now's funding because it actually provided the "offensive" programming; indeed, all of the witnesses testified that no programming relating to race, ethnicity, or any other protected characteristic was provided. (PI Hr'g Tr. at 29:22–30:2, 43:18–21, 57:15–58:3, 70:7–20, 85:1–11.) Nor is there evidence that ACT Now was not meeting performance expectations or that ACT Now misused federal funds. Again, the record supports the opposite finding: ACT Now's performance was exemplar, and the Department identified no problems with ACT Now's operations before issuing the Notices. (Dkt. 3-6.) The *only* reason Defendants gave for discontinuing ACT Now's grants were the excerpted statements from its grant applications, which, as explained above, supplies direct evidence of Defendants' retaliatory motive, or at the very least, supports a plausible inference therefor.

**2.  Plaintiffs are likely to succeed on their unconstitutional conditions claim.**

The unconstitutional conditions doctrine "prevents the government from awarding or withholding a public benefit for the purpose of coercing the beneficiary to give up a constitutional right or to penalize his exercise of a constitutional right." *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*, 699 F.3d 962, 986 (7th Cir. 2012). This applies even

where "a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons." *Id.* (quoting *Perry*, 408 U.S. at 597). In the funding context, the distinction between permissible and impermissible funding conditions "is between conditions that define the limits of the Government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the federal program itself." *Agency for Int'l Dev. v. Alliance for Open Society Int'l, Inc.*, 570 U.S. 205, 214–15 (2013).

The funding condition imposed by the Department here falls on the impermissible side of the line. The Department's decision to discontinue ACT Now's funding is driven by what ACT Now said in its application (i.e., to regulate speech), not what it did (i.e., to regulate the activities ACT Now performed). The Notices identify no performance failures, compliance issues, or financial impropriety; they instead quote and object to statements in ACT Now's application describing its mission as centering on "equity and racial justice" and describing its training as developed "with a racial equity and cultural competency lens." (Dkt. 3-7 at 2, 5–6.) Yet the uncontested testimony of all five witnesses at the hearing establishes that those statements do not describe any programming ACT Now conducted under the grant—confirming the Department penalized ACT Now's stated values, not its actual activities. That the Department applied identical, boilerplate reasoning to at least seventeen other grantees confirms it was not defining the program's scope but rather leveraging its funding power to punish disfavored speech.

More importantly, the Department's conduct had the effect of chilling ACT Now's speech. Rather than lose its funding, ACT Now twice offered to submit a revised application removing the flagged language, but the Department declined. (PI Hr'g Tr. at 152:16–19; *see also* TRO Hr'g Tr. at 16:16–25.) Had the Department's actual concern been the funding of program activities rather

19

than viewpoint, an application without that language should have cured the problem. The Department's refusal confirms that the target was always ACT Now's viewpoint. Having been told that continued funding required forfeiting that viewpoint, ACT Now faced the very choice the doctrine prohibits between protected speech and a benefit for which it otherwise qualified. *Perry*, 408 U.S. at 597.

### 3. The district court's errors require reversal.

#### a. The district court erred in finding that the Department discontinued ACT Now's funding because of programming provided by ACT Now.

The record does not support the court's finding that the ACT Now proposed using grant funds for "DEI-related projects." (Dkt. 62 at 2.) The court cited as support for that finding five statements from Plaintiffs' application materials, three of which are taken from a single paragraph across 211 pages. As explained below, none of these statements proposes "DEI-related projects"— the court's term, not the Department's. Rather, they express values or describe access to the diverse resources Community School infrastructure requires. The court ignored all the undisputed evidence to the contrary—including Plaintiffs' Requests for Reconsideration of Non-Continuation and five uncontroverted witnesses—making clear that Plaintiffs never used, or proposed to use, grant funds for "DEI-related projects." The court's contrary finding is clearly erroneous.

The court cited five statements from Plaintiffs' applications. (Dkt. 62 at 2.) The first four describe ACT Now's access to "a variety of trainings" that ACT Now "has developed", "offer[s]", or "hosts" to Community School partners. Three come from a single paragraph directly responding to the Department's Competitive Preference Priority for applicants that can create "supportive, positive, and identity-safe" environments. (Dkt. 62 at 2 (citing Dkt. 3-4 at 40, 144).) Another comes from ACT Now's discussion of "pipeline services" preventing juvenile crime and rehabilitation, in a section proposing "the *types of strategies*" that schools *might* employ given their unique

20

"populations, resources, and needs." (*Id.* (citing Dkt. 3-4 at 53, 63).) The fifth—the court's only cite to Plaintiffs' application regarding rural Illinois—truncates ACT Now's statements about the values that drive its work generally. (*Id.* (quoting Dkt. 3-4 at 40, 144) ("[E]quity is intentionally and sustainably integrated into all that we do[.]").)

None of these statements describe specific, proposed grant activities. Indeed, the record makes plain the only two projects Plaintiffs actually proposed: scaling Full-Service Community Schools infrastructure across urban and rural Illinois. Over 211 pages, Plaintiffs painstakingly detailed the need for services in Illinois treating the whole child, family, and community, as well as their unique ability to administer two statewide grants simultaneously. (*See generally* Dkt. 3-4.) They described annual, measurable objectives, their plans to collect and analyze outcome data, and their values and capacities in response to Priorities the Department identified in its Notice Inviting Applications. (*Id.* at 3–42, 73–100, 107 – 143, 179–206.) And they described the wide array of services and experience necessary to be competitive for infrastructure funding. (*Id*. at 43–71, 144–178.) Since their Requests for Reconsideration, Plaintiffs have repeatedly explained that the cited application language did not propose specific "DEI-related projects" under either grant. (Dkt. 3-8 at 2–4, 11–12.) Nevertheless, the Department's Denial Letters assert without explanation that Plaintiffs' evidence documenting the false premise of the Non-Continuations was "not sufficient to refute these findings." (Dkt. 3-15 at 3, 6.)

Moreover, Plaintiffs' uncontroverted witnesses uniformly testified that ACT never conducted the purported "activities" the Department flagged. (PI Hr'g Tr. at 19:19–20:2, 20:13–18, 26:22–27:9, 21:3–8, 27:10–17, 21:16–21, 27:18–25, 22:11–16, 23:4–9, 28:1–10, 23:23–24:3, 28:23.) The court expressly acknowledged that "[t]he record contains nothing to cast doubt on the

21

veracity of that claim." (Dkt. 62 at 14.) In her testimony, the Executive Director explained why

ACT Now's applications included descriptions of resources that were not implemented:

> [E]ach application was over a hundred pages, and this is just a few sentences from those. However, the Department requires that you be prepared to mitigate barriers for students and school communities, so we wanted to ensure and assure the government that we had the infrastructure and capacity to be able to do that. . . . [A]t the end of the day, our services and activities had to be based on what grantees needed, and these types of services weren't what our data and needs assessments showed us.

(PI Hr'g Tr. at 29:22–30:15.)

Nothing supports the court's finding that Plaintiffs proposed using FSCS funds to promote

"DEI-related projects." (Dkt. 62 at 1.) In fact, "DEI-related projects"—a term created by the

court—appears nowhere in the Defendants' Notices of Non-Continuation, Denial Letters, briefing,

or argument. The five statements on which the court relies do not propose any grant-funded

projects at all. They simply cannot bear the weight of the court's contrary finding that "the record

suggests [Plaintiffs] were denied grant funding because of what they proposed to do with that

funding." (*Id.* at 7.)

      **b.  The district court erred by interpreting *Rust* and its progeny to allow the Department (as opposed to Congress) to discriminate against disfavored viewpoints in making funding decisions.**

The Spending Clause, U.S. Const. art. I, § 8, cl. 8, gives Congress the power to make value

judgments in the public interest and to fund programs based on those value judgments. *Agency for

Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) (citing *Rust*, 500 U.S. at

195). These "selective subsidy" cases, and others cited by the district court, allow some forms of

otherwise-prohibited viewpoint discrimination when Congress properly exercises its Spending

Clause powers. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587–88 (1998) (collecting

cases). The district court, however, erred when it clipped quotes from these cases in ways that elide

the constitutional, Congressional source of the Department's funding authority. This alone

22

warrants reversal. *Cf. Chi. Headline Club v. Noem*, No. 25-3023, 2025 LX 683672, at *4–5 (7th Cir. Nov. 19, 2025) (reversing grant of preliminary injunction for, inter alia, "impermissibly infringing on principles of separation of powers").

The selective subsidy cases advance the "fundamental and comprehensive purpose" of the Spending Clause: "to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *OPM v. Richmond*, 496, U.S. 414, 427–28 (1990). Every case on which the district court relied involved challenges to *statutory* funding conditions or regulations faithfully implementing them.[4]

But even Congress cannot leverage its power of the purse to target viewpoints expressed without the use of federal funding. *Alliance for Open Society,* 570 U.S. at 215. And because all the Department's spending power comes from Congress, *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), the Department has no power to adopt its own conditions on federal funds, *see Finley*, 524 U.S. at 586 (upholding statutory funding criteria "unless and until [they are] applied in a manner that raises concern about the suppression of disfavored viewpoints").

The district court reached its contrary conclusion by rewriting the selective subsidy cases. The court held that "the best read of all the existing precedent" provides no constitutional

---

[4]*See Camelot Banquet Rooms, Inc. v. United States SBA*, 24 F.4th 640 (7th Cir. 2022) (facial First Amendment challenge to statute prohibiting funding adult entertainment); *Agency for International Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205 (2013) (same as to agency directives implementing statutory conditions on grants for global HIV/AIDs prevention); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) (same as to statutory criteria for arts funding); *Rust v. Sullivan*, 500 U.S. 173 (1991) (same as to regulations that "implement [a] statutory prohibition" against funding abortion); *Regan v. Taxation with Representation*, 461 U.S. 540 (1983) (same as to conditions on tax-deductible contributions); *Maher v. Roe*, 432 U.S. 464 (1977) (same as to state regulation implementing joint federal-state Medicaid program); *Speiser v. Randall*, 357 U.S. 513 (1958) (same as to state statute implementing speech-related conditions on tax exemptions).

prohibition on the Department's conduct. (Dkt. 62 at 10.) But the court ignores the critical distinction between the branches by repeatedly substituting "the government" for "Congress" when quoting from these cases and omitting relevant context that grounds their holdings on Congress's unique power over federal spending. For example, in *Finley* the Supreme Court said:

> "[A]s we held in *Rust*, **Congress** may 'selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program….'" 524 U.S. at 588 (quoting *Rust*, 500 U.S. at 193) (emphasis added).

The district court, meanwhile, cited *Finley* to say:

> "***[T]he government*** may 'selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program….'" (Dkt. 62 at 7 (emphasis added).)

It engaged in a similar sleight of hand in discussing *Rust* (*id.* at 7), *Camelot Banquet Rooms* (*id.* at 8), and *Alliance for Open Society* (*id.* at 9)—each time either switching the word "Congress" to "government" or ignoring the Supreme Court's focus on the unique role of Congress as the governmental actor.

The district court's treatment of the Ninth Circuit's opinion in *Thakur v. Trump* highlights its erroneous reading of these cases. In a long footnote, the court chided the Ninth Circuit for purporting to draw a line between limits Congress could impose on federal funds when creating a program, and those the Executive Branch could impose when implementing that program. The district court noted that:

> The trouble with this distinction is that it would permit Congress to create conditions on the use of funds which the Executive branch could not independently create…. But nothing in *Rust* itself suggests this result, which speaks generally about the judgments the "government may make" without violating the Free Speech Clause.

(Dkt. 62 at 8, n.3.) But this is precisely the line *Rust* and its progeny trace: *Congress* can "define the contours of the government spending program," but neither it nor the Executive may "leverage

funding to regulate speech outside the contours of the program itself." *All. For Open Soc'y,* 570 U.S. at 214–15. *Thakur* did not create the distinction that troubled the district court; the Constitution did.

Moreover, by conflating Congress with the Department, the court erred in describing the problem "the government" sought to solve with the Full-Service Community Schools program. Congress created the FSCS program not to "provide education programming," (Dkt. 62 at 12), but to subsidize the infrastructure needed in high-poverty areas to expand the Community Schools model of education. 20 U.S.C. §§ 7271, 7273. Congress described in detail the ultimate, equity-focused aims for Community Schools, and the "pipeline services" grantees must be able to "integrate" and "coordinate" into a "continuum of community-based supports." 20 U.S.C. §§ 7272, 7275. Accordingly, the court erred in treating the Department's non-continuations as merely choosing not to subsidize "a particular kind of education programming, programming that is DEI-focused." (Dkt. 62 at 12.)

The district court thus allowed the Department to wield its delegated funding authority to express viewpoints contrary to Congress's policy judgments. This Executive hijacking of the power of the purse "allow[s] tyranny to flourish, and our system of government is wisely set up by the Founders to foreclose such a danger." *City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020)*.* When it misidentified the problem "the government" sought to solve with FSCS funds, (Dkt. 62 at 12), the court blinded itself to the Departments' hijacking.

### c. The district court erred in concluding that the selective subsidy cases permit the Department's non-continuations.

The district court concluded that the Department's non-continuations were permissible because the court found that the Department's non-continuations "defined the contours" of the FSCS program with a "categorical judgment" that "a potential *grantee* who says it might use grant

25

funds for DEI-related projects should not receive grant funds at the expense of other *grantees*." (Dkt. 62 at 14.) The court erred.

First, even the Defendants rejected that characterization. Defendants repeatedly disclaimed the idea that the non-continuations were merely the rote application of a categorical rule about some grantees versus others. (*Id*.) In the Defendants' words, the challenged conduct constituted "individualized non-continuation decision[s]" that "address only a particular set of disputed facts and *do not establish generally applicable standards*." (Dkt. 51 at 10–11 (emphasis added).) Nor does any such categorical rule appear in the Notices of Non-Continuation, which instead refer to illusory conflicts "with the Department's policy of prioritizing merit, fairness, and excellence in Education." (Dkt. 3-7 at 2, 5.) The court's contrary finding thus finds no support in the record.

And even if the non-continuations established "generally applicable standards," they would be illegal. The FSCS Program's authorizing statute, the Department's regulations, and the Notices of Non-Continuation preclude such categorial rules. GEPA prohibits the Department or the Secretary from prescribing generally applicable rules or guidelines impacting Education funds without notice-and-comment rulemaking or exceptions inapplicable here. 20 U.S.C. § 1232. No such rulemaking took place here.

In addition, the FSCS Program's authorizing statute requires grants to be awarded on a competitive basis. 20 U.S.C. § 7273(a)(1). To the extent the Department seeks to implement its own funding priorities in those contests, its own regulations require it to do so in the Federal Register. *See* 34 C.F.R. § 75.105. The Department did not publish its February memo prioritizing review of "programs or organizations that promote or take part in diversity, equity, and inclusion." (Dkt. 49-22 at 2.) Nor did it rescind or otherwise mention in its Notices of Non-Continuations the

2023 Notice Inviting Applications establishing the priorities under which Plaintiffs applied and were approved.

Moreover, the First Amendment prohibits the categorical judgment the court found. The court recognized that under the selective subsidy cases, "the government" can "pick favored projects to fund but not favored grantees to fund." (Dkt. 62 at 7.) Yet, the court then blessed the grantee-based viewpoint it found, concluding, in essence, an agency can deny a class of grantees funding because their disfavored viewpoints risk funding a viewpoint-related project. This is just viewpoint discrimination with an extra step, as the "easy example" the court drew from *Camelot* demonstrates. (*Id.* at 9.) In *Camelot*, this Court reasoned that if Congress subsidized lobbying, it could not subsidize Democratic lobbyists while excluding Republican ones. On the district court's logic, an agency could lawfully implement that subsidy through a "categorical judgment" to scour active grantees' past application statements and deny support to any organization whose values and non-grant activities suggest a risk of supporting "[Republican]-related projects." (*Id*. at 14.) The selective subsidy cases do not permit that result. *Finley*, 524 U.S. at 586.

The court justified its finding not on the record, but on faulty logic. The court reasoned that if the Department could not impose "categorical judgments" via non-continuation, it would have to "constantly monitor its grantees to see if its grant funds are, in fact, being used for purposes it does not approve of," and that "nothing in law or logic" suggests such a "reactive system." (*Id.* at 14.) That is, of course, exactly what law and logic command. As the court found, Congress structured FSCS grants as multi-year project periods funded, at most, one year at a time, with the Department annually reviewing grantees for continued funding due to legal limits on budget periods. (*Id*. at 2.) That is logical: statewide infrastructure projects take years to develop, and annual reviews ensure that grantees are stewarding federal funds responsibly. The "reactive

system" the district court disparages is the exact relief that Plaintiffs sought—a review of how grant funds were actually used—and is the mechanism the Department hijacked to target ACT Now for expressing its values.

Finally, even if the record supported or the law permitted the categorical judgment the court found, it would not have justified ending ACT Now's grants. ACT Now was not a *potential* grantee when the Department discontinued its grants. It was an active grantee who had completed the first two years of its five-year projects and sought non-competing continuation awards for the next annual budget period. The record contains no evidence that continuing ACT Now's projects would have displaced any particular grantee or project; the opinion itself expressly acknowledges that "[t]he parties did not put evidence into the record about what projects the government did fund." (Dkt. 62 at 14 n.7.) The court therefore converted a continuation review for active grantees into a hypothetical contest between potential grantees without evidentiary support.

In sum, the court's conclusion that the Department "simply did not want to accept the risk that grant funds would be used on projects that are not in line with the current Administration's funding priorities" (*id*. at 15) is riddled with legal errors and amply refuted by the record. That risk rationale appears nowhere in the Notices of Non-Continuation or the Denials of Reconsideration. The Department did not fear future misuse of funds, identify a prohibited activity, establish permissible contours for future spending, or ask Plaintiffs to provide an assurance concerning future activities. In the face of undisputed evidence to the contrary, Defendants instead maintained that the Department had made individual determinations based on specific grant activities, even though no such activities existed. The record admits only one conclusion: Defendants leveraged their power over federal spending awards to target grantees like Plaintiffs because they expressed

28

viewpoints that the Administration disfavors. Under the selective subsidy cases, the First Amendment forbids that conduct. *Finley*, 524 U.S. at 586.

### B. The district court abused its discretion by failing to consider Plaintiffs' irreparable harm.

District courts are supposed to use a two-step process when considering a request for preliminary injunctive relief. First, the plaintiff must show that "(1) without this relief, it will suffer 'irreparable harm'; (2) 'traditional legal remedies would be inadequate'; and (3) it has some likelihood of prevailing on the merits of its claims." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (quoting *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020)); *see also Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Next, the court "proceeds to a balancing analysis, where the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Mays,* 974 F.3d at 818 (citing *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018)). This second step "involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Id*. In this way, the second step necessarily informs the first step. "How strong a claim on the merits is enough *depends on the balance of harms*: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life. Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009).

As a threshold matter, this court presumes irreparable harm in First Amendment cases given "the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." *Ezell v. City of Chicago*, 651 F.3d 684, 699–700 (7th Cir. 2011) (collecting cases). But in any event, irreparable harm was certain and

29

uncontested here. ACT Now's shutdown was not a contingent possibility but the inevitable, indisputable, and immediate consequence of losing funding, and such a loss of funding that would force a plaintiff to shut down while awaiting trial constitutes irreparable harm. *See Wisconsinites for Alternatives to Smoking & Tobacco, Inc. v. Casey*, 172 F.4th 976, 990 (7th Cir. 2026). ACT Now's Executive Director testified that without FSCS funding, ACT Now must eliminate its core staff positions and cease all FSCS-funded operations outright. (PI Hr'g Tr. at 7:3; Dkt. 49-1 at 40.) Most fundamentally, the harm to the students these programs serve cannot be remedied by damages or other legal relief—a lost year of services and opportunity cannot be given back.

The district court erred by failing to engage in this balance of the harms analysis. The court did not make any findings as to irreparable harm or consider how the undisputed evidence of ACT Now's certain and immediate harm measures up against its assessment of the merits. (*See* Dkt. 62.) Such an error—a failure to exercise its discretion—is itself an error warranting vacatur. *Dolin v. GlaxoSmithKline LLC*, 951 F.3d 882, 889 (7th Cir. 2020) ("Where the law gives a court discretion that the court does not recognize and exercise, [t]he 'failure of the trial court to exercise its discretion at all…constitutes an abuse of discretion.'" (quoting *Brown-Bey v. United States*, 720 F.2d 467, 471 (7th Cir. 1983)). Abandoning even the pretense of balancing the preliminary injunction factors thus warrants vacatur.

## VIII.  Conclusion

For the foregoing reasons, Appellants respectfully request that this court vacate the denial of preliminary relief, remand for further proceedings, and provide any other relief this court deems appropriate.

Dated August 4, 2026

*/s/ Scott C. Solberg*
SCOTT C. SOLBERG

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify the following:

This Brief complies with the type-volume limitation of Circuit Rule 29 because it contains 30 pages, excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(f).

This Brief complies with all typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) and Circuit Rule 32(b), because it has been prepared in a proportionally spaced typeface using Microsoft Word version 2024 in 12-point Times New Roman in the body of the brief and 11-point Century Schoolbook in footnotes.

Dated August 4, 2026

*/s/ Scott C. Solberg*
SCOTT C. SOLBERG

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of August, 2026, I filed the foregoing Brief with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

Pursuant to Circuit Rule 31(b), and upon notice of this Court's acceptance of the electronic brief for filing, I certify that I will cause ten (10) copies of the above-named brief to be transmitted to the Court via Federal Express overnight delivery, delivery charge prepaid, within seven days of that date.

*/s/ Scott C. Solberg*
SCOTT C. SOLBERG

**No. 26-2473**

# In the United States Court of Appeals
## FOR THE SEVENTH CIRCUIT

AFTERSCHOOL FOR CHILDREN AND TEENS (ACT NOW) and METROPOLITAN FAMILY SERVICES,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES DEPARTMENT OF EDUCATION and LINDA MCMAHON,

*Defendants-Appellees*.

On Appeal from the United States District Court for the Northern District of Illinois
No. 1:25-cv-15704 (Honorable Martha M. Pacold)

### REQUIRED SHORT APPENDIX OF
### PLAINTIFF-APPELLANT AFTERSCHOOL FOR CHILDREN AND TEENS
### (ACT) NOW and METROPOLITAN FAMILY SERVICES

Jocelyn (Josie) E. Skinner
(*application for admission pending*)
Emily K. Merolli
(*admission for application pending*)
SLIGO LAW GROUP, PLLC
1717 K St. NW, Suite 900
Washington, DC 20006
Telephone: (202) 888-2084
Scott C. Solberg (No. 6204487)
Elizabeth M. Hady (No. 6316542)
EIMER STAHL LLP
224 S. Michigan Ave., Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718

Aneel L. Chablani (No. 6242658)
Michael R. Ortega (No. 6339469)
CHICAGO LAWYERS' COMMITTEE FOR
CIVIL RIGHTS
25 E. Washington St., Suite 1300
Chicago, IL 60602
Telephone: (312) 630-9744
Fax: (312) 630-1127

*Attorneys for Plaintiffs-Appellants After-school for Children and Teens (ACT) Now and Metropolitan Family Services*

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30

Pursuant to Circuit Rule 30(d), I certify that all material required by Circuit rule 30(a) and (b) are included in the appendices to this brief.

Dated: August 4, 2026

/s/ *Scott C. Solberg*
SCOTT C. SOLBERG

**TABLE OF CONTENTS**

Page

June 26, 2026, Memorandum Opinion and Order, ECF 62……….…..……….…..A-1

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| AFTERSCHOOL FOR CHILDREN AND TEENS (ACT) NOW and METROPOLITAN FAMILY SERVICES,<br><br>       Plaintiffs,<br><br>       v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION and LINDA MCMAHON, in her official capacity as Secretary, U.S. Department of Education,<br><br>       Defendants. | Case No. 1:25-cv-15704<br><br>Judge Martha M. Pacold |

## MEMORANDUM OPINION AND ORDER

Plaintiffs' motion for a preliminary injunction [46][1] is denied.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff ACT Now is "a statewide unincorporated organization based in Illinois" that, among other goals, "works to expand access to high-quality out-of-school time." [1] ¶ 12. Plaintiff Metropolitan Family Services ("MFS") is "an Illinois nonprofit" which, among other tasks, "holds ACT Now's federal grant awards." *Id.* ¶ 11. Defendants are the Department of Education ("Education"), which is "responsible for administering federal education grant programs," and Linda McMahon, the Secretary of Education. *Id.* ¶¶ 14–15.

Education administers a grant program called the "Full-Service Community Schools (FSCS) program," which "is a discretionary grant program authorized by Title IV." *Id.* ¶ 20 (citing 20 U.S.C. §§ 7271–75). A few pieces of information about how FSCS grants are structured are relevant. Education "approves grants that span multi-year project periods," but Education only "awards funds for an initial budget period" lasting about a year. *Id.* ¶ 27. Education then awards funds through "the remainder of the project period through regular continuation awards." *Id.* (citing 34

---

[1] Bracketed numbers refer to docket entries and are followed by page and / or paragraph number citations. Page numbers refer to the CM/ECF page number.

C.F.R. § 75.251(a)–(b)). "Continuation awards are made," in part, if "the grantee continues to meet multiple, specific regulatory requirements concerning grant performance [and] financial reporting." *Id.* (citing 34 C.F.R. §§ 75.118, 75.253(a)(1)–(4)). But those are not the only requirements. Education must also "determine that continuing the project is 'in the best interest of the Federal Government.'" *Id.* (quoting 34 C.F.R. § 75.253(a)(5)).

ACT Now was awarded two FSCS grants, the potential remaining value of which is millions of dollars. When it applied for those grants, ACT Now made numerous statements in its grant application about what it intended to use, or could use, the grant funds for. Those statements include the following:

- "ACT Now has already developed a variety of trainings" such as "professional development on equity and inclusion."
- "ACT Now . . . offer[s] Gender and Sexuality in OST 101 and 102 professional development courses."
- "ACT Now" "hosts a variety of trainings for educators focused on trauma-informed care and racial equity."
- "ACT Now has developed a variety of trainings . . . to support violence prevention in youth development programs, including . . . Cultural Competency, and Gender and Sexuality."
- "[E]quity is intentionally and sustainably integrated into all that we do[.]"

[3-4] at 40, 63, 144. The court, as a shorthand, refers to these projects as "Diversity, Equity, and Inclusion-related projects," or "DEI-related projects," throughout the remainder of the opinion.

"On December 12, 2025," "the Department issued Notices of Non-Continuation for both grants." [1] ¶ 36. In its notices of non-continuation, which are nearly identical, Education stated that "applicant *has proposed project activities* that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education." [3-7] at 2 (emphasis added). As examples, Education noted that ACT Now claimed, in its grant applications, to be "a statewide leader in providing trainings on gender and sexuality," that ACT Now "has access to a variety of partners and content experts that develop curriculum focused on inclusion, such as the 1619 project," and that it "hosts a variety of trainings for educators focused on trauma-informed care and racial equity." *Id.*

ACT Now then requested reconsideration. In its request, it clarified that it "provide[s] services to *all* students." [3-8] at 3. It also clarified that it had "never provided . . . development courses on gender or sexuality as part of the FSCS grant" and that "it has not implemented the" DEI-related trainings mentioned by Education in the notice of non-continuation. *Id.* at 3–4.

Education nevertheless denied reconsideration, reiterating that ACT Now, in its grant application, had stated that it would "actively ensure that equity is intentionally and sustainably integrated into all that [it] [would] do" and that what services it would provide in the future would be determined by "needs assessment[s]" of the "communit[ies]" ACT Now was servicing. [3-15] at 2–3 (labeled as Exhibit 23).

Plaintiffs sued, bringing eight counts. *See* [1]. The court dismissed Counts I–VI for want of jurisdiction in a contemporaneously-filed opinion. *See* [60] at 28. But in that opinion, the court also found that jurisdiction over Counts VII–VIII is likely (although with reservations, as precedent is unclear). *See id.* Those counts allege violations of the Free Speech clause of U.S. Const. amend. I. Count VII alleges that Education violated plaintiffs' free speech rights by denying them funding for "expressing their mission, values, and commitments in their grant applications." [1] ¶ 101. This, plaintiffs allege, constituted "penaliz[ing] [p]laintiffs not for what they did with federal funds, but for what they said about their beliefs, values, and experience." *Id.* ¶ 105. Count VIII alleges Education violated plaintiffs' free speech rights by "conditioning continuation funding on whether [p]laintiffs' previously approved applications align with the current Administration's preferred viewpoints." *Id.* ¶ 112.

As remedies, plaintiffs request several things: to "Declare that the Department's actions violate [p]laintiffs' rights under the First Amendment," to "Vacate and set aside the Notices of Non-Continuation and Denials of Request for Reconsideration issued to [p]laintiffs for its Full-Service Community Schools grants," to "Order the Department to, consistent with applicable statutes and regulations, review [p]laintiffs' eligibility for a continuation award and, if necessary, to release such funding," to "Preliminarily and permanently enjoin the Department, its officers, agents, servants, employees, and all persons acting in concert with it from enforcing the challenged Notices of Non-Continuation and Denials of Request for Reconsideration," and to "Enjoin the Department from denying continuation funding based on . . . viewpoint-based criteria." [1] at 25–26. Plaintiffs also requested a few other things; namely, to retain jurisdiction over the case, award attorneys' fees, and grant other "just and proper" relief. *Id.* at 26.

Plaintiffs then filed for a preliminary injunction. *See* [46]. Plaintiffs request that the court preliminarily enjoin Education "from enforcing the Notices of Non-Continuation of Plaintiffs' Full-Service Community Schools grants" and preliminarily enjoin Education "from non-continuing Plaintiffs' grants pending a final determination of" their "claims on the merits." *Id.* at 3. After full briefing on the motion, on June 8, 2026, the court held a preliminary injunction hearing. *See* [54]. At that hearing, plaintiffs presented five witnesses who spoke to the services plaintiffs provide and to the harm that they believe would ensue if their funding is not restored and testified that no funds thus far have been used for DEI-related projects. Defendants did not present evidence or cross-examine plaintiffs' witnesses. The parties then provided legal argument on the motion.

## ANALYSIS

After a few brief notes on the legal principles governing the issuance of preliminary injunctions, the court turns to plaintiffs' likelihood of success in this suit. Because plaintiffs are unlikely to succeed, a preliminary injunction is unwarranted.

## I. Preliminary Injunction Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

A few features of preliminary injunctions are worth noting.

To start, the first *Winter* factor is mandatory—the absence of a likelihood of success on the merits is dispositive. *See, e.g.*, *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020).

Next, in the context of a preliminary injunction, unsolved issues of jurisdiction go to *Winter*'s first factor. Ordinarily, courts must address issues of jurisdiction before deciding the merits of a case. *See, e.g.*, *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007). But *Winter*'s phrasing—that courts must assess the likelihood of success on the merits—is somewhat imprecise. While *Winter* charges courts with making a prediction about the merits, what *Winter* really tasks courts with is making a prediction about the likely "outcome of the case." *Mullin v. Doe*, 609 U.S. __, __ (2026) (plurality opinion) (slip op. at 19); *see also Am. Fed'n of Teachers v. Bessent*, 152 F.4th 162, 169 n.3 (4th Cir. 2025) (Richardson, J.) (citing *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)) (courts evaluate "the party's likelihood of success *in the lawsuit before the court*."), *abrogated in part on other grounds*, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 172 F.4th 361 (4th Cir. 2026) (en banc). And that prediction, the Supreme Court has explained, includes both merits and jurisdictional issues. *Mullin*, 609 U.S. at __ (slip op. at 19); *Murthy*, 603 U.S. at 58 (analyzing the likelihood of a litigant establishing standing, a jurisdictional issue, in the *Winter* analysis). That is because "the likelihood that the court has jurisdiction over a claim and the likelihood that the claim is meritorious both bear on the claim's ultimate prospects." *Mullin*, 609 U.S. at __ (slip op. at 19). Courts, then, may factor in a plaintiff's likelihood of establishing jurisdiction while evaluating *Winter*'s first factor and need not definitively solve outstanding jurisdictional questions before issuing, or declining to issue, a preliminary injunction.[2]

---

[2] The court notes one interesting, yet ultimately non-dispositive, consideration regarding the first *Winter* factor. A panel of the Fourth Circuit has analyzed what it means to make a merits prediction, in the context of evaluating *Winter*'s first factor, when "a plaintiff must prevail on

Finally, it is worth reiterating that a "preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Interim relief is an exception to the norm and allows a litigant to obtain relief without first definitively proving his case. That is justified under certain circumstances, but it is not justified just because a litigant claims they have a claim and that they would be harmed if an injunction is not granted. Unless a plaintiff can meet its burden, the default rule is that a preliminary injunction should not be granted.

With those background principles established, the court turns to plaintiffs' likelihood of success in this suit.

## II.    Plaintiffs Are Unlikely To Succeed In This Suit

To be entitled to a preliminary injunction, plaintiffs must establish that they are likely to prevail. As explained above, whether plaintiffs are so likely turns both on whether they can establish the court has jurisdiction as well as on whether they will succeed on at least one of their remaining substantive counts. The court takes those issues in turn.

### A.    Whether the court has jurisdiction is debatable

As explained in the court's prior opinion, the court is inclined to find that the Tucker Act likely does not bar Counts VII–VIII of the complaint, but that is debatable. *See* [60] at 28. The Tucker Act, roughly speaking, bars claims founded upon contracts

---

a first issue," like jurisdiction, and then "on a second issue" "to ultimately receive relief." *Bessent*, 152 F.3d at 170. That panel dubbed "this structure" a "multiplicative problem" where the plaintiffs' "likelihood of success overall is the product of their probability of success on each of the independent, dispositive issues." *Id.* That, the panel contended, is simply a result of basic arithmetic. *Id.* Naturally, the panel explained, "[i]f 'success' means flipping heads every time, the more coins you need to flip, the less likely you are to win." *Id.* And that means that when there are successive and independent issues, it becomes harder for plaintiffs to win, for "as probabilities are multiplied, their product shrinks rapidly": "[e]ven if a plaintiff has good odds to win any one issue, their overall odds" may "crater because they must run the table to ultimately prevail." *Id.* If that panel decision is right, its logic would apply in this case because the plaintiffs must prevail on jurisdiction *and* at least one of Counts VII and VIII to ultimately succeed.

The *en banc* Fourth Circuit, however, has criticized that seemingly unobjectionable arithmetic. *See Soc. Sec. Admin.*, 172 F.4th at 366 (disavowing the multiplicative approach). The court, therefore, clarifies that the correctness of this "multiplicative problem" has no bearing on its analysis. The court concludes that plaintiffs are simply unlikely to succeed on either Count VII or VIII, *see* § II(B), *infra*, meaning that the likelihood of success on jurisdiction is ultimately irrelevant to the propriety of a preliminary injunction. What result would obtain if plaintiffs were only ever so slightly likely to succeed on both jurisdiction *and* at least one of Count VII or VIII is a question reserved for another day.

with the federal government. *Id.* at 5–7. Plaintiffs have sued, contesting actions which Education took pursuant to a grant contract. *See, e.g.*, *id.* at 1–5, 15. While plaintiffs have not brought a breach of contract claim, well-established precedent recognizes that litigants often attempt to evade the jurisdictional limitations imposed by the Tucker Act with crafty pleading. *Id.* at 7–8. And precedent provides a test for whether plaintiffs have so attempted. Whether a claim is a contract claim in disguise turns on two considerations, the so-called *Megapulse* factors: whether the source of the rights they are asserting is contractual, and whether the remedies they seek (or which are appropriate) are contractual. *Id.* at 7 (first citing *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); and then citing *Evers v. Astrue*, 536 F.3d 651, 657–58 (7th Cir. 2008)).

In this case, for Counts VII and VIII in particular, the jurisdictional question is a difficult one. The rights plaintiffs assert are not contractual—plaintiffs assert some constitutional rights which are truly independent of any contractual arrangement. *Id.* at 21–22. The remedies they seek, however, present a more difficult question. *Id.* at 22–28. All of them would impact the parties' contractual arrangement, and some of them are directly contractual in that they seek to enforce obligations which only exist because of the grant contract, including the obligation to release funds that may become owed on the grant contract. *See id.* The litigants have not given the court any source of authority one way or the other about whether the Tucker Act applies in such a situation; that is, when the two *Megapulse* factors point in opposite directions. In the court's estimation, it likely has jurisdiction because at least some of plaintiffs' requested remedies are non-contractual. *See id.* at 25, 28. But as explained, the court reserves definitive judgment for a later date given the complexity of this issue. *See id.* at 28.

Even if the court has jurisdiction, to succeed in this suit plaintiffs must also demonstrate that Education likely imposed an unconstitutional condition or violated the First Amendment when making funding decisions.

> **B.    Plaintiffs have not demonstrated that Education likely imposed an unconstitutional condition on funding or that it likely violated the First Amendment**

Plaintiffs allege Education violated the First Amendment when it elected not to continue their grants. Specifically, Count VII alleges that Education discontinued their grant funding in retaliation for plaintiffs "expressing their mission, values, and commitments in their grant applications," which, plaintiffs claim, "penalize[d] [p]laintiffs not for what they did with federal funds, but for what they said about their beliefs, values, and experience." [1] ¶¶ 101, 105. Plaintiffs also allege in Count VIII that Education placed an unconstitutional condition on their funding by "conditioning continuation funding on whether [their] previously approved applications align[ed] with the current Administration's preferred viewpoints." *Id.* ¶ 112.

6

A-6

Those two issues are intertwined, so the court addresses them together. The court begins with a summary of the relevant law governing the provision of government subsidies. The court then evaluates whether plaintiffs have adequately demonstrated that Education is likely to have violated their rights. They have not. That is because the record does not support the notion that plaintiffs were subject to any conditions on speech unrelated to what they proposed to use grant funding for. The record also does not support the notion that plaintiffs were retaliated against for their viewpoints generally. Rather, the record suggests they were denied grant funding because of what they proposed to do with that funding.

### 1.   *The law*

The general rule regarding government subsidies appears to be that the government may "selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998) (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991)). Where the government picks a position on how to tackle a problem and chooses to fund projects that accord with that position, the Supreme Court has explained, "'the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other.'" *Id.* (quoting *Rust*, 500 U.S. at 193)). For example, under *Rust,* the government may choose to fund "family planning" services and "may [also] 'make a value judgment favoring childbirth over abortion, and . . . implement that judgment by the allocation of public funds.'" *Rust*, 500 U.S. at 192–93 (quoting *Maher v. Roe*, 432 U.S. 464, 474 (1977)).

It is no doubt true that when the government provides funding selectively, it expresses, or at least supports, a particular viewpoint. It is also no doubt true that when the government picks between potential grantees based on the services they provide (or might provide) and whether it agrees with those services, that choice supports the government's viewpoint on the proper way of solving problems and disfavors other viewpoints. Nevertheless, the law seems to permit the government to express such a viewpoint and to so pick between services to fund: "the Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake. So long as legislation does not infringe on other constitutionally protected rights, Congress has wide latitude to set spending priorities." *Finley*, 524 U.S. at 587–88; *accord Rust*, 500 U.S. at 194 (it is not true "that if the government chooses to subsidize one protected right, it must subsidize analogous counterpart rights.").[3] And that is no less true where that

---

[3] The court is cognizant that the Ninth Circuit has suggested otherwise. In *Thakur v. Trump*, the Ninth Circuit held that "where the government establishes a subsidy program, it may not discriminate between speakers within that program to suppress viewpoints." 176 F.4th 1187, 1200 (9th Cir. 2026). The court agrees that precedent indicates that the government may not place conditions on funding that regulate what grantees may say outside of the

which is not funded is a protected form of expression. "The Supreme Court has repeatedly drawn a line between government regulation of speech, on one hand, and government subsidy of speech, on the other," noting that "the government is not required to subsidize activity simply because the activity is protected by the First Amendment." *Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 24 F.4th 640, 646 (7th Cir. 2022).

But while the government has "wide latitude to set spending priorities," *Finley*, 524 U.S. at 588, its latitude is not unlimited. Even where "a person has no 'right' to a valuable governmental benefit," the government nevertheless "may not deny [that] benefit to a person on a basis that infringes his constitutionally protected interests— especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). That said, because of the government's wide latitude and ability to pick and

------

contours of the grant program, and that the government may not deny funding because of a grantee's viewpoints generally, as explained below. *See also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 221–24 (2013) (Scalia, J., dissenting) (recognizing, but dissenting from the correctness of, this line).

But the Ninth Circuit appears to have gone further. The district court decision it reviewed concluded the government had aimed "to suppress" "particular point[s] of view" at least in part because it had declined to fund "grants that focused on or promoted" DEI-related environmental projects. *Id.* at 1201. The Ninth Circuit found that such a funding decision was an impermissible "penalty on disfavored viewpoints." *Id.* at 1202 (quotation omitted). But that seems to run headfirst into *Rust*, where the government established a grant for family planning services and then disallowed the use of grant funds to advocate for, or facilitate, abortion. The Supreme Court was clear that such selective funding of projects is permissible.

To distinguish *Rust*, the Ninth Circuit would draw a distinction between "creating or ceasing a particular program . . . and discriminating against disfavored speaker viewpoints within a program." *Id.* In other words, the Ninth Circuit would draw a distinction between the creation of a government program and its implementation. The trouble with this distinction is that it would permit Congress to create conditions on the use of funds which the Executive branch could not independently create. For example, it is black letter law that Congress can condition family-planning funds on the grantee agreeing not to facilitate abortion. *Rust*, 500 U.S. at 193–94. But under the Ninth Circuit's logic, if Congress appropriates funds for family planning generally but does not impose that condition, the Executive branch would then, as a matter of the First Amendment, seemingly be obligated award grant funds without considering whether they will be used for abortions or pro-abortion advocacy. The Executive branch could not, under the Ninth Circuit's logic, independently choose not to fund such projects. But nothing in *Rust* itself suggests this result, which speaks generally about the judgments the "government may make" without violating the Free Speech Clause. *Id.* at 192 (quotation omitted). Nor does any case that the court is aware of require this result. Moreover, plaintiffs have not advanced the Ninth Circuit's view in their briefs or at argument. The court therefore declines to address it further at this stage of the litigation, reserving final judgment on the issue for a later stage of litigation.

choose between ways of solving problems, precedent has made clear that the "refusal to fund protected activity, *without more*, cannot be equated with the imposition of a 'penalty' on that activity." *Rust*, 500 U.S. at 193 (quotation omitted) (emphasis added); *accord Camelot*, 24 F.4th at 646. The relevant question, then, is what constitutes "more."

Precedent has shed light on when the government transgresses its wide latitude. "[A] selective subsidy program may violate the First Amendment if it is 'aim[ed] at the suppression of dangerous ideas.'" *Camelot*, 24 F.4th at 646 (quoting *Regan v. Taxation With Representation*, 461 U.S. 540, 548 (1983)). Throughout the admittedly murky caselaw exploring the intersection of the First Amendment and funding decisions, a line of what it means to "aim at the suppression of dangerous ideas" emerges. That line is that the government may pick and choose to fund methods of solving problems that it agrees with, but it may not regulate a person's speech generally, including by punishing people for expressing or holding disfavored viewpoints. "[T]he relevant distinction," in other words, "is between conditions that define the limits of the government spending program—those that specify the activities" the government "wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). Thought of in a related but slightly different way, in its funding decisions the government can pick favored "project[s]" to fund but not favored "grantee[s]" to fund. *Rust*, 500 U.S. at 196.

An "easy example" illustrating this principle, the Seventh Circuit has explained, is that "even if Congress can choose to exclude political lobbyists entirely from [a] Program's subsidies, it could not choose to subsidize Democratic lobbyists while excluding Republicans." *Camelot*, 24 F.4th at 646. The former expresses a view on the use of government funds for lobbying, which the government may do. *See Regan*, 461 U.S. at 542. The latter, by contrast, is a condition on members of one party alone—no matter whether they are using grant funds in the exact same way as members of another party. Such a grantee-based condition is impermissible.

Other datapoints elucidate the line. Starting with impermissible conditions, take *Speiser v. Randall*, 357 U.S. 424 (1958). In that case, the Court made clear that the Government had "aimed at the suppression of dangerous ideas" in a problematic way when it conditioned tax exemptions on an organization's willingness to sign an anti-insurrection oath. *Id.* at 515, 519 (quotation omitted). Such a condition controlled what the grantee must say generally, as opposed to controlling the use of government funds, and was thus impermissible. Next take *Agency for International Development*. In that case, Congress appropriated "billions of dollars to fund efforts by nongovernmental organizations to assist in the fight" against HIV and AIDS. *Id.* at 208. But Congress imposed two conditions on the receipt of funds. One provided that "no [grant] funds" could "be used by an organization that d[id] not have a policy explicitly opposing prostitution and sex trafficking." *Id.* (quotation to statute omitted). That was an unconstitutional condition on funding, the Court explained,

because it "s[ought] to leverage funding to regulate speech outside the contours of the program itself." *Id.* at 214–15. Examples of permissible conditions further crystallize the line. Start with the other condition in *Agency for International Development*: Congress provided that "no [grant] funds" could "be used to promote or advocate the legalization or practice of prostitution or sex trafficking." *Id.* at 208 (quotation to statute omitted). That condition was not even challenged in the suit, but the Seventh Circuit has commented that it "posed no First Amendment problem." *Camelot*, 24 F.4th at 650. And *Camelot* itself provides another example. In that case the Seventh Circuit evaluated a condition on the receipt of COVID-19 relief funding. By statute, Congress excluded businesses that "[p]resent[ed] live performances of a prurient sexual nature" or that "[d]erive[d] . . . more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature." 24 F.4th at 645 (quotations to statute omitted). In that case, because the money would have gone to support a product or service the government did not want to subsidize, it was allowed to deny funding. *See id.* at 646.

Those examples, however, are all of explicit conditions. The court is cognizant of the fact that some conditions may be implicit. It thus stands to reason that if such a condition is being imposed implicitly in the selection of grant projects to fund, the government has transgressed its latitude and improperly "aim[ed] at the suppression of dangerous ideas." *Id.* at 646 (quoting *Regan*, 461 U.S. at 548). What the government cannot do overtly, it cannot do clandestinely.

In this case, then, the best read of all the existing precedent is that plaintiffs cannot succeed on Count VII or VIII merely by demonstrating that Education has declined to provide grant funding which can be used for DEI-related projects. Plaintiffs, in their briefing, have given the court no reason grounded in the Constitution[4] to think that Education is prohibited from adopting the view that funding such projects is not within its policy prerogatives and making grant decisions accordingly. Rather, precedent suggests that plaintiffs must prove something "more." That something "more" could come in two forms. Plaintiffs could show that explicit

---

[4] Plaintiffs, in their briefs and at argument, did not disagree with the court's interpretation of *Rust* and other cases in the selective-subsidy line and have not advanced an alternative theory about what those cases might mean. 6/8/2026 Hr'g Tr. at 157–58. Rather, when asked at argument why *Rust* did not defeat their First Amendment claims, plaintiffs responded in two ways. The first is that even if there was no First Amendment problem with Education's actions, their actions violated the APA's requirement to engage in notice and comment rulemaking. *See id.* That answer, however, is not grounded in the Constitution and, as the court has explained, is a disguised contract theory over which the court lacks jurisdiction. *See* [60] at 10–16. The second is that Education imposed unconstitutional limitations on funding in the non-continuation notices and reconsideration denials described above by making those decisions based on plaintiffs' views generally, as opposed to what they planned to use the grant funding for. 6/8/2026 Hr'g Tr. at 158. That factual claim is addressed, and rejected, below.

limits were placed on their ability to speak outside the context of the grant program, or that they were denied funding not because of what they would use grant funding for, but because Education disfavored their views more generally.[5]

Before turning to the facts of this case, the court notes one further legal consideration. In a limited set of cases the Supreme Court has said the government has less latitude to make content and viewpoint-based distinctions when it provides subsidies. Those cases involve factual scenarios where the government has created a program "designed to facilitate private speech" as opposed to a program which "promote[s] a governmental message." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001). In *Velazquez*, for example, the government had funded legal aid services to represent indigent clients in suits *against the government. See id.* It was obvious, then, that the funding was not being used to "deliver the government's message in the litigation." *Id.*

The most prominent example where the government's latitude to express a viewpoint via a grant funding decision was limited is *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995). That case dealt with government (via a state university) funding for student publications where, as a condition of receiving funding to pay to print the publications, the government and clubs expressly agreed via contract that the government was not expressing its viewpoint via the clubs' publications. *Id.* at 823–25. As part of the program, the government had imposed a restriction on the use of funds: "religious activities," among others, were not reimbursable. *Id.* at 825. The petitioners in *Rosenberger* wanted to publish a paper called "Wide Awake: A Christian Perspective at the University of Virginia," but were denied funding to print it. *Id.* at 826–27. They sued, arguing that the government had imposed a problematic speech-based restriction on the use of funds. *Id.* at 827. The Court agreed, finding that because the government was funding explicitly private speech, it could not draw such a distinction. *Id.* at 834–35 ("Having offered to pay the third-party contractors on behalf of private speakers who convey their own messages, the [government] may not silence the expression of selected viewpoints.").

Most cases, however, are not like *Rosenberger* and *Velazquez*, which both dealt with the unique factual scenario of funding allocated to facilitate private speech. In *Finley*, for example, the Court seemed to narrow *Rosenberger*, suggesting that *Rosenberger*'s logic was driven by the fact that the government had "indiscriminately 'encourage[d] a diversity of views from private speakers.'" 524 U.S. at 586 (quoting *Rosenberger*, 515 U.S. at 834); *see also id.* (in cases where the government facilitates a "competitive process according to which . . . grants are allocated" to grantees, *Rosenberger* is "distinguish[ed]."). *Rosenberger* and *Velazquez*, then, appear to be the exception, not the rule. The general rule for funding cases appears to be that where

---

[5] The court does not conclude that this is an exhaustive list. But these are the types of actions precedent has condemned, and plaintiffs have not pointed to other impermissible actions.

the government selectively funds a grant, it is in some sense expressing its own views and can therefore adopt a viewpoint. As the *Velazquez* Court explained, the Court in "*Rust* did not place explicit reliance on the rationale that the" funded activities "amounted to governmental speech." 531 U.S. at 541. But "when interpreting the holding" of *Rust* "in later cases . . . we have explained *Rust* on this understanding." *Id.* In *Rust* and cases like it—where the government chooses to fund projects to tackle a problem—content and "viewpoint-based funding decisions can be sustained" because the "government is itself the speaker." *Id.*

Ultimately, as Education contends, the situation in this case resembles *Rust* and *Finley*, not *Rosenberger* and *Valezquez*, and involves government speech. 6/8/2026 Hr'g Tr. at 132–33. The government has chosen to solve a problem, a need for education programming, while at the same time choosing not to fund a particular type of education programming, programming that is DEI-focused. Plaintiffs have not shown that the grants at issue are "indiscriminately" awarded. *Finley*, 524 U.S. at 586. Rather, FSCS grants are awarded under a "competitive process." *Id.*; *see* [1] at 5. Furthermore, no facts suggest that Congress or Education have agreed that the programs being funded reflect only private views. *See Rosenberger*, 515 U.S. at 834–35. In fact, plaintiffs were clear at argument that they "do not purport to speak through their grant activities." 6/8/2026 Hr'g Tr. at 102. The rule governing this case, then, seems to be the general one: "the Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech . . . at stake"—that is, by picking a viewpoint on how to solve problems and funding projects which accord with that viewpoint. *Finley*, 524 U.S. at 587–88; *see also Rust*, 500 U.S. at 193.

But again, none of that means Education's discretion was unlimited. As explained above, it still could not make funding decisions in a manner designed to suppress dangerous ideas. *See Camelot*, 24 F.4th at 646. Education was not permitted to place limits on what plaintiffs can say outside of the context of the grant program nor deny funding as a result of plaintiffs' speech outside of the context of the grant program. The court next turns to the factual issue of whether plaintiffs have established that they are likely to prove that Education did any of those things, concluding that they have not.

### 2.    *The facts*

Starting first with whether Education imposed any explicit unconstitutional conditions. Plaintiffs allege that Education illegally "condition[ed] continuation funding on whether [p]laintiffs' previously approved applications align with the current Administration's preferred viewpoints." [1] ¶ 112. What plaintiffs do not allege is that they were required to sign any statement disavowing DEI generally or even that they were required to forfeit the ability to conduct DEI-related projects using separate funding. In fact, plaintiffs have not pointed to any stated condition on what they could say at all. Rather, plaintiffs allege that their funds were conditioned

"on whether" their "previously approved [grant] applications align with the current Administration's preferred viewpoints." *Id.* But the grant applications, of course, were made within the context of, and for the precise purpose of, the grant program. They set out the projects plaintiffs proposed using the grant funding for, and in those applications plaintiffs noted that they could use grant funds for DEI-related projects. *See* [3-4] at 40, 63, 144. Plaintiffs confirmed exactly that at the oral argument. *See* 6/8/2026 Hr'g Tr. at 154–56.[6] It therefore is clear that plaintiffs have not identified any explicit unconstitutional condition. The government *is allowed* to condition grant funds on what the grantee will use the funds for. Just as the government is allowed to condition funds on whether funds will be used to promote the legalization of prostitution or human trafficking, *see Camelot*, 24 F.4th at 650, the government may condition funds on whether funds will be used to engage in DEI-related projects. In both scenarios, the government has taken a viewpoint on what activities it wants to fund and what activities it does not and has chosen to deny funding unless the grantee will not, under any circumstances, use the funds for that purpose.

Turning next to the possibility that Education imposed an implicit condition or otherwise targeted plaintiffs for their viewpoints. Plaintiffs allege that Education "relied on [their] expressive statements regarding its overarching values" to deny funding. [1] ¶ 104. At this stage, the court determines that plaintiffs have not established anything more than that they expressed certain values and that funding was denied. Plaintiffs have not persuasively established the requisite causal link between those two things needed to make success likely.

As explained previously, plaintiffs noted in their grant applications that they were ready and able to use grant funds for DEI-focused projects and they confirmed at the preliminary injunction hearing that they might provide such programming. *See* [3-4] at 40, 63, 144; 6/8/2026 Hr'g Tr. at 154–56. The use of grant funding for such purposes was Education's chief justification for discontinuing plaintiffs' funding: "applicant *has proposed project activities* that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education." [3-7] at 2 (emphasis added). The court considers that strong evidence that Education was concerned plaintiffs would use government funds for projects that conflicted with Education's policies.

On the other side of the factual ledger, plaintiffs raise two points. Plaintiffs' first point is that they have not yet used any funds for DEI-related projects, and that they told Education exactly that when they challenged their notices of non-continuation. At the June 8, 2026, hearing, plaintiffs presented several

---

[6] THE COURT: "Is that language from the grant applications . . . saying" you could "use funds for DEI programming?"

COUNSEL FOR PLAINTIFFS: "[I]f that community determined that those kinds of programs were necessary . . . then they may be able to do that."

uncontroverted witnesses who testified that they have not used funds for such activities. *See, e.g.*, 6/8/2026 Hr'g Tr. at 20. The record contains nothing to cast doubt on the veracity of that claim.

But that plaintiffs have not *yet* used funds for DEI-related projects is no rejoinder. Grant funding is limited. When picking among potential grantees, the government is permitted to make categorical judgments—it may define the "contours" of a grant program by choosing what sorts of activities to fund. *Camelot*, 24 F.4th at 650 (quotation omitted). For example, as explained above, the government may categorically exclude the use of grant funds to promote prostitution or sex trafficking. *See Agency for Int'l Dev.*, 570 U.S. at 208. Or, under *Rust*, it may fund "family planning" services but decline to fund abortion or abortion advocacy. *See Rust*, 500 U.S. at 179, 192–93. Such categorical judgments on the use of funds are not problematic.

Here the government has made a similar categorical judgment: a potential grantee who says it might use grant funds for DEI-related projects should not receive grant funds at the expense of other grantees.[7] That is just another way of defining the "contours" of a grant program. *Camelot*, 24 F.4th at 650 (quotation omitted). And Education's categorical judgment makes sense. Plaintiffs have not said one way or another whether they will stay within Education's contours. *See* [3-4] at 40, 63, 144; 6/8/2026 Hr'g Tr. at 154–56. When they applied for their initial grants and when they applied for continuation funding, then, plaintiffs left Education in a state of uncertainty about the use of grant funds. But nothing in law or logic suggests Education must take a bet that plaintiffs will, on their own volition, stay within the lines on funding use Education wishes to draw. That would be an odd bet to force, as it would require Education to constantly monitor its grantees to see if its grant funds are, in fact, being used for purposes it does not approve of. Such a reactive system is entirely contrary to the notion of defining the contours of a program in the first place.

Plaintiffs' second point is that Education "cited [p]laintiffs' statements expressing its values and mission as evidence that continuation funding was not in the best interest of the Federal Government." [48] at 27 (quotation omitted). Even assuming that this is some evidence that the *grantees' views generally* were considered as opposed to the *projects the grantees proposed*, at best that evidence is quite weak or, at worst (and in conjunction with other evidence) cuts the other way. To start, that evidence must be weighed against the other pieces of the grant application that Education cited; specifically, plaintiffs' statements that they can and do provide DEI-related programming and that they were ready and able to use grant funding to do so. It is thus hard to know with any certainty whether Education was motivated by those statements or by plaintiffs' mission statement. But also, plaintiffs'

---

[7] The parties did not put evidence into the record about what projects the government did fund.

mission statement, in conjunction with their stated capabilities, suggests that they are likely to at some point utilize funds for purposes inconsistent with Education's policies. Take an example. If a family-planning organization says "abortion as a method of family planning is intentionally integrated into all that" it does, and then that organization applies for grant funds and vaguely says that it will use the funds to provide family-planning resources, it does not stretch the imagination that the organization might, at some point, use grant funds to promote or facilitate abortions. The same is true in this case. Plaintiffs made open-ended project proposals, said that they can facilitate DEI-related projects, and then also said that "[e]quity is intentionally and sustainably integrated into all that [ACT Now] do[es]." [3-4] at 144. In conjunction, those capabilities and the stated mission suggest a genuine risk that plaintiffs will at some point use funds for DEI-related projects. Or, at the very least, Education would not be unreasonable in concluding that there is such a genuine risk and making a decision based on that conclusion. The court is thus not convinced that plaintiffs are likely to prove that the real motivation behind Education's funding decisions was the value statement—at this stage, it is more likely that Education simply did not want to accept the risk that grant funds would be used on projects that are not in line with the current Administration's funding priorities.

* * *

Plaintiffs face an uphill climb. Case after case suggests that the government has "wide latitude" to make funding decisions and that nothing in the Constitution prohibits Education from tackling problems in the way it sees fit. *Finley*, 524 U.S. at 588. That means plaintiffs are unlikely to prove that Education could not categorically decline to fund DEI-related programming. To that end, if a potential grantee says that it is ready and able to use grant funds for DEI-related projects if the need arises, precedent strongly suggests that the Government may decline to fund that grant project. There are limits to funding decisions, however. What Education cannot do is place an explicit or implicit condition on funding which regulates what grantees can say generally or punish grantees for their general viewpoints. Plaintiffs have not pointed to any such explicit condition, and the evidence plaintiffs have proffered of an implicit condition is quite weak and is outweighed by contrary evidence. Thus, the court finds plaintiffs are unlikely to succeed on the merits of either Count VII or Count VIII. Although plaintiffs are likely to establish that the court has jurisdiction over those counts, jurisdiction is debatable and they are nevertheless unlikely to ultimately prevail in this suit. Plaintiffs' motion for a preliminary injunction [46] is accordingly denied.

Dated: June 26, 2026                                                    /s/ Martha M. Pacold

15

A-15