**No. 26-2473**

# In the United States Court of Appeals
## FOR THE SEVENTH CIRCUIT

AFTERSCHOOL FOR CHILDREN AND TEENS (ACT NOW) and METROPOLITAN FAMILY SERVICES,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES DEPARTMENT OF EDUCATION and LINDA MCMAHON,

*Defendants-Appellees*.

On Appeal from the United States District Court for the Northern District of Illinois
No. 1:25-cv-15704 (Honorable Martha M. Pacold)

### SUPPLEMENTAL APPENDIX TO BRIEF OF PLAINTIFF-APPELLANT AFTERSCHOOL FOR CHILDREN AND TEENS (ACT) NOW and METROPOLITAN FAMILY SERVICES

Jocelyn (Josie) E. Skinner
(*application for admission pending*)
Emily K. Merolli
(*admission for application pending*)
SLIGO LAW GROUP, PLLC
1717 K St. NW, Suite 900
Washington, DC 20006
Telephone: (202) 888-2084
Scott C. Solberg (No. 6204487)
Elizabeth M. Hady (No. 6316542)
EIMER STAHL LLP
224 S. Michigan Ave., Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718

Aneel L. Chablani (No. 6242658)
Michael R. Ortega (No. 6339469)
CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS
25 E. Washington St., Suite 1300
Chicago, IL 60602
Telephone: (312) 630-9744
Fax: (312) 630-1127

*Attorneys for Plaintiffs-Appellants After-school for Children and Teens (ACT) Now and Metropolitan Family Services*

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30

Pursuant to Circuit Rule 30, I certify that all material required by Circuit rule 30(a) are included in the appendices to this brief.

Dated: August 4, 2026

/s/ *Scott C. Solberg*
SCOTT C. SOLBERG

# TABLE OF CONTENTS

Page

Complaint, ECF 1……………………………………………………….Supp. App. - 001

Grant award letter and continuation notice, ECF 3-5………………… Supp. App. - 028

Grant award letter and continuation notice, ECF 3-6………………… Supp. App. - 149

Notices of Non-Continuation, ECF 3-7…………………………….… Supp. App. - 158

Requests for Reconsideration, ECF 3-8…………………………….… Supp. App. - 165

Denials of Reconsideration, ECF 3-13……………………………….… Supp. App. - 181

Declaration of Susan Stanton, ECF 49-1……………………………… Supp. App. - 187

Declaration of Lesley Rivers, ECF 49-2……………………….……… Supp. App. - 202

Declaration of Aaminah Long, ECF 49-3……………………………… Supp. App. - 210

Declaration of Michael Guilmette, ECF 49-4……….……………….… Supp. App. - 218

Declaration of Sydney Stigge-Kaufman, ECF 49-17….…...…………… Supp. App. - 228

Declaration of Rebecca Kinsey, ECF 49-21……………………….…… Supp. App. - 240

Excerpts from the 6/8/2026 Prel. Inj. Transcript, ECF 58 …..…...………Supp. App. - 253

Excerpts from the 12/31/2025 TRO Transcript, ECF 64………….……...Supp. App. - 327

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AFTERSCHOOL FOR CHILDREN AND TEENS NOW (ACT NOW) COALITION and METROPOLITAN FAMILY SERVICES | |
| Plaintiffs, | Case No. 25-cv-15704 |
| v. | **COMPLAINT** |
| U.S. DEPARTMENT OF EDUCATION and LINDA McMAHON, in her official capacity as Secretary, U.S. Department of Education, | |
| Defendants. | |

**<u>INTRODUCTION</u>**

1.      This action challenges an unprecedented and unlawful decision by the United States Department of Education to discontinue two previously awarded, multi-year federal grants based not on grantee performance, statutory criteria, or regulatory standards, but on perceived misalignment with the current Administration's policy preferences and priorities.

2.      Acting just 19 days before the close of the current budget period, the Department issued Notices of Non-Continuation (Notices) that notified Plaintiffs that they would not be receiving continuation awards for their two Full-Service Community Schools (FSCS) grants, despite the continued availability of appropriated funds and Plaintiffs' full compliance with all programmatic and fiscal requirements.

3.      Just two days before the close of the current budget period, the Department issued letters denying Plaintiffs' request for reconsideration of its two grants.

4.      These FSCS programs serve thousands of students across Illinois through partnerships with school districts and community organizations.

5.      Congress created the FSCS program to support stable, multi-year investments in integrated academic, health, and community services for students in high-need schools. The governing statutes and regulations strictly limit the circumstances under which the Department may deny continuation funding for approved projects, tying those decisions to grantee performance, compliance, and progress toward established objectives.

6.      The Department's decision here departed from that framework entirely. Rather than identifying any deficiencies in Plaintiffs' performance or administration of the grants, the Department cited excerpts from Plaintiffs' approved grant applications—language unrelated to how the grant was actually carried out—and concluded that the programs reflected policy

2

priorities of a prior Administration and, solely on the basis of the applications, no longer served the "best interest of the Federal Government."

7. That rationale finds no support in the statute, the regulations, or the published terms of the fiscal year (FY) 2023 competition under which Plaintiffs' applications were reviewed, scored, and awarded. By retroactively conditioning continuation funding on compliance with unpublished and newly articulated policy preferences, the Department acted arbitrarily and capriciously, misinterpreted its own regulations, and exceeded the authority delegated to it by Congress. The Department further penalized Plaintiffs for complying with statutory requirements imposed by Congress itself, including mandatory assurances under the General Education Provisions Act (GEPA), converting compliance into grounds for funding denial.

8. Absent immediate judicial intervention, Plaintiffs will be forced to dismantle active community school programs mid-school year, terminate staff, sever partnerships with school districts and community organizations, and disrupt services relied upon by approximately 19,000 students statewide. These harms are concrete, imminent, and irreparable.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Constitution and laws of the United States, including the Administrative Procedure Act, 5 U.S.C. §§ 701–06, and federal statutes and regulations governing the administration of federal education grants. This Court also has authority to grant declaratory and injunctive relief under Federal Rule of Civil Procedure 65.

10. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and (e)(1) because Plaintiffs ACT Now and Metropolitan Family Services reside and conduct business in this

3

District, a substantial part of the events or omissions giving rise to the claims occurred here and continue to occur within the District, and Defendants are officers and agencies of the United States acting in their official capacities.

### PARTIES

11.     Plaintiff Metropolitan Family Services ("MFS") is an Illinois nonprofit corporation and federally recognized tax-exempt organization that serves as ACT Now's fiscal sponsor. In that capacity, MFS holds ACT Now's federal grant awards, provides fiduciary and administrative oversight, and is the official grantee of record for ACT Now's FSCS grants.

12.     Plaintiff Afterschool for Children and Teens Now ("ACT Now") is a statewide unincorporated organization based in Illinois that works to expand access to high-quality out-of-school time, community school, and youth development programs. *See* Decl. of Susan Stanton (Stanton Decl.), Ex.1, ⁋ 10.

13.     Plaintiff ACT Now has a long-standing relationship with the Illinois State Board of Education, state agencies, school districts, and national partners, and has played a central role in scaling community school initiatives statewide, particularly in both rural and urban/suburban communities with the highest levels of need. *Id.* ⁋ 11.

14.     Defendant United States Department of Education ("Department") is an agency of the United States government responsible for administering federal education grant programs, including the FSCS program authorized under section 4625 of the Elementary and Secondary Education Act of 1965, codified at 20 U.S.C. § 7275.

15.     Defendant Linda McMahon is sued in her official capacity as Secretary of the United States Department of Education and is responsible for the administration and oversight of the Department and its discretionary grant programs.

16.    Plaintiffs' FSCS grant programs support 48.5 full time employees at partner schools and organizations, provide 545 hourly employment opportunities that would be immediately eliminated with the loss of funding. *See* Decl. of Lesley Rivers (Rivers Decl.), Ex. 2, ⁋ 9.

17.    Plaintiffs' FSCS grant programs support the schools and communities of 19,000 students throughout the state of Illinois through comprehensive programming that would immediately stop with the loss of funds. Rivers Decl., Ex. 2, ⁋⁋ 10, 14.

18.    Plaintiffs would suffer immediate and irreparable harm to their program infrastructure if they are forced to cease all FSCS grant-related activities on January 1, 2026.

19.    The combined total of Plaintiffs' two FSCS grants is approximately $18.5 million annually, with funding originally awarded for five years. Loss of continued funding would eliminate more than $55 million in expected support over the remaining grant period. Stanton Decl., Ex. 1, ⁋ 22.

## FACTUAL ALLEGATIONS

### I.    The Full-Service Community Schools Program

20.    The Full-Service Community Schools (FSCS) program is a discretionary grant program authorized by Title IV, Part F, Subpart 2[1] of the Elementary and Secondary Education Act of 1965 (ESEA) and administered by the U.S. Department of Education. 20 U.S.C. §§ 7271–7275. Under the statute, Congress directed that the Secretary use not less than 95 percent of the amounts made available for Subpart 2 programs to award grants, on a competitive basis, to entities carrying out Subpart 2 programs. 20 U.S.C. § 7273(1).

---

[1] Subpart 2 includes both the Full-Service Community Schools program and the Promise Neighborhoods program.

21. Congress created the FCFS grant program to:

significantly improve the academic and developmental outcomes of children living in the most distressed communities in the United States, including ensuring school readiness, high school graduation, and access to a community-based continuum of high-quality services" by providing support for "full-service community schools that improve the coordination and integration, accessibility, and effectiveness of services for children and families, particularly for children attending high-poverty schools, including high-poverty rural schools."

20 U.S.C. § 7271.

22. In alignment with its statutory obligations, the Department's stated purpose of the FCFS is to support the development and expansion of community schools that provide comprehensive academic, social, and health services to students and families through coordinated partnerships among schools, local educational agencies, and community-based organizations. *Full-Service Community Schools Program (FSCS)*, U.S. DEPARTMENT OF EDUCATION, https://www.ed.gov/grants-and-programs/grants-birth-grade-12/school-and-community-improvement-grants/full-service-community-schools-program-fscs (last visited Dec. 26, 2025).

23. Pursuant to this authority, the Secretary of Education (Secretary) awards grants to support full-service community schools, defined as public elementary and secondary schools that participate in community-based efforts to coordinate and integrate educational, developmental, family, health, and other comprehensive services through community-based organizations and public and private partnerships and provides access to these services in school to students, family, and the community, including before- and after-school hours and weekends and during the summer. 20 U.S.C. § 7272(2). Grants are awarded on a competitive basis to eligible entities—including local educational agencies, nonprofit organizations, and eligible consortia— to carry out activities and evidence-based strategies identified in the statute. 20 U.S.C. § 7275.

24.    In addition to the authorizing statute, the FSCS program is governed by the General Education Provisions Act (GEPA), codified at 20 U.S.C. § 1221 et seq., the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards set forth in 2 C.F.R. Part 200 (Uniform Guidance), and the Education Department General Administrative Regulations (EDGAR), including 34 C.F.R. Parts 75 through 81. Together, these authorities establish the requirements governing the application process, selection criteria, grant administration, reporting obligations, and continuation funding for multi-year discretionary grants.

25.    FSCS competitions are conducted pursuant to 34 C.F.R. Part 75. Under this framework, the Department issues a notice inviting applications that identifies the applicable statutory authority, eligibility requirements, application requirements, selection criteria, performance measures, and any priorities applicable to the competition. Program priorities may include statutory priorities as well as any absolute, competitive preference, or invitational priorities established by the Secretary through notice-and-comment rulemaking.[2] 34 C.F.R. § 75.105(b). Applicants must submit proposals responsive to the published requirements, and the Department evaluates applications based on the criteria and priorities identified in the notice. *See generally* 34 C.F.R. §§ 75.200–27.

26.    Once awarded, the grant obligates both the Department and the grantee to comply with the terms and conditions of the award, including the approved project design, scope, objectives, performance measures, and budget. 34 C.F.R. § 75.236. Specifically, grantees may

---

[2] Under 34 C.F.R. § 75.105(c), a competitive preference priority grants an application preference over other applications without that priority; an absolute priority establishes a separate competition for applications meeting that priority, and the Secretary reserves all or part of a program's funds solely for that competition; and an invitational priority grants neither competitive preference nor absolute priority to an application.

not alter the scope or objectives of the project without first requesting and obtaining the

Secretary's prior approval. *See* 2 C.F.R. § 200.308(b).

27.     Where the Secretary approves grants that span multi-year project periods, the

Department awards funds for an initial budget period (typically no more than twelve months) and

funds the remainder of the project period through regular continuation awards. 34 C.F.R.

§ 75.251(a)–(b). Continuation awards are made for subsequent budget periods assuming the

grantee continues to meet multiple, specific regulatory requirements concerning grant

performance, financial reporting, continued eligibility, and financial and administrative

management requirements. *See* 34 C.F.R. §§ 75.118, 75.253(a)(1)–(4). Additionally, the

Secretary must determine that continuing the project is "in the best interest of the Federal

Government." 34 C.F.R. § 75.253(a)(5).

28.     When deciding whether to issue a continuation award, including whether the

project is "in the best interest of the Federal Government," the Secretary "may consider any

relevant information *regarding grantee performance*," including required performance and

financial reports, performance measures the Secretary established in the application notice, and

"any other relevant information." 34 C.F.R. § 75.253(b) (emphasis added). A continuation award

may be denied only if the grantee fails to meet one or more of these enumerated requirements. 34

C.F.R. § 75.253(f)(1).[3]

29.     During the previous 45 years—and throughout six administrations, both

Republican and Democratic—non-continuation determinations have been "exceedingly rare" and

---

[3] The Secretary may also deny a continuation award if a grantee fails to redress data-quality issues not relevant here. 34 C.F.R. § 75.253(f)(2).

"only tied to significant concerns related to project performance." Decl. of Ron Petracca (Petracca Decl.), Ex. 3 ¶¶ 28-29

### **Plaintiffs' FSCS Grant Awards**

30. Plaintiff Metropolitan Family Services (MFS) has been the fiscal sponsor of Afterschool for Children and Teens NOW (ACT Now) since 2017. Stanton Decl., Ex. 1, ¶13. ACT Now has been the recipient of two FSCS grants through MFS. Both are state-scaling grants, which are designed to expand and sustain community-school infrastructure across the state. *Id.* at ¶ 17.

31. In the FY 2023 Notice of Final Rules and Notice Inviting Applications for the Full-Service Community Schools (FSCS) program, 88 Fed. Reg. 37222 (June 7, 2023), the Department announced the governing priorities for the competition pursuant to 34 C.F.R. § 75.105. Under that regulation, applications were eligible for funding *only* if they satisfied the applicable Absolute Priorities, while competitive preference priorities could earn additional points but were not required for eligibility, and invitational priorities reflected areas of interest without affecting scoring.

32. The Notice established five Absolute Priorities: (1) Title I, Part A schoolwide eligibility, (2) Title I, Part A schoolwide eligibility and rural districts, (3) Capacity Building and Development, (4) Multi-LEA, and (5) State Scaling.[4] The Notice announced funding slates only for applications meeting Absolute Priority 1 or 2 and one additional Absolute Priority. The Notice also established two competitive preference priorities, one focused on integrated student

---

[4] "Title I, Part A" refers to that section of the Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act. 20 U.S.C. § 6301 et seq. Since 1965, Congress's stated purpose for Title I "is to provide all children significant opportunity to receive a fair, equitable, and high-quality education, and to close educational achievement gaps." 20 U.S.C. § 6301.

supports and inclusive, trauma-informed, and identity-safe practices addressing students' "social, emotional, and academic needs," and the other focused on meaningful "cross-agency coordination and community engagement" to support systemic implementation and sustainability. 88 Fed. Reg. 37222, 37224–25 (June 7, 2023).

33.    Plaintiffs submitted two FY 2023 applications under this framework, seeking funding to serve low-income schools in both rural and urban districts across Illinois. The first application (PR/Award # S215J230149) was submitted under Absolute Priorities 1 and 5, and the second application (PR/Award # S215J230147) was submitted under Absolute Priorities 2 and 5. Grant Applications, Ex. 4. In both applications, Plaintiffs met all required Absolute Priorities and affirmatively elected to address both competitive preference priorities, seeking additional points for providing integrated student supports, inclusive and trauma-informed practices, and robust cross-agency and community coordination. Each application was reviewed, scored, and granted separately within its respective funding slate. 88 Fed. Reg. at 37224.

34.    Both of Plaintiffs' FSCS grants were awarded as multi-year discretionary grants with a five-year project period running from January 1, 2024, through December 31, 2028, and annual budget periods running from January 1 through December 31 of each year. 2024 Grant Award Notifications, Ex.5.

35.    Plaintiffs submitted all required regular reports. Through these grants, Plaintiffs serve approximately 19,000 students across Illinois and support dozens of school districts and community partners by providing mental health supports, afterschool programming, family engagement services, and schoolwide interventions that benefit entire school communities. Stanton Decl., Ex. 1, ¶¶ 24, 26. Plaintiffs received a continuation award for the 2025 budget period. 2025 Grant Award Notifications, Ex. 6.

36. On December 12, 2025—19 days before the end of the budget period—the Department issued Notices of Non-Continuation for both grants. Notices of Non-Continuation, Ex. 7. Each Notice stated that the Department had determined not to continue the award for the next budget period because the grants "provide[] funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration," the grants are "therefore inconsistent with, and no longer effectuates, the best interest of the Federal government." The Notices did not identify deficiencies in programmatic performance, fiscal management, or reporting.

37. Each Notice advised Plaintiffs of the right to request reconsideration within seven calendar days; Plaintiffs timely submitted these requests to the Department on December 18, 2025. Letters to Asst. Sec'y Baesler, Ex. 8.

38. On December 29, 2025, the Department notified Plaintiffs that the Department had denied the requests for reconsideration for both grants. Denials of Requests for Reconsideration (Denial Letters), Ex 23.

39. Congress appropriated $150,000,000 for the FSCS program under ESEA Title IV, Part F, Subpart 2, which established a period of availability through which these funds could be obligated through December 31, 2024. Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 684 (2024). That period of availability was subsequently and explicitly extended to December 31, 2025, via continuing resolution in March 2025. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101, 139 Stat. 9, 11 (2025). As a result, at the time the Department issued the challenged Notices of Non-Continuation, the FY 2025 FSCS funds at issue remained lawfully available for obligation under governing appropriations law.

Supp. App. - 011

40.    However, absent injunctive relief, those funds will not be available for obligation by the Department after December 31, 2025.

**Impact of December 31, 2025, Funding Termination**

41.    Without injunctive relief, funding will lapse. Plaintiffs will be unable to use any funds, including carryover funds, to carry out any grant operations.[5] Plaintiffs will be forced to cease all FSCS-funded operations and begin grant closeout procedures as of January 1, 2026. Stanton Decl., Ex. 1, ¶ 27.

42.    Because Plaintiffs' grants were discontinued, and the Department did not grant Plaintiffs a no-cost extension, once the current budget period ends, Plaintiffs will be legally prohibited from incurring any new obligations under the awards and required to unwind contracts, terminate staff, and halt reimbursements to partner schools and community organizations. Stanton Decl., Ex. 1, ¶ 29.

43.    This will cause an immediate shutdown of statewide FSCS activities, including integrated student supports, mental and behavioral health services, family engagement programming, expanded learning opportunities, data collection and analysis, school safety initiatives, food insecurity initiatives, career support programming, and community-based partnerships that are currently operating in the middle of the school year. *Id.*, Ex. 1 at 29-30, Decl. of Michael Guilmette (Guilmette Decl.), Ex. 9, ¶¶ 13-14; Rivers Decl., Ex. 2, ¶¶ 14-18; Decl. of Sarah Norton (Norton Decl.), Ex. 10, ¶¶ 13-15; Decl. of Patrick Brosnan (Brosnan Decl.), Ex. 11, ¶¶ 12-17; Decl. of Valerie Clodi (Clodi Decl.), Ex. 12, ¶¶ 10, 14.

---

[5] While Plaintiffs would not be able to carry out any grant activities with grant funds, they would be able charge "necessary administrative costs" during closeout up until the due date of the final reports. 2 C.F.R. § 200.472(b).

44.     ACT Now administers and supports these grants through a unified statewide framework that includes staffing, fiscal oversight, compliance support, technical assistance, and coordination across all partner sites. As a result, the termination of funding affects not only individual partner sites, but ACT Now's ability to function as the central entity responsible for implementing and sustaining statewide FSCS programming. Stanton Decl., Ex. 1 ¶ 30(a), (b).

45.     Furthermore, because these programs operate on a reimbursement model and rely on predictable access to federal funds, even a temporary disruption in funding will have disastrous consequences for Plaintiffs. Schools and community partners cannot lawfully continue services without assurance of reimbursement, and thus must immediately stop operations, terminate staff, and cancel contracts. Stanton Decl., Ex. 1, ¶ 29. Indeed, some have already begun doing so. Rivers Decl., Ex. 2,¶ 17. Once staff are laid off and services are discontinued, restarting them is not a simple matter of restoring funds. Hiring, background checks, training, restoring community networks, and rebuilding service delivery infrastructure would take months or years Guilmette Decl., Ex. 9,¶¶ 13-14; Rivers Decl., Ex. 2, ¶ 16; Norton Decl., Ex. 10,¶ 14; Brosnan Decl., Ex. 11, ¶ 17; Clodi Decl., Ex. 12,¶ 14.

**Harm to Infrastructure and Organizational Capacity**

46.     The sudden and unanticipated loss of FSCS funding will result in the dismantling of organizational infrastructure and operational capacity for Plaintiffs and their subgrantee partners. The grants fund not only direct services, but also the personnel and administrative systems necessary for program coordination, compliance, reporting, and sustainability.

47.     ACT Now will be forced to eliminate 13 core staff positions and dismantle its statewide technical assistance, compliance, and oversight infrastructure, rendering it unable to

support subgrantees, manage data and reporting obligations, or coordinate statewide learning networks. Stanton Decl., Ex. 1, ¶ 30; Guilmette Decl., Ex. 9, ¶¶ 4, 13, 14.

48.     Partner school districts will experience corresponding losses in staffing and program capacity. Herrin Central Unified School District, which serves approximately 2,300 students, is supported by nine staff positions funded by Plaintiffs' FSCS rural grant that will be eliminated if funding is removed. *See* Clodi Decl., Ex. 12, ¶¶ 5, 8. As a school district, hiring and even re-hiring decisions have to be approved by the Board of Education and are long and resource-intensive processes that would likely extend until the end of the school year. *Id*. ¶ 14.

49.     Because Plaintiffs did not receive reasonable notice of the discontinuation of their grants, Plaintiffs were unable to take steps to mitigate harm and create a sustainability plan that would have allowed it to continue functioning after the grants ended.

**Harm to Relationships**

50.     Funding termination will also disrupt long-standing relationships that support community schools. FSCS grants are designed to sustain long-term partnerships among schools, families, community organizations, and state-level intermediaries. Abrupt termination mid-year will fracture trust with school districts, parents, and community partners; undermine ACT Now's credibility as a reliable intermediary; and permanently damage partnerships that have taken years to build. Guilmette Decl., Ex. 9, ¶¶ 13, 14, 16; Rivers Decl., Ex. 2, ¶¶ 16, 17; Stanton Decl., Ex. 1, ¶ 30(c).

## CAUSES OF ACTION

### COUNT I
### Administrative Procedure Act
### Arbitrary and Capricious Agency Action

51. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

52. The Department's issuance of the Notices of Non-Continuation and subsequent Denial Letters constitutes final agency action reviewable under the Administrative Procedure Act (APA). See 5 U.S.C. § 704.

53. Under the APA, an agency must provide a reasoned explanation for its decisions, *Judulang v. Holder*, 565 U.S. 42, 45 (2011)), that includes "a rational connection between the facts found and the choice made," *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292–93 (2024) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). For the decision to be upheld, an agency must have "considered relevant data under the correct legal standards and offered a satisfactory explanation for its action." *Dana Container, Inc. v. Sec'y of Lab.*, 847 F.3d 495, 499 (7th Cir. 2017).

54. The Department acted arbitrarily and capriciously because the Notices of Non-Continuation and Denial Letters failed to identify any deficiencies in Plaintiffs' grant performance, compliance, or progress toward approved objectives, as required by governing regulations. *See* 34 C.F.R. § 75.253(b).

55. Instead, the Department relied on vague and conclusory assertions that continuation was not in the "best interest of the Federal Government," without reference to Plaintiffs' performance reports, grant activities, or other relevant information.

56. The Department cited only a sparse handful of quotes from Plaintiffs' grant applications and failed to explain how—or the extent to which—any evidence considered supports its determination that the grants conflict with agency priorities or were not in the best

interest of the Federal Government to continue. The Notices lack the "rational connection" the APA requires. *Ohio*, 603 U.S. at 292–93.

57.     Likewise, the Denial Letters failed to provide any explanation for its decision to deny Plaintiffs' requests for reconsideration. Instead, the Department quoted again from Plaintiffs' applications—some identical and some new references—and simply concluded that "the information in your request for reconsideration was not sufficient to refute these findings." Denial Letters, Ex. 23.

58.     The Denial Letters lack any discussion of the information in Plaintiffs' requests for reconsideration. For example, the Denials Letters do not respond to Plaintiffs' arguments that the offending grant-application language was a) in response to priorities the Department established through notice-and-comment rulemaking, b) described Plaintiffs' mission and values rather than proposed programs, and c) to the extent programs were contemplated, "**the proposed activities were not implemented as part of this grant project.**" Letters to Asst. Sec'y Baesler, Ex. 8.

59.     The Denial Letters also fail to contend with Plaintiffs' assertion that the records submitted with their request "that the budget is in full compliance with the Administration's guidance prohibiting the use of grant funds for activities that do not prioritize merit, fairness, and excellence in education, and remains consistent with—and effectuates—the best interests of the Federal Government." Letters to Asst. Sec'y Baesler, Ex. 8. The Department further acted arbitrarily and capriciously by relying on factors Congress did not intend the Department to consider, including perceived misalignment with the current Administration's policy preferences.

60.     Defendants ignored regulations requiring non-continuation decisions to be based on grantee performance. Instead, the Department appears to have created an entirely new factor

for non-continuation based on policy alignment within the grant application, in essence withdrawing funding because the Plaintiffs' grant applications did not align with the policy preferences of an administration that did not exist at the time the applications were submitted and approved for funding.

61. Neither the statute nor the regulations suggest an intent to allow changes in policy following new administrations to impact FSCS grants. *See* 20 U.S.C. § 7273(c) (making continued funding beyond a grant's third year contingent on a grantee's progress the "annual performance objectives and outcomes" laid out in statute.)

62. The Department's actions therefore violate the APA and must be set aside. *See* 5 U.S.C. § 706(2)(A).

<u>**COUNT II**</u>
<u>**Administrative Procedure Act**</u>
<u>**Agency Action Contrary to Law**</u>

63. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

64. The Department's non-continuation decisions are contrary to law because they misinterpret and misapply the regulatory framework governing continuation awards for multi-year discretionary grants.

65. When interpreting regulations, courts apply the same core principles that govern statutory interpretation. *See Exelon Generation Co. v. Local 15, International Brotherhood of Electrical Workers, AFL-CIO*, 676 F.3d 566, 570 (7th Cir. 2012).

66. Like a statute, a regulation should be read in context and as part of a coherent regulatory scheme, such that each provision is interpreted consistently with the others and "no

Supp. App. - 017

clause, sentence, or word shall be superfluous, void, or insignificant." *Young v. UPS*, 575 U.S. 206 (2015) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

67.    Through the Notices and Denial Letters, the Department appears to have interpreted the "best interest" requirement to create from whole cloth a de facto second review of approved grant applications for alignment with new, unpublished, and previously undisclosed grant priorities—priorities that conflict with the published FY 2023 Notice against which these applications have already been awarded, and priorities of which the applicants could not have been aware.[6]

68.    By interpreting the regulation to permit non-continuation based on undisclosed and retroactive policy preferences unrelated to grant performance, the Department acted contrary to law in violation of the APA.

### COUNT III
### Administrative Procedure Act
### Agency Action in Excess of Statutory Authority

69.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

70.    The Department's actions were contrary to law because they penalized Plaintiffs for complying with a statutory requirement imposed by Congress.

71.    Section 427 of the General Education Provisions Act (GEPA), 20 U.S.C. § 1288a, requires every applicant for federal education funds "to develop and describe in such applicant's

---

[6] Such a review process appears to comply with President Trump's Executive Order requiring that agencies "review discretionary grants to ensure that they are consistent with agency priorities and the national interest" and ensure that such awards "must, where applicable, demonstrably advance the President's policy priorities." Sec. 3, 4(b)(i), Exec. Order 14332, "Improving Oversight of Federal Grantmaking", 90 Fed. Reg. 38929 (Aug. 7, 2025).

application the steps such applicant proposes to take to ensure equitable access to, and equitable participation in, the project or activity to be conducted with such assistance, by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age."

72.    Plaintiffs complied with this statutory requirement and included a statement on how it would ensure equitable access: "ACT Now will also ensure equitable access to the resources and trainings we create to support community schools. All of our trainings are developed with a racial equity and cultural competency lens." FY 2024 GEPA Statements, Ex. 14.

73.    The Department nevertheless cited in the Notices and Denial Letters to the response to this required assurance as a basis for denying continuation funding. Notices of Non-Continuation, Ex. 7; Denial Letters, Ex. 23.

74.    There is no authority in the authorizing statute or governing regulations that permits the Department to treat compliance with Section 427 as a reason to discontinue funding.

75.    By converting a congressionally-mandated application element into evidence against Plaintiffs, and by applying that penalty selectively rather than uniformly across all applicants subject to the same statutory requirement, the Department acted arbitrarily, capriciously, and in excess of its statutory authority and in direct contravention of law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C).

### COUNT IV
### U.S. Constitution
### Violation of the Spending Clause and the Separation of Powers

Supp. App. - 019

76.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

77.     The Department's actions violate the Spending Clause, U.S. CONST. art. I, § 8, cl. 1, in that they constitute an exercise of authority not granted to the Executive Branch.

78.     The Spending Clause vests Congress, not the Executive Branch, with authority to determine the terms and conditions under which federal funds are spent. *New York v. United States*, 505 U.S. 144, 167 (1992); *South Dakota v. Dole*, 483 U.S. 203, 206 (1987).

79.     Although Congress may delegate limited spending authority to executive agencies, agencies may not impose extra-statutory or retroactive conditions on federal grants to advance policy objectives not authorized by Congress. *City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020).

80.     The Department not only applied their own funding conditions but applied them retroactively by conditioning continuation awards not on the statutory and regulatory criteria in effect when the grants were awarded, but on the grant application's alignment with the current Administration's policy preferences.

81.     The federal government may not retroactively apply changes to the substantive requirements of a federal grant program. *Bennett v. New Jersey*, 470 U.S. 632, 640 (1985).

82.     By conditioning receipt of continuation funding on whether Plaintiffs' approved applications aligned with the current Administration's political priorities, the Department exceeded the authority delegated to it by Congress, in violation of the Spending Clause and the Separation of Powers.

**COUNT V**
**U.S. Constitution, Fifth Amendment**
**Due Process, Void-for-Vagueness**

20

83.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

84.     The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V.

85.     The Fifth Amendment "requires the invalidation of laws that are impermissibly vague." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

86.     A fundamental principal of due process is "that regulated parties should know what is required of them so they may act accordingly." *Id.*

87.     The Department relied on the claim that continuation of Plaintiff's grants was not in the "best interest of the Federal Government" without providing a clear definition of that term or identifying what conduct, program characteristics, or grant activities would satisfy the best interest standard.

88.     The Department's interpretation of the best interest standard functioned as an open-ended and discretionary basis for denying continuation funding, which permitted decisions based in indeterminate discretionary criteria rather than objective measures.

89.     This indeterminate standard invites arbitrary enforcement in violation of the Fifth Amendment's due process protections.

## COUNT VI
### U.S. Constitution, Fifth Amendment
### Due Process, Procedural Due Process

90.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

Supp. App. - 021

91. The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V.

92. The Department's actions violated Plaintiffs' Fifth Amendment rights to procedural due process by depriving them of fair notice and a meaningful opportunity to be heard before the loss of federal grant funding.

93. Even when a person does not have a legal entitlement to a benefit or where the government retains discretion in a final determination, "[a] person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972).

94. The awarding of continuation awards for multi-year discretionary grants is based on a detailed statutory and regulatory scheme. *See, e.g.,* 20 U.S.C. §§ 7271–75, 34 C.F.R. Parts 75–81; 2 C.F.R. Part 200.

95. That framework, together with the longstanding practice of making the decision to award continuation awards on the basis of performance rather than application content, created reasonable procedural expectations that Plaintiff's continuation award determinations would be made in accordance with these procedures, together with fair notice and a reasonable opportunity to respond.

96. The Department deprived Plaintiffs of due process by issuing Notices of Non-Continuation only 19 days—and Denial Letters only 2 days—before the end of Plaintiff's budget period. This compressed timeline deprived Plaintiffs of fair notice and made virtually impossible a meaningful review of the Department's actions before funding expires on December 31, 2025.

97.    The Department therefore violated the Fifth Amendment's guarantee of due process.

**COUNT VII**
**U.S. Constitution, First Amendment**
**Free Speech Clause (Retaliation and Viewpoint Discrimination)**

98.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

99.    The First Amendment provides that the government "shall make no law . . .abridging the freedom of speech." U.S. CONST. amend. I.

100.    The First Amendment prohibits government officials from retaliating against individuals or entities for engaging in protected speech. *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019).

101.    Plaintiffs engaged in protected speech by expressing their mission, values, and commitments in their grant applications, including statements required by federal statute.

102.    In one of the Notices and Denial Letters, the Department cited a section of Plaintiffs' application that described Plaintiff ACT Now's mission and values but did not propose any grant activities. Plaintiffs wrote that "ACT Now's mission has equity and racial justice at its core. We are driven to ensuring that all youth are prepared for success in school, career, and life, through participation in high-quality community schools programs." Notices of Non-Continuation, Ex. 7; Denial Letters, Ex. 23.

103.    In both Notices, the Department cited language regarding Plaintiff ACT Now's access to resources, and descriptions of trainings and projects that were not proposed grant activities, not integral to the project's scope and objectives, and not paid for with grant funds:

> ACT Now is a statewide leader in providing trainings on gender and sexuality to educators, offering Gender and Sexuality in OST 101 and 102 professional development

courses. ACT Now, as the statewide afterschool network, has access to a variety of partners and content experts that develop curriculum focused on inclusion, such as the 1619 project. Throughout the year, ACT Now also hosts a variety of trainings for educators focused on trauma-informed care and racial equity."

Notices of Non-Continuation, Ex. 7.

104.    Rather than identifying any misuse of funds, deviation from the approved scope of work, or failure to meet performance measures, the Department relied on Plaintiffs' expressive statements regarding its overarching values and principles as evidence that continuation funding was not in the "best interest of the Federal Government." Notices, Ex. 7.

105.    The Department's decision accordingly penalizes Plaintiffs not for what they did with federal funds, but for what they said about their beliefs, values, and experience.

106.    The Department relied on those expressive statements as a basis for denying continuation funding, rather than on Plaintiff's use of federal funds or on grant performance.

### Count VIII
### U.S. Constitution, First Amendment
### Free Speech Clause (Unconstitutional Condition)

107.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

108.    The First Amendment provides that the government "shall make no law . . .abridging the freedom of speech." U.S. CONST. amend. I.

109.    The unconstitutional conditions doctrine "prevents the government from awarding or withholding a public benefit for the purpose of coercing the beneficiary to give up a constitutional right or to penalize his exercise of a constitutional right." *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health*, 699 F.3d 962, 986 (7th Cir. 2012); *see also Rumsfeld v. FAIR, Inc.,* 547 U.S. 47, 59 (2006).

110.    Conditioning federal funds on the grantee's agreement not to engage in protected speech even when engaging in activities that are not funded by the federal government is a violation of the First Amendment. *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548-49 (2001); *FCC v. League of Women Voters*, 468 U.S. 364, 400 (1984).

111.    Promoting the concepts of equity, racial justice, inclusion, and trauma-informed care is protected speech.

112.    By conditioning continuation funding on whether Plaintiffs' previously approved applications align with the current Administration's preferred viewpoints, the Department penalized Plaintiffs for protected speech and imposed unconstitutional conditions on the receipt of federal funds.

113.    The Department's actions therefore violate the First Amendment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in its favor and grant the following relief:

A.      Declare that the Department's issuance of the Notices of Non-Continuation and subsequent Denials of Request for Reconsideration constitutes final agency action that is arbitrary, capricious, contrary to law, and in excess of statutory authority, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A) and (C);

B.      Declare that the Department's actions violate the Spending Clause and separation-of-powers principles of the United States Constitution;

C.      Declare that the Department's actions violate Plaintiffs' rights under the First Amendment and the Due Process Clause of the Fifth Amendment;

Supp. App. - 025

D.      Vacate and set aside the Notices of Non-Continuation and Denials of Request for

Reconsideration issued to Plaintiffs for its Full-Service Community Schools grants;

E.      Order the Department to, consistent with applicable statutes and regulations,

review Plaintiffs' eligibility for a continuation award and, if necessary, to release such funding;

F.      Preliminarily and permanently enjoin the Department, its officers, agents,

servants, employees, and all persons acting in concert with it from enforcing the challenged

Notices of Non-Continuation and Denials of Request for Reconsideration;

G.      Enjoin the Department from denying continuation funding based on extra-

statutory, retroactive, or viewpoint-based criteria not authorized by Congress or disclosed

through lawful rulemaking;

H.      Retain jurisdiction over this action to ensure compliance with the Court's orders

and to provide such further relief as justice may require;

I.      Award Plaintiffs its reasonable attorneys' fees and costs; and

J.      Grant such other and further relief as the Court deems just and proper.

Dated: December 29, 2025                    Respectfully Submitted,

/s/ Jocelyn Skinner
Jocelyn (Josie) E. Skinner*
Emily K. Merolli*
SLIGO LAW GROUP, PLLC
1717 K St. NW, suite 900
Washington, DC 20006
Tel: (202) 888-2084
josie@sligolawgroup.com
emily@sligolawgroup.com

/s/ Aneel Chablani
Aneel L. Chablani (No. 6242658)
Beatriz A. Diaz-Pollack (No. 6274809)
Michael R. Ortega (No. 6339469)**
Chicago Lawyers' Committee for Civil
Rights
25 E. Washington St., Ste. 1300
Chicago, IL 60602
Telephone: (312) 630-9744
Facsimile: (312) 630-1127
achablani@clccrul.org
bdiaz-pollack@clccrul.org
mortega@clccrul.org

Supp. App. - 026

Attorneys for Metropolitan Family Services and Action for Children and Teens Now (ACT Now) Coalition

*Pro hac vice motion forthcoming

**Application for admission pending

# Exhibit 5

S215J230149 - 24

Lesley Rivers
Metropolitan Family Services
101 N Wacker
Floor 17
Chicago, IL 60606

S215J230149 - 24

Theresa Nihill
Metropolitan Family Services
101 N Wacker
Floor 17
Chicago, IL 60606

S215J230149 - 24



## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

<table>
<tr><td><b>1</b></td><td>RECIPIENT NAME<br><br>Metropolitan Family Services<br>101 N Wacker<br>Floor 17<br>Chicago, IL 60606</td><td><b>2</b></td><td>AWARD INFORMATION<br><br>PR/AWARD NUMBER   S215J230149 - 24<br>ACTION NUMBER   5<br>ACTION TYPE   Continuation<br>AWARD TYPE   Discretionary<br>(Research and Development)</td></tr>
<tr><td><b>3</b></td><td>PROJECT STAFF<br><br>RECIPIENT PROJECT DIRECTOR<br>  Lesley Rivers   (312) 273-8252<br>  RiversL@actnowillinois.org<br>EDUCATION PROGRAM CONTACT<br>  Stephen Kostyo   (202) 987-1966<br>  Stephen.Kostyo@ed.gov<br>EDUCATION PAYMENT HOTLINE<br>  G5 PAYEE HELPDESK   888-336-8930<br>  obssed@servicenowservices.com</td><td><b>4</b></td><td>PROJECT TITLE<br><br>84.215J<br>Expanding Full Service Community Schools in Illinois</td></tr>
</table>

**5** KEY PERSONNEL

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| Lesley Rivers | Project Director | 50 % |

**6** AWARD PERIODS

BUDGET PERIOD   01/01/2025 - 12/31/2025
PERFORMANCE PERIOD   01/01/2024 - 12/31/2028

FUTURE BUDGET PERIODS

| BUDGET PERIOD | DATE | AMOUNT |
|---|---|---|
| 3 | 01/01/2026 - 12/31/2026 | $9,420,400.00 |
| 4 | 01/01/2027 - 12/31/2027 | $9,420,400.00 |
| 5 | 01/01/2028 - 12/31/2028 | $9,420,400.00 |

**7** AUTHORIZED FUNDING

THIS ACTION   $9,093,852.00
BUDGET PERIOD   $9,093,852.00
PERFORMANCE PERIOD   $18,514,252.00

**8** ADMINISTRATIVE INFORMATION

UEI   PDNNR2MS6AX3
REGULATIONS   CFR PART 20 USC 7423-7423b
EDGAR AS APPLICABLE
2 CFR AS APPLICABLE
ATTACHMENTS   2 , 3 , 6 , 8 , 9 , 11 , 12 , 13 , 14 , B OESE , GE1 , GE2 , GE3 , GE4 , GE5

**9** LEGISLATIVE AND FISCAL DATA

AUTHORITY:   PL XXX V, PART D, SUBPART 1 EVERY STUDENT SUCCEEDS ACT,
TITLE IV, PART F SUBPART 2, SECTION 4625
PROGRAM TITLE:   INNOVATIVE APPROACHES TO LITERACY; FULL-SERVICE
COMMUNITY SCHOOLS; AND PROMISE NEIGHBORHOOD

S215J230149 - 24



## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

CFDA/SUBPROGRAM NO:      84.215J

| FUND CODE | FUNDING YEAR | AWARD YEAR | ORG. CODE | CATEGORY | LIMITATION | ACTIVITY | CFDA | OBJECT CLASS | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| 0203M | 2024 | 2025 | ES000000 | B | GNH | 000 | 215 | 4101C | $9,093,852.00 |

**10**

PR/AWARD NUMBER:           S215J230149 - 24

RECIPIENT NAME:            Metropolitan Family Services

GRANTEE NAME:             METROPOLITAN FAMILY SERVICES

101 N WACKER DR STE 1700,

CHICAGO, IL 60606 - 7384

PROGRAM INDIRECT COST TYPE:    Restricted

PROJECT INDIRECT COST RATE:

TERMS AND CONDITIONS

(1)  The Office of Management and Budget requires all Federal agencies to assign a Federal Award Identifying Number (FAIN) to each of their financial assistance awards. The PR/AWARD NUMBER identified in Block 2 is your FAIN. If subawards are permitted under this grant, and you choose to make subawards, you must document the assigned PR/AWARD NUMBER (FAIN) identified in Block 2 of this Grant Award Notification on each subaward made to a subrecipient under this grant.
The term subaward means:
1) An award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor [See 2 CFR 200.331(a)(5)], beneficiary, or participant. A subaward may be provided through any form of legal agreement consistent with criteria in with 200.331, including an agreement the pass-through entity considers a contract. See 2 CFR 200.1.

In accordance with 2 CFR 200.331 (a), a subaward is made to a subrecipient for the purpose of carrying out a portion of the Federal award and creates a Federal financial assistance relationship with a subrecipient. Characteristics that support the classification of the entity as a subrecipient include, but are not limited to, when the entity:

1) Determines who is eligible to receive what Federal assistance;
2) Has its performance measured in relation to whether the objectives of a Federal program were met;
3) Has responsibility for programmatic decision-making;
4) Is responsible for adherence to applicable Federal program requirements specified in the Federal award; and
5) Implements a program for a public purpose specified in authorizing statute, as opposed to providing goods or services for the benefit of the pass-through entity.

(2)  THE FOLLOWING ITEMS ARE INCORPORATED IN THE GRANT AGREEMENT:
1) THE RECIPIENT'S APPLICATION (BLOCK 2);
2) THE APPLICABLE EDUCATION DEPARTMENT REGULATIONS: 2 CFR PART 180, NONPROCUREMENT DEBARMENT AND SUSPENSION AS ADOPTED AT 2 CFR PART 3485; 2 CFR PART 200 AS ADOPTED AT 2 CFR 3474 (BLOCK 8), AND 34 CFR PARTS 75, 77, 79, 81, 82, 84, 86, 97, 98, 99; AND THE PROGRAM REGULATIONS SPECIFIED IN BLOCK 8; AND
3) THE SPECIFIC CONDITIONS SHOWN AS ATTACHMENTS IN BLOCK 8 ON THE INITIAL AWARD APPLY UNTIL CHANGED.
THIS AWARD SUPPORTS ONLY THE BUDGET PERIOD SHOWN IN BLOCK 6. IN ACCORDANCE WITH 34 CFR 75.253, A GRANTEE, IN ORDER TO RECEIVE A CONTINUATION AWARD FROM THE SECRETARY FOR A BUDGET PERIOD AFTER THE FIRST BUDGET PERIOD OF AN APPROVED MULTIYEAR PROJECT, MUST 1) EITHER
(I) DEMONSTRATE THAT IT HAS MADE SUBSTANTIAL PROGRESS IN ACHIEVING
(A) THE GOALS AND OBJECTIVES OF THE PROJECT; AND

S215J230149 - 24



**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

(B) THE PERFORMANCE TARGETS IN THE GRANTEE'S APPROVED APPLICATION, IF THE SECRETARY ESTABLISHED PERFORMANCE MEASUREMENT REQUIREMENTS FOR THE GRANT IN THE APPLICATION NOTICE; OR

(II) OBTAIN THE SECRETARY'S APPROVAL FOR CHANGES TO THE PROJECT THAT

(A) DO NOT INCREASE THE AMOUNT OF FUNDS OBLIGATED TO THE PROJECT BY THE SECRETARY; AND

(B) ENABLE THE GRANTEE TO ACHIEVE THE GOALS AND OBJECTIVES OF THE PROJECT AND MEET THE PERFORMANCE TARGETS OF THE PROJECT, IF ANY, WITHOUT CHANGING THE SCOPE OR OBJECTIVES OF THE PROJECT;

2) SUBMIT ALL REPORTS AS REQUIRED BY 75.118;

3) CONTINUE TO MEET ALL APPLICABLE ELIGIBILITY REQUIREMENTS OF THE GRANT PROGRAM;

4) MAINTAIN FINANCIAL AND ADMINISTRATIVE MANAGEMENT SYSTEMS THAT MEET THE REQUIREMENTS IN 2 CFR 200.302 AND 200.303; AND

5) RECEIVE A DETERMINATION FROM THE SECRETARY THAT CONTINUATION OF THE PROJECT IS IN THE BEST INTEREST OF THE FEDERAL GOVERNMENT.

IN ACCORDANCE WITH 2 CFR 200.308(f)(2) CHANGES TO KEY PERSONNEL IDENTIFIED IN BLOCK 5 MUST RECEIVE PRIOR APPROVAL FROM THE DEPARTMENT.

THE SECRETARY ANTICIPATES FUTURE FUNDING FOR THIS AWARD ACCORDING TO THE SCHEDULE IDENTIFIED IN BLOCK 6. THESE FIGURES ARE ESTIMATES ONLY AND DO NOT BIND THE SECRETARY TO FUNDING THE AWARD FOR THESE PERIODS OR FOR THE SPECIFIC AMOUNTS SHOWN. THE RECIPIENT WILL BE NOTIFIED OF SPECIFIC FUTURE FUNDING ACTIONS THAT THE SECRETARY TAKES FOR THIS AWARD.

(3) Unless this grant solely funds research, you must comply with new regulations regarding awards to faith-based organizations (FBOs) that provide beneficiary services under this grant or under a contract you award to provide beneficiary services under this grant. These new regulations clarify the rights of FBOs and impose certain duties on FBOs regarding the referral of beneficiaries they serve. See 34 CFR 75.52, 75.712-75.714, appendix A to part 75, and 2 CFR 3474.15. The Department has established a web page that provides guidance on the new regulations, including FAQs and other implementation tools, which is available at http://www2.ed.gov/policy/fund/reg/fbci-reg.html. If you have any questions about these regulations, please contact the Education Program Contact identified in Block 3 of this GAN.

(4) Reimbursement of indirect costs is subject to the availability of funds and statutory and regulatory restrictions (34 CFR 75.564(a) and 34 CFR 76.562(a)). The negotiated indirect cost rate agreement authorizes a recipient to draw down indirect costs from the grant awards (34 CFR 75.564(b) and 34 CFR 76.562(b)). The following conditions apply to the below entities.

A. All entities (other than Institutions of Higher Education (IHE)

The GAN for this grant award shows the indirect cost rate that applies on the date of the initial grant for this project. However, after the initial grant date, when a new indirect cost rate agreement is negotiated, the newly approved indirect cost rate supersedes the indirect cost rate shown on the GAN for the initial grant. This new indirect cost rate should be applied according to the period specified in the indirect cost rate agreement, unless expressly limited under statutes, departmental regulations (Education Department General Administrative Regulations (EDGAR)), or program regulations. Any grant award with an approved budget can amend the budget to account for a change in the indirect cost rate. However, for a discretionary grant award any material changes to the budget which may impact the scope or objectives of the grant must be discussed with the program officer at the Department. See 34 CFR 75.560 (d)(3) (ii) (part 75 of EDGAR).

B. Institutions of Higher Education (IHE)

Under 2 CFR part 200, Appendix III, Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), the Department must apply the negotiated indirect cost rate in effect on the date of the initial grant award to every budget period of the project, including all continuation grants made for this

S215J230149 - 24



**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

project. See 2 CFR Part 200, Appendix III, paragraph C.7. Therefore, the GAN for each continuation grant will show the original indirect cost rate and it applies to the entire period of performance of this project. If the indirect cost rate agreement that is applicable to this grant does not extend to the end of the grant project period, the indirect cost rate set at the start of the project period must still be applied to the end of project period regardless of the fact that the rate has otherwise expired.

## LISA HARRISON
Digitally signed by LISA HARRISON
Date: 2024.12.20 14:02:05 -05'00'

————————————————————————————     ——————————

**AUTHORIZING OFFICIAL**                                      **DATE**

Ver. 1

# EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**     (See Block 2 of the Notification)

**1. RECIPIENT NAME -** The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION -**   Unique items of information that identify this notification.

> **PR/AWARD NUMBER -**   A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

> **ACTION NUMBER -**  A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

> **ACTION TYPE -**  The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

> **AWARD TYPE -**  The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF -**  This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

> **\*RECIPIENT PROJECT DIRECTOR -**  The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

> **EDUCATION PROGRAM CONTACT -**  The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

> **EDUCATION PAYMENT CONTACT -**  The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER -**  Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL -** Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS -**   Project activities and funding are approved with respect to three different time periods, described below:

> **BUDGET PERIOD -**  A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

> **PERFORMANCE PERIOD -**  The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

> **\*FUTURE BUDGET PERIODS -**  The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING -**  The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

> **\*THIS ACTION -** The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

> **\*BUDGET PERIOD -** The total amount of funds available for use by the grantee during the stated budget period to this date.

> **\*PERFORMANCE PERIOD -** The amount of funds obligated from the start date of the first budget period to this date.

> **RECIPIENT COST SHARE -**  The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

> **RECIPIENT NON-FEDERAL AMOUNT -** The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION -**  This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

> **UEI -**     The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

Case: 23-3473     Document: 20     Filed: 09/06/2026     Pages: 494

**\*REGULATIONS -** Title 2 of the Code of Federal Regulations (CFR), Part 200 as adopted at 2 CFR 3474, the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS -** Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA -** The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS -** The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award. **AMOUNT -** The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS -** Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER -** The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME -** The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE -** The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE -** The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL -** The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award

**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF -** The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT -** The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT -** The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT -** The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE -** If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

\* This item differs or does not appear on formula and block grants.

# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF THE CHIEF FINANCIAL OFFICER
## & CHIEF INFORMATION OFFICER

Lesley Rivers
Metropolitan Family Services
101 N Wacker
Floor 17

Chicago, IL 60606

SUBJECT: Payee Verification for Grant Award S215J230149 - 24

This is to inform you of the payee for the above listed grant award issued by the United States Department of Education

Grantee UEI: PDNNR2MS6AX3
Grantee Name: METROPOLITAN FAMILY SERVICES

Payee UEI: PDNNR2MS6AX3
Payee Name: METROPOLITAN FAMILY SERVICES

If any of the above information is not correct, please contact a Payee Customer Support Representative at 1-888-336-8930. Please send all the correspondence relating to the payee or bank information changes to the following address:

U.S. Department of Education
550 12th Street, SW
Room 6087
Washington, DC 20202

Attn: Stephanie Barnes
Phone: 202-245-8006

**GAN ATTACHMENT 2**
**Revised 10 2024**

**SPECIFIC GRANT TERMS AND CONDITIONS FOR**
**FINANCIAL AND PERFORMANCE REPORTS**

**PERFORMANCE REPORTS:**

**(1) FINAL REPORTS - ALL RECIPIENTS** are required to submit a final performance report within 120 days after the expiration or termination of grant support in accordance with submission instructions provided in box 10 of the Grant Award Notification (GAN), or through another notification provided by the Department of Education (Department) (2 CFR § 200.329(c)).

**(2) ANNUAL, QUARTERLY, or SEMIANNUAL REPORTS - ALL RECIPIENTS** of a multi-year discretionary award must submit an annual Grant Performance Report (34 CFR § 75.118). The annual performance report shall provide the most current performance and financial expenditure information that is sufficient to meet the reporting requirements of 2 CFR §§ 200.328, 200.329, 200.332, and 34 CFR §§ 75.590; 75.718; 75.720; 75.623; and 75.732.

Your education program contact will provide you with information about your performance report submissions, including the due date, as a grant term or condition in box 10 on the GAN, or through another notification provided by the Department. The grant term or condition in box 10 on the GAN or another notification may reflect any of the following:

1. That a performance report is due before the next budget period begins. The report should contain current performance and financial expenditure information for this grant. It will either identify the date the performance report is due or state that the Department will provide additional information about this report, including due date, at a later time.

2. That an interim performance report is required because of the nature of the award or because of statutory or regulatory provisions governing the program under which this award is made, and that the report is due more frequently than annually as indicated, e.g., due quarterly and submitted within 30 days after the end of each quarter, or due semiannually and submitted within 30 days after the end of each 6-month period (2 CFR § 200.329(c)(1)).

3. That other reports are required, e.g., program specific reports required in a program's statute or regulation or specific conditions are applied (2 CFR § 200.208).

**(3) FINANCIAL REPORTS – SOME RECIPIENTS:**

If a financial report is required, your education program contact will provide you with information about your financial report submission, including the due date, as a grant term or condition in box 10 on the GAN, or through another notification.

A Standard Form (SF) 425 Federal Financial Report (FFR) is required if:

1. A grant involves cost sharing, and the ED 524B, which collects cost sharing information, is not submitted or a program-specific report approved by U.S. Office of Management and Budget (OMB) does not collect cost sharing information;
2. Program income was earned;

1

**GAN ATTACHMENT 2**
**Revised 04/2024**

3. Indirect cost information is to be reported and the ED 524B was not used or a program-specific report approved by OMB does not collect indirect cost information;
4. Program regulations or statute require the submission of the FFR; or
5. Specific Award Conditions, or specific grant or subgrant conditions for designation of "high risk," were imposed in accordance with 2 C.F.R. part 200.208 and part 3474.10 and required the submission of the FFR.

If the FFR is required, the notification may indicate one of the following (see the form and its instructions at Standard Form (SF) 425 Federal Financial Report (FFR)):

1. Quarterly - FFRs are required for reporting periods ending on 12/31, 03/31, 06/30, 09/30, and are due within 30 days after each reporting period.

2. Semi-annual - FFRs are required for reporting periods ending on 03/31 and 09/30, and are due within 30 days after each reporting period.

3. Annual - FFRs are required for reporting period ending 09/30, and is due within 30 days after the reporting period.

4. Final - In coordination with the submission of final performance reports, FFRs are due within 120 days after the project or grant period end date (2 CFR § 200.328).

When completing an FFR for submission, the following must be noted:

1. *Multiple Grant Reporting Using SF 425A Prohibited:* While the FFR is a governmentwide form that is designed for single grant and multiple grant award reporting, the Department's policy is that multiple grant award reporting is not permitted for Department grants. Thus, a Department grantee that is required to submit an FFR in accordance with any of the above referenced selections must complete and submit one FFR for each of its grants. Do not use the FFR attachment (Standard Form 425A), which is available for reporting multiple grants, for reporting on Department grants. As such, references to multiple grant reporting and to the FFR attachment in item 2 of the FFR are not applicable to Department grantees. With regards to item 1 of the note found in the FFR Instructions, a grantee must complete items 10(a) through 10(o) for each of its grants. The multiple grant and FFR attachment reference found in item 2 of the Line Item Instructions for the FFR is not applicable to Department grants.

2. *Program Income*: Unless disallowed by statute or regulation, a grantee will complete item 10(m) or 10(n) in accordance with the options or combination of options as provided in 2 CFR Part 200.307. A grantee is permitted, in accordance with 2 CFR Part 200.307, to add program income to its Federal share to further eligible project or program objectives, use program income to finance the non-Federal share of the project or program; and deduct program income from the Federal share of the total project costs.

3. *Indirect Costs:* A grantee will complete item 11(a) by listing the indirect cost rate type identified on its indirect cost rate agreement, as approved by its cognizant agency for indirect costs.

2

**GAN ATTACHMENT 2**
**Revised 04/2024**

A Department grantee that does not have an indirect cost rate agreement approved by its cognizant agency for indirect costs, and that is using the Department approved (beyond the 90-day temporary period) temporary indirect cost rate of 10% of budgeted direct salaries and wages, or the de minimis rate of 15% of modified total direct cost (MTDC) must list its indirect cost rate in 11(a) as a Department Temporary Rate or De Minimis Rate.  The de minimis rate of 15% of MTDC consists of:

> All direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and subawards and contracts up to the first $50,000 of each subaward (i.e., subgrant). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $50,000. Other items, including contract costs in excess of $50,000, may be excluded when necessary to avoid a serious inequity in the distribution of indirect costs (2 CFR 200.1 "Modified Total Direct Cost (MTDC)").

A training program grantee whose recovery of indirect cost limits indirect cost recovery to 8% of MTDC or the grantees negotiated indirect cost rate, whichever is less in accordance with 34 CFR § 75.562 (c), must list its rate in 11(a) as a Department Training Grant Rate.  The 8% limit does not apply to agencies of Indian tribal governments, local governments, and States[1] as defined in 2 CFR § 200.1.

A restricted program grantee must list its rate as a Restricted Indirect Cost Rate in 11(a).  A restricted program (i.e., programs with statutory supplement-not-supplant requirements) grantee must utilize a restricted indirect cost rate negotiated with its cognizant agency for indirect costs, or may elect to utilize a restricted indirect cost rate of 8% MTDC if their negotiated restricted indirect cost rate calculated under 34 CFR 75.563 and 76.564 – 76.569, is not less than 8% MTDC.  A State or local government[2] that is a restricted program grantee may not elect to utilize the 8% MTDC rate.  Additionally, restricted program grantees may not utilize the de minimis rate, but may utilize the temporary rate until a restricted indirect cost rate is negotiated.  If a restricted program grantee elects to utilize the temporary rate, it must list its rate as a Department Temporary Rate in 11(a).

Grantees with indirect cost rates prescribed in program statute or regulation must list their rate as a Rate Required in Program Statute or Regulation in 11(a).  Grantees are required to follow program-specific statutory or regulatory requirements that mandate either indirect cost rate type or maximum administrative costs recovery.

For detailed information including restrictions related to temporary, de minimis, training, restricted, and program prescribed indirect cost rates see GAN ATTACHMENT 4.

4.  *Supplemental Pages:* If grantees need additional space to report financial information, beyond what is available within the FFR, they should provide supplemental pages. These additional pages must indicate the following information at the top of each page: the PR/Award Number

---

[1] Note that a State-funded institution of higher education is not considered a "State government" for these purposes; and a Tribal college or university funded by a federally-recognized Tribe is not considered a Tribe for these purposes.
[2] Note that a State-funded institution of higher education is not considered a "State government" for these purposes.

3

**GAN ATTACHMENT 2**
**Revised 04/2024**

also known as the Federal Identifying Number or FAIN, recipient organization, Unique Entity Identifier, Employer Identification Number (EIN), and period covered by the report.


Upon request of the Secretary, a grantee must, at the time of submission to the Secretary, post any performance and financial reports on a public-facing website maintained by the grantee, after redacting any privacy or confidential business information (34 CFR § 75.720).

4

**GAN ATTACHMENT 3**
**Revised 10/2024**

## AN OVERVIEW OF AUDIT REQUIREMENTS OF STATES,
## LOCAL GOVERNMENTS, AND NONPROFIT ORGANIZATIONS

This GAN ATTACHMENT is **not** applicable to for-profit organizations.  For-profit organizations comply with audit requirements specified in block 10 of their Grant Award Notification (GAN).

**Summary of Audit Requirements for States, Local Governments, and Nonprofit Organizations:**

1. Single Audit.  A non-Federal entity (a State, local government, Indian tribe, Institution of Higher Education (IHE)[1], or nonprofit organization) that expends $1,000,000 or more in Federal awards during the non-Federal entity's fiscal year must have a single audit conducted annually in accordance with 2 CFR § 200.501, "Audit Requirements," except when it elects to have a program specific audit conducted.

2. Program-specific audit election.  When an auditee expends Federal awards under only one Federal program (excluding research and development (R&D)), and the Federal program's statutes, regulations, or the terms and conditions of the Federal award do not require a financial statement audit of the auditee, the auditee may elect to have a program-specific audit conducted.  A program–specific audit may not be elected for R&D unless all of the Federal awards expended were received from the same Federal agency, or the same Federal agency and the same pass-through entity, and that Federal agency, or pass-through entity in the case of a subrecipient, approves in advance a program-specific audit.

3. Exemption when Federal awards expended are less than $1,000,000.  A non-Federal entity that expends less than $1,000,000 during the non-Federal entity's fiscal year in Federal awards is exempt from Federal audit requirements for that year, except as noted in 2 CFR § 200.503, but records must be available for review or audit by appropriate officials of the Federal agency, pass-through entity, and Government Accountability Office (GAO). Generally, grant records must be maintained for a period of three years after the date of the final expenditure report (2 CFR § 200.334)

4. Federally Funded Research and Development Centers (FFRDC).  Management of an auditee that owns or operates a FFRDC may elect to treat the FFRDC as a separate entity (2 CFR § 501(e)).

5. Report Submission.  To meet audit requirements of U.S. Office of Management and Budget (OMB) Uniform Guidance: Cost Principles, Audit, and Administrative Requirements for Federal Awards (Uniform Guidance), grantees must submit all audit documents required by Uniform Guidance 2 CFR § 200.512, as well as relevant

---

[1] As defined under the Higher Education Act of 1965, as amended (HEA) section 101.

1

**GAN ATTACHMENT 3**
**Revised 10/2024**

SF-SAC workbook(s) electronically to the Federal Audit Clearinghouse at:
https://www.fac.gov/.

6.  The audit, the workbook(s), and reporting package must be submitted within of 30
    calendar days after receipt of the auditor's report(s) or nine months after the end of
    the audit period (whichever is earlier).  If the due date falls on a Saturday, Sunday,
    or Federal holiday, the reporting package is due the next business day.  The auditee
    must make copies available for public inspection unless restricted by Federal
    statutes or regulation.  Auditees and auditors must ensure that their respective
    parts of the reporting package do not include protected personally identifiable
    information (2 CFR § 200.512).

Additional grantee requirements can be found in Uniform Guidance §200.510, including:

- Preparing financial statements that reflect the grantee's financial position, results of operations
  or changes in net assets, and where appropriate, cash flows for the fiscal year audited;
- Preparing a schedule of expenditures of Federal awards (SEFA) for the period covered by the
  grantee's financial statements;
    - List Federal programs by Federal agency
    - For Federal awards received as a subrecipient, the name of the pass-through entity and
      assigned identifying number
    - Provide the total Federal awards expended for each Federal program and the Assistance
      Listing Number (ALN).  For a cluster of programs, also provide the total for the cluster
    - Include the total amount provided to subrecipients from each Federal program

Grantees are strongly urged to obtain the "OMB Compliance Supplement" and to contact their
cognizant agency for single audit technical assistance. This supplement will be instructive to both
grantees and their auditors.  Appendix III of the supplement provides a list of Federal Agency Contacts
for Single Audits, including addresses, phone numbers, fax numbers, and e-mail addresses for technical
assistance.

The designated cognizant agency for single audit purposes is "the Federal awarding agency that provides
the predominant amount of direct funding to the recipient." The Compliance Supplement will be
instructive to both grantees and their auditors.  Appendix III of the supplement provides a list of Federal
Agency Contacts for Single Audits, including addresses, phone numbers, fax numbers, and e-mail
addresses for technical assistance.

For single audit-related questions, if the U.S. Department of Education is the cognizant agency, grantees
should contact the Non-Federal Audit Team in the Department's Office of Inspector General, at oignon-
federalaudit@ed.gov.  Additional resources for single audits are also available on the Non-Federal Audit
Team's website at https://www2.ed.gov/about/offices/list/oig/nonfed/index.html.  For programmatic
questions, grantees should contact the education program contact shown on the Department's GAN.

Grantees can obtain information on audits from:

The OMB website at www.omb.gov.  Look under Office of Management and Budget (in right column)
then click Office of Federal Financial Management (to obtain the Current OMB Compliance Supplement

2

**GAN ATTACHMENT 3**
**Revised 10/2024**

in the right column).  The SF-SAC Workbooks and Instructions can be found at the Federal Audit Clearinghouse at:
https://facides.census.gov/Files/2019-2021%20Checklist%20Instructions%20and%20Form.pdf.

The American Institute of Certified Public Accountants (AICPA) has illustrative OMB Single Audit report examples that might be of interest to accountants, auditors, or financial staff that can be downloaded by searching for "single audit report illustrations" at www.aicpa-cima.com.

3

**GAN ATTACHMENT 6**
**Revised 10/2024**

### REQUEST FOR APPROVAL OF PROGRAM INCOME

In projects that generate program income, the recipient calculates the amount of program income according to the guidance given in 2 CFR Part 200.307, which addresses the use and expenditure of program income as well as the methods for use of program income

**\*\*\* IF YOU RECEIVED YOUR GRANT AWARD NOTIFICATION ELECTRONICALLY AND YOU ARE SUBJECT TO ANY OF THE RESTRICTIONS IDENTIFIED BELOW, THE RESTRICTION(S) WILL APPEAR IN BOX 10 ON YOUR GRANT AWARD NOTIFICATION AS A GRANT TERM OR CONDITION OF THE AWARD. \*\*\***

Unless checked below as NOT ALLOWED, the recipient may exercise any of the options or combination of options, as provided in 2 CFR Part 200.307, for using program income generated in the course of the recipient's authorized project activities:

_____ Not Allowed  Adding program income to funds committed to the project by the Secretary and recipient and using it to further eligible project or program objectives;

_____ Not Allowed  Using program income to finance the non-Federal share of the project or program; and

_____ Not Allowed  Deducting program income from the total allowable cost to determine the net allowable costs.

1

**GAN ATTACHMENT 8**
**Revised 10/2024**

## TRAFFICKING IN PERSONS

The Department of Education adopts the requirements of the Trafficking Victims Protection Act (TVPA) of 2000, as codified at 22 U.S.C. 7101 to 7115, in 22 U.S.C. 7104(g); 22 U.S.C. 7104a; 22 U.S.C. 7104b; and 22 U.S.C. 7104c into this grant through this condition as per the Code of Federal Regulations at 2 CFR Part 175 .

(a) Condition:

The Department, as authorized by 22 U.S.C. 7104b(c), may without penalty, terminate a grant or take any remedial actions if a recipient or subrecipient engages in:

(1) Severe forms of trafficking in persons;

(2) The procurement of a commercial sex act during the period of time that the grant or cooperative agreement is in effect;

(3) The use of forced labor in the performance of the grant or cooperative agreement; or

(4) Acts that directly support or advance trafficking in persons, including the following acts:

(i) Destroying, concealing, removing, confiscating, or otherwise denying an employee access to that employee's identity or immigration documents;

(ii) Failing to provide return transportation or pay for return transportation costs to an employee from a country outside the United States to the country from which the employee was recruited upon the end of employment if requested by the employee, unless:

(A) exempted from the requirement to provide or pay for such return transportation by the Department; or

(B) the employee is a victim of human trafficking seeking victim services or legal redress in the country of employment or a witness in a human trafficking enforcement action;

(iii) Soliciting a person for the purpose of employment, or offering employment, by means of materially false or fraudulent pretenses, representations, or promises regarding that employment;

(iv) Charging recruited employees a placement or recruitment fee; or

1

Supp. App. - 046

**GAN ATTACHMENT 8**
**Revised 10/2024**

(v) Providing or arranging housing that fails to meet the host country's housing and safety standards.

(b) Compliance plan and certification requirement:

(1) Prior to receiving a grant, if the estimated value of services required to be performed under the grant or cooperative agreement outside the United States exceeds $500,000, you must certify that:

(i) You have implemented a plan to prevent the activities described in paragraph (a) of this section, and are in compliance with this plan;

(ii) You have implemented procedures to prevent any activities described in paragraph (a) of this section and to monitor, detect, and terminate any subrecipient, contractor, subcontractor, or employee of the recipient engaging in any activities described in paragraph (a) of this section; and

(iii) To the best of your knowledge, neither you, nor any subrecipient, contractor, or subcontractor of the recipient or any agent of the recipient or of such a subrecipient, contractor, or subcontractor, is engaged in any of the activities described in paragraph (a) of this section.

(2) Annual certification. You must submit an annual certification consistent with paragraph (b)(1) of this section for each year the award is in effect.

(3) Compliance plan. Any plan or procedures implemented pursuant to paragraph (b) must be appropriate to the size and complexity of the grant or cooperative agreement and to the nature and scope of its activities, including the number of non-United States citizens expected to be employed.

(4) Copies of the compliance plan. The recipient must provide a copy of the plan to the grant officer upon request, and as appropriate, must post the useful and relevant contents of the plan or related materials on its website and at the workplace.

(5) Minimum requirements of the compliance plan. The compliance plan must include, at a minimum, the following:

(i) An awareness program to inform recipient employees about the Government's policy prohibiting trafficking-related activities described in paragraph (a) of this section, the activities prohibited, and the actions that will be taken against the employee for violations. Additional information about Trafficking in Persons and examples of awareness programs can be found at the website for the Department of State's Office to Monitor and Combat Trafficking in Persons at http://www.state.gov/j/tip/.

2

**GAN ATTACHMENT 8**
**Revised 10/2024**

(ii) A process for employees to report, without fear of retaliation, activity inconsistent with the policy prohibiting trafficking in persons.

(iii) A recruitment and wage plan that only permits the use of recruitment companies with trained employees, prohibits charging recruitment fees to the employees or potential employees and ensures that wages meet applicable host-country legal requirements or explains any variance.

(iv) A housing plan, if the recipient, subrecipient, contractor, or subcontractor intends to provide or arrange housing, that ensures that the housing meets host-country housing and safety standards.

(v) Procedures to prevent agents, subrecipients, contractors, or subcontractors at any tier and at any dollar value from engaging in trafficking in persons, including activities in paragraph (a) of this section, and to monitor, detect, and terminate any agents, subgrants, or subrecipient, contractor, or subcontractor employees that have engaged in such activities.

(c) Notification to Inspectors General and cooperation with government. In addition, you must:

(1) Immediately inform the Department and Inspector General of the Department of any information you receive from any source that alleges credible information that you, any subrecipient, contractor, or subcontractor, or any agent of your organization or subrecipient, contractor, or subcontractor, has engaged in conduct described in paragraph (a) of this section; and

(2) Fully cooperate with any Federal agencies responsible for audits, investigations, or corrective actions relating to trafficking in persons.

3

**GAN ATTACHMENT – 9**
**Revised 10/2024**

FEDERAL FUNDING ACCOUNTABILITY TRANSPARENCY ACT
REPORTING SUBAWARDS AND EXECUTIVE COMPENSATION

The Federal Funding Accountability and Transparency Act (FFATA) is designed to increase transparency and improve the public's access to Federal government information.  To this end, FFATA requires that Department of Education (Department) grant recipients:

1.  Report **first-tier subawards** made under Federal grants that are funded at $30,000 or more that meet the reporting conditions as set forth in this grant award term;
2.  Report a subaward if a modification increases the Federal funding to an amount that equals or exceeds $30,000;
3.  Report their executives' compensation for all new Federal grants that are funded at $30,000 and that meet the reporting conditions as set forth in this grant award term; and
4.  Report executive compensation data for their **first-tier subrecipients** that meet the reporting conditions as set forth in this grant award term.

For FFATA reporting purposes, the Department grant recipient is the entity listed in box 1 of the Grant Award Notification.

Only **first-tier subawards** made by the Department grant recipient to its **first-tier subrecipients** and the **first-tier subrecipients'** executive compensation are required to be reported in accordance with FFATA.

*Subaward, Subrecipient, Recipient, Total Compensation, Executives*, and other key terms, are defined within item 5, Definitions, of this grant award term.

This grant award term is issued in accordance with 2 CFR Part 170—Reporting Subaward And Executive Compensation Information.

1.  ***Reporting of First-tier Subawards -***

a.  *Applicability and what to report.*

Unless you are exempt as provided item 4, Exemptions, of this grant award term, you must report each obligation that **equals or exceeds $30,000** in Federal funds for a first-tier subaward to a non-Federal entity or Federal agency.

You must report the information about each obligating action that are specified in the submission instructions posted at FSRS.

b.  *Where and when to report.*

The Department grant recipient must report each obligating action described in paragraph **1.a.** of this award term to FSRS.

Report subaward information no later than the end of the month following the month in which the subaward obligation was made. For example, if the obligation was made on November 7, 2025, the obligation must be reported by no later than December 31, 2025.

Supp. App. - 049

**GAN ATTACHMENT – 9**
**Revised 10/2024**

**2.** ***Reporting Total Compensation of the Department's Grant Recipients' Executives -***

a. *Applicability and what to report.*

You must report total compensation for each of your five most highly compensated executives for the preceding completed fiscal year, if—

i    The total Federal funding authorized to date under this Federal award **equals or exceeds $30,000**;

ii    In the preceding fiscal year, you received—

    A.  80 percent or more of your annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards), **and**

    B.  $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); **and**,

    C.  The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986 after receipt of a subaward.  (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.)

b. *Where and when to report.*

You must report executive total compensation described in paragraph **2.a.** of this grant award term:

i.    As part of your registration profile at https://www.sam.gov.

ii.    No later than the month following the month in which this award is made and annually after that. (For example, if the obligation was made on November 7, 2025, the executive compensation must be reported by no later than December 31, 2025, and annually thereafter.)

**3.** ***Reporting of Total Compensation of Subrecipient Executives –***

a. *Applicability and what to report.*

Unless you are exempt as provided in item 4, Exemptions, of this award term, for each first-tier **non-Federal entity** subrecipient under this award, you shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if—

2

Supp. App. - 050

**GAN ATTACHMENT – 9**
**Revised 10/2024**

    i    The total Federal funding authorized to date under this Federal award **equals or exceeds $30,000**;

    ii    In the preceding fiscal year, you received—

    A.    80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards), **and**

    B.    $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); **and**,

    C.    The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986 after receipt of a subaward. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.)

b.   *Where and when to report.*

You must report subrecipient executive total compensation described in paragraph **3.a.** of this grant award term:

    i.    In FSRS. You must include a condition on subawards that requires the subrecipients to timely report the information required under paragraph **3.a.** to you the prime awardee, or in the SAM.gov. Subrecipient executive compensation entered in SAM.gov by the subrecipient will pre-populate in FSRS, so you do not have to report when subrecipients enter this information in SAM.gov. Subrecipient executive compensation not entered in SAM.gov by the subrecipient is reported in FSRS by you the Department grant recipient.

    ii.    No later than the end of the month following the month during which you make the subaward. For example, if the subaward obligation was made on November 7, 2025 the subrecipient's executive compensation must be reported by no later than December 31, 2025.

**4.**   *Exemptions –*

a.   If, in the previous tax year, you had gross income, from all sources, under $300,000, you are exempt from the requirements to report:

    i.    Subawards, and

    ii.    The total compensation of the five most highly compensated executives of any **subrecipient**.

**5.**   *Definitions -*

a.   For purposes of this award term:

Supp. App. - 051

**GAN ATTACHMENT – 9**
**Revised 10/2024**

Entity includes:

(1) Whether for profit or nonprofit:

(i) A corporation;

(ii) An association;

(iii) A partnership;

(iv) A limited liability company;

(v) A limited liability partnership;

(vi) A sole proprietorship;

(vii) Any other legal business entity;

(viii) Another grantee or contractor that is not excluded by subparagraph (2); and

(ix) Any State or locality;

(2) Does not include:

(i) An individual recipient of Federal financial assistance; or

(ii) A Federal employee.

Executive means an officer, managing partner, or any other employee holding a management position.

Subaward has the meaning given in 2 CFR § 200.1.

Subrecipient has the meaning given in 2 CFR § 200.1.

Total Compensation means the cash and noncash dollar value an executive earns during an entity's preceding fiscal year. This includes all items of compensation as prescribed in 17 CFR § 229.402(c)(2).

4

**GAN ATTACHMENT 11**
**Revised 10/2024**

## SPECIFIC CONDITIONS FOR DISCLOSING
## FEDERAL FUNDING IN PUBLIC ANNOUNCEMENTS

When issuing statements, press releases, requests for proposals, bid solicitations and other documents describing projects or programs funded in whole or in part with Federal money, U.S. Department of Education grantees shall clearly state:

1) the percentage of the total costs of the program or project which will be financed with Federal money;

2) the dollar amount of Federal funds for the project or program; and

3) the percentage and dollar amount of the total costs of the project or program that will be financed by non-governmental sources.

1

**GAN ATTACHMENT 12**
**10/2024**

### PROHIBITION OF TEXT MESSAGING AND EMAILING WHILE DRIVING
### DURING OFFICIAL FEDERAL GRANT BUSINESS

Federal grant recipients, subrecipients, and their grant personnel are prohibited from text messaging while driving a government owned vehicle, or while driving their own privately-owned vehicle during official grant business, or from using government supplied electronic equipment to text message or email when driving.

Recipients must comply with these conditions under Executive Order 13513, "Federal Leadership on Reducing Text Messaging While Driving," October 1, 2009.

1

**GAN ATTACHMENT 13**
**Revised 10/2024**

### REGISTRATION OF UNIQUE ENTITY IDENTIFIER (UEI) NUMBER AND TAXPAYER IDENTIFICATION NUMBER (TIN) IN THE SYSTEM FOR AWARD MANAGEMENT (SAM.gov)

The U.S. Department of Education's (Department) Grants Management System (G5) disburses payments via the U.S. Department of Treasury (Treasury).  The U.S. Treasury requires that we include your Tax Payer Identification Number (TIN) with each payment.   Therefore, to do business with the Department you must have a registered Unique Entity Identifier (UEI) and TIN number in SAM.gov, the U.S. Federal Government's primary registrant database.

What is a UEI?  SAM.gov assigns a UEI to entities when they pass validation in SAM.gov. The UEI is a 12-character alphanumeric identifier used in SAM.gov and other federal government systems to identify a unique entity.

If the payee UEI number is different than your grantee UEI number, both numbers must be registered in SAM.gov. Failure to register both will delay the receipt of payments from the Department.

What is a TIN?  A TIN is an identification number used by the Internal Revenue Service (IRS) in the administration of tax laws. It is issued either by the Social Security Administration (SSA) or by the IRS. A Social Security number (SSN) is issued by the SSA whereas all other TINs are issued by the IRS.

The following are all considered TINs according to the IRS.

- Social Security Number "SSN"
- Employer Identification Number "EIN"
- Individual Taxpayer Identification Number "ITIN"
- Taxpayer Identification Number for Pending U.S. Adoptions "ATIN"
- Preparer Taxpayer Identification Number "PTIN"

If your UEI number is not currently registered with SAM.gov, you can easily register by going to www.sam.gov.  Allow at least ten business days after you submit your registration for it to become active in SAM.gov.  If you need a new TIN, please allow 2-5 weeks for your TIN to become active.  If you need assistance during the registration process, you may contact the Federal Service Desk (FSD).  Live chat information and other information about the FSD is available at: GSAFSD Service Portal Landing - GSA Federal Service Desk Service Portal.

If you are currently registered with SAM.gov, you may not have to make any changes.  However, please take the time to validate that the TIN associated with your UEI is correct.

If you have any questions or concerns, please contact the G5 Hotline at 888-336-8930.

**GAN ATTACHMENT 14**
**Revised 10/2024**

## SYSTEM FOR AWARD MANAGEMENT REQUIREMENTS FOR RECIPIENTS AND THEIR SUBRECIPIENTS

**1.   Requirement for System for Award Management (SAM.gov)**

Unless you are exempted from this requirement under 2 CFR § 25.110, you are, in accordance with your grant program's Notice Inviting Applications, required to maintain an active SAM.gov registration with current information about your organization, including information on your immediate and highest level owner and subsidiaries, as well as on all predecessors that have been awarded a Federal contract or grant within the last three years, if applicable, at all times during which you have an active Federal award or an application or plan under consideration by a Federal awarding agency.  To remain registered in SAM.gov after your initial registration, you are required to review and update your information in SAM.gov on an annual basis from the date of initial registration or subsequent updates to ensure it is current, accurate and complete.

2.   **Recipient Requirements of Subrecipients**

In accordance with 2 CFR § 25.300 you are required to ensure that your subrecipients have a Unique Entity Identifier (UEI).  Note that subrecipients are not required to complete full registration in SAM.gov to obtain a UEI, which is required for an entity to **directly** do business with the Federal government. Instead, subrecipients may obtain a UEI by signing up in SAM.gov to get an account and establish a profile.

You may not make a subaward to a subrecipient that has not obtained a UEI and provided it to you, and you are required to notify any potential subrecipients that you cannot make a subaward unless the subrecipient obtains a UEI and provides it to you.

**3.   Definitions**

For purposes of this award term:

1.   System for Award Management (SAM.gov) means the Federal repository into which a recipient must provide information required for the conduct of business as a recipient. See 2 CFR 25.400.

2.   Unique Entity Identifier (UEI) Means the universal identifier assigned by SAM.gov to uniquely identify business entities. See 2 CFR 25.400.

3.   Recipient means an entity that receives a Federal award directly from a Federal agency to carry out an activity under a Federal program. The term recipient does not include subrecipients or individuals that are participants or beneficiaries of the award. See 2 CFR 200.1.

4.   Subaward means an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant. A subaward may be provided through any form of legal agreement consistent with criteria in with § 200.331, including an agreement the pass-through entity considers a contract. See 2 CFR 200.1.

1

Supp. App. - 056

5.  Subrecipient means an entity that receives a subaward from a pass-through entity to carry out part of a Federal award. The term subrecipient does not include a beneficiary or participant. A subrecipient may also be a recipient of other Federal awards directly from a Federal agency. See 2 CFR 200.1.

2

**ATTACHMENT B**
**SPECIAL GRANT TERMS AND CONDITIONS FOR**
**FINANCIAL AND PERFORMANCE REPORTS**

**PERFORMANCE REPORTS:**

**ALL RECIPIENTS** are required to submit a final performance report within 90 days after the expiration or termination of grant support.

**ALL RECIPIENTS** of a multi-year discretionary award must submit an annual Grant Performance Report. The report should contain current performance and financial expenditure information for this grant. (34 CFR 75.118)

**\*\*\* IF YOU HAVE RECEIVED YOUR GRANT AWARD NOTIFICATION ELECTRONICALLY, THE ITEMS BELOW WILL NOT BE CHECKED. YOUR EDUCATION PROGRAM CONTACT WILL PROVIDE YOU WITH INFORMATION ABOUT YOUR PERFORMANCE REPORT SUBMISSIONS, INCLUDING THE DUE DATE, AS A GRANT TERM OR CONDITION IN BOX 10 ON THE GRANT AWARD NOTIFICATION, OR THROUGH ANOTHER NOTIFICATION AT A LATER TIME. \*\*\***

Refer to the item(s) checked below for other reporting requirements that may apply to this grant:

_____1. A performance report is due before the next budget period begins. The report should contain current performance and financial expenditure information for this grant. (34 CFR 75.118)

_____The continuation report is due on _____.

_____The Department will provide recipients with additional information about this report, including due date, at a later time.

_____2. An interim performance report is required because of the nature of this award or because of statutory or regulatory provisions governing the program under which this award is made. The report is due more frequently than annually as indicated:

_____Quarterly  Submit within 30 days after the end of each quarter.

_____Semiannually  Submit within 30 days after the end of each 6-month period.

_____3. Other Required Reports:


**\*\*\* IF YOU HAVE RECEIVED YOUR GRANT AWARD NOTIFICATION ELECTRONICALLY, THE ITEMS BELOW WILL NOT BE CHECKED. IF A FINANCIAL REPORT IS REQUIRED, YOUR EDUCATION PROGRAM CONTACT WILL PROVIDE YOU WITH INFORMATION ABOUT YOUR FINANCIAL REPORT SUBMISSION, INCLUDING THE DUE DATE, AS A GRANT TERM OR CONDITION IN BOX 10 ON THE GRANT AWARD NOTIFICATION, OR THROUGH ANOTHER NOTIFICATION AT A LATER TIME. \*\*\***


**FINANCIAL REPORTS:**

Unless an item down below is checked, a Standard Form 425 Federal Financial Report (FFR) is not required for this grant. The Department will rely on the drawdown of funds by grant award and record such drawdowns as expenditures by grantees. (34 CFR 75.720)

_____Quarterly FFRs are required for reporting periods ending on 12/31, 03/31, 06/30, 09/30, and are due within 45 days after each reporting period.

_____Semi-annual FFRs are required for reporting periods ending on 03/31 and 09/30, and are due within 45 days after each reporting period.

_____An annual FFR is required for reporting period ending 09/30, and is due within 45 days after the reporting period.

_____A final FFR is due within 90 days after the project or grant period end date.

A quarterly, semi-annual, annual, and/or final FFR as noted hereinabove is due for this grant because:

_____(34 CFR 74.14 or 80.12) Special Award Conditions or Special grant or subgrant conditions for "high-risk" grantees:

_____Statutory Requirement or Other Special Condition

**When completing an FFR for submission in accordance with the above referenced selection, the following must be noted:**

1.  While the FFR is a government wide form that is designed for single grant and multiple grant award reporting, the U.S. Department of Education's (EDs) policy is that multiple grant award reporting is not permitted for ED grants. Thus, an ED grantee that is required to submit an FFR in accordance with any of the above referenced selections must complete and submit one FFR for each of its grants. The FFR attachment (Standard Form 425A), which is available for reporting multiple grants, is not to be used for ED grants. As such, references to multiple grant reporting and to the FFR attachment in items 2, 5 and 10 of the FFR are not applicable to ED grantees. With regards to item 1 of the note found in the Federal Financial Report Instructions, it is EDs policy that a grantee must complete items 10(a) through 10(o) for each of its grants. The multiple award, multiple grant, and FFR attachment references found in items 2, 5, 6, before 10(a), in item 10(b), before 10(d), before 10(i) and before 10(l) of the Line Item Instructions for the Federal Financial Report are not applicable to ED grants.

2.  Unless disallowed by statute or regulation, a grantee will complete item 10(m) or 10(n) in accordance with the options or combination of options as provided in 34 CFR 74.24(a)-(h) and 34 CFR 80.25(a)-(h). A grantee is permitted, in accordance with 34 CFR 74.24(a)-(h) and 34 CFR 80.25(a)-(h), to add program income to its Federal share to further eligible project or program objectives, use program income to finance the non-Federal share of the project or program; and deduct program income from the Federal share of the total project costs.

3.  A grantee will complete item 11(a) by listing the rate type identified in its indirect cost rate agreement, as approved by its cognizant agency. An ED grantee that does not have an indirect cost rate agreement approved by its cognizant agency, and that is using the ED approved temporary rate of 10% of budgeted direct salaries and wages, must list its rate in 11(a) as an ED Temporary Rate. A training program grantee whose recovery of indirect cost is limited to 8% of a modified total direct cost base in accordance with EDGAR § 75.562 (c), must list its rate as an ED Training Grant Rate. A restricted rate program grantee (such as one with a supplement-not-supplant grant provision) that has not negotiated an indirect cost agreement with its cognizant agency and that has limited the recovery of indirect costs in accordance with 34 CFR 75.563 and 76.564 (c), must list its rate as an ED Restricted Rate.

4.  Quarterly, semi-annual, and annual interim reports shall be due within 45 days after the end of the reporting period. Although the Office of Management and Budget (OMB) published in its December 7, 2007 Federal Register Notice (72 FR 69236) that interim reports are due within 45 days of the interim reporting end dates instead of within 30 days as originally identified, OMB has not revised the FFR instructions to reflect this change. Grantees are, nevertheless, permitted to exercise the 45 day period as published by OMB

within the Federal Register.   Final reports shall be due no later than 90 days after the project or grant period end date.  Extensions of reporting due dates may be approved by the program office upon request by the grantee.

5.   If grantees need additional space to report financial information, beyond what is available within the FFR, they should provide supplemental pages.  These additional pages must indicate the following information at the top of each page: Federal Grant or other identifying number, recipient organization, Data Universal Number System (DUNS) number, Employer Identification Number (EIN), and period covered by the report.

**One original and one copy of all reports should be mailed to:**

U.S. Department of Education
Executive Director
Office of Elementary and Secondary Education
400 Maryland Avenue, SW, FB6, Room 3W342
Washington, DC 20202-6100

12/2012

GAN ENCLOSURE 1
Revised 10/2024

## KEY FINANCIAL MANAGEMENT REQUIREMENTS FOR DISCRETIONARY GRANTS AWARDED BY THE DEPARTMENT OF EDUCATION

The Department expects grantees to administer Department grants in accordance with generally accepted business practices, exercising prudent judgment to maintain proper stewardship of taxpayer dollars.  This includes using fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds.  In addition, grantees may use grant funds only for obligations incurred during the funding period.

Title 2 of the Code of Federal Regulations Part 200, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," establishes requirements for Federal awards made to non-Federal entities.  The Education Department General Administrative Regulations (EDGAR) in 34 CFR Parts 75, 76, 77, 79, 81, 82, 84, 86, 97, 98, and 99 contain additional requirements for administering discretionary grants made by this Department.  The most recent version of these regulations may be accessed at the following URLs:

2 CFR 34 Subtitle A (see EDGAR Parts 75, 76, 77, 79, 81, 82, 84, 86, 97, 98, & 99)

2 CFR Part 200 Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards

The information on page 2 of this enclosure, "Selected Topics in Administering Department Discretionary Grants," highlights major administrative requirements of 2 CFR Part 200.  In addition, a few of the topics explain requirements that the Department imposes on its discretionary grantees under EDGAR, Part 75 (Direct Grants).  The specific sections of 2 CFR Part 200 and of EDGAR that address the topics are shown in parentheses.  The Department urges grantees to read the full text of these and other topics in EDGAR and in 2 CFR Part 200.

Grantees are reminded that a particular grant might be subject to additional requirements of the authorizing statute for the program that awarded the grant and/or any regulations issued by the program office.  Grantees should become familiar with those requirements as well because program-specific requirements might differ from those in 2 CFR Part 200 and in EDGAR.

The Department recommends that the project director and the fiscal management staff of a grantee organization communicate frequently with each other about the grant budget.  Doing so will help to ensure that you use Federal funds only for those expenditures associated with activities that conform to the goals and objectives approved for the project.

Grantees may direct any questions regarding the topics on page 2 of this enclosure, "Selected Topics in Administering Department Discretionary Grants," or about any other aspect of administering your grant award to the Department program staff person named in Block 3 of the Grant Award Notification.

1

**GAN ENCLOSURE 1**
**Revised 10/2024**

**SELECTED TOPICS IN ADMINISTERING DEPARTMENT DISCRETIONARY GRANTS**

**I.        Financial Management Systems (2 CFR § 200.302)**

The grantee's and subrecipient's financial management system must provide for the following (see §§ 200.334, 200.335, 200.336, and 200.337):

- Identification of all Federal awards received and expended and the Federal programs under which they were received. Federal program and Federal award identification must include, as applicable, the Assistance Listings title and number, Federal award identification number, year the Federal award was issued, and name of the Federal agency or pass-through entity.
- Accurate, current, and complete disclosure of the financial results of each Federal award or program in accordance with the reporting requirements in §§ 200.328 and 200.329.
- Maintaining records that sufficiently identify the amount, source, and expenditure of Federal funds for Federal awards. These records must contain information necessary to identify Federal awards, authorizations, financial obligations, unobligated balances, as well as assets, expenditures, income, and interest. All records must be supported by source documentation.
- Effective control over, and accountability for, all funds, property, and assets. The grantee or subrecipient must safeguard all assets and ensure they are used solely for authorized purposes. See § 200.303.
- Comparison of expenditures with budget amounts for each Federal award.
- Written procedures to implement the requirements of § 200.305.
- Written procedures for determining the allowability of costs in accordance with subpart E of 2 CFR Part 200 and the terms and conditions of the Federal award.

State systems must account for funds in accordance with State laws and procedures that apply to the expenditure of and the accounting for a State's own funds. A State's procedures, as well as those of its subrecipients and contractors, must be sufficient to permit the preparation of reports that may be required under the award as well as provide the tracing of expenditures to a level adequate to establish that award funds have not been used in violation of any applicable statutory restrictions or prohibitions.

**II.       Internal controls (2 CFR § 200.303)**

The grantee and subrecipient must:

- Establish, document, and maintain effective internal control over the Federal award that provides reasonable assurance that the grantee or subrecipient is managing the Federal award in compliance with Federal statutes, regulations, and the terms and conditions of the Federal award. These internal controls should align with the guidance in "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States or the "Internal Control Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).
- Comply with the U.S. Constitution, Federal statutes, regulations, and the terms and conditions of the Federal award.
- Evaluate and monitor the grantee's or subrecipient's compliance with statutes, regulations, and the terms and conditions of Federal awards.

**GAN ENCLOSURE 1**
**Revised 10/2024**

- Take prompt action when instances of noncompliance are identified.
- Take reasonable cybersecurity and other measures to safeguard information including protected personally identifiable information (PII) and other types of information consistent with applicable Federal, State, local, and tribal laws regarding privacy and responsibility over confidentiality.

### III.    Federal Payment (2 CFR § 200.305)

Under this part --

- the Department pays grantees in advance of their expenditures if the grantee demonstrates a willingness and ability to minimize the time between the transfer of funds to the grantee and the disbursement of the funds by the grantee;
- where the time between the transfer of funds to the grantee and the disbursement of funds cannot be minimized, the preferred method of payment is reimbursement of expenditures incurred by the non-Federal entity;
- grantees, generally, must maintain advance payments of Federal awards in interest bearing accounts that are insured; grantees or subrecipients may retain up to $500 per year of interest earned on Federal funds to use for administrative expenses of the grantee or subrecipient. Any additional interest earned on Federal funds must be returned annually to the Department of Health and Human Services Payment Management System (PMS) through either the Automated Clearing House (ACH) network or a Fedwire Funds Service payment. All interest in excess of $500 per year must be returned to PMS regardless of whether the grantee or subrecipient was paid through PMS. Instructions for returning interest can be found at: Returning Funds/Interest | HHS PSC FMP Payment Management Services.

In general, grantees should make payment requests frequently, only for small amounts sufficient to meet the cash needs of the immediate future.

The Department has recently encountered situations where grantees failed to request funds until long after the grantee actually expended its own funds for the costs of its grant. Grantees need to be aware that, by law, Federal funds are available for grantees to draw down for only a limited period of time, after which the funds revert to the U.S. Treasury. In some cases grantees have requested funds too late for the Department to be able to pay the grantees for legitimate costs incurred during their project periods. The Department urges financial managers to regularly monitor requests for payment under their grants to assure that Federal funds are drawn from the Department G5 Payment System at the time those funds are needed for payments to vendors and employees.

### IV.    Personnel (EDGAR 34 CFR §§ 75.511-75.519 and 2 CFR Part 200 Subparts D and E)

The rules governing personnel costs are located in EDGAR Part 75 and 2 CFR Part 200 Subparts D and E. Part 75 covers issues such as paying consultants with grant funds, prohibiting dual compensation of staff, and waiving the requirement for a full-time project director. The rules clarifying changes in key project staff are located in 2 CFR § 200.308 (f)(2). General rules governing reimbursement of salaries and compensation for staff working on grant projects are addressed in the post Federal award requirements and cost principles in 2 CFR Part 200

3

Supp. App. - 063

**GAN ENCLOSURE 1**
**Revised 10/2024**

Subparts D and E.  In all cases, payments of any type to personnel must be supported by complete and accurate records of employee time and effort.  For those employees that work on multiple functions or separately funded programs or projects, the grantee must also maintain time distribution records to support the allocation of employee salaries among each function and separately funded program or project.

**V.      Cost Principles (2 CFR Part 200 Subpart E)**

All costs incurred under any grant are subject to the cost principles found in 2 CFR Part 200 Subpart E.  The cost principles provide a list of selected items of allowable and unallowable costs and must be used in determining the allowability of costs funded under the grant.

**VI.      Procurement Standards (2 CFR §§ 200.317-327)**

Under 2 CFR §§ 200.317 – 200.327, States are required to follow the procurement rules the States have established for purchases funded by non-Federal sources.  When procuring goods and services for a grant's purposes, all other grantees (i.e., grantees that are not States) may follow their own procurement procedures, but only to the extent that those procedures meet the minimum requirements for procurement specified in the regulations.  These requirements include written competition procedures and codes of conduct for grantee staff, as well as requirements for cost and price analysis, record-keeping and contractor compliance with certain Federal laws and regulations.  These regulations also require grantees to include certain conditions in contracts and subcontracts, as mandated by the regulations and statutes.

**VII.      Indirect Costs (EDGAR §§§75.560-564, 76.560-569, and 2 CFR § 200.414)**

In addition to the information presented below, see GAN ATTACHMENT 2 and 4 for additional information including restrictions related to temporary, de minimis, training, restricted and program prescribed indirect cost rates.

A.   Unrestricted Indirect Cost Rate

To utilize an unrestricted indirect cost rate the grant must not have restricted (supplement-not-supplant), training, or program specific indirect cost rate restrictions.

To obtain an unrestricted indirect cost rate the grantee may:
- negotiate an indirect cost agreement with its cognizant agency for indirect costs (2 CFR §200.1 "Cognizant agency for indirect costs"), by submitting an indirect cost proposal within 90 days after the award of this grant; or
- elect to utilize the de minimis rate under 2 CFR §200.414(f); or
- a temporary indirect cost rate subject to the limitations in 34 CFR §75.560(d)

The grantee must provide proof of its negotiated indirect cost rate agreement to the Department as soon as it has signed such an agreement with its cognizant agency.

4

**GAN ENCLOSURE 1**
**Revised 10/2024**

B.   Temporary Indirect Cost Rate

A grantee that does not have a current negotiated indirect cost rate agreement may recover indirect costs at a temporary rate, which is limited to 10% of budgeted direct salaries and wages (See 34 CFR §§ 75.560(c) and 76.560(d)); or it may choose not to charge indirect costs to the grant.  The temporary rate can only be used for 90 days unless the exceptional circumstances apply under 34 CFR § 75.560(d)(2).

If the grantee has not submitted its indirect cost proposal to its cognizant agency within the 90-day period, it may no longer recover indirect costs utilizing the temporary indirect cost rate until it has negotiated an indirect cost rate agreement with its cognizant agency. Once a grantee obtains a current federally recognized indirect cost rate that is applicable to this grant, the grantee may use that indirect cost rate to claim indirect cost reimbursement.

C.   De minimis Indirect Cost Rate

Institutions of Higher Education (IHEs), federally recognized Indian Tribes, State and Local Governments[1] receiving less than $35 million (appendix VII to this part, paragraph D.1.b) in direct federal funding, and nonprofit organizations, if they do not have a current negotiated (including a provisional[2]) rate, and are not subject to the Department's training rate or restricted rate (supplement-not-supplant provisions) may elect to charge a de minimis  indirect cost rate of 15% of modified total direct costs (2 CFR 200.1 "Modified Total Direct Cost (MTDC)). This rate may be used indefinitely.

MTDC consists of all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and subawards and contracts up to the first $50,000 of each subaward (i.e., subgrant). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs, and the portion of each subaward in excess of $50,000.  Other items, including contract costs in excess of $50,000, may be excluded when necessary to avoid a serious inequity in the distribution of indirect costs (2 CFR 200.1 "Modified Total Direct Cost (MTDC).

Additionally, the de minimis rate may not be used by grantees that are subject to the Department's training indirect cost rate (34 CFR § 75.562) or restricted indirect cost (34 CFR §§ 75.563 and 76.563). The de minimis rate may be used indefinitely.  However, if a grantee chooses to use the de minimis rate to recover indirect costs, it must do so for all its Federal awards until such time as the grantee negotiates an indirect cost rate with its cognizant Federal agency.  Once a grantee obtains a current federally recognized indirect cost rate that is applicable to this grant, the grantee may use that indirect cost rate to claim indirect cost reimbursement.

D.   Restricted Indirect Cost Rate (Programs with a Supplement-not-supplant requirement

A restricted program (i.e., programs with statutory supplement-not-supplant requirements) grantee must utilize a restricted indirect cost rate negotiated with its cognizant Federal agency for indirect costs

---

[1] Note that a State-funded institution of higher education is not considered a "State government" for these purposes.

[2] Provisional rate means a temporary indirect cost rate applicable to a specified period which is used for funding, interim reimbursement, and reporting indirect costs on Federal awards pending the establishment of a final rate for the period.

5

**GAN ENCLOSURE 1**
**Revised 10/2024**

or may elect to utilize a restricted indirect cost rate of 8% MTDC if their negotiated restricted indirect cost rate calculated under 34 CFR §§ 75.563 and 76.564 – 76.569, is not less than 8% MTDC.  A State or local government[3] that is a restricted program grantee may not elect to utilize the 8% MTDC rate.  Additionally, restricted program grantees may not utilize the de minimis rate but may utilize the temporary rate until a restricted indirect cost rate is negotiated.

E.   Training Grant Indirect Cost Rate

If the grantee is a training grant recipient and is not a State, local, or Tribal government[4], the grantee must negotiate a rate under 34 CFR § 75.562.  This provision limits indirect cost recovery to 8% of modified total direct costs or the grantee's negotiated indirect cost rate, whichever is less.

The recovery using the training grant indirect cost rate is subject to the following limitations:

i.   The lesser of the 8% indirect cost rate or negotiated indirect cost rate also applies to sub-awards that fund training.
ii.   The 8% limit does not apply to agencies of Indian tribal governments, local governments, and States as defined in 2 CFR § 200.1, respectively.
iii.   Indirect costs in excess of the 8% limit may not be charged directly, used to satisfy matching or cost-sharing requirements, or charged to another Federal award.
iv.   A grantee using the training rate of 8% is required to have documentation available for audit that shows that its negotiated indirect cost rate is at least 8%.

F.   Program-Specific Indirect Cost Rate

Grantees are required to follow program-specific statutory or regulatory requirements that mandate either indirect cost rate type or maximum administrative costs recovery instead of the general requirements described here.

**VIII.   Audit Requirements (2 CFR Part 200 Subpart F)**

2 CFR 200 Subpart F requires that grantees that are non-Federal entities (a State, local government, Indian tribe, IHE, or nonprofit organization that carries out a Federal award as a recipient or subrecipient) obtain a non-Federal audit of their expenditures under their Federal grants if the grantee expends more than $1,000,000 in Federal funds in one fiscal year.  2 CFR Part 200 Subpart F contains the requirements imposed on grantees for audits conducted in connection with the Single Audit Act of 1984—Public Law No. 98-502 and its Amendments of 1996—Public Law No. 104-.

The Department recommends hiring auditors who have specific experience in auditing Federal awards under the regulations and the Compliance Supplement.

---

[3] Note that a State-funded institution of higher education is not considered a "State government" for these purposes.
[4] Note that a State-funded institution of higher education is not considered a "State government" for these purposes; and a Tribal college or university funded by a federally recognized Tribe is not considered a Tribe for these purposes.

6

**GAN ENCLOSURE 1**

**Revised 10/2024**

**IX.     Other Considerations**

Some other topics of financial management covered in 2 CFR Part 200 that might affect particular grants include program income (2 CFR § 200.307), cost sharing or matching (2 CFR § 200.306), property management requirements for equipment (2 CFR § 200.313), and equipment and other capital expenditures (2 CFR § 200.439).

Supp. App. - 067

**GAN  ENCLOSURE 2**
**Revised 10/2024**

## MEMORANDUM TO ED DISCRETIONARY GRANTEES

You are receiving this memorandum to remind you of Federal requirements, found in 2 CFR Part 200, *Uniform Administrative Requirements, Cost Principles, and Audit Requirements,* regarding cash drawdowns under your grant account.

For any cash that you draw from your Department of Education (*the* Department) grant account, you must:

- draw down only as much cash as is necessary to meet the immediate needs of the grant project;
- keep to the minimum the time between drawing down the funds and paying them out for grant activities; and
- return to the Government the interest earned on grant funds deposited in interest-bearing bank accounts except for a small amount of interest earned each year that your entity is allowed to keep to reimburse itself for administrative expenses).

In order to meet these requirements, you are urged to:

- take into account the need to coordinate the timing of drawdowns with prior internal clearances (e.g., by boards, directors, or other officials) when projecting immediate cash needs so that funds drawn down from ED do not stay in a bank account for extended periods of time while waiting for approval;
- monitor the fiscal activity (drawdowns and payments) under your grant on a continuous basis;
- plan carefully for cash flow in your grant project during the budget period and review project cash requirements before each drawdown; and
- pay out grant funds for project activities as soon as it is practical to do so after receiving cash from the Department.

Keep in mind that the Department monitors cash drawdown activity for all grants. Department staff will contact grantees who appear to have drawn down excessive amounts of cash under one or more grants during the fiscal quarter to discuss the particular situation. For the purposes of drawdown monitoring, the Department will contact grantees who have drawn down 50% or more of the grant in the first quarter, 80% or more in the second quarter, and/or 100% of the cash in the third quarter of the budget period. However, even amounts less than these thresholds could still represent excessive drawdowns for your particular grant activities in any particular quarter. Grantees determined to have drawn down excessive cash will be required to return the excess funds to the Department, along with any associated earned interest, until such time as the money is legitimately needed to pay for grant activities.  If you need assistance with returning funds and interest, please contact the Department's G5 Hotline by calling 1-888-336-8930.

Grantees that do not follow Federal cash management requirements and/or consistently appear on the Department's reports of excessive drawdowns could be:

- subjected to specific award conditions or designated as a "high-risk" grantee [2 CFR Part 200.208 and 2 CFR 3474.10], which could mean being placed on a "cash-reimbursement" payment method (i.e., a grantee would experience the inconvenience of having to pay for grant activities with its own money and waiting to be reimbursed by the Department afterwards);

1

**GAN  ENCLOSURE 2**
**Revised 10/2024**

- subject to further corrective action;
- denied selection for funding on future ED grant applications [EDGAR 75.217(d)(3)(ii)]; and/or
- debarred or suspended from receiving future Federal awards from any executive agency of the Federal government.

You are urged to read 2 CFR Part 200.305 to learn more about Federal requirements related to grant payments and to determine how to apply these requirements to any subgrantees. You are urged to make copies of this memorandum and share it with all affected individuals within your organization.

2

Supp. App. - 069

**Frequently Asked Questions (FAQs) to Assist U.S. Department of Education (ED) Grantees
to Appropriately Use Federal Funds for Food, Conferences, and Meetings[1]**
August 2024

**Using Federal ED Grant (Discretionary and Formula) Funds for Food**

1.  **May a grantee use its U.S. Department of Education (ED) grant funds for food, beverages, or snacks at an event related to its grant?**

All grant expenditures, including those for food, beverages, or snacks, must be reasonable, necessary, allocable to the grant, and allowable. (Office of Management and Budget's (*OMB) Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (Uniform Guidance)* at 2 CFR §§ 200.403 through 200.405).[2]

Generally, a grantee needs to substantiate with specificity the rationale for why paying for food and beverages with Department funds is necessary to meet the goals and objectives of a grant. When a grantee is hosting an event related to its ED grant, the grantee should first consider structuring the agenda for the meeting so that there is time for participants to bring or purchase their own food, beverages, and snacks. In addition, when planning a meeting, grantees may want to consider a location in which participants have easy access to food and beverages.

There may be limited circumstances under which providing food or beverages is reasonable and necessary to achieve the purpose of a particular grant. Because food and beverage costs are not of a type generally recognized as ordinary and necessary for the operation of the grantee or the proper and efficient performance of the Federal award (see 2 CFR § 200.404(a)), grantees must document their evidence and analysis that justify that the use of food or beverage is reasonable and necessary in each instance.

In determining reasonableness of a given cost, including those for food and drink, consideration must be given to:

- Whether the cost is generally recognized as ordinary and necessary for the grantee's operation or the proper and efficient performance of the Federal award;

- The restraints or requirements imposed by such factors as: sound business practices; arm's-length bargaining; Federal, State, local, Tribal, and other laws and regulations; and terms and conditions of the Federal award;

- Market prices for comparable costs for the geographic area;

- Whether the individuals concerned acted with prudence in the circumstances considering their responsibilities to the recipient or grantee, its employees, its students or membership (if applicable), the public at large, and the Federal Government; and

---

[1] Other than statutory and regulatory requirements included in the document, the contents of this FAQ document do not have the force and effect of law and are not meant to bind the public. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.

[2] Revisions to 2 CFR part 200, referred to as the "OMB Uniform Guidance," were published on April 22, 2024, and are generally effective on October 1, 2024. In general, the April 2024 revisions do not substantively affect the content in this FAQ document. While the OMB Uniform Guidance in 2 CFR § 200.1 defines recipient, this FAQ uses the term grantee to align with the definitions that apply to ED regulations in the Education Department General Administrative Regulations (EDGAR) in 34 CFR § 77.1.

1

- Whether the cost represents a deviation from the recipient or grantee's established written policies and procedures for incurring (2 CFR § 200.404).

Please note that, in addition to determining whether the costs are necessary and reasonable, State grantees also must determine whether the same costs are allowable under State law for the use of State funds. Under 2 CFR § 200.302(a), States are required to expend and account for Federal funds in accordance with State laws and procedures for expending and accounting for their own State funds. In other words, if State laws or procedures would not permit the use of State funds for conferences or meals, then State grantees may not use their Federal grant funds to pay those costs either.

**2. Are there examples of when food costs might be considered reasonable and necessary to the performance of a particular grant?**

The question of whether a food cost is reasonable and necessary to the performance of a grant will depend on the ED grant, including any program-specific rules or requirements that may apply to that grant, as well as the unique circumstances of the food cost. The following are some examples of situations when a food cost might be considered reasonable and necessary:

- <u>Food costs at a family engagement event</u>: For some ED programs, family engagement is a critical part of the purpose of the program or of the success of a project. In such a program, if a family meeting would occur during a typical mealtime, or if the grantee has evidence that attendance at the event would be affected by the absence of food or snacks, the grantee may be able to justify that is reasonable and necessary to provide light refreshments or meals to participants.

- <u>Food costs for a working lunch at a day-long meeting</u>: A grantee may find that one critical component of its grant activities is hosting an onsite day-long training for professionals working in a field that is a central focus of the grant. If the grantee is able to demonstrate that the lunchtime session is necessary to achieve the goals of the project, attendance at the lunchtime session is necessary to achieve full participation by attendees, and the business carried out at the lunchtime session could not be carried out at another reasonable time, the grantee may be able to justify that it is reasonable and necessary to provide meals or a snack to attendees.

- <u>Light refreshments at a series of regular after-hours meetings</u>: A grantee may find that an important part of its grant activities is hosting meetings after the traditional working day so that professionals from within the field but across different employers have an opportunity to collaborate on focused topics. If the grantee can demonstrate that the sessions have planned agendas that are central to the grant, that engaging this group of people is necessary to achieve the purposes of the grant, and that there is evidence that attendance at the meetings would be affected by the absence of food, the grantee may be able to justify that it is reasonable and necessary to provide light refreshments to participants.

- <u>Costs of light snacks at a day-long meeting</u>: To achieve the purposes of its grant, a grantee may find that is necessary to host day-long meetings or training sessions so that involved individuals can collaborate. If the grantee has evidence that providing light snacks (e.g., granola bars and water) at the meeting will result in improved participation, such as more

2

time spent on grant activities and less time needed for breaks during the sessions, the grantee may be able to justify that is reasonable and necessary to provide light snacks to participants.

If an ED grantee has questions about a specific food cost, they should contact their ED program officer.

**3. What are examples of situations when costs for food would not be considered reasonable and necessary?**

There are some situations when food costs would not be considered reasonable and necessary to a grant or would otherwise be unallowable under the *Uniform Guidance* found at 2 CFR part 200.

- <u>Food costs at networking sessions</u>: In nearly all cases, using grant funds to pay for food and beverages for networking sessions with a purely social focus is not justified because participation in such activities is rarely necessary to achieve the purpose of the grant.

- <u>Food costs at regular staff meetings</u>: Food costs for recurring business meetings, staff meetings, or other day-to-day activities are generally not reasonable because participation in such activities is rarely necessary to achieve the purpose of the grant.

- <u>Food costs for remote meetings</u>: Food costs for meetings conducted remotely, such as sending food to individual meeting participants' locations, are generally not justified since participants' participation is less impacted by them attending the meeting remotely.

- <u>Entertainment</u>: Federal grant funds may not be used to pay for entertainment, which includes costs for amusement, diversion, and social activities, unless they have a specific and direct programmatic purpose and are included in the Federal award. 2 CFR § 200.438. Celebrations, receptions, banquets, and other social events generally are not events where purchasing food with ED grant funds is appropriate.

- <u>Alcohol</u>: In all cases, use of Federal funds for alcoholic beverages is unallowable. 2 CFR § 200.423.

## <u>Using ED Federal Grant (Discretionary and Formula) Funds to Host a Meeting or Conference</u>

**4. May a grantee receiving funds from ED use its Federal grant funds to host a meeting or conference?**

Yes. Federal grant funds may be used to host a meeting or conference if doing so is:

- Consistent with its approved application or plan;

- For purposes that are directly relevant to the program and the operation of the grant, such as for conveying technical information related to the objectives of the grant; and

- Reasonable and necessary to achieve the goals and objectives of the approved grant.

The *Uniform Guidance* in 2 CFR § 200.432 describes costs associated with conferences that may be allowable.

**5. What are examples of "technical information" that may be conveyed at a meeting or conference?**

3

Examples of technical information include, but are not limited to, the following, each of which must be related to implementing the program or project funded by the grant:

- Specific programmatic, administrative, or fiscal accountability requirements;

- Best practices in a particular field;

- Theoretical, empirical, or methodological advances in a particular field;

- Effective methods of training or professional development; and

- Effective grant management and accountability.

**6. What factors should a grantee consider when deciding whether to host a meeting or conference?**

Grantees should consider whether a face-to-face meeting or conference is the most effective or efficient way to achieve the desired result and whether there are alternatives, such as webinars or video conferences, that would be equally or similarly effective and more efficient in terms of time and costs than a face-to-face meeting. In addition, grantees should consider how the meeting or conference will be perceived by the public; for example, will the meeting or conference be perceived as a good use of taxpayer dollars?

**7. Are there conflict-of-interest rules that grantees should follow when selecting vendors, such as logistics contractors, to help with a meeting or conference?**

As specified in 2 CFR § 200.317, States and Indian Tribes[3] must comply with their own procurement policies and procedures, including any policies or procedures for ensuring that there are no conflicts of interest in the procurement process. In addition to its own policies and procedures, a State or Indian Tribe must also comply with the following procurement standards: 2 CFR §§ 200.321, 200.322, 200.323, and 200.327. If a State or Indian Tribe does not have its own procurement policies and procedures, it must follow the procurement standards in 2 CFR §§ 200.318 through 200.327.

Other grantees must follow procurement procedures that are consistent with their State, local, or Tribal laws and regulations, as appropriate, and that are also consistent with 2 CFR §§ 200.318 through 200.327, including the minimum requirements in 2 CFR § 200.318 related to conflict of interest rules.

**8. When a meeting or conference is hosted by a grantee and charged to a Federal grant, may the meeting or conference be promoted as a U.S. Department of Education event?**

No. Meetings and conferences hosted by grantees are directed by the grantee, not the U.S. Department of Education. Therefore, the meeting or conference may <u>not</u> be promoted as a U.S. Department of Education meeting or conference, and the seal of the U.S. Department of Education must <u>not</u> be used on conference materials or signage, without ED's written approval. In addition, all meeting or conference materials paid for with Federal grant funds must include appropriate disclaimers, such as the disclaimer provided in 34 CFR§ 75.620. That language reads:

---

[3] Please note that "States" were the only entities listed under 2 CFR § 200.317 prior to the revisions announced in OMB's April 22, 2024, *Federal Register* notice.

4

The contents of this [insert type of publication; such as book, report, film, website, and web page] were developed under a grant from the U.S. Department of Education (Department). The Department does not mandate or prescribe practices, models, or other activities described or discussed in this document. The contents of this [insert type of publication] may contain examples of, adaptations of, and links to resources created and maintained by another public or private organization. The Department does not control or guarantee the accuracy, relevance, timeliness, or completeness of this outside information. The content of this [insert type of publication] does not necessarily represent the policy of the Department. This publication is not intended to represent the views or policy of, or be an endorsement of any views expressed or materials provided by, any Federal agency.

**Please note that if a grantee charges a fee for attendance at a particular meeting or conference paid for with Federal grant funds, any income generated must be treated as program income under 2 CFR § 200.307 or specific program regulations addressing program income.**

9.  **When a grantee is hosting a meeting or conference, may the grantee use Federal grant funds to pay for food, beverages, or snacks?**

As detailed in questions #1-3 above, in general there is a need to substantiate with specificity the rationale for why paying for food and beverages with Department funds is necessary to meet the goals and objectives of a grant, but there may be circumstances when providing food or beverages at a conference is reasonable and necessary to achieve the purpose of the grant. Please see those questions for information about requirements and considerations related to food costs.

10. **May a grantee contract with a hotel under which Federal grant funds will be used to provide meals, snacks, and beverages as part of the cost for meeting rooms and other allowable conference-related costs?**

Federal grant funds may only be used for expenses that are reasonable and necessary. In planning a conference or meeting and negotiating with vendors for meeting space and other relevant goods and services, grantees may only pay for allowable costs. The fact that food and beverages are embedded in a contract for meeting space does not mean that the food and beverages are being provided at no cost to the grantee. Therefore, if the food and beverage cost is not an allowable cost, and a hotel vendor embeds food and beverage costs into a hotel contract for meeting space, the grantee should work with the hotel to have the food and beverage costs identified and removed from the contract, and have the price for the meeting space appropriately adjusted.

11. **What if a hotel or other venue provides "complimentary" beverages (e.g., coffee, tea) and there is no charge to the grantee hosting the meeting?**

The grantee has an obligation, under these circumstances, to confirm that the beverages are truly complimentary and will not be reflected as a charge to the grant in another area. For example, many hotels provide complimentary beverages to all guests who attend a meeting at their facility without reflecting the costs of those beverages in other items that their guests or, in this case, the grantee purchases. As noted above, it would not be acceptable for a vendor to embed the cost of beverages in other costs, such as meeting space, without those costs being separately allowable.

12. **May indirect cost funds be used to pay for food and beverages?**

No. The cost of food and beverages, which are related to meetings that are easily associated with a specific cost and grant objectives, are more appropriately treated as direct costs rather than indirect

5

costs. As noted above, Federal grant funds cannot be used to pay for food and beverages unless doing so is reasonable and necessary.

6

**13. May a grantee use <u>non-Federal</u> resources (e.g., State or local resources) to pay for food or beverages at a meeting or conference that is being held to meet the goals and objectives of its grant?**

Grantees should follow their own policies and procedures and State and local law for using <u>non-Federal</u> resources to pay for food or beverages, including its policies and procedures for accepting gifts or in-kind contributions from third parties. Grantees should be sure that any food and beverages provided with non-Federal funds are appropriate for the grantee event, and do not detract from the event's purpose. Please note that, in general, any funds that a grantee contributes to a project as part of the program's matching or cost-sharing requirement would be subject to the same rules that govern the Federal funds; therefore, the non-Federal funds used to pay for food and beverages for a meeting or conference could only be eligible for use in meeting cost-share or match obligations if Federal funds would also be allowable to pay for the food and beverages.

**14. May grantees provide meeting participants with the option of paying for food and beverages (e.g., could a grantee have boxed lunches provided at cost for participants)?**

Yes. Grantees may offer meeting participants the option of paying for food (such as lunch, breakfast, or snacks) and beverages, and arrange for these items to be available at the meeting.

## <u>Using Federal Grant Funds to Pay for Costs of Attending a Meeting or Conference Sponsored by ED or a Third Party</u>

**15. May grantees use Federal grant funds to pay for the cost of attending a meeting or conference?**

If attending a meeting or conference is necessary to achieve the goals and objectives of the grant, and if the expenses are reasonable (based on the grantee's own policies and procedures, and State and local laws), Federal grant funds may be used to pay for travel expenses of grantee employees, consultants, or experts to attend a meeting or conference. To determine whether a meeting or conference is "necessary," grantees should consider whether the goals and objectives of the grant can be achieved without the meeting or conference and whether there is an equally effective and more efficient way (in terms of time and money) to achieve the goals and objectives of the grant (see question #6). To determine whether the expenses are "reasonable," grantees should consider how the costs (e.g., lodging, travel, registration fees) compare with other similar events and whether the public would view the expenses as a worthwhile use of Federal funds.

**16. What should a grantee consider when planning to use Federal grant funds for attending a meeting or conference?**

Among other considerations, grantees should consider how many people should attend a meeting or conference on its behalf. The number of attendees should be reasonable and necessary to accomplish the goals and objectives of the grant. The grantee should also determine whether it is necessary to attend the entire meeting or conference, or whether attending only a portion of the meeting or conference is reasonable and necessary.

**17. What travel expenses may be paid for with Federal grant funds?**

7

Grantees may use Federal grant funds for travel expenses only to the extent such costs are reasonable and necessary and do not exceed charges normally allowed by the grantee in its regular operations consistent with its written travel policies. See 2 CFR § 200.475. Federal grant funds may be used to pay expenses for transportation, per diem, and lodging if the costs are reasonable and necessary. Federal grant funds may not be spent on alcohol. See 2 CFR § 200.423. Grantees should follow their own travel and per diem rules and costs when charging travel expenses to their Federal grant. In the absence of an acceptable written policy regarding travel costs, grantees must satisfy the requirements of 2 CFR § 200.475(d).

**18. What should grantees consider when including Federal employees at a grantee-sponsored meeting or conference?**

In some situations, a grantee may invite a Federal employee to participate in or present at a grantee-organized meeting or conference. Federal employees are subject to Federal ethics laws and regulations. This includes laws and regulations governing conflicts of interest and gifts (e.g., waiver of a registration fee, travel expenses, and meals). Grantees may be subject to their own ethics laws and regulations, and grantee employees should ensure that they comply with them.

**Questions Regarding the Allowable Use of Federal Grant Funds**

**19. What resources are available to help grantees determine whether costs associated with meetings and conferences are reasonable and necessary?**

Grantees must follow all applicable statutory and regulatory requirements in determining whether costs are reasonable, necessary, and allowable, especially the regulations found at 2 CFR part 200.

**20. Is it allowable for a person whose travel costs are being paid with Federal grant funds to attend a conference in Washington, D.C., and lobby members of Congress while in town?**

Appropriated funds may not, except under very limited circumstances, be used for expenses related to any activity designed to influence the enactment of legislation, appropriations, regulations, administrative actions, or Executive Orders proposed or pending before the Congress or the Administration. See 2 CFR § 200.450. To the extent that a portion of time at a conference is spent on lobbying activities, costs associated with the lobbying, including transportation to and from Washington, D.C., lodging, and per diem, may not be charged to the Federal grant. For example, if a meeting or conference lasts for two days and a visit to lobby a member of Congress requires an additional day of travel, it could be determined that one-third (1/3) of all costs involved in attending the meeting or conference, including travel to and from Washington, D.C., may not be charged to the grant.

On the other hand, educating members of Congress about facts relevant to a particular grant program would not, absent other facts, constitute lobbying. For example, it would not be considered a prohibited lobbying activity for a grantee to inform a member of Congress about its program, the services it provides, and the individuals it serves. It also would not be considered a prohibited lobbying activity to attend a presentation by members of Congress related to issues relevant to a grantee's program or the population it serves in general. However, such education-oriented

8

discussions could easily cross—or appear to cross—the thin line to prohibited lobbying activities. For example, a discussion about the challenges a grantee faces with respect to requirements governing matching funds could easily expand to a discussion about the need for more appropriated funds or legislative changes, which would constitute prohibited lobbying activities. Given that Congress frequently considers the reauthorization of ED programs, a grantee's interactions with members of Congress on such topics could meet the definition of lobbying, which is prohibited. In that case, the costs associated with those interactions could not be supported with Federal funds.

**21. What are the consequences of using Federal grant funds on unallowable expenses?**

ED may seek to recover any Federal grant funds identified, in an audit or through program monitoring, as having been used for unallowable costs, including unallowable conference expenses.

**22. Whom should grantees call if they have specific questions about the allowable use of Federal grant funds?**

ED grantees are encouraged to contact their ED program officer to discuss the allowable use of Federal grant funds, including the allowable use of Federal grant funds for meetings and conferences.

9

Supp. App. - 078

**GAN Enclosure 4**
**Revised 10/2024**

## MEMORANDUM TO REMIND DEPARTMENT OF EDUCATION GRANTEES OF EXISTING CASH MANAGEMENT REQUIREMENTS CONCERNING PAYMENTS

The Department of Education (the Department) requires that its grantees adhere to existing cash management requirements concerning payments and will ensure that their subgrantees are also aware of these policies by providing them relevant information.

A grantee's failure to comply with cash management requirements may result in an improper payment determination by the Department in accordance with the [Payment Integrity Information Act (PIIA) of 2019](#).

**Excessive Drawdowns**

In the context of grants, excessive drawdown refers to the situation where a grantee withdraws more funds than necessary from the grantor, which can lead to financial and compliance issues. In accordance with cash management requirements, grant funds are drawn down incrementally to cover immediate expenses related to the grant activities. If a grantee draws down excessive funds, they may be required to return the surplus along with interest. This situation can arise from poor financial management, lack of proper accounting practices, or misalignment with the grant's stipulated budget and objectives.

To avoid excessive drawdown, it is crucial for grantees to implement and maintain robust accounting systems, track expenses accurately, and adhere to the grant's budget and reporting requirements. Proper planning and monitoring of fund allocation, maintaining accurate records, and ensuring timely drawdowns aligned with actual expenses are essential practices. Additionally, grantees should be aware of the specific drawdown procedures and requirements set by the grantor, which can vary depending on whether the grant is federally funded or comes from other sources.

**Cash Management Requirements**

There are three categories of payment requirements that apply to the drawdown of funds from grant accounts at the Department.  The first two types of payments are subject to the requirements in the Treasury Department regulations implementing the Cash Management Improvement Act (CMIA) of 1990, 31 U.S.C.6513, and the third is subject to the requirements in the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (Uniform Guidance) at 2 CFR part 200,[1] as follows:

1.  Payments to a State under programs that are covered by a State's Treasury State Agreement (TSA);

2.  Payments to States under programs that are not covered by a TSA; and

3.  Payments to other non-Federal entities, including nonprofit organizations and local governments.

---

[1] The Department adopts the Uniform Guidance as regulations of the Department at 2 CFR part 3474.

1

**GAN Enclosure 4**
**Revised 10/2024**

**CMIA Requirements Applicable to Programs included in a TSA**

Generally, under the Treasury Department regulations implementing the CMIA, only major assistance programs (large-dollar programs meeting thresholds in 31 CFR § 205.5) are included in a State's written TSA. See 31 CFR § 205, subpart A.  Programs included in a TSA must use approved funding techniques and both States and the Federal government are subject to interest liabilities for late payments. State interest liabilities accrue from the day federal funds are credited to a State account to the day the State pays out the federal funds for federal assistance program purposes. 31 CFR § 205.15.  If a State makes a payment under a Federal assistance program before funds for that payment have been transferred to the State, Federal Government interest liabilities accrue from the date of the State payment until the Federal funds for that payment have been deposited to the State account. 31 CFR § 205.14.

**CMIA Requirements Applicable to Programs Not Included in a TSA**

Payments to States under programs not covered by a State's TSA are subject to subpart B of Treasury's regulations in 31 CFR § 205.  These regulations provide that a State must minimize the time between the drawdown of funds from the federal government and their disbursement for approved program activities.  The timing and amount of funds transfers must be kept to a minimum and be as close as is administratively feasible to a State's actual cash outlay for direct program costs and the proportionate share of any allowable indirect costs.  31 CFR § 205.33(a).  States should exercise sound cash management in funds transfers to subgrantees.

Under subpart B, neither the States nor the Department owe interest to the other for late payments. 31 CFR § 205.33(b).  However, if a State or a Federal agency is consistently late in making payments, Treasury can require the program to be included in the State's TSA.  31 CFR § 205.35.

**Fund transfer requirements for grantees other than State governments and subgrantees**

The transfer of Federal program funds to grantees other than States and to subgrantees are subject to the payment and interest accrual requirements in the Uniform Guidance at 2 CFR § 200.305(b).  These requirements are like those in subpart B of the Treasury Department regulations in 31 CFR part 205, requiring that "For recipients and subrecipients other than States, payment methods must minimize the time elapsing between the transfer of funds from the Federal agency or the pass-through entity and the disbursement of funds by the recipient or subrecipient regardless of whether the payment is made by electronic funds transfer or by other means."  2 CFR § 200.305(b).

The Federal Government and pass-through entities must make payments in advance of expenditures by grantees and subgrantees if these non-Federal entities maintain, or demonstrate the willingness to maintain, written procedures "that minimize the time elapsing between the transfer of funds and disbursement by the recipient or subrecipient, and financial management systems that meet the standards for fund control and accountability." 2 CFR § 200.305(b)(1).  If a grantee or subgrantee cannot meet the criteria for advance payments, a Federal agency or pass-through entity can pay that entity through reimbursement.  See 2 CFR § 200.305(b)(1) and (3) for more detailed description of the payment requirements and the standards for requiring that payments be made by reimbursement.

**GAN Enclosure 4**
**Revised 10/2024**

**Returning Earned Interest**

Non-Federal entities must maintain advance payments in interest bearing accounts unless certain conditions exist.  See 2 CFR § 200.305(b)(11) for those conditions.  The requirements regarding interest accrual and remittance follow:

Recipients or subrecipients may retain up to $500 per year of interest earned on Federal funds to use for administrative expenses of the recipient or subrecipient. Any additional interest earned on Federal funds must be returned annually to the Department of Health and Human Services Payment Management System (PMS) through either the Automated Clearing House (ACH) network or a Fedwire Funds Service payment. All interest in excess of $500 per year must be returned to PMS regardless of whether the recipient or subrecipient was paid through PMS. Instructions for returning interest can be found at Returning Funds/Interest | HHS PSC FMP Payment Management Services. 2 CFR § 200.305(b)(12). Additionally, these instructions are provided below.

1.   **Returning Interest to PMS**

PMS is the central collection point for interest earned on all federal grants, whether they are paid through the Payment Management System or not.

a.   **Domestic** Automated Clearing House (ACH) Returns (Direct Deposit)

Returning funds via Automated Clearing House (ACH) means you will most likely be returning funds in the manner in which they were received at your organization.

ACH account information to be included:

- PSC ACH Routing Number is: 051036706
- PSC DFI Accounting Number: 303000
- Bank Name: Credit Gateway - ACH Receiver
- Location: St. Paul, MN

Additionally, include the following:

- An explanation stating that the refund is for interest
- The name of the awarding agency
- The grant number(s) for which the interest was earned
- The return should be made payable to: Department of Health and Human Services.

b.   **International** Automated Clearing House (ACH) Returns (Direct Deposit)

ACH Account Information to be Included For Payments Sent in **U.S. Dollars (USD)**:

- Beneficiary Account: Federal Reserve Bank of New York/ITS (Can abbreviate: FRBNY/ITS)
- Bank: Citibank N.A. (New York)
- SWIFT Code: CITIUS33
- Account Number: 36838868
- Routing Number: 021000089
- Bank Address: 388 Greenwich Street, New York, NY 10013

3

**GAN Enclosure 4**
**Revised 10/2024**

- Payment Details (Line 70): Agency Name (abbreviated when possible) and Agency Locator Code (ALC)
- Agency POC: James Kruper, (301) 492-4998

For a USD payment, the payment sender must include:

- **Agency Locator Code (ALC):** 75010501
- **Name:** US Department of Health and Human Services, PMS Account Number and Grant Subaccount Number in the Payment Details (Line 70) section of the SWIFT message.

This information must be in this section of the payment instructions, or the International Treasury Service (ITS) will not be able to identify the federal agency the payment is for. Without this identifying information, ITS will be required to return the payment as unidentified or unable to post. The receiving account is in the name of "Federal Reserve Bank of New York/ITS" and the payment originator should list that as the name on the beneficiary account.

Additionally, include the following:

- An explanation stating that the refund is for interest
- The name of the awarding agency
- The grant number(s) for which the interest was earned
- The return should be made payable to: Department of Health and Human Services.

c.   FedWire Returns

Service charges may be incurred from a grantee's financial institution when a Fedwire to return interest is initiated.  For FedWire returns, Fedwire account information is as follows:

- Fedwire Routing Number: 021030004
- Agency Location Code (ALC): 75010501
- Bank Name: Federal Reserve Bank
- Treas NYC/Funds Transfer Division
- Location: New York, NY

Additionally, include the following:

- An explanation stating that the refund is for interest
- The name of the awarding agency
- The grant number(s) for which the interest was earned
- The return should be made payable to: Department of Health and Human Services.

d.   Check Returns (USPS Only)

Interest may be returned by check using only the U.S. Postal Service; however, returning interest via check may take 4-6 weeks for processing before a check payment may be applied to the appropriate PMS account.

4

Supp. App. - 082

**GAN Enclosure 4**
**Revised 10/2024**

- Interests returned by check are to be mailed (USPS only) to:

    HHS Program Support Center
    PO Box 979132
    St. Louis, MO 63197

    A brief statement explaining the nature of the return must be included.

    To return interest on a grant not paid through the PMS, make the check payable to the Department of Health and Human Services, and include the following with the check:

    - An explanation stating that the refund is for interest
    - The name of the awarding agency
    - The grant number(s) for which the interest was earned
    - The return should be made payable to: Department of Health and Human Services.

**Cash Management Monitoring Responsibilities of Pass-Through Entities**

Grantees, including grantees that act as pass-through entities and subgrantees have other responsibilities regarding the use of Federal funds.  For example, all grantees and subgrantees must have procedures for determining the allowability of costs for their awards.  We highlight the following practices related to the oversight of subgrantee compliance with the financial management requirements in the Uniform Guidance that will assist State grantees (pass-through entities) in meeting their monitoring responsibilities.  Under 2 CFR § 200.332, pass-through entities must –

1. Verify that the subrecipient is not excluded or disqualified in accordance with §180.300.  Verification methods are provided in § 180.300, which include confirming in SAM.gov that a potential subrecipient is not suspended, debarred, or otherwise excluded from receiving Federal funds.

2. Ensure that every subaward is clearly identified to the subrecipient as a subaward and includes the information identified in § 200.332(b).

3. Evaluate each subrecipient's fraud risk and risk of noncompliance with a subaward to determine the appropriate subrecipient monitoring.  See § 200.332(b) & (f).

4. Monitor the activities of a subrecipient as necessary to ensure that the subrecipient complies with Federal statutes, regulations, and the terms and conditions of the subaward.  The pass-through entity is responsible for monitoring the overall performance of a subrecipient to ensure that the goals and objectives of the subaward are achieved. See § 200.332(e).

5. Consider taking enforcement action against noncompliant subrecipients as described in § 200.339 and in program regulations.

A small number of Department grant programs have program-specific cash management and payment requirements based on the authorizing legislation or program regulations.  These program-specific requirements may supplement or override general cash management or payment requirements.  If you

5

Supp. App. - 083

**GAN Enclosure 4**
**Revised 10/2024**

have any questions about your specific grant, please contact the Education Program Contact listed in Block 3 of your Grant Award Notification.

Supp. App. - 084

**GAN Enclosure 5**
**Revised 10/2024**

## RECIPIENTS OF DEPARTMENT OF EDUCATION GRANTS AND COOPERATIVE AGREEMENTS
## FREQUENTLY ASKED QUESTIONS ON CASH MANAGEMENT

**Q**    **What are the Federal Laws and Regulations Regarding Payments to the States?**

**A**    The *Cash Management Improvement Act of 1990* (*CMIA*) establishes interest liabilities for the Federal and State governments when the Federal Government makes payments to the States. See 31 U.S.C. 3335 and 6503.  The implementing regulations are in Title 31 of the Code of Federal Regulations (CFR), Part 205, eCFR :: 31 CFR Part 205 -- Rules and Procedures for Efficient Federal-State Funds Transfers.  Non-Federal entities other than States follow the rules on Federal payments set out in 2 CFR 200.305.

**Q**    **What is a Treasury-State Agreement (TSA)?**

**A**    A TSA documents the accepted funding techniques and methods for calculating interest agreed upon by the U.S. Department of the Treasury (Treasury) and a State.  It identifies the Federal assistance programs that are subject to interest liabilities under the CMIA.  The CMIA regulations specify several different funding techniques that may be used by a State, but a State can negotiate with the Treasury Department to establish a different funding technique for a particular program. A TSA is effective until terminated and, if a state does not have a TSA, payments to the State are subject to the default techniques in the regulations that Treasury determines are appropriate.

**Q**    **What are the CMIA requirements for a program subject to a Treasury-State Agreement?**

**A**    Payments to a State under a program of the Department are subject to the interest liability requirements of the CMIA if the program is included in the State's Treasury-State Agreement (TSA) with the Department of Treasury.  If the Federal government is late in making a payment to a State, it owes interest to the State from the time the State spent its funds to pay for expenditure until the time the Federal government deposits funds to the State's account to pay for the expenditure.  Conversely, if a State is late in making a payment under a program of the Department, the State owes interest to the Federal government from the time the Federal government deposited the funds to the State's account until the State uses those funds to make a payment.  For more information, see GAN Enclosure 4.

**Q**    **What are the CMIA requirements for a program that is not subject to a Treasury-State Agreement?**

**A**    If a program is not included in the State's TSA, neither the State nor the Federal government are liable for interest for making late payments.  However, both the Federal government and the State must minimize the time elapsing between the date the State requests funds and the date that the funds are deposited to the State's accounts.  The State is also required to minimize the time elapsed between the date it receives funds from the Federal government and the date it makes a payment under the program. Also, the Department must minimize the amount of funds transferred to a State to only that needed to meet the immediate cash needs of the State.  The timing and amount of funds transferred must be as close as is administratively feasible to a State's actual cash outlay for direct program costs and the proportionate share of any allowable indirect costs.

Supp. App. - 085

**GAN Enclosure 5**
**Revised 10/2024**

**Q**    **What if there is no TSA?**
**A**    When a State does not have a TSA in effect, default procedures in 31 CFR, part 205 that the Treasury Department determines appropriate apply.  The default procedures will prescribe efficient funds transfer procedures consistent with State and Federal law and identify the covered Federal assistance programs and designated funding techniques.

**Q**    **Who is responsible for Cash Management?**
**A**    Grantees and subgrantees that receive grant funds under programs of the Department are responsible for the financial management and maintaining internal controls regarding the management of Federal program funds under the Uniform Guidance in accordance with 2 CFR 200.302 and 200.303 respectively.  In addition, grantees are responsible for ensuring that subgrantees are aware of the cash management and requirements in 2 CFR part 200, subpart D.

**Q**    **Who is responsible for monitoring cash drawdowns to ensure compliance with cash management policies?**
**A**    Recipients must monitor their own cash drawdowns **and** those of their subrecipients to assure substantial compliance to the standards of timing and amount of advances.

**Q**    **How soon may I draw down funds from the G5 grants management system?**
**A**    Grantees are required to minimize the amount of time between the drawdown and the expenditure of funds from their bank accounts.  (See 2 CFR 200.305(b).)  Funds must be drawn only to meet a grantee's immediate cash needs for each individual grant.  The G5 screen displays the following message:

**By submitting this payment request, I certify to the best of my knowledge and belief that the request is based on true, complete, and accurate information. I further certify that the expenditures and disbursements made with these funds are for the purposes and objectives set forth in the applicable Federal award or program participation agreement, and that the organization on behalf of which this submission is being made is and will remain in compliance with the terms and conditions of that award or program participation agreement. I am aware that the provision of any false, fictitious, or fraudulent information, or the omission of any material fact, may subject me, and the organization on behalf of which this submission is being made, to criminal, civil, or administrative penalties for fraud, false statements, false claims, or other violations. (U.S. Code Title 18, Section 1001; Title 20, Section 1097; and Title 31, Sections 3729-3730 and 3801-3812)**

**Q**    **How may I use Federal funds?**
**A**    Federal funds must be used as specified in the Grant Award Notification (GAN) and the approved application or State plan for allowable direct costs of the grant and an allocable portion of indirect costs, if authorized.

**Q**    **What are the consequences to recipients/subrecipients for not complying with terms of the grant award?**
**A**    The Federal agency or pass-through entity may implement specific conditions if the recipient or subrecipient fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award. See § 200.208 for additional information on specific conditions. When the Federal agency or pass-through entity determines that noncompliance

2

Supp. App. - 086

GAN Enclosure 5
Revised 10/2024

cannot be remedied by imposing specific conditions, the Federal agency or pass-through entity may take one or more of the following actions:

- Temporarily withhold payments until the recipient or subrecipient takes corrective action.
- Disallow costs for all or part of the activity associated with the noncompliance of the recipient or subrecipient.
- Suspend or terminate the Federal award in part or in its entirety.
- Initiate suspension or debarment proceedings as authorized in 2 CFR part 180 and the Federal agency's regulations, or for pass-through entities, recommend suspension or debarment proceedings be initiated by the Federal agency.
- Withhold further Federal funds (new awards or continuation funding) for the project or program.
- Pursue other legally available remedies.

**Q** **Who is responsible for determining the amount of interest owed to the Federal government?**

**A** As set forth in 31 CFR 205.9, the method used to calculate and document interest liabilities is included in the State's TSA.  A non-State entity must maintain advances of Federal funds in interest-bearing accounts unless certain limited circumstances apply and remit interest earned on those funds to the Department of Health and Human Services, Payment Management System annually.  See 2 CFR 200.305.

**Q** **What information should accompany my interest payment?**

**A** In accordance with 2 CFR § 200.305(b)(12)), interest in excess of $500.00 earned on Federal advance payments deposited in interest-bearing accounts must be remitted annually to the Department of Health and Human Services Payment Management System (PMS) through an electronic medium using either Automated Clearing House (ACH) network or a Fedwire Funds Service payment. Instructions for returning interest, including the information that must be submitted, can be found at Returning Funds/Interest | HHS PSC FMP Payment Management Services.  Additionally, these instructions are provided in GAN Enclosure 4.

**Q** **Are grant recipients/subrecipients automatically permitted to draw funds in advance of the time they need to disburse funds in order to liquidate obligations?**

**A** The payment requirements in 2 CFR 200.305(b) authorize a grantee or subgrantee to request funds in advance of expenditures if certain conditions are met.  However, if those conditions are not met, the Department and a pass-through agency may place a payee on reimbursement.

**Q** **For formula grant programs such as ESEA Title I, for which States distribute funds to LEAs, may States choose to pay LEAs on a reimbursement basis?**

**A** A subgrantee must be paid in advance if it meets the standards for advance payments in 2 CFR 200.305(b)(1) but if the subgrantee cannot meet those standards, the State may put the subgrantee on reimbursement payment.  See 2 CFR 200.305(b).

**Q** **Will the Department issue special procedures in advance if G5 plans to shut down for 3 days or more?**

**A** Yes, before any shutdown of G5 lasting three days or more, the Department issues special guidance for drawing down funds during the shutdown.  The guidance will include cash

3

Supp. App. - 087

**GAN Enclosure 5**
**Revised 10/2024**

management improvement act procedures for States and certain State institutions of higher education and procedures for grants (including Pell grants) that are not subject to CMIA.

Supp. App. - 088

S215J230147 - 24

Lesley Rivers

Metropolitan Family Services

101 N Wacker

Floor 17

Chicago, IL 60606

S215J230147 - 24

Theresa Nihill
Metropolitan Family Services
101 N Wacker
Floor 17
Chicago, IL 60606

S215J230147 - 24

## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION



| | | | |
|---|---|---|---|
| **1** | RECIPIENT NAME<br><br>Metropolitan Family Services<br>101 N Wacker<br>Floor 17<br>Chicago, IL 60606 | **2** | AWARD INFORMATION<br><br>PR/AWARD NUMBER   S215J230147 - 24<br>ACTION NUMBER   5<br>ACTION TYPE   Continuation<br>AWARD TYPE   Discretionary<br>(Research and Development) |

| | | | |
|---|---|---|---|
| **3** | PROJECT STAFF<br><br>RECIPIENT PROJECT DIRECTOR<br>  Lesley Rivers    (312) 273-8252<br>  RiversL@actnowillinois.org<br>EDUCATION PROGRAM CONTACT<br>  Stephen Kostyo    (202) 987-1966<br>  Stephen.Kostyo@ed.gov<br>EDUCATION PAYMENT HOTLINE<br>  G5 PAYEE HELPDESK   888-336-8930<br>  obssed@servicenowservices.com | **4** | PROJECT TITLE<br><br>84.215J<br>Expanding Full Service Community Schools in Rural Illinois |

**5** KEY PERSONNEL

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| Lesley Rivers | Project Director | 50 % |

**6** AWARD PERIODS

BUDGET PERIOD    01/01/2025 - 12/31/2025
PERFORMANCE PERIOD    01/01/2024 - 12/31/2028

FUTURE BUDGET PERIODS

| BUDGET PERIOD | DATE | AMOUNT |
|---|---|---|
| 3 | 01/01/2026 - 12/31/2026 | $9,420,400.00 |
| 4 | 01/01/2027 - 12/31/2027 | $9,420,400.00 |
| 5 | 01/01/2028 - 12/31/2028 | $9,420,400.00 |

**7** AUTHORIZED FUNDING

THIS ACTION    $9,093,852.00
BUDGET PERIOD    $9,093,852.00
PERFORMANCE PERIOD    $18,514,252.00

**8** ADMINISTRATIVE INFORMATION

UEI    PDNNR2MS6AX3
REGULATIONS    CFR PART 20 USC 7423-7423b
    EDGAR AS APPLICABLE
    2 CFR AS APPLICABLE
ATTACHMENTS    2 , 3 , 6 , 8 , 9 , 11 , 12 , 13 , 14 , B OESE , GE1 , GE2 , GE3 , GE4 , GE5

**9** LEGISLATIVE AND FISCAL DATA

AUTHORITY:    PL XXX V, PART D, SUBPART 1 EVERY STUDENT SUCCEEDS ACT,
    TITLE IV, PART F SUBPART 2, SECTION 4625
PROGRAM TITLE:    INNOVATIVE APPROACHES TO LITERACY; FULL-SERVICE
    COMMUNITY SCHOOLS; AND PROMISE NEIGHBORHOOD



S215J230147 - 24

## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

CFDA/SUBPROGRAM NO:        84.215J

| FUND CODE | FUNDING YEAR | AWARD YEAR | ORG. CODE | CATEGORY | LIMITATION | ACTIVITY | CFDA | OBJECT CLASS | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| 0203M | 2024 | 2025 | ES000000 | B | GNH | 000 | 215 | 4101C | $9,093,852.00 |

PR/AWARD NUMBER:            S215J230147 - 24

RECIPIENT NAME:            Metropolitan Family Services

GRANTEE NAME:            METROPOLITAN FAMILY SERVICES

101 N WACKER DR STE 1700,

CHICAGO, IL 60606 - 7384

PROGRAM INDIRECT COST TYPE:    Restricted

PROJECT INDIRECT COST RATE:

TERMS AND CONDITIONS

(1)    The Office of Management and Budget requires all Federal agencies to assign a Federal Award Identifying Number (FAIN) to each of their financial assistance awards. The PR/AWARD NUMBER identified in Block 2 is your FAIN. If subawards are permitted under this grant, and you choose to make subawards, you must document the assigned PR/AWARD NUMBER (FAIN) identified in Block 2 of this Grant Award Notification on each subaward made to a subrecipient under this grant.
The term subaward means:
1) An award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor [See 2 CFR 200.331(a)(5)], beneficiary, or participant. A subaward may be provided through any form of legal agreement consistent with criteria in with 200.331, including an agreement the pass-through entity considers a contract. See 2 CFR 200.1.

In accordance with 2 CFR 200.331 (a), a subaward is made to a subrecipient for the purpose of carrying out a portion of the Federal award and creates a Federal financial assistance relationship with a subrecipient. Characteristics that support the classification of the entity as a subrecipient include, but are not limited to, when the entity:

1) Determines who is eligible to receive what Federal assistance;
2) Has its performance measured in relation to whether the objectives of a Federal program were met;
3) Has responsibility for programmatic decision-making;
4) Is responsible for adherence to applicable Federal program requirements specified in the Federal award; and
5) Implements a program for a public purpose specified in authorizing statute, as opposed to providing goods or services for the benefit of the pass-through entity.

(2)    THE FOLLOWING ITEMS ARE INCORPORATED IN THE GRANT AGREEMENT:
1) THE RECIPIENT'S APPLICATION (BLOCK 2);
2) THE APPLICABLE EDUCATION DEPARTMENT REGULATIONS: 2 CFR PART 180, NONPROCUREMENT DEBARMENT AND SUSPENSION AS ADOPTED AT 2 CFR PART 3485; 2 CFR PART 200 AS ADOPTED AT 2 CFR 3474 (BLOCK 8), AND 34 CFR PARTS 75, 77, 79, 81, 82, 84, 86, 97, 98, 99; AND THE PROGRAM REGULATIONS SPECIFIED IN BLOCK 8; AND
3) THE SPECIFIC CONDITIONS SHOWN AS ATTACHMENTS IN BLOCK 8 ON THE INITIAL AWARD APPLY UNTIL CHANGED.
THIS AWARD SUPPORTS ONLY THE BUDGET PERIOD SHOWN IN BLOCK 6. IN ACCORDANCE WITH 34 CFR 75.253, A GRANTEE, IN ORDER TO RECEIVE A CONTINUATION AWARD FROM THE SECRETARY FOR A BUDGET PERIOD AFTER THE FIRST BUDGET PERIOD OF AN APPROVED MULTIYEAR PROJECT, MUST 1) EITHER
(I) DEMONSTRATE THAT IT HAS MADE SUBSTANTIAL PROGRESS IN ACHIEVING
(A) THE GOALS AND OBJECTIVES OF THE PROJECT; AND



S215J230147 - 24

**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

(B) THE PERFORMANCE TARGETS IN THE GRANTEE'S APPROVED APPLICATION, IF THE SECRETARY ESTABLISHED PERFORMANCE MEASUREMENT REQUIREMENTS FOR THE GRANT IN THE APPLICATION NOTICE; OR
(II) OBTAIN THE SECRETARY'S APPROVAL FOR CHANGES TO THE PROJECT THAT
(A) DO NOT INCREASE THE AMOUNT OF FUNDS OBLIGATED TO THE PROJECT BY THE SECRETARY; AND
(B) ENABLE THE GRANTEE TO ACHIEVE THE GOALS AND OBJECTIVES OF THE PROJECT AND MEET THE PERFORMANCE TARGETS OF THE PROJECT, IF ANY, WITHOUT CHANGING THE SCOPE OR OBJECTIVES OF THE PROJECT;
2) SUBMIT ALL REPORTS AS REQUIRED BY 75.118;
3) CONTINUE TO MEET ALL APPLICABLE ELIGIBILITY REQUIREMENTS OF THE GRANT PROGRAM;
4) MAINTAIN FINANCIAL AND ADMINISTRATIVE MANAGEMENT SYSTEMS THAT MEET THE REQUIREMENTS IN 2 CFR 200.302 AND 200.303; AND
5) RECEIVE A DETERMINATION FROM THE SECRETARY THAT CONTINUATION OF THE PROJECT IS IN THE BEST INTEREST OF THE FEDERAL GOVERNMENT.

IN ACCORDANCE WITH 2 CFR 200.308(f)(2) CHANGES TO KEY PERSONNEL IDENTIFIED IN BLOCK 5 MUST RECEIVE PRIOR APPROVAL FROM THE DEPARTMENT.
THE SECRETARY ANTICIPATES FUTURE FUNDING FOR THIS AWARD ACCORDING TO THE SCHEDULE IDENTIFIED IN BLOCK 6. THESE FIGURES ARE ESTIMATES ONLY AND DO NOT BIND THE SECRETARY TO FUNDING THE AWARD FOR THESE PERIODS OR FOR THE SPECIFIC AMOUNTS SHOWN. THE RECIPIENT WILL BE NOTIFIED OF SPECIFIC FUTURE FUNDING ACTIONS THAT THE SECRETARY TAKES FOR THIS AWARD.

(3) Unless this grant solely funds research, you must comply with new regulations regarding awards to faith-based organizations (FBOs) that provide beneficiary services under this grant or under a contract you award to provide beneficiary services under this grant. These new regulations clarify the rights of FBOs and impose certain duties on FBOs regarding the referral of beneficiaries they serve. See 34 CFR 75.52, 75.712-75.714, appendix A to part 75, and 2 CFR 3474.15. The Department has established a web page that provides guidance on the new regulations, including FAQs and other implementation tools, which is available at http://www2.ed.gov/policy/fund/reg/fbci-reg.html. If you have any questions about these regulations, please contact the Education Program Contact identified in Block 3 of this GAN.

(4) Reimbursement of indirect costs is subject to the availability of funds and statutory and regulatory restrictions (34 CFR 75.564(a) and 34 CFR 76.562(a)). The negotiated indirect cost rate agreement authorizes a recipient to draw down indirect costs from the grant awards (34 CFR 75.564(b) and 34 CFR 76.562(b)). The following conditions apply to the below entities.

A. All entities (other than Institutions of Higher Education (IHE)

The GAN for this grant award shows the indirect cost rate that applies on the date of the initial grant for this project. However, after the initial grant date, when a new indirect cost rate agreement is negotiated, the newly approved indirect cost rate supersedes the indirect cost rate shown on the GAN for the initial grant. This new indirect cost rate should be applied according to the period specified in the indirect cost rate agreement, unless expressly limited under statutes, departmental regulations (Education Department General Administrative Regulations (EDGAR)), or program regulations. Any grant award with an approved budget can amend the budget to account for a change in the indirect cost rate. However, for a discretionary grant award any material changes to the budget which may impact the scope or objectives of the grant must be discussed with the program officer at the Department. See 34 CFR 75.560 (d)(3) (ii) (part 75 of EDGAR).

B. Institutions of Higher Education (IHE)

Under 2 CFR part 200, Appendix III, Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), the Department must apply the negotiated indirect cost rate in effect on the date of the initial grant award to every budget period of the project, including all continuation grants made for this



S215J230147 - 24

**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

project. See 2 CFR Part 200, Appendix III, paragraph C.7. Therefore, the GAN for each continuation grant will show the original indirect cost rate and it applies to the entire period of performance of this project. If the indirect cost rate agreement that is applicable to this grant does not extend to the end of the grant project period, the indirect cost rate set at the start of the project period must still be applied to the end of project period regardless of the fact that the rate has otherwise expired.

## LISA HARRISON

Digitally signed by LISA HARRISON
Date: 2024.12.20 13:59:04 -05'00'

———————————————————————     —————————

**AUTHORIZING OFFICIAL**     **DATE**

Ver. 1

# EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants** (See Block 2 of the Notification)

**1. RECIPIENT NAME -** The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION -** Unique items of information that identify this notification.

**PR/AWARD NUMBER -** A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

**ACTION NUMBER -** A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

**ACTION TYPE -** The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

**AWARD TYPE -** The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF -** This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

**\*RECIPIENT PROJECT DIRECTOR -** The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

**EDUCATION PROGRAM CONTACT -** The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

**EDUCATION PAYMENT CONTACT -** The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER -** Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL -** Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS -** Project activities and funding are approved with respect to three different time periods, described below:

**BUDGET PERIOD -** A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

**PERFORMANCE PERIOD -** The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

**\*FUTURE BUDGET PERIODS -** The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING -** The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

**\*THIS ACTION -** The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

**\*BUDGET PERIOD -** The total amount of funds available for use by the grantee during the stated budget period to this date.

**\*PERFORMANCE PERIOD -** The amount of funds obligated from the start date of the first budget period to this date.

**RECIPIENT COST SHARE -** The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

**RECIPIENT NON-FEDERAL AMOUNT -** The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION -** This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

**UEI -** The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

Supp. App. - 095

Case: 23-2473    Document: 20    Filed: 09/06/2026    Pages: 494

**\*REGULATIONS -** Title 2 of the Code of Federal Regulations(CFR), Part 200 as adopted at 2 CFR 3474, the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS -** Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA -** The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS -** The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award. **AMOUNT -** The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS -** Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER -** The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME -** The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE -** The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE -** The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL -** The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award

**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF -** The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT -** The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT -** The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT -** The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE -** If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

* This item differs or does not appear on formula and block grants.

# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF THE CHIEF FINANCIAL OFFICER
### & CHIEF INFORMATION OFFICER

Lesley Rivers
Metropolitan Family Services
101 N Wacker
Floor 17

Chicago, IL 60606

SUBJECT: Payee Verification for Grant Award S215J230147 - 24

This is to inform you of the payee for the above listed grant award issued by the United States Department of Education

Grantee UEI: PDNNR2MS6AX3
Grantee Name: METROPOLITAN FAMILY SERVICES

Payee UEI: PDNNR2MS6AX3
Payee Name: METROPOLITAN FAMILY SERVICES

If any of the above information is not correct, please contact a Payee Customer Support Representative at 1-888-336-8930. Please send all the correspondence relating to the payee or bank information changes to the following address:

U.S. Department of Education
550 12th Street, SW
Room 6087
Washington, DC 20202

Attn: Stephanie Barnes
Phone: 202-245-8006

**GAN ATTACHMENT 2**
**Revised 10 2024**

## SPECIFIC GRANT TERMS AND CONDITIONS FOR
## FINANCIAL AND PERFORMANCE REPORTS

**PERFORMANCE REPORTS:**

**(1) FINAL REPORTS - ALL RECIPIENTS** are required to submit a final performance report within 120 days after the expiration or termination of grant support in accordance with submission instructions provided in box 10 of the Grant Award Notification (GAN), or through another notification provided by the Department of Education (Department) (2 CFR § 200.329(c)).

**(2) ANNUAL, QUARTERLY, or SEMIANNUAL REPORTS - ALL RECIPIENTS** of a multi-year discretionary award must submit an annual Grant Performance Report (34 CFR § 75.118). The annual performance report shall provide the most current performance and financial expenditure information that is sufficient to meet the reporting requirements of 2 CFR §§ 200.328, 200.329, 200.332, and 34 CFR §§ 75.590; 75.718; 75.720; 75.623; and 75.732.

Your education program contact will provide you with information about your performance report submissions, including the due date, as a grant term or condition in box 10 on the GAN, or through another notification provided by the Department. The grant term or condition in box 10 on the GAN or another notification may reflect any of the following:

1. That a performance report is due before the next budget period begins. The report should contain current performance and financial expenditure information for this grant. It will either identify the date the performance report is due or state that the Department will provide additional information about this report, including due date, at a later time.

2. That an interim performance report is required because of the nature of the award or because of statutory or regulatory provisions governing the program under which this award is made, and that the report is due more frequently than annually as indicated, e.g., due quarterly and submitted within 30 days after the end of each quarter, or due semiannually and submitted within 30 days after the end of each 6-month period (2 CFR § 200.329(c)(1)).

3. That other reports are required, e.g., program specific reports required in a program's statute or regulation or specific conditions are applied (2 CFR § 200.208).

**(3) FINANCIAL REPORTS – SOME RECIPIENTS:**

If a financial report is required, your education program contact will provide you with information about your financial report submission, including the due date, as a grant term or condition in box 10 on the GAN, or through another notification.

A Standard Form (SF) 425 Federal Financial Report (FFR) is required if:

1. A grant involves cost sharing, and the ED 524B, which collects cost sharing information, is not submitted or a program-specific report approved by U.S. Office of Management and Budget (OMB) does not collect cost sharing information;
2. Program income was earned;

1

**GAN ATTACHMENT 2**
**Revised 04/2024**

3. Indirect cost information is to be reported and the ED 524B was not used or a program-specific report approved by OMB does not collect indirect cost information;
4. Program regulations or statute require the submission of the FFR; or
5. Specific Award Conditions, or specific grant or subgrant conditions for designation of "high risk," were imposed in accordance with 2 C.F.R. part 200.208 and part 3474.10 and required the submission of the FFR.

If the FFR is required, the notification may indicate one of the following (see the form and its instructions at Standard Form (SF) 425 Federal Financial Report (FFR)):

1. Quarterly - FFRs are required for reporting periods ending on 12/31, 03/31, 06/30, 09/30, and are due within 30 days after each reporting period.

2. Semi-annual - FFRs are required for reporting periods ending on 03/31 and 09/30, and are due within 30 days after each reporting period.

3. Annual - FFRs are required for reporting period ending 09/30, and is due within 30 days after the reporting period.

4. Final - In coordination with the submission of final performance reports, FFRs are due within 120 days after the project or grant period end date (2 CFR § 200.328).

When completing an FFR for submission, the following must be noted:

1. *Multiple Grant Reporting Using SF 425A Prohibited:* While the FFR is a governmentwide form that is designed for single grant and multiple grant award reporting, the Department's policy is that multiple grant award reporting is not permitted for Department grants. Thus, a Department grantee that is required to submit an FFR in accordance with any of the above referenced selections must complete and submit one FFR for each of its grants. Do not use the FFR attachment (Standard Form 425A), which is available for reporting multiple grants, for reporting on Department grants. As such, references to multiple grant reporting and to the FFR attachment in item 2 of the FFR are not applicable to Department grantees. With regards to item 1 of the note found in the FFR Instructions, a grantee must complete items 10(a) through 10(o) for each of its grants. The multiple grant and FFR attachment reference found in item 2 of the Line Item Instructions for the FFR is not applicable to Department grants.

2. *Program Income*: Unless disallowed by statute or regulation, a grantee will complete item 10(m) or 10(n) in accordance with the options or combination of options as provided in 2 CFR Part 200.307. A grantee is permitted, in accordance with 2 CFR Part 200.307, to add program income to its Federal share to further eligible project or program objectives, use program income to finance the non-Federal share of the project or program; and deduct program income from the Federal share of the total project costs.

3. *Indirect Costs:* A grantee will complete item 11(a) by listing the indirect cost rate type identified on its indirect cost rate agreement, as approved by its cognizant agency for indirect costs.

2

**GAN ATTACHMENT 2**
**Revised 04/2024**

A Department grantee that does not have an indirect cost rate agreement approved by its cognizant agency for indirect costs, and that is using the Department approved (beyond the 90-day temporary period) temporary indirect cost rate of 10% of budgeted direct salaries and wages, or the de minimis rate of 15% of modified total direct cost (MTDC) must list its indirect cost rate in 11(a) as a Department Temporary Rate or De Minimis Rate. The de minimis rate of 15% of MTDC consists of:

> All direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and subawards and contracts up to the first $50,000 of each subaward (i.e., subgrant). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $50,000. Other items, including contract costs in excess of $50,000, may be excluded when necessary to avoid a serious inequity in the distribution of indirect costs (2 CFR 200.1 "Modified Total Direct Cost (MTDC)").

A training program grantee whose recovery of indirect cost limits indirect cost recovery to 8% of MTDC or the grantees negotiated indirect cost rate, whichever is less in accordance with 34 CFR § 75.562 (c), must list its rate in 11(a) as a Department Training Grant Rate. The 8% limit does not apply to agencies of Indian tribal governments, local governments, and States[1] as defined in 2 CFR § 200.1.

A restricted program grantee must list its rate as a Restricted Indirect Cost Rate in 11(a). A restricted program (i.e., programs with statutory supplement-not-supplant requirements) grantee must utilize a restricted indirect cost rate negotiated with its cognizant agency for indirect costs, or may elect to utilize a restricted indirect cost rate of 8% MTDC if their negotiated restricted indirect cost rate calculated under 34 CFR 75.563 and 76.564 – 76.569, is not less than 8% MTDC. A State or local government[2] that is a restricted program grantee may not elect to utilize the 8% MTDC rate. Additionally, restricted program grantees may not utilize the de minimis rate, but may utilize the temporary rate until a restricted indirect cost rate is negotiated. If a restricted program grantee elects to utilize the temporary rate, it must list its rate as a Department Temporary Rate in 11(a).

Grantees with indirect cost rates prescribed in program statute or regulation must list their rate as a Rate Required in Program Statute or Regulation in 11(a). Grantees are required to follow program-specific statutory or regulatory requirements that mandate either indirect cost rate type or maximum administrative costs recovery.

For detailed information including restrictions related to temporary, de minimis, training, restricted, and program prescribed indirect cost rates see GAN ATTACHMENT 4.

4. *Supplemental Pages:* If grantees need additional space to report financial information, beyond what is available within the FFR, they should provide supplemental pages. These additional pages must indicate the following information at the top of each page: the PR/Award Number

---

[1] Note that a State-funded institution of higher education is not considered a "State government" for these purposes; and a Tribal college or university funded by a federally-recognized Tribe is not considered a Tribe for these purposes.
[2] Note that a State-funded institution of higher education is not considered a "State government" for these purposes.

3

**GAN ATTACHMENT 2**
**Revised 04/2024**

also known as the Federal Identifying Number or FAIN, recipient organization, Unique Entity Identifier, Employer Identification Number (EIN), and period covered by the report.

Upon request of the Secretary, a grantee must, at the time of submission to the Secretary, post any performance and financial reports on a public-facing website maintained by the grantee, after redacting any privacy or confidential business information (34 CFR § 75.720).

4

**GAN ATTACHMENT 3**
**Revised 10/2024**

## AN OVERVIEW OF AUDIT REQUIREMENTS OF STATES, LOCAL GOVERNMENTS, AND NONPROFIT ORGANIZATIONS

This GAN ATTACHMENT is **not** applicable to for-profit organizations.  For-profit organizations comply with audit requirements specified in block 10 of their Grant Award Notification (GAN).

**Summary of Audit Requirements for States, Local Governments, and Nonprofit Organizations:**

1. Single Audit.  A non-Federal entity (a State, local government, Indian tribe, Institution of Higher Education (IHE)[1], or nonprofit organization) that expends $1,000,000 or more in Federal awards during the non-Federal entity's fiscal year must have a single audit conducted annually in accordance with 2 CFR § 200.501, "Audit Requirements," except when it elects to have a program specific audit conducted.

2. Program-specific audit election.  When an auditee expends Federal awards under only one Federal program (excluding research and development (R&D)), and the Federal program's statutes, regulations, or the terms and conditions of the Federal award do not require a financial statement audit of the auditee, the auditee may elect to have a program-specific audit conducted.  A program–specific audit may not be elected for R&D unless all of the Federal awards expended were received from the same Federal agency, or the same Federal agency and the same pass-through entity, and that Federal agency, or pass-through entity in the case of a subrecipient, approves in advance a program-specific audit.

3. Exemption when Federal awards expended are less than $1,000,000.  A non-Federal entity that expends less than $1,000,000 during the non-Federal entity's fiscal year in Federal awards is exempt from Federal audit requirements for that year, except as noted in 2 CFR § 200.503, but records must be available for review or audit by appropriate officials of the Federal agency, pass-through entity, and Government Accountability Office (GAO). Generally, grant records must be maintained for a period of three years after the date of the final expenditure report (2 CFR § 200.334)

4. Federally Funded Research and Development Centers (FFRDC).  Management of an auditee that owns or operates a FFRDC may elect to treat the FFRDC as a separate entity (2 CFR § 501(e)).

5. Report Submission.  To meet audit requirements of U.S. Office of Management and Budget (OMB) Uniform Guidance: Cost Principles, Audit, and Administrative Requirements for Federal Awards (Uniform Guidance), grantees must submit all audit documents required by Uniform Guidance 2 CFR § 200.512, as well as relevant

---

[1] As defined under the Higher Education Act of 1965, as amended (HEA) section 101.

1

**GAN ATTACHMENT 3**
**Revised 10/2024**

SF-SAC workbook(s) electronically to the Federal Audit Clearinghouse at:
https://www.fac.gov/.

6.  The audit, the workbook(s), and reporting package must be submitted within of 30 calendar days after receipt of the auditor's report(s) or nine months after the end of the audit period (whichever is earlier).  If the due date falls on a Saturday, Sunday, or Federal holiday, the reporting package is due the next business day.  The auditee must make copies available for public inspection unless restricted by Federal statutes or regulation.  Auditees and auditors must ensure that their respective parts of the reporting package do not include protected personally identifiable information (2 CFR § 200.512).

Additional grantee requirements can be found in Uniform Guidance §200.510, including:

*   Preparing financial statements that reflect the grantee's financial position, results of operations or changes in net assets, and where appropriate, cash flows for the fiscal year audited;
*   Preparing a schedule of expenditures of Federal awards (SEFA) for the period covered by the grantee's financial statements;
    o List Federal programs by Federal agency
    o For Federal awards received as a subrecipient, the name of the pass-through entity and assigned identifying number
    o Provide the total Federal awards expended for each Federal program and the Assistance Listing Number (ALN).  For a cluster of programs, also provide the total for the cluster
    o Include the total amount provided to subrecipients from each Federal program

Grantees are strongly urged to obtain the "OMB Compliance Supplement" and to contact their cognizant agency for single audit technical assistance. This supplement will be instructive to both grantees and their auditors.  Appendix III of the supplement provides a list of Federal Agency Contacts for Single Audits, including addresses, phone numbers, fax numbers, and e-mail addresses for technical assistance.

The designated cognizant agency for single audit purposes is "the Federal awarding agency that provides the predominant amount of direct funding to the recipient." The Compliance Supplement will be instructive to both grantees and their auditors.  Appendix III of the supplement provides a list of Federal Agency Contacts for Single Audits, including addresses, phone numbers, fax numbers, and e-mail addresses for technical assistance.

For single audit-related questions, if the U.S. Department of Education is the cognizant agency, grantees should contact the Non-Federal Audit Team in the Department's Office of Inspector General, at oignon-federalaudit@ed.gov.  Additional resources for single audits are also available on the Non-Federal Audit Team's website at https://www2.ed.gov/about/offices/list/oig/nonfed/index.html.  For programmatic questions, grantees should contact the education program contact shown on the Department's GAN.

Grantees can obtain information on audits from:

The OMB website at www.omb.gov.  Look under Office of Management and Budget (in right column) then click Office of Federal Financial Management (to obtain the Current OMB Compliance Supplement

2

in the right column).  The SF-SAC Workbooks and Instructions can be found at the Federal Audit Clearinghouse at:
https://facides.census.gov/Files/2019-2021%20Checklist%20Instructions%20and%20Form.pdf.

The American Institute of Certified Public Accountants (AICPA) has illustrative OMB Single Audit report examples that might be of interest to accountants, auditors, or financial staff that can be downloaded by searching for "single audit report illustrations" at www.aicpa-cima.com.

**GAN ATTACHMENT 6**
**Revised 10/2024**

## REQUEST FOR APPROVAL OF PROGRAM INCOME

In projects that generate program income, the recipient calculates the amount of program income according to the guidance given in 2 CFR Part 200.307, which addresses the use and expenditure of program income as well as the methods for use of program income

**\*\*\* IF YOU RECEIVED YOUR GRANT AWARD NOTIFICATION ELECTRONICALLY AND YOU ARE SUBJECT TO ANY OF THE RESTRICTIONS IDENTIFIED BELOW, THE RESTRICTION(S) WILL APPEAR IN BOX 10 ON YOUR GRANT AWARD NOTIFICATION AS A GRANT TERM OR CONDITION OF THE AWARD. \*\*\***

Unless checked below as NOT ALLOWED, the recipient may exercise any of the options or combination of options, as provided in 2 CFR Part 200.307, for using program income generated in the course of the recipient's authorized project activities:

\_\_\_\_\_ Not Allowed  Adding program income to funds committed to the project by the Secretary and recipient and using it to further eligible project or program objectives;

\_\_\_\_\_ Not Allowed  Using program income to finance the non-Federal share of the project or program; and

\_\_\_\_\_ Not Allowed  Deducting program income from the total allowable cost to determine the net allowable costs.

1

GAN ATTACHMENT 8
Revised 10/2024

**TRAFFICKING IN PERSONS**

The Department of Education adopts the requirements of the Trafficking Victims Protection Act (TVPA) of 2000, as codified at 22 U.S.C. 7101 to 7115, in 22 U.S.C. 7104(g); 22 U.S.C. 7104a; 22 U.S.C. 7104b; and 22 U.S.C. 7104c into this grant through this condition as per the Code of Federal Regulations at 2 CFR Part 175 .

(a) Condition:

The Department, as authorized by 22 U.S.C. 7104b(c), may without penalty, terminate a grant or take any remedial actions if a recipient or subrecipient engages in:

(1) Severe forms of trafficking in persons;

(2) The procurement of a commercial sex act during the period of time that the grant or cooperative agreement is in effect;

(3) The use of forced labor in the performance of the grant or cooperative agreement; or

(4) Acts that directly support or advance trafficking in persons, including the following acts:

(i) Destroying, concealing, removing, confiscating, or otherwise denying an employee access to that employee's identity or immigration documents;

(ii) Failing to provide return transportation or pay for return transportation costs to an employee from a country outside the United States to the country from which the employee was recruited upon the end of employment if requested by the employee, unless:

(A) exempted from the requirement to provide or pay for such return transportation by the Department; or

(B) the employee is a victim of human trafficking seeking victim services or legal redress in the country of employment or a witness in a human trafficking enforcement action;

(iii) Soliciting a person for the purpose of employment, or offering employment, by means of materially false or fraudulent pretenses, representations, or promises regarding that employment;

(iv) Charging recruited employees a placement or recruitment fee; or

1

**GAN ATTACHMENT 8**
**Revised 10/2024**

(v) Providing or arranging housing that fails to meet the host country's housing and safety standards.

(b) Compliance plan and certification requirement:

(1) Prior to receiving a grant, if the estimated value of services required to be performed under the grant or cooperative agreement outside the United States exceeds $500,000, you must certify that:

(i) You have implemented a plan to prevent the activities described in paragraph (a) of this section, and are in compliance with this plan;

(ii) You have implemented procedures to prevent any activities described in paragraph (a) of this section and to monitor, detect, and terminate any subrecipient, contractor, subcontractor, or employee of the recipient engaging in any activities described in paragraph (a) of this section; and

(iii) To the best of your knowledge, neither you, nor any subrecipient, contractor, or subcontractor of the recipient or any agent of the recipient or of such a subrecipient, contractor, or subcontractor, is engaged in any of the activities described in paragraph (a) of this section.

(2) Annual certification. You must submit an annual certification consistent with paragraph (b)(1) of this section for each year the award is in effect.

(3) Compliance plan. Any plan or procedures implemented pursuant to paragraph (b) must be appropriate to the size and complexity of the grant or cooperative agreement and to the nature and scope of its activities, including the number of non-United States citizens expected to be employed.

(4) Copies of the compliance plan. The recipient must provide a copy of the plan to the grant officer upon request, and as appropriate, must post the useful and relevant contents of the plan or related materials on its website and at the workplace.

(5) Minimum requirements of the compliance plan. The compliance plan must include, at a minimum, the following:

(i) An awareness program to inform recipient employees about the Government's policy prohibiting trafficking-related activities described in paragraph (a) of this section, the activities prohibited, and the actions that will be taken against the employee for violations. Additional information about Trafficking in Persons and examples of awareness programs can be found at the website for the Department of State's Office to Monitor and Combat Trafficking in Persons at http://www.state.gov/j/tip/.

2

Supp. App. - 107

**GAN ATTACHMENT 8**
**Revised 10/2024**

(ii) A process for employees to report, without fear of retaliation, activity inconsistent with the policy prohibiting trafficking in persons.

(iii) A recruitment and wage plan that only permits the use of recruitment companies with trained employees, prohibits charging recruitment fees to the employees or potential employees and ensures that wages meet applicable host-country legal requirements or explains any variance.

(iv) A housing plan, if the recipient, subrecipient, contractor, or subcontractor intends to provide or arrange housing, that ensures that the housing meets host-country housing and safety standards.

(v) Procedures to prevent agents, subrecipients, contractors, or subcontractors at any tier and at any dollar value from engaging in trafficking in persons, including activities in paragraph (a) of this section, and to monitor, detect, and terminate any agents, subgrants, or subrecipient, contractor, or subcontractor employees that have engaged in such activities.

(c) Notification to Inspectors General and cooperation with government. In addition, you must:

(1) Immediately inform the Department and Inspector General of the Department of any information you receive from any source that alleges credible information that you, any subrecipient, contractor, or subcontractor, or any agent of your organization or subrecipient, contractor, or subcontractor, has engaged in conduct described in paragraph (a) of this section; and

(2) Fully cooperate with any Federal agencies responsible for audits, investigations, or corrective actions relating to trafficking in persons.

3

**GAN ATTACHMENT – 9**
**Revised 10/2024**

### FEDERAL FUNDING ACCOUNTABILITY TRANSPARENCY ACT
### REPORTING SUBAWARDS AND EXECUTIVE COMPENSATION

The Federal Funding Accountability and Transparency Act (FFATA) is designed to increase transparency and improve the public's access to Federal government information.  To this end, FFATA requires that Department of Education (Department) grant recipients:

1. Report **first-tier subawards** made under Federal grants that are funded at $30,000 or more that meet the reporting conditions as set forth in this grant award term;
2. Report a subaward if a modification increases the Federal funding to an amount that equals or exceeds $30,000;
3. Report their executives' compensation for all new Federal grants that are funded at $30,000 and that meet the reporting conditions as set forth in this grant award term; and
4. Report executive compensation data for their **first-tier subrecipients** that meet the reporting conditions as set forth in this grant award term.

For FFATA reporting purposes, the Department grant recipient is the entity listed in box 1 of the Grant Award Notification.

Only **first-tier subawards** made by the Department grant recipient to its **first-tier subrecipients** and the **first-tier subrecipients'** executive compensation are required to be reported in accordance with FFATA.

*Subaward, Subrecipient, Recipient, Total Compensation, Executives*, and other key terms, are defined within item 5, Definitions, of this grant award term.

This grant award term is issued in accordance with 2 CFR Part 170—Reporting Subaward And Executive Compensation Information.

1. ***Reporting of First-tier Subawards -***

a. *Applicability and what to report.*

Unless you are exempt as provided item 4, Exemptions, of this grant award term, you must report each obligation that **equals or exceeds $30,000** in Federal funds for a first-tier subaward to a non-Federal entity or Federal agency.

You must report the information about each obligating action that are specified in the submission instructions posted at FSRS.

b. *Where and when to report.*

The Department grant recipient must report each obligating action described in paragraph **1.a.** of this award term to FSRS.

Report subaward information no later than the end of the month following the month in which the subaward obligation was made. For example, if the obligation was made on November 7, 2025, the obligation must be reported by no later than December 31, 2025.

1

**GAN ATTACHMENT – 9**
**Revised 10/2024**

**2.** *Reporting Total Compensation of the Department's Grant Recipients' Executives -*

a. *Applicability and what to report.*

You must report total compensation for each of your five most highly compensated executives for the preceding completed fiscal year, if—

i The total Federal funding authorized to date under this Federal award **equals or exceeds $30,000**;

ii In the preceding fiscal year, you received—

    A. 80 percent or more of your annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards), **and**

    B. $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); **and**,

    C. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986 after receipt of a subaward. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.)

b. *Where and when to report.*

You must report executive total compensation described in paragraph **2.a.** of this grant award term:

i. As part of your registration profile at https://www.sam.gov.

ii. No later than the month following the month in which this award is made and annually after that. (For example, if the obligation was made on November 7, 2025, the executive compensation must be reported by no later than December 31, 2025, and annually thereafter.)

**3.** *Reporting of Total Compensation of Subrecipient Executives –*

a. *Applicability and what to report.*

Unless you are exempt as provided in item 4, Exemptions, of this award term, for each first-tier **non-Federal entity** subrecipient under this award, you shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if—

2

**GAN ATTACHMENT – 9**
**Revised 10/2024**

i   The total Federal funding authorized to date under this Federal award **equals or exceeds $30,000**;

ii   In the preceding fiscal year, you received—

   A.   80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards), **and**
   B.   $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); **and**,
   C.   The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986 after receipt of a subaward. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.)

b.   *Where and when to report.*

You must report subrecipient executive total compensation described in paragraph **3.a.** of this grant award term:

i.   In FSRS. You must include a condition on subawards that requires the subrecipients to timely report the information required under paragraph **3.a.** to you the prime awardee, or in the SAM.gov. Subrecipient executive compensation entered in SAM.gov by the subrecipient will pre-populate in FSRS, so you do not have to report when subrecipients enter this information in SAM.gov. Subrecipient executive compensation not entered in SAM.gov by the subrecipient is reported in FSRS by you the Department grant recipient.

ii.   No later than the end of the month following the month during which you make the subaward. For example, if the subaward obligation was made on November 7, 2025 the subrecipient's executive compensation must be reported by no later than December 31, 2025.

**4.   *Exemptions –***

a.   If, in the previous tax year, you had gross income, from all sources, under $300,000, you are exempt from the requirements to report:

   i.   Subawards, and

   ii.   The total compensation of the five most highly compensated executives of any **subrecipient**.

**5.   *Definitions -***

a.   For purposes of this award term:

**GAN ATTACHMENT – 9**
**Revised 10/2024**

Entity includes:

(1) Whether for profit or nonprofit:

(i) A corporation;

(ii) An association;

(iii) A partnership;

(iv) A limited liability company;

(v) A limited liability partnership;

(vi) A sole proprietorship;

(vii) Any other legal business entity;

(viii) Another grantee or contractor that is not excluded by subparagraph (2); and

(ix) Any State or locality;

(2) Does not include:

(i) An individual recipient of Federal financial assistance; or

(ii) A Federal employee.

Executive means an officer, managing partner, or any other employee holding a management position.

Subaward has the meaning given in 2 CFR § 200.1.

Subrecipient has the meaning given in 2 CFR § 200.1.

Total Compensation means the cash and noncash dollar value an executive earns during an entity's preceding fiscal year. This includes all items of compensation as prescribed in 17 CFR § 229.402(c)(2).

4

**GAN ATTACHMENT 11**
**Revised 10/2024**

## SPECIFIC CONDITIONS FOR DISCLOSING
## FEDERAL FUNDING IN PUBLIC ANNOUNCEMENTS

When issuing statements, press releases, requests for proposals, bid solicitations and other documents describing projects or programs funded in whole or in part with Federal money, U.S. Department of Education grantees shall clearly state:

1) the percentage of the total costs of the program or project which will be financed with Federal money;

2) the dollar amount of Federal funds for the project or program; and

3) the percentage and dollar amount of the total costs of the project or program that will be financed by non-governmental sources.

1

**PROHIBITION OF TEXT MESSAGING AND EMAILING WHILE DRIVING
DURING OFFICIAL FEDERAL GRANT BUSINESS**

Federal grant recipients, subrecipients, and their grant personnel are prohibited from text messaging while driving a government owned vehicle, or while driving their own privately-owned vehicle during official grant business, or from using government supplied electronic equipment to text message or email when driving.

Recipients must comply with these conditions under Executive Order 13513, "Federal Leadership on Reducing Text Messaging While Driving," October 1, 2009.

1

**GAN ATTACHMENT 13**
**Revised 10/2024**

## REGISTRATION OF UNIQUE ENTITY IDENTIFIER (UEI) NUMBER AND TAXPAYER IDENTIFICATION NUMBER (TIN) IN THE SYSTEM FOR AWARD MANAGEMENT (SAM.gov)

The U.S. Department of Education's (Department) Grants Management System (G5) disburses payments via the U.S. Department of Treasury (Treasury).  The U.S. Treasury requires that we include your Tax Payer Identification Number (TIN) with each payment.   Therefore, to do business with the Department you must have a registered Unique Entity Identifier (UEI) and TIN number in SAM.gov, the U.S. Federal Government's primary registrant database.

What is a UEI?  SAM.gov assigns a UEI to entities when they pass validation in SAM.gov. The UEI is a 12-character alphanumeric identifier used in SAM.gov and other federal government systems to identify a unique entity.

If the payee UEI number is different than your grantee UEI number, both numbers must be registered in SAM.gov. Failure to register both will delay the receipt of payments from the Department.

What is a TIN?  A TIN is an identification number used by the Internal Revenue Service (IRS) in the administration of tax laws. It is issued either by the Social Security Administration (SSA) or by the IRS. A Social Security number (SSN) is issued by the SSA whereas all other TINs are issued by the IRS.

The following are all considered TINs according to the IRS.

- Social Security Number "SSN"
- Employer Identification Number "EIN"
- Individual Taxpayer Identification Number "ITIN"
- Taxpayer Identification Number for Pending U.S. Adoptions "ATIN"
- Preparer Taxpayer Identification Number "PTIN"

If your UEI number is not currently registered with SAM.gov, you can easily register by going to www.sam.gov.  Allow at least ten business days after you submit your registration for it to become active in SAM.gov.  If you need a new TIN, please allow 2-5 weeks for your TIN to become active.  If you need assistance during the registration process, you may contact the Federal Service Desk (FSD).  Live chat information and other information about the FSD is available at: GSAFSD Service Portal Landing - GSA Federal Service Desk Service Portal.

If you are currently registered with SAM.gov, you may not have to make any changes.  However, please take the time to validate that the TIN associated with your UEI is correct.

If you have any questions or concerns, please contact the G5 Hotline at 888-336-8930.

**GAN ATTACHMENT 14**
**Revised 10/2024**

### SYSTEM FOR AWARD MANAGEMENT REQUIREMENTS FOR RECIPIENTS AND THEIR SUBRECIPIENTS

**1.   Requirement for System for Award Management (SAM.gov)**

Unless you are exempted from this requirement under 2 CFR § 25.110, you are, in accordance with your grant program's Notice Inviting Applications, required to maintain an active SAM.gov registration with current information about your organization, including information on your immediate and highest level owner and subsidiaries, as well as on all predecessors that have been awarded a Federal contract or grant within the last three years, if applicable, at all times during which you have an active Federal award or an application or plan under consideration by a Federal awarding agency.  To remain registered in SAM.gov after your initial registration, you are required to review and update your information in SAM.gov on an annual basis from the date of initial registration or subsequent updates to ensure it is current, accurate and complete.

2.   **Recipient Requirements of Subrecipients**

In accordance with 2 CFR § 25.300 you are required to ensure that your subrecipients have a Unique Entity Identifier (UEI).  Note that subrecipients are not required to complete full registration in SAM.gov to obtain a UEI, which is required for an entity to **directly** do business with the Federal government. Instead, subrecipients may obtain a UEI by signing up in SAM.gov to get an account and establish a profile.

You may not make a subaward to a subrecipient that has not obtained a UEI and provided it to you, and you are required to notify any potential subrecipients that you cannot make a subaward unless the subrecipient obtains a UEI and provides it to you.

**3.   Definitions**

For purposes of this award term:

1.   System for Award Management (SAM.gov) means the Federal repository into which a recipient must provide information required for the conduct of business as a recipient. See 2 CFR 25.400.

2.   Unique Entity Identifier (UEI) Means the universal identifier assigned by SAM.gov to uniquely identify business entities. See 2 CFR 25.400.

3.   Recipient means an entity that receives a Federal award directly from a Federal agency to carry out an activity under a Federal program. The term recipient does not include subrecipients or individuals that are participants or beneficiaries of the award. See 2 CFR 200.1.

4.   Subaward means an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant. A subaward may be provided through any form of legal agreement consistent with criteria in with § 200.331, including an agreement the pass-through entity considers a contract. See 2 CFR 200.1.

1

5. Subrecipient means an entity that receives a subaward from a pass-through entity to carry out part of a Federal award. The term subrecipient does not include a beneficiary or participant. A subrecipient may also be a recipient of other Federal awards directly from a Federal agency. See 2 CFR 200.1.

2

**ATTACHMENT B**
**SPECIAL GRANT TERMS AND CONDITIONS FOR**
**FINANCIAL AND PERFORMANCE REPORTS**

**PERFORMANCE REPORTS:**

**ALL RECIPIENTS** are required to submit a final performance report within 90 days after the expiration or termination of grant support.

**ALL RECIPIENTS** of a multi-year discretionary award must submit an annual Grant Performance Report. The report should contain current performance and financial expenditure information for this grant. (34 CFR 75.118)

\*\*\* **IF YOU HAVE RECEIVED YOUR GRANT AWARD NOTIFICATION ELECTRONICALLY, THE ITEMS BELOW WILL NOT BE CHECKED. YOUR EDUCATION PROGRAM CONTACT WILL PROVIDE YOU WITH INFORMATION ABOUT YOUR PERFORMANCE REPORT SUBMISSIONS, INCLUDING THE DUE DATE, AS A GRANT TERM OR CONDITION IN BOX 10 ON THE GRANT AWARD NOTIFICATION, OR THROUGH ANOTHER NOTIFICATION AT A LATER TIME.** \*\*\*

Refer to the item(s) checked below for other reporting requirements that may apply to this grant:

_____ 1. A performance report is due before the next budget period begins. The report should contain current performance and financial expenditure information for this grant. (34 CFR 75.118)

_____ The continuation report is due on _____.

_____ The Department will provide recipients with additional information about this report, including due date, at a later time.

_____ 2. An interim performance report is required because of the nature of this award or because of statutory or regulatory provisions governing the program under which this award is made. The report is due more frequently than annually as indicated:

_____ Quarterly  Submit within 30 days after the end of each quarter.

_____ Semiannually  Submit within 30 days after the end of each 6-month period.

_____ 3. Other Required Reports:

\*\*\* **IF YOU HAVE RECEIVED YOUR GRANT AWARD NOTIFICATION ELECTRONICALLY, THE ITEMS BELOW WILL NOT BE CHECKED. IF A FINANCIAL REPORT IS REQUIRED, YOUR EDUCATION PROGRAM CONTACT WILL PROVIDE YOU WITH INFORMATION ABOUT YOUR FINANCIAL REPORT SUBMISSION, INCLUDING THE DUE DATE, AS A GRANT TERM OR CONDITION IN BOX 10 ON THE GRANT AWARD NOTIFICATION, OR THROUGH ANOTHER NOTIFICATION AT A LATER TIME.** \*\*\*

**FINANCIAL REPORTS:**

Unless an item down below is checked, a Standard Form 425 Federal Financial Report (FFR) is not required for this grant. The Department will rely on the drawdown of funds by grant award and record such drawdowns as expenditures by grantees. (34 CFR 75.720)

\_\_\_\_\_ Quarterly FFRs are required for reporting periods ending on 12/31, 03/31, 06/30, 09/30, and are due within 45 days after each reporting period.

_____Semi-annual FFRs are required for reporting periods ending on 03/31 and 09/30, and are due within 45 days after each reporting period.

_____An annual FFR is required for reporting period ending 09/30, and is due within 45 days after the reporting period.

_____A final FFR is due within 90 days after the project or grant period end date.

A quarterly, semi-annual, annual, and/or final FFR as noted hereinabove is due for this grant because:

_____(34 CFR 74.14 or 80.12) Special Award Conditions or Special grant or subgrant conditions for "high-risk" grantees:

_____Statutory Requirement or Other Special Condition

**When completing an FFR for submission in accordance with the above referenced selection, the following must be noted:**

1.  While the FFR is a government wide form that is designed for single grant and multiple grant award reporting, the U.S. Department of Education's (EDs) policy is that multiple grant award reporting is not permitted for ED grants. Thus, an ED grantee that is required to submit an FFR in accordance with any of the above referenced selections must complete and submit one FFR for each of its grants. The FFR attachment (Standard Form 425A), which is available for reporting multiple grants, is not to be used for ED grants. As such, references to multiple grant reporting and to the FFR attachment in items 2, 5 and 10 of the FFR are not applicable to ED grantees. With regards to item 1 of the note found in the Federal Financial Report Instructions, it is EDs policy that a grantee must complete items 10(a) through 10(o) for each of its grants. The multiple award, multiple grant, and FFR attachment references found in items 2, 5, 6, before 10(a), in item 10(b), before 10(d), before 10(i) and before 10(l) of the Line Item Instructions for the Federal Financial Report are not applicable to ED grants.

2.  Unless disallowed by statute or regulation, a grantee will complete item 10(m) or 10(n) in accordance with the options or combination of options as provided in 34 CFR 74.24(a)-(h) and 34 CFR 80.25(a)-(h). A grantee is permitted, in accordance with 34 CFR 74.24(a)-(h) and 34 CFR 80.25(a)-(h), to add program income to its Federal share to further eligible project or program objectives, use program income to finance the non-Federal share of the project or program; and deduct program income from the Federal share of the total project costs.

3.  A grantee will complete item 11(a) by listing the rate type identified in its indirect cost rate agreement, as approved by its cognizant agency. An ED grantee that does not have an indirect cost rate agreement approved by its cognizant agency, and that is using the ED approved temporary rate of 10% of budgeted direct salaries and wages, must list its rate in 11(a) as an ED Temporary Rate. A training program grantee whose recovery of indirect cost is limited to 8% of a modified total direct cost base in accordance with EDGAR § 75.562 (c), must list its rate as an ED Training Grant Rate. A restricted rate program grantee (such as one with a supplement-not-supplant grant provision) that has not negotiated an indirect cost agreement with its cognizant agency and that has limited the recovery of indirect costs in accordance with 34 CFR 75.563 and 76.564 (c), must list its rate as an ED Restricted Rate.

4.  Quarterly, semi-annual, and annual interim reports shall be due within 45 days after the end of the reporting period. Although the Office of Management and Budget (OMB) published in its December 7, 2007 Federal Register Notice (72 FR 69236) that interim reports are due within 45 days of the interim reporting end dates instead of within 30 days as originally identified, OMB has not revised the FFR instructions to reflect this change. Grantees are, nevertheless, permitted to exercise the 45 day period as published by OMB

within the Federal Register.   Final reports shall be due no later than 90 days after the project or grant period end date.  Extensions of reporting due dates may be approved by the program office upon request by the grantee.

5.   If grantees need additional space to report financial information, beyond what is available within the FFR, they should provide supplemental pages.  These additional pages must indicate the following information at the top of each page: Federal Grant or other identifying number, recipient organization, Data Universal Number System (DUNS) number, Employer Identification Number (EIN), and period covered by the report.

**One original and one copy of all reports should be mailed to:**

U.S. Department of Education
Executive Director
Office of Elementary and Secondary Education
400 Maryland Avenue, SW, FB6, Room 3W342
Washington. DC 20202-6100

12/2012

**GAN ENCLOSURE 1**
**Revised 10/2024**

## KEY FINANCIAL MANAGEMENT REQUIREMENTS FOR DISCRETIONARY GRANTS AWARDED BY THE DEPARTMENT OF EDUCATION

The Department expects grantees to administer Department grants in accordance with generally accepted business practices, exercising prudent judgment to maintain proper stewardship of taxpayer dollars.  This includes using fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds.  In addition, grantees may use grant funds only for obligations incurred during the funding period.

Title 2 of the Code of Federal Regulations Part 200, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," establishes requirements for Federal awards made to non-Federal entities.  The Education Department General Administrative Regulations (EDGAR) in 34 CFR Parts 75, 76, 77, 79, 81, 82, 84, 86, 97, 98, and 99 contain additional requirements for administering discretionary grants made by this Department.  The most recent version of these regulations may be accessed at the following URLs:

2 CFR 34 Subtitle A (see EDGAR Parts 75, 76, 77, 79, 81, 82, 84, 86, 97, 98, & 99)

2 CFR Part 200 Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards

The information on page 2 of this enclosure, "Selected Topics in Administering Department Discretionary Grants," highlights major administrative requirements of 2 CFR Part 200.  In addition, a few of the topics explain requirements that the Department imposes on its discretionary grantees under EDGAR, Part 75 (Direct Grants).  The specific sections of 2 CFR Part 200 and of EDGAR that address the topics are shown in parentheses.  The Department urges grantees to read the full text of these and other topics in EDGAR and in 2 CFR Part 200.

Grantees are reminded that a particular grant might be subject to additional requirements of the authorizing statute for the program that awarded the grant and/or any regulations issued by the program office.  Grantees should become familiar with those requirements as well because program-specific requirements might differ from those in 2 CFR Part 200 and in EDGAR.

The Department recommends that the project director and the fiscal management staff of a grantee organization communicate frequently with each other about the grant budget.  Doing so will help to ensure that you use Federal funds only for those expenditures associated with activities that conform to the goals and objectives approved for the project.

Grantees may direct any questions regarding the topics on page 2 of this enclosure, "Selected Topics in Administering Department Discretionary Grants," or about any other aspect of administering your grant award to the Department program staff person named in Block 3 of the Grant Award Notification.

Supp. App. - 121

**GAN ENCLOSURE 1**
**Revised 10/2024**

**SELECTED TOPICS IN ADMINISTERING DEPARTMENT DISCRETIONARY GRANTS**

**I.       Financial Management Systems (2 CFR § 200.302)**

The grantee's and subrecipient's financial management system must provide for the following (see §§ 200.334, 200.335, 200.336, and 200.337):

- Identification of all Federal awards received and expended and the Federal programs under which they were received. Federal program and Federal award identification must include, as applicable, the Assistance Listings title and number, Federal award identification number, year the Federal award was issued, and name of the Federal agency or pass-through entity.
- Accurate, current, and complete disclosure of the financial results of each Federal award or program in accordance with the reporting requirements in §§ 200.328 and 200.329.
- Maintaining records that sufficiently identify the amount, source, and expenditure of Federal funds for Federal awards. These records must contain information necessary to identify Federal awards, authorizations, financial obligations, unobligated balances, as well as assets, expenditures, income, and interest. All records must be supported by source documentation.
- Effective control over, and accountability for, all funds, property, and assets. The grantee or subrecipient must safeguard all assets and ensure they are used solely for authorized purposes. See § 200.303.
- Comparison of expenditures with budget amounts for each Federal award.
- Written procedures to implement the requirements of § 200.305.
- Written procedures for determining the allowability of costs in accordance with subpart E of 2 CFR Part 200 and the terms and conditions of the Federal award.

State systems must account for funds in accordance with State laws and procedures that apply to the expenditure of and the accounting for a State's own funds. A State's procedures, as well as those of its subrecipients and contractors, must be sufficient to permit the preparation of reports that may be required under the award as well as provide the tracing of expenditures to a level adequate to establish that award funds have not been used in violation of any applicable statutory restrictions or prohibitions.

**II.      Internal controls (2 CFR § 200.303)**

The grantee and subrecipient must:

- Establish, document, and maintain effective internal control over the Federal award that provides reasonable assurance that the grantee or subrecipient is managing the Federal award in compliance with Federal statutes, regulations, and the terms and conditions of the Federal award. These internal controls should align with the guidance in "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States or the "Internal Control Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).
- Comply with the U.S. Constitution, Federal statutes, regulations, and the terms and conditions of the Federal award.
- Evaluate and monitor the grantee's or subrecipient's compliance with statutes, regulations, and the terms and conditions of Federal awards.

2

**GAN ENCLOSURE 1**
**Revised 10/2024**

- Take prompt action when instances of noncompliance are identified.
- Take reasonable cybersecurity and other measures to safeguard information including protected personally identifiable information (PII) and other types of information consistent with applicable Federal, State, local, and tribal laws regarding privacy and responsibility over confidentiality.

### III.   Federal Payment (2 CFR § 200.305)

Under this part --

- the Department pays grantees in advance of their expenditures if the grantee demonstrates a willingness and ability to minimize the time between the transfer of funds to the grantee and the disbursement of the funds by the grantee;
- where the time between the transfer of funds to the grantee and the disbursement of funds cannot be minimized, the preferred method of payment is reimbursement of expenditures incurred by the non-Federal entity;
- grantees, generally, must maintain advance payments of Federal awards in interest bearing accounts that are insured; grantees or subrecipients may retain up to $500 per year of interest earned on Federal funds to use for administrative expenses of the grantee or subrecipient. Any additional interest earned on Federal funds must be returned annually to the Department of Health and Human Services Payment Management System (PMS) through either the Automated Clearing House (ACH) network or a Fedwire Funds Service payment.  All interest in excess of $500 per year must be returned to PMS regardless of whether the grantee or subrecipient was paid through PMS. Instructions for returning interest can be found at: Returning Funds/Interest | HHS PSC FMP Payment Management Services.

In general, grantees should make payment requests frequently, only for small amounts sufficient to meet the cash needs of the immediate future.

The Department has recently encountered situations where grantees failed to request funds until long after the grantee actually expended its own funds for the costs of its grant.  Grantees need to be aware that, by law, Federal funds are available for grantees to draw down for only a limited period of time, after which the funds revert to the U.S. Treasury.  In some cases grantees have requested funds too late for the Department to be able to pay the grantees for legitimate costs incurred during their project periods.  The Department urges financial managers to regularly monitor requests for payment under their grants to assure that Federal funds are drawn from the Department G5 Payment System at the time those funds are needed for payments to vendors and employees.

### IV.   Personnel (EDGAR 34 CFR §§ 75.511-75.519 and 2 CFR Part 200 Subparts D and E)

The rules governing personnel costs are located in EDGAR Part 75 and 2 CFR Part 200 Subparts D and E.  Part 75 covers issues such as paying consultants with grant funds, prohibiting dual compensation of staff, and waiving the requirement for a full-time project director.  The rules clarifying changes in key project staff are located in 2 CFR § 200.308 (f)(2).  General rules governing reimbursement of salaries and compensation for staff working on grant projects are addressed in the post Federal award requirements and cost principles in 2 CFR Part 200

3

**GAN ENCLOSURE 1**
**Revised 10/2024**

Subparts D and E.  In all cases, payments of any type to personnel must be supported by complete and accurate records of employee time and effort.  For those employees that work on multiple functions or separately funded programs or projects, the grantee must also maintain time distribution records to support the allocation of employee salaries among each function and separately funded program or project.

**V.      Cost Principles (2 CFR Part 200 Subpart E)**

All costs incurred under any grant are subject to the cost principles found in 2 CFR Part 200 Subpart E.  The cost principles provide a list of selected items of allowable and unallowable costs and must be used in determining the allowability of costs funded under the grant.

**VI.     Procurement Standards (2 CFR §§ 200.317-327)**

Under 2 CFR §§ 200.317 – 200.327, States are required to follow the procurement rules the States have established for purchases funded by non-Federal sources.  When procuring goods and services for a grant's purposes, all other grantees (i.e., grantees that are not States) may follow their own procurement procedures, but only to the extent that those procedures meet the minimum requirements for procurement specified in the regulations.  These requirements include written competition procedures and codes of conduct for grantee staff, as well as requirements for cost and price analysis, record-keeping and contractor compliance with certain Federal laws and regulations.  These regulations also require grantees to include certain conditions in contracts and subcontracts, as mandated by the regulations and statutes.

**VII.    Indirect Costs (EDGAR §§§75.560-564, 76.560-569, and 2 CFR § 200.414)**

In addition to the information presented below, see GAN ATTACHMENT 2 and 4 for additional information including restrictions related to temporary, de minimis, training, restricted and program prescribed indirect cost rates.

A.   Unrestricted Indirect Cost Rate

To utilize an unrestricted indirect cost rate the grant must not have restricted (supplement-not-supplant), training, or program specific indirect cost rate restrictions.

To obtain an unrestricted indirect cost rate the grantee may:
- negotiate an indirect cost agreement with its cognizant agency for indirect costs (2 CFR §200.1 "Cognizant agency for indirect costs"), by submitting an indirect cost proposal within 90 days after the award of this grant; or
- elect to utilize the de minimis rate under 2 CFR §200.414(f); or
- a temporary indirect cost rate subject to the limitations in 34 CFR §75.560(d)

The grantee must provide proof of its negotiated indirect cost rate agreement to the Department as soon as it has signed such an agreement with its cognizant agency.

4

**GAN ENCLOSURE 1**
**Revised 10/2024**

B.   Temporary Indirect Cost Rate

A grantee that does not have a current negotiated indirect cost rate agreement may recover indirect costs at a temporary rate, which is limited to 10% of budgeted direct salaries and wages (See 34 CFR §§ 75.560(c) and 76.560(d)); or it may choose not to charge indirect costs to the grant.  The temporary rate can only be used for 90 days unless the exceptional circumstances apply under 34 CFR § 75.560(d)(2).

If the grantee has not submitted its indirect cost proposal to its cognizant agency within the 90-day period, it may no longer recover indirect costs utilizing the temporary indirect cost rate until it has negotiated an indirect cost rate agreement with its cognizant agency. Once a grantee obtains a current federally recognized indirect cost rate that is applicable to this grant, the grantee may use that indirect cost rate to claim indirect cost reimbursement.

C.   De minimis Indirect Cost Rate

Institutions of Higher Education (IHEs), federally recognized Indian Tribes, State and Local Governments[1] receiving less than $35 million (appendix VII to this part, paragraph D.1.b) in direct federal funding, and nonprofit organizations, if they do not have a current negotiated (including a provisional[2]) rate, and are not subject to the Department's training rate or restricted rate (supplement-not-supplant provisions) may elect to charge a de minimis  indirect cost rate of 15% of modified total direct costs (2 CFR 200.1 "Modified Total Direct Cost (MTDC)). This rate may be used indefinitely.

MTDC consists of all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and subawards and contracts up to the first $50,000 of each subaward (i.e., subgrant).  MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs, and the portion of each subaward in excess of $50,000.  Other items, including contract costs in excess of $50,000, may be excluded when necessary to avoid a serious inequity in the distribution of indirect costs (2 CFR 200.1 "Modified Total Direct Cost (MTDC)).

Additionally, the de minimis rate may not be used by grantees that are subject to the Department's training indirect cost rate (34 CFR § 75.562) or restricted indirect cost (34 CFR §§ 75.563 and 76.563).  The de minimis rate may be used indefinitely.  However, if a grantee chooses to use the de minimis rate to recover indirect costs, it must do so for all its Federal awards until such time as the grantee negotiates an indirect cost rate with its cognizant Federal agency.  Once a grantee obtains a current federally recognized indirect cost rate that is applicable to this grant, the grantee may use that indirect cost rate to claim indirect cost reimbursement.

D.   Restricted Indirect Cost Rate (Programs with a Supplement-not-supplant requirement

A restricted program (i.e., programs with statutory supplement-not-supplant requirements) grantee must utilize a restricted indirect cost rate negotiated with its cognizant Federal agency for indirect costs

---

[1] Note that a State-funded institution of higher education is not considered a "State government" for these purposes.

[2] Provisional rate means a temporary indirect cost rate applicable to a specified period which is used for funding, interim reimbursement, and reporting indirect costs on Federal awards pending the establishment of a final rate for the period.

5

or may elect to utilize a restricted indirect cost rate of 8% MTDC if their negotiated restricted indirect cost rate calculated under 34 CFR §§ 75.563 and 76.564 – 76.569, is not less than 8% MTDC.  A State or local government[3] that is a restricted program grantee may not elect to utilize the 8% MTDC rate.  Additionally, restricted program grantees may not utilize the de minimis rate but may utilize the temporary rate until a restricted indirect cost rate is negotiated.

E.   Training Grant Indirect Cost Rate

If the grantee is a training grant recipient and is not a State, local, or Tribal government[4], the grantee must negotiate a rate under 34 CFR § 75.562.  This provision limits indirect cost recovery to 8% of modified total direct costs or the grantee's negotiated indirect cost rate, whichever is less.

The recovery using the training grant indirect cost rate is subject to the following limitations:

i.    The lesser of the 8% indirect cost rate or negotiated indirect cost rate also applies to sub-awards that fund training.
ii.   The 8% limit does not apply to agencies of Indian tribal governments, local governments, and States as defined in 2 CFR § 200.1, respectively.
iii.  Indirect costs in excess of the 8% limit may not be charged directly, used to satisfy matching or cost-sharing requirements, or charged to another Federal award.
iv.   A grantee using the training rate of 8% is required to have documentation available for audit that shows that its negotiated indirect cost rate is at least 8%.

F.   Program-Specific Indirect Cost Rate

Grantees are required to follow program-specific statutory or regulatory requirements that mandate either indirect cost rate type or maximum administrative costs recovery instead of the general requirements described here.

**VIII.   Audit Requirements (2 CFR Part 200 Subpart F)**

2 CFR 200 Subpart F requires that grantees that are non-Federal entities (a State, local government, Indian tribe, IHE, or nonprofit organization that carries out a Federal award as a recipient or subrecipient) obtain a non-Federal audit of their expenditures under their Federal grants if the grantee expends more than $1,000,000 in Federal funds in one fiscal year.  2 CFR Part 200 Subpart F contains the requirements imposed on grantees for audits conducted in connection with the Single Audit Act of 1984—Public Law No. 98-502 and its Amendments of 1996—Public Law No. 104-.

The Department recommends hiring auditors who have specific experience in auditing Federal awards under the regulations and the Compliance Supplement.

---

[3] Note that a State-funded institution of higher education is not considered a "State government" for these purposes.
[4] Note that a State-funded institution of higher education is not considered a "State government" for these purposes; and a Tribal college or university funded by a federally recognized Tribe is not considered a Tribe for these purposes.

Supp. App. - 126

**IX.      Other Considerations**

Some other topics of financial management covered in 2 CFR Part 200 that might affect particular grants include program income (2 CFR § 200.307), cost sharing or matching (2 CFR § 200.306), property management requirements for equipment (2 CFR § 200.313), and equipment and other capital expenditures (2 CFR § 200.439).

**GAN  ENCLOSURE 2**

**Revised 10/2024**

## MEMORANDUM TO ED DISCRETIONARY GRANTEES

You are receiving this memorandum to remind you of Federal requirements, found in 2 CFR Part 200, *Uniform Administrative Requirements, Cost Principles, and Audit Requirements,* regarding cash drawdowns under your grant account.

For any cash that you draw from your Department of Education (*the* Department) grant account, you must:

- draw down only as much cash as is necessary to meet the immediate needs of the grant project;
- keep to the minimum the time between drawing down the funds and paying them out for grant activities; and
- return to the Government the interest earned on grant funds deposited in interest-bearing bank accounts except for a small amount of interest earned each year that your entity is allowed to keep to reimburse itself for administrative expenses).

In order to meet these requirements, you are urged to:

- take into account the need to coordinate the timing of drawdowns with prior internal clearances (e.g., by boards, directors, or other officials) when projecting immediate cash needs so that funds drawn down from ED do not stay in a bank account for extended periods of time while waiting for approval;
- monitor the fiscal activity (drawdowns and payments) under your grant on a continuous basis;
- plan carefully for cash flow in your grant project during the budget period and review project cash requirements before each drawdown; and
- pay out grant funds for project activities as soon as it is practical to do so after receiving cash from the Department.

Keep in mind that the Department monitors cash drawdown activity for all grants. Department staff will contact grantees who appear to have drawn down excessive amounts of cash under one or more grants during the fiscal quarter to discuss the particular situation. For the purposes of drawdown monitoring, the Department will contact grantees who have drawn down 50% or more of the grant in the first quarter, 80% or more in the second quarter, and/or 100% of the cash in the third quarter of the budget period. However, even amounts less than these thresholds could still represent excessive drawdowns for your particular grant activities in any particular quarter. Grantees determined to have drawn down excessive cash will be required to return the excess funds to the Department, along with any associated earned interest, until such time as the money is legitimately needed to pay for grant activities.  If you need assistance with returning funds and interest, please contact the Department's G5 Hotline by calling 1-888-336-8930.

Grantees that do not follow Federal cash management requirements and/or consistently appear on the Department's reports of excessive drawdowns could be:

- subjected to specific award conditions or designated as a "high-risk" grantee [2 CFR Part 200.208 and 2 CFR 3474.10], which could mean being placed on a "cash-reimbursement" payment method (i.e., a grantee would experience the inconvenience of having to pay for grant activities with its own money and waiting to be reimbursed by the Department afterwards);

1

Supp. App. - 128

**GAN ENCLOSURE 2**
**Revised 10/2024**

- subject to further corrective action;
- denied selection for funding on future ED grant applications [EDGAR 75.217(d)(3)(ii)]; and/or
- debarred or suspended from receiving future Federal awards from any executive agency of the Federal government.

You are urged to read 2 CFR Part 200.305 to learn more about Federal requirements related to grant payments and to determine how to apply these requirements to any subgrantees. You are urged to make copies of this memorandum and share it with all affected individuals within your organization.

2

**Frequently Asked Questions (FAQs) to Assist U.S. Department of Education (ED) Grantees to Appropriately Use Federal Funds for Food, Conferences, and Meetings[1]**
August 2024

## Using Federal ED Grant (Discretionary and Formula) Funds for Food

1.  **May a grantee use its U.S. Department of Education (ED) grant funds for food, beverages, or snacks at an event related to its grant?**

All grant expenditures, including those for food, beverages, or snacks, must be reasonable, necessary, allocable to the grant, and allowable. (Office of Management and Budget's (*OMB) Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (Uniform Guidance)* at 2 CFR §§ 200.403 through 200.405).[2]

Generally, a grantee needs to substantiate with specificity the rationale for why paying for food and beverages with Department funds is necessary to meet the goals and objectives of a grant. When a grantee is hosting an event related to its ED grant, the grantee should first consider structuring the agenda for the meeting so that there is time for participants to bring or purchase their own food, beverages, and snacks. In addition, when planning a meeting, grantees may want to consider a location in which participants have easy access to food and beverages.

There may be limited circumstances under which providing food or beverages is reasonable and necessary to achieve the purpose of a particular grant. Because food and beverage costs are not of a type generally recognized as ordinary and necessary for the operation of the grantee or the proper and efficient performance of the Federal award (see 2 CFR § 200.404(a)), grantees must document their evidence and analysis that justify that the use of food or beverage is reasonable and necessary in each instance.

In determining reasonableness of a given cost, including those for food and drink, consideration must be given to:

*   Whether the cost is generally recognized as ordinary and necessary for the grantee's operation or the proper and efficient performance of the Federal award;

*   The restraints or requirements imposed by such factors as: sound business practices; arm's-length bargaining; Federal, State, local, Tribal, and other laws and regulations; and terms and conditions of the Federal award;

*   Market prices for comparable costs for the geographic area;

*   Whether the individuals concerned acted with prudence in the circumstances considering their responsibilities to the recipient or grantee, its employees, its students or membership (if applicable), the public at large, and the Federal Government; and

---

[1] Other than statutory and regulatory requirements included in the document, the contents of this FAQ document do not have the force and effect of law and are not meant to bind the public. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.

[2] Revisions to 2 CFR part 200, referred to as the "OMB Uniform Guidance," were published on April 22, 2024, and are generally effective on October 1, 2024. In general, the April 2024 revisions do not substantively affect the content in this FAQ document. While the OMB Uniform Guidance in 2 CFR § 200.1 defines recipient, this FAQ uses the term grantee to align with the definitions that apply to ED regulations in the Education Department General Administrative Regulations (EDGAR) in 34 CFR § 77.1.

1

- Whether the cost represents a deviation from the recipient or grantee's established written policies and procedures for incurring (2 CFR § 200.404).

Please note that, in addition to determining whether the costs are necessary and reasonable, State grantees also must determine whether the same costs are allowable under State law for the use of State funds. Under 2 CFR § 200.302(a), States are required to expend and account for Federal funds in accordance with State laws and procedures for expending and accounting for their own State funds. In other words, if State laws or procedures would not permit the use of State funds for conferences or meals, then State grantees may not use their Federal grant funds to pay those costs either.

**2. Are there examples of when food costs might be considered reasonable and necessary to the performance of a particular grant?**

The question of whether a food cost is reasonable and necessary to the performance of a grant will depend on the ED grant, including any program-specific rules or requirements that may apply to that grant, as well as the unique circumstances of the food cost. The following are some examples of situations when a food cost might be considered reasonable and necessary:

- Food costs at a family engagement event: For some ED programs, family engagement is a critical part of the purpose of the program or of the success of a project. In such a program, if a family meeting would occur during a typical mealtime, or if the grantee has evidence that attendance at the event would be affected by the absence of food or snacks, the grantee may be able to justify that is reasonable and necessary to provide light refreshments or meals to participants.

- Food costs for a working lunch at a day-long meeting: A grantee may find that one critical component of its grant activities is hosting an onsite day-long training for professionals working in a field that is a central focus of the grant. If the grantee is able to demonstrate that the lunchtime session is necessary to achieve the goals of the project, attendance at the lunchtime session is necessary to achieve full participation by attendees, and the business carried out at the lunchtime session could not be carried out at another reasonable time, the grantee may be able to justify that it is reasonable and necessary to provide meals or a snack to attendees.

- Light refreshments at a series of regular after-hours meetings: A grantee may find that an important part of its grant activities is hosting meetings after the traditional working day so that professionals from within the field but across different employers have an opportunity to collaborate on focused topics. If the grantee can demonstrate that the sessions have planned agendas that are central to the grant, that engaging this group of people is necessary to achieve the purposes of the grant, and that there is evidence that attendance at the meetings would be affected by the absence of food, the grantee may be able to justify that it is reasonable and necessary to provide light refreshments to participants.

- Costs of light snacks at a day-long meeting: To achieve the purposes of its grant, a grantee may find that is necessary to host day-long meetings or training sessions so that involved individuals can collaborate. If the grantee has evidence that providing light snacks (e.g., granola bars and water) at the meeting will result in improved participation, such as more

2

time spent on grant activities and less time needed for breaks during the sessions, the grantee may be able to justify that is reasonable and necessary to provide light snacks to participants.

If an ED grantee has questions about a specific food cost, they should contact their ED program officer.

**3. What are examples of situations when costs for food would not be considered reasonable and necessary?**

There are some situations when food costs would not be considered reasonable and necessary to a grant or would otherwise be unallowable under the *Uniform Guidance* found at 2 CFR part 200.

- Food costs at networking sessions: In nearly all cases, using grant funds to pay for food and beverages for networking sessions with a purely social focus is not justified because participation in such activities is rarely necessary to achieve the purpose of the grant.

- Food costs at regular staff meetings: Food costs for recurring business meetings, staff meetings, or other day-to-day activities are generally not reasonable because participation in such activities is rarely necessary to achieve the purpose of the grant.

- Food costs for remote meetings: Food costs for meetings conducted remotely, such as sending food to individual meeting participants' locations, are generally not justified since participants' participation is less impacted by them attending the meeting remotely.

- Entertainment: Federal grant funds may not be used to pay for entertainment, which includes costs for amusement, diversion, and social activities, unless they have a specific and direct programmatic purpose and are included in the Federal award. 2 CFR § 200.438. Celebrations, receptions, banquets, and other social events generally are not events where purchasing food with ED grant funds is appropriate.

- Alcohol: In all cases, use of Federal funds for alcoholic beverages is unallowable. 2 CFR § 200.423.

**Using ED Federal Grant (Discretionary and Formula) Funds to Host a Meeting or Conference**

**4. May a grantee receiving funds from ED use its Federal grant funds to host a meeting or conference?**

Yes. Federal grant funds may be used to host a meeting or conference if doing so is:

- Consistent with its approved application or plan;

- For purposes that are directly relevant to the program and the operation of the grant, such as for conveying technical information related to the objectives of the grant; and

- Reasonable and necessary to achieve the goals and objectives of the approved grant.

The *Uniform Guidance* in 2 CFR § 200.432 describes costs associated with conferences that may be allowable.

**5. What are examples of "technical information" that may be conveyed at a meeting or conference?**

3

Supp. App. - 132

Examples of technical information include, but are not limited to, the following, each of which must be related to implementing the program or project funded by the grant:

- Specific programmatic, administrative, or fiscal accountability requirements;

- Best practices in a particular field;

- Theoretical, empirical, or methodological advances in a particular field;

- Effective methods of training or professional development; and

- Effective grant management and accountability.

**6. What factors should a grantee consider when deciding whether to host a meeting or conference?**

Grantees should consider whether a face-to-face meeting or conference is the most effective or efficient way to achieve the desired result and whether there are alternatives, such as webinars or video conferences, that would be equally or similarly effective and more efficient in terms of time and costs than a face-to-face meeting. In addition, grantees should consider how the meeting or conference will be perceived by the public; for example, will the meeting or conference be perceived as a good use of taxpayer dollars?

**7. Are there conflict-of-interest rules that grantees should follow when selecting vendors, such as logistics contractors, to help with a meeting or conference?**

As specified in 2 CFR § 200.317, States and Indian Tribes[3] must comply with their own procurement policies and procedures, including any policies or procedures for ensuring that there are no conflicts of interest in the procurement process. In addition to its own policies and procedures, a State or Indian Tribe must also comply with the following procurement standards: 2 CFR §§ 200.321, 200.322, 200.323, and 200.327. If a State or Indian Tribe does not have its own procurement policies and procedures, it must follow the procurement standards in 2 CFR §§ 200.318 through 200.327.

Other grantees must follow procurement procedures that are consistent with their State, local, or Tribal laws and regulations, as appropriate, and that are also consistent with 2 CFR §§ 200.318 through 200.327, including the minimum requirements in 2 CFR § 200.318 related to conflict of interest rules.

**8. When a meeting or conference is hosted by a grantee and charged to a Federal grant, may the meeting or conference be promoted as a U.S. Department of Education event?**

No. Meetings and conferences hosted by grantees are directed by the grantee, not the U.S. Department of Education. Therefore, the meeting or conference may <u>not</u> be promoted as a U.S. Department of Education meeting or conference, and the seal of the U.S. Department of Education must <u>not</u> be used on conference materials or signage, without ED's written approval. In addition, all meeting or conference materials paid for with Federal grant funds must include appropriate disclaimers, such as the disclaimer provided in 34 CFR§ 75.620. That language reads:

---

[3] Please note that "States" were the only entities listed under 2 CFR § 200.317 prior to the revisions announced in OMB's April 22, 2024, *Federal Register* notice.

4

The contents of this [insert type of publication; such as book, report, film, website, and web page] were developed under a grant from the U.S. Department of Education (Department). The Department does not mandate or prescribe practices, models, or other activities described or discussed in this document. The contents of this [insert type of publication] may contain examples of, adaptations of, and links to resources created and maintained by another public or private organization. The Department does not control or guarantee the accuracy, relevance, timeliness, or completeness of this outside information. The content of this [insert type of publication] does not necessarily represent the policy of the Department. This publication is not intended to represent the views or policy of, or be an endorsement of any views expressed or materials provided by, any Federal agency.

**Please note that if a grantee charges a fee for attendance at a particular meeting or conference paid for with Federal grant funds, any income generated must be treated as program income under 2 CFR § 200.307 or specific program regulations addressing program income.**

**9. When a grantee is hosting a meeting or conference, may the grantee use Federal grant funds to pay for food, beverages, or snacks?**

As detailed in questions #1-3 above, in general there is a need to substantiate with specificity the rationale for why paying for food and beverages with Department funds is necessary to meet the goals and objectives of a grant, but there may be circumstances when providing food or beverages at a conference is reasonable and necessary to achieve the purpose of the grant. Please see those questions for information about requirements and considerations related to food costs.

**10. May a grantee contract with a hotel under which Federal grant funds will be used to provide meals, snacks, and beverages as part of the cost for meeting rooms and other allowable conference-related costs?**

Federal grant funds may only be used for expenses that are reasonable and necessary. In planning a conference or meeting and negotiating with vendors for meeting space and other relevant goods and services, grantees may only pay for allowable costs. The fact that food and beverages are embedded in a contract for meeting space does not mean that the food and beverages are being provided at no cost to the grantee. Therefore, if the food and beverage cost is not an allowable cost, and a hotel vendor embeds food and beverage costs into a hotel contract for meeting space, the grantee should work with the hotel to have the food and beverage costs identified and removed from the contract, and have the price for the meeting space appropriately adjusted.

**11. What if a hotel or other venue provides "complimentary" beverages (e.g., coffee, tea) and there is no charge to the grantee hosting the meeting?**

The grantee has an obligation, under these circumstances, to confirm that the beverages are truly complimentary and will not be reflected as a charge to the grant in another area. For example, many hotels provide complimentary beverages to all guests who attend a meeting at their facility without reflecting the costs of those beverages in other items that their guests or, in this case, the grantee purchases. As noted above, it would not be acceptable for a vendor to embed the cost of beverages in other costs, such as meeting space, without those costs being separately allowable.

**12. May indirect cost funds be used to pay for food and beverages?**

No. The cost of food and beverages, which are related to meetings that are easily associated with a specific cost and grant objectives, are more appropriately treated as direct costs rather than indirect

5

costs. As noted above, Federal grant funds cannot be used to pay for food and beverages unless doing so is reasonable and necessary.

6

**13. May a grantee use <u>non-Federal</u> resources (e.g., State or local resources) to pay for food or beverages at a meeting or conference that is being held to meet the goals and objectives of its grant?**

Grantees should follow their own policies and procedures and State and local law for using <u>non-Federal</u> resources to pay for food or beverages, including its policies and procedures for accepting gifts or in-kind contributions from third parties. Grantees should be sure that any food and beverages provided with non-Federal funds are appropriate for the grantee event, and do not detract from the event's purpose. Please note that, in general, any funds that a grantee contributes to a project as part of the program's matching or cost-sharing requirement would be subject to the same rules that govern the Federal funds; therefore, the non-Federal funds used to pay for food and beverages for a meeting or conference could only be eligible for use in meeting cost-share or match obligations if Federal funds would also be allowable to pay for the food and beverages.

**14. May grantees provide meeting participants with the option of paying for food and beverages (e.g., could a grantee have boxed lunches provided at cost for participants)?**

Yes. Grantees may offer meeting participants the option of paying for food (such as lunch, breakfast, or snacks) and beverages, and arrange for these items to be available at the meeting.

## <u>Using Federal Grant Funds to Pay for Costs of Attending a Meeting or Conference Sponsored by ED or a Third Party</u>

**15. May grantees use Federal grant funds to pay for the cost of attending a meeting or conference?**

If attending a meeting or conference is necessary to achieve the goals and objectives of the grant, and if the expenses are reasonable (based on the grantee's own policies and procedures, and State and local laws), Federal grant funds may be used to pay for travel expenses of grantee employees, consultants, or experts to attend a meeting or conference. To determine whether a meeting or conference is "necessary," grantees should consider whether the goals and objectives of the grant can be achieved without the meeting or conference and whether there is an equally effective and more efficient way (in terms of time and money) to achieve the goals and objectives of the grant (see question #6). To determine whether the expenses are "reasonable," grantees should consider how the costs (e.g., lodging, travel, registration fees) compare with other similar events and whether the public would view the expenses as a worthwhile use of Federal funds.

**16. What should a grantee consider when planning to use Federal grant funds for attending a meeting or conference?**

Among other considerations, grantees should consider how many people should attend a meeting or conference on its behalf. The number of attendees should be reasonable and necessary to accomplish the goals and objectives of the grant. The grantee should also determine whether it is necessary to attend the entire meeting or conference, or whether attending only a portion of the meeting or conference is reasonable and necessary.

**17. What travel expenses may be paid for with Federal grant funds?**

7

Grantees may use Federal grant funds for travel expenses only to the extent such costs are reasonable and necessary and do not exceed charges normally allowed by the grantee in its regular operations consistent with its written travel policies. See 2 CFR § 200.475. Federal grant funds may be used to pay expenses for transportation, per diem, and lodging if the costs are reasonable and necessary. Federal grant funds may not be spent on alcohol. See 2 CFR § 200.423. Grantees should follow their own travel and per diem rules and costs when charging travel expenses to their Federal grant. In the absence of an acceptable written policy regarding travel costs, grantees must satisfy the requirements of 2 CFR § 200.475(d).

**18. What should grantees consider when including Federal employees at a grantee-sponsored meeting or conference?**

In some situations, a grantee may invite a Federal employee to participate in or present at a grantee-organized meeting or conference. Federal employees are subject to Federal ethics laws and regulations. This includes laws and regulations governing conflicts of interest and gifts (e.g., waiver of a registration fee, travel expenses, and meals). Grantees may be subject to their own ethics laws and regulations, and grantee employees should ensure that they comply with them.

## Questions Regarding the Allowable Use of Federal Grant Funds

**19. What resources are available to help grantees determine whether costs associated with meetings and conferences are reasonable and necessary?**

Grantees must follow all applicable statutory and regulatory requirements in determining whether costs are reasonable, necessary, and allowable, especially the regulations found at 2 CFR part 200.

**20. Is it allowable for a person whose travel costs are being paid with Federal grant funds to attend a conference in Washington, D.C., and lobby members of Congress while in town?**

Appropriated funds may not, except under very limited circumstances, be used for expenses related to any activity designed to influence the enactment of legislation, appropriations, regulations, administrative actions, or Executive Orders proposed or pending before the Congress or the Administration. See 2 CFR § 200.450. To the extent that a portion of time at a conference is spent on lobbying activities, costs associated with the lobbying, including transportation to and from Washington, D.C., lodging, and per diem, may not be charged to the Federal grant. For example, if a meeting or conference lasts for two days and a visit to lobby a member of Congress requires an additional day of travel, it could be determined that one-third (1/3) of all costs involved in attending the meeting or conference, including travel to and from Washington, D.C., may not be charged to the grant.

On the other hand, educating members of Congress about facts relevant to a particular grant program would not, absent other facts, constitute lobbying. For example, it would not be considered a prohibited lobbying activity for a grantee to inform a member of Congress about its program, the services it provides, and the individuals it serves. It also would not be considered a prohibited lobbying activity to attend a presentation by members of Congress related to issues relevant to a grantee's program or the population it serves in general. However, such education-oriented

8

discussions could easily cross—or appear to cross—the thin line to prohibited lobbying activities. For example, a discussion about the challenges a grantee faces with respect to requirements governing matching funds could easily expand to a discussion about the need for more appropriated funds or legislative changes, which would constitute prohibited lobbying activities. Given that Congress frequently considers the reauthorization of ED programs, a grantee's interactions with members of Congress on such topics could meet the definition of lobbying, which is prohibited. In that case, the costs associated with those interactions could not be supported with Federal funds.

**21. What are the consequences of using Federal grant funds on unallowable expenses?**

ED may seek to recover any Federal grant funds identified, in an audit or through program monitoring, as having been used for unallowable costs, including unallowable conference expenses.

**22. Whom should grantees call if they have specific questions about the allowable use of Federal grant funds?**

ED grantees are encouraged to contact their ED program officer to discuss the allowable use of Federal grant funds, including the allowable use of Federal grant funds for meetings and conferences.

9

**GAN Enclosure 4**
**Revised 10/2024**

## MEMORANDUM TO REMIND DEPARTMENT OF EDUCATION GRANTEES OF EXISTING CASH MANAGEMENT REQUIREMENTS CONCERNING PAYMENTS

The Department of Education (the Department) requires that its grantees adhere to existing cash management requirements concerning payments and will ensure that their subgrantees are also aware of these policies by providing them relevant information.

A grantee's failure to comply with cash management requirements may result in an improper payment determination by the Department in accordance with the Payment Integrity Information Act (PIIA) of 2019.

**Excessive Drawdowns**

In the context of grants, excessive drawdown refers to the situation where a grantee withdraws more funds than necessary from the grantor, which can lead to financial and compliance issues. In accordance with cash management requirements, grant funds are drawn down incrementally to cover immediate expenses related to the grant activities. If a grantee draws down excessive funds, they may be required to return the surplus along with interest. This situation can arise from poor financial management, lack of proper accounting practices, or misalignment with the grant's stipulated budget and objectives.

To avoid excessive drawdown, it is crucial for grantees to implement and maintain robust accounting systems, track expenses accurately, and adhere to the grant's budget and reporting requirements. Proper planning and monitoring of fund allocation, maintaining accurate records, and ensuring timely drawdowns aligned with actual expenses are essential practices. Additionally, grantees should be aware of the specific drawdown procedures and requirements set by the grantor, which can vary depending on whether the grant is federally funded or comes from other sources.

**Cash Management Requirements**

There are three categories of payment requirements that apply to the drawdown of funds from grant accounts at the Department.  The first two types of payments are subject to the requirements in the Treasury Department regulations implementing the Cash Management Improvement Act (CMIA) of 1990, 31 U.S.C.6513, and the third is subject to the requirements in the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (Uniform Guidance) at 2 CFR part 200,[1] as follows:

1. Payments to a State under programs that are covered by a State's Treasury State Agreement (TSA);

2. Payments to States under programs that are not covered by a TSA; and

3. Payments to other non-Federal entities, including nonprofit organizations and local governments.

---

[1] The Department adopts the Uniform Guidance as regulations of the Department at 2 CFR part 3474.

1

**GAN Enclosure 4**
**Revised 10/2024**

**CMIA Requirements Applicable to Programs included in a TSA**

Generally, under the Treasury Department regulations implementing the CMIA, only major assistance programs (large-dollar programs meeting thresholds in 31 CFR § 205.5) are included in a State's written TSA. See 31 CFR § 205, subpart A.  Programs included in a TSA must use approved funding techniques and both States and the Federal government are subject to interest liabilities for late payments. State interest liabilities accrue from the day federal funds are credited to a State account to the day the State pays out the federal funds for federal assistance program purposes. 31 CFR § 205.15.  If a State makes a payment under a Federal assistance program before funds for that payment have been transferred to the State, Federal Government interest liabilities accrue from the date of the State payment until the Federal funds for that payment have been deposited to the State account. 31 CFR § 205.14.

**CMIA Requirements Applicable to Programs Not Included in a TSA**

Payments to States under programs not covered by a State's TSA are subject to subpart B of Treasury's regulations in 31 CFR § 205.  These regulations provide that a State must minimize the time between the drawdown of funds from the federal government and their disbursement for approved program activities.  The timing and amount of funds transfers must be kept to a minimum and be as close as is administratively feasible to a State's actual cash outlay for direct program costs and the proportionate share of any allowable indirect costs.  31 CFR § 205.33(a).  States should exercise sound cash management in funds transfers to subgrantees.

Under subpart B, neither the States nor the Department owe interest to the other for late payments. 31 CFR § 205.33(b).  However, if a State or a Federal agency is consistently late in making payments, Treasury can require the program to be included in the State's TSA.  31 CFR § 205.35.

**Fund transfer requirements for grantees other than State governments and subgrantees**

The transfer of Federal program funds to grantees other than States and to subgrantees are subject to the payment and interest accrual requirements in the Uniform Guidance at 2 CFR § 200.305(b).  These requirements are like those in subpart B of the Treasury Department regulations in 31 CFR part 205, requiring that "For recipients and subrecipients other than States, payment methods must minimize the time elapsing between the transfer of funds from the Federal agency or the pass-through entity and the disbursement of funds by the recipient or subrecipient regardless of whether the payment is made by electronic funds transfer or by other means."  2 CFR § 200.305(b).

The Federal Government and pass-through entities must make payments in advance of expenditures by grantees and subgrantees if these non-Federal entities maintain, or demonstrate the willingness to maintain, written procedures "that minimize the time elapsing between the transfer of funds and disbursement by the recipient or subrecipient, and financial management systems that meet the standards for fund control and accountability." 2 CFR § 200.305(b)(1).  If a grantee or subgrantee cannot meet the criteria for advance payments, a Federal agency or pass-through entity can pay that entity through reimbursement.  See 2 CFR § 200.305(b)(1) and (3) for more detailed description of the payment requirements and the standards for requiring that payments be made by reimbursement.

Supp. App. - 140

**GAN Enclosure 4**
**Revised 10/2024**

**Returning Earned Interest**

Non-Federal entities must maintain advance payments in interest bearing accounts unless certain conditions exist.  See 2 CFR § 200.305(b)(11) for those conditions.  The requirements regarding interest accrual and remittance follow:

Recipients or subrecipients may retain up to $500 per year of interest earned on Federal funds to use for administrative expenses of the recipient or subrecipient. Any additional interest earned on Federal funds must be returned annually to the Department of Health and Human Services Payment Management System (PMS) through either the Automated Clearing House (ACH) network or a Fedwire Funds Service payment. All interest in excess of $500 per year must be returned to PMS regardless of whether the recipient or subrecipient was paid through PMS. Instructions for returning interest can be found at Returning Funds/Interest | HHS PSC FMP Payment Management Services. 2 CFR § 200.305(b)(12). Additionally, these instructions are provided below.

1.  **Returning Interest to PMS**

    PMS is the central collection point for interest earned on all federal grants, whether they are paid through the Payment Management System or not.

    a.  **Domestic** Automated Clearing House (ACH) Returns (Direct Deposit)

    Returning funds via Automated Clearing House (ACH) means you will most likely be returning funds in the manner in which they were received at your organization.

    ACH account information to be included:

    - PSC ACH Routing Number is: 051036706
    - PSC DFI Accounting Number: 303000
    - Bank Name: Credit Gateway - ACH Receiver
    - Location: St. Paul, MN

    Additionally, include the following:

    - An explanation stating that the refund is for interest
    - The name of the awarding agency
    - The grant number(s) for which the interest was earned
    - The return should be made payable to: Department of Health and Human Services.

    b.  **International** Automated Clearing House (ACH) Returns (Direct Deposit)

    ACH Account Information to be Included For Payments Sent in **U.S. Dollars (USD)**:

    - Beneficiary Account: Federal Reserve Bank of New York/ITS (Can abbreviate: FRBNY/ITS)
    - Bank: Citibank N.A. (New York)
    - SWIFT Code: CITIUS33
    - Account Number: 36838868
    - Routing Number: 021000089
    - Bank Address: 388 Greenwich Street, New York, NY 10013

3

**GAN Enclosure 4**
**Revised 10/2024**

- Payment Details (Line 70): Agency Name (abbreviated when possible) and Agency Locator Code (ALC)
- Agency POC: James Kruper, (301) 492-4998

For a USD payment, the payment sender must include:

- **Agency Locator Code (ALC):** 75010501
- **Name:** US Department of Health and Human Services, PMS Account Number and Grant Subaccount Number in the Payment Details (Line 70) section of the SWIFT message.

This information must be in this section of the payment instructions, or the International Treasury Service (ITS) will not be able to identify the federal agency the payment is for. Without this identifying information, ITS will be required to return the payment as unidentified or unable to post. The receiving account is in the name of "Federal Reserve Bank of New York/ITS" and the payment originator should list that as the name on the beneficiary account.

Additionally, include the following:

- An explanation stating that the refund is for interest
- The name of the awarding agency
- The grant number(s) for which the interest was earned
- The return should be made payable to: Department of Health and Human Services.

c.  FedWire Returns

Service charges may be incurred from a grantee's financial institution when a Fedwire to return interest is initiated.  For FedWire returns, Fedwire account information is as follows:

- Fedwire Routing Number: 021030004
- Agency Location Code (ALC): 75010501
- Bank Name: Federal Reserve Bank
- Treas NYC/Funds Transfer Division
- Location: New York, NY

Additionally, include the following:

- An explanation stating that the refund is for interest
- The name of the awarding agency
- The grant number(s) for which the interest was earned
- The return should be made payable to: Department of Health and Human Services.

d.  Check Returns (USPS Only)

Interest may be returned by check using only the U.S. Postal Service; however, returning interest via check may take 4-6 weeks for processing before a check payment may be applied to the appropriate PMS account.

Supp. App. - 142

**GAN Enclosure 4**
**Revised 10/2024**

- Interests returned by check are to be mailed (USPS only) to:

    HHS Program Support Center
    PO Box 979132
    St. Louis, MO 63197

    A brief statement explaining the nature of the return must be included.

    To return interest on a grant not paid through the PMS, make the check payable to the Department of Health and Human Services, and include the following with the check:

- An explanation stating that the refund is for interest
- The name of the awarding agency
- The grant number(s) for which the interest was earned
- The return should be made payable to: Department of Health and Human Services.

**Cash Management Monitoring Responsibilities of Pass-Through Entities**

Grantees, including grantees that act as pass-through entities and subgrantees have other responsibilities regarding the use of Federal funds.  For example, all grantees and subgrantees must have procedures for determining the allowability of costs for their awards.  We highlight the following practices related to the oversight of subgrantee compliance with the financial management requirements in the Uniform Guidance that will assist State grantees (pass-through entities) in meeting their monitoring responsibilities.  Under 2 CFR § 200.332, pass-through entities must –

1. Verify that the subrecipient is not excluded or disqualified in accordance with §180.300.  Verification methods are provided in § 180.300, which include confirming in SAM.gov that a potential subrecipient is not suspended, debarred, or otherwise excluded from receiving Federal funds.

2. Ensure that every subaward is clearly identified to the subrecipient as a subaward and includes the information identified in § 200.332(b).

3. Evaluate each subrecipient's fraud risk and risk of noncompliance with a subaward to determine the appropriate subrecipient monitoring.  See § 200.332(b) & (f).

4. Monitor the activities of a subrecipient as necessary to ensure that the subrecipient complies with Federal statutes, regulations, and the terms and conditions of the subaward.  The pass-through entity is responsible for monitoring the overall performance of a subrecipient to ensure that the goals and objectives of the subaward are achieved. See § 200.332(e).

5. Consider taking enforcement action against noncompliant subrecipients as described in § 200.339 and in program regulations.

A small number of Department grant programs have program-specific cash management and payment requirements based on the authorizing legislation or program regulations.  These program-specific requirements may supplement or override general cash management or payment requirements.  If you

5

Supp. App. - 143

**GAN Enclosure 4**
**Revised 10/2024**

have any questions about your specific grant, please contact the Education Program Contact listed in
Block 3 of your Grant Award Notification.

**GAN Enclosure 5**
**Revised 10/2024**

### RECIPIENTS OF DEPARTMENT OF EDUCATION GRANTS AND COOPERATIVE AGREEMENTS
### FREQUENTLY ASKED QUESTIONS ON CASH MANAGEMENT

**Q**     **What are the Federal Laws and Regulations Regarding Payments to the States?**

**A**     The *Cash Management Improvement Act of 1990* (*CMIA*) establishes interest liabilities for the Federal and State governments when the Federal Government makes payments to the States. See 31 U.S.C. 3335 and 6503.  The implementing regulations are in Title 31 of the Code of Federal Regulations (CFR), Part 205, eCFR :: 31 CFR Part 205 -- Rules and Procedures for Efficient Federal-State Funds Transfers.  Non-Federal entities other than States follow the rules on Federal payments set out in 2 CFR 200.305.

**Q**     **What is a Treasury-State Agreement (TSA)?**

**A**     A TSA documents the accepted funding techniques and methods for calculating interest agreed upon by the U.S. Department of the Treasury (Treasury) and a State.  It identifies the Federal assistance programs that are subject to interest liabilities under the CMIA.  The CMIA regulations specify several different funding techniques that may be used by a State, but a State can negotiate with the Treasury Department to establish a different funding technique for a particular program. A TSA is effective until terminated and, if a state does not have a TSA, payments to the State are subject to the default techniques in the regulations that Treasury determines are appropriate.

**Q**     **What are the CMIA requirements for a program subject to a Treasury-State Agreement?**

**A**     Payments to a State under a program of the Department are subject to the interest liability requirements of the CMIA if the program is included in the State's Treasury-State Agreement (TSA) with the Department of Treasury.  If the Federal government is late in making a payment to a State, it owes interest to the State from the time the State spent its funds to pay for expenditure until the time the Federal government deposits funds to the State's account to pay for the expenditure.  Conversely, if a State is late in making a payment under a program of the Department, the State owes interest to the Federal government from the time the Federal government deposited the funds to the State's account until the State uses those funds to make a payment.  For more information, see GAN Enclosure 4.

**Q**     **What are the CMIA requirements for a program that is not subject to a Treasury-State Agreement?**

**A**     If a program is not included in the State's TSA, neither the State nor the Federal government are liable for interest for making late payments.  However, both the Federal government and the State must minimize the time elapsing between the date the State requests funds and the date that the funds are deposited to the State's accounts.  The State is also required to minimize the time elapsed between the date it receives funds from the Federal government and the date it makes a payment under the program. Also, the Department must minimize the amount of funds transferred to a State to only that needed to meet the immediate cash needs of the State.  The timing and amount of funds transferred must be as close as is administratively feasible to a State's actual cash outlay for direct program costs and the proportionate share of any allowable indirect costs.

1

**GAN Enclosure 5**
**Revised 10/2024**

**Q**   **What if there is no TSA?**

**A**   When a State does not have a TSA in effect, default procedures in 31 CFR, part 205 that the Treasury Department determines appropriate apply.  The default procedures will prescribe efficient funds transfer procedures consistent with State and Federal law and identify the covered Federal assistance programs and designated funding techniques.

**Q**   **Who is responsible for Cash Management?**

**A**   Grantees and subgrantees that receive grant funds under programs of the Department are responsible for the financial management and maintaining internal controls regarding the management of Federal program funds under the Uniform Guidance in accordance with 2 CFR 200.302 and 200.303 respectively.  In addition, grantees are responsible for ensuring that subgrantees are aware of the cash management and requirements in 2 CFR part 200, subpart D.

**Q**   **Who is responsible for monitoring cash drawdowns to ensure compliance with cash management policies?**

**A**   Recipients must monitor their own cash drawdowns **and** those of their subrecipients to assure substantial compliance to the standards of timing and amount of advances.

**Q**   **How soon may I draw down funds from the G5 grants management system?**

**A**   Grantees are required to minimize the amount of time between the drawdown and the expenditure of funds from their bank accounts.  (See 2 CFR 200.305(b).)  Funds must be drawn only to meet a grantee's immediate cash needs for each individual grant.  The G5 screen displays the following message:

**By submitting this payment request, I certify to the best of my knowledge and belief that the request is based on true, complete, and accurate information. I further certify that the expenditures and disbursements made with these funds are for the purposes and objectives set forth in the applicable Federal award or program participation agreement, and that the organization on behalf of which this submission is being made is and will remain in compliance with the terms and conditions of that award or program participation agreement. I am aware that the provision of any false, fictitious, or fraudulent information, or the omission of any material fact, may subject me, and the organization on behalf of which this submission is being made, to criminal, civil, or administrative penalties for fraud, false statements, false claims, or other violations. (U.S. Code Title 18, Section 1001; Title 20, Section 1097; and Title 31, Sections 3729-3730 and 3801-3812)**

**Q**   **How may I use Federal funds?**

**A**   Federal funds must be used as specified in the Grant Award Notification (GAN) and the approved application or State plan for allowable direct costs of the grant and an allocable portion of indirect costs, if authorized.

**Q**   **What are the consequences to recipients/subrecipients for not complying with terms of the grant award?**

**A**   The Federal agency or pass-through entity may implement specific conditions if the recipient or subrecipient fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award. See § 200.208 for additional information on specific conditions. When the Federal agency or pass-through entity determines that noncompliance

2

**GAN Enclosure 5**
**Revised 10/2024**

cannot be remedied by imposing specific conditions, the Federal agency or pass-through entity may take one or more of the following actions:

- Temporarily withhold payments until the recipient or subrecipient takes corrective action.
- Disallow costs for all or part of the activity associated with the noncompliance of the recipient or subrecipient.
- Suspend or terminate the Federal award in part or in its entirety.
- Initiate suspension or debarment proceedings as authorized in 2 CFR part 180 and the Federal agency's regulations, or for pass-through entities, recommend suspension or debarment proceedings be initiated by the Federal agency.
- Withhold further Federal funds (new awards or continuation funding) for the project or program.
- Pursue other legally available remedies.

**Q  Who is responsible for determining the amount of interest owed to the Federal government?**

**A**  As set forth in 31 CFR 205.9, the method used to calculate and document interest liabilities is included in the State's TSA.  A non-State entity must maintain advances of Federal funds in interest-bearing accounts unless certain limited circumstances apply and remit interest earned on those funds to the Department of Health and Human Services, Payment Management System annually.  See 2 CFR 200.305.

**Q  What information should accompany my interest payment?**

**A**  In accordance with 2 CFR § 200.305(b)(12)), interest in excess of $500.00 earned on Federal advance payments deposited in interest-bearing accounts must be remitted annually to the Department of Health and Human Services Payment Management System (PMS) through an electronic medium using either Automated Clearing House (ACH) network or a Fedwire Funds Service payment. Instructions for returning interest, including the information that must be submitted, can be found at Returning Funds/Interest | HHS PSC FMP Payment Management Services.  Additionally, these instructions are provided in GAN Enclosure 4.

**Q  Are grant recipients/subrecipients automatically permitted to draw funds in advance of the time they need to disburse funds in order to liquidate obligations?**

**A**  The payment requirements in 2 CFR 200.305(b) authorize a grantee or subgrantee to request funds in advance of expenditures if certain conditions are met.  However, if those conditions are not met, the Department and a pass-through agency may place a payee on reimbursement.

**Q  For formula grant programs such as ESEA Title I, for which States distribute funds to LEAs, may States choose to pay LEAs on a reimbursement basis?**

**A**   A subgrantee must be paid in advance if it meets the standards for advance payments in 2 CFR 200.305(b)(1) but if the subgrantee cannot meet those standards, the State may put the subgrantee on reimbursement payment.  See 2 CFR 200.305(b).

**Q  Will the Department issue special procedures in advance if G5 plans to shut down for 3 days or more?**

**A**  Yes, before any shutdown of G5 lasting three days or more, the Department issues special guidance for drawing down funds during the shutdown.  The guidance will include cash

Supp. App. - 147

management improvement act procedures for States and certain State institutions of higher education and procedures for grants (including Pell grants) that are not subject to CMIA.

# Exhibit 6

S215J230149



## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

**1** **RECIPIENT NAME**

Metropolitan Family Services
101 N Wacker
Floor 17
Chicago, IL 60606

**2** **AWARD INFORMATION**

| | |
|---|---|
| PR/AWARD NUMBER | S215J230149 |
| ACTION NUMBER | 4 |
| ACTION TYPE | Administrative |
| AWARD TYPE | Discretionary (Research and Development) |

**3** **PROJECT STAFF**

RECIPIENT PROJECT DIRECTOR
Lesley Rivers             (312) 273-8252
RiversL@actnowillinois.org
EDUCATION PROGRAM CONTACT
Stephen Kostyo            (202) 987-1966
Stephen.Kostyo@ed.gov
EDUCATION PAYMENT HOTLINE
G5 PAYEE HELPDESK       888-336-8930
obssed@servicenowservices.com

**4** **PROJECT TITLE**

84.215J
Expanding Full Service Community Schools in Illinois

**5** **KEY PERSONNEL**

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| Lesley Rivers | Project Director | 50 % |

**6** **AWARD PERIODS**

| | |
|---|---|
| BUDGET PERIOD | 01/01/2024 - 12/31/2024 |
| PERFORMANCE PERIOD | 01/01/2024 - 12/31/2028 |

FUTURE BUDGET PERIODS

| BUDGET PERIOD | DATE | AMOUNT |
|---|---|---|
| 2 | 01/01/2025 - 12/31/2025 | $9,420,400.00 |
| 3 | 01/01/2026 - 12/31/2026 | $9,420,400.00 |
| 4 | 01/01/2027 - 12/31/2027 | $9,420,400.00 |
| 5 | 01/01/2028 - 12/31/2028 | $9,420,400.00 |

**7** **AUTHORIZED FUNDING**

| | |
|---|---|
| THIS ACTION | N/A |
| BUDGET PERIOD | $9,420,400.00 |
| PERFORMANCE PERIOD | $9,420,400.00 |

**8** **ADMINISTRATIVE INFORMATION**

| | |
|---|---|
| UEI | PDNNR2MS6AX3 |
| REGULATIONS | CFR PART 20 USC 7423-7423b |
| | EDGAR AS APPLICABLE |
| | 2 CFR AS APPLICABLE |
| ATTACHMENTS | N/A |

**9** **LEGISLATIVE AND FISCAL DATA**

AUTHORITY:        PL XXX V, PART D, SUBPART 1 EVERY STUDENT SUCCEEDS ACT,
                  TITLE IV, PART F SUBPART 2, SECTION 4625
PROGRAM TITLE:    INNOVATIVE APPROACHES TO LITERACY; FULL-SERVICE
                  COMMUNITY SCHOOLS - AND PROMISE NEIGHBORHOOD

Grant Award - 150

S215J230149



**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

| | |
|---|---|
| CFDA/SUBPROGRAM NO: | 84.215J |

**10**

| | |
|---|---|
| PR/AWARD NUMBER: | S215J230149 |
| RECIPIENT NAME: | Metropolitan Family Services |
| GRANTEE NAME: | METROPOLITAN FAMILY SERVICES |
| | 101 N WACKER DR STE 1700, |
| | CHICAGO, IL 60606 – 7384 |
| PROGRAM INDIRECT COST TYPE: | Restricted |
| PROJECT INDIRECT COST RATE: | |

TERMS AND CONDITIONS

    (1)    THE RECIPIENT'S PROJECT DIRECTOR IS CHANGED TO THE PERSON NAMED IN BLOCK 3.

## JANE HODGDON
Digitally signed by JANE HODGDON
Date: 2024.04.26 09:54:02 -04'00'

           **AUTHORIZING OFFICIAL**           **DATE**

Ver. 1

# EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**      (See Block 2 of the Notification)

**1. RECIPIENT NAME -** The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION -**   Unique items of information that identify this notification.

  **PR/AWARD NUMBER -** A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

  **ACTION NUMBER -** A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

  **ACTION TYPE -** The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

  **AWARD TYPE -**  The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF -** This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

  **\*RECIPIENT PROJECT DIRECTOR -** The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

  **EDUCATION PROGRAM CONTACT -** The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

  **EDUCATION PAYMENT CONTACT -**  The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER -**  Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL -** Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS -**   Project activities and funding are approved with respect to three different time periods, described below:

  **BUDGET PERIOD -** A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

  **PERFORMANCE PERIOD -** The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

  **\*FUTURE BUDGET PERIODS -** The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING -** The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

  **\*THIS ACTION -** The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

  **\*BUDGET PERIOD -** The total amount of funds available for use by the grantee during the stated budget period to this date.

  **\*PERFORMANCE PERIOD -** The amount of funds obligated from the start date of the first budget period to this date.

  **RECIPIENT COST SHARE -**  The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

  **RECIPIENT NON-FEDERAL AMOUNT -** The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION -** This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

  **UEI -**          The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

**\*REGULATIONS -** Title 2 of the Code of Federal Regulations (CFR), Part 200 as adopted at 2 CFR 3474, the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS -** Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA -** The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS -**
The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award.
**AMOUNT -** The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS -** Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER -** The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME -** The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE -** The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE -** The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL -** The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award


**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF -** The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT -** The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT -** The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT -** The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE -** If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

\* This item differs or does not appear on formula and block grants.

Supp. App. - 153

S215J230147

**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

| | | | |
|---|---|---|---|
| **1** | RECIPIENT NAME<br><br>Metropolitan Family Services<br>101 N Wacker<br>Floor 17<br>Chicago, IL 60606 | **2** | AWARD INFORMATION<br><br>PR/AWARD NUMBER    S215J230147<br>ACTION NUMBER    4<br>ACTION TYPE    Administrative<br>AWARD TYPE    Discretionary<br>(Research and Development) |
| **3** | PROJECT STAFF<br><br>RECIPIENT PROJECT DIRECTOR<br>Lesley Rivers    (312) 273-8252<br>RiversL@actnowillinois.org<br>EDUCATION PROGRAM CONTACT<br>Stephen Kostyo    (202) 987-1966<br>Stephen.Kostyo@ed.gov<br>EDUCATION PAYMENT HOTLINE<br>G5 PAYEE HELPDESK    888-336-8930<br>obssed@servicenowservices.com | **4** | PROJECT TITLE<br><br>84.215J<br>Expanding Full Service Community Schools in Rural Illinois |

**5** KEY PERSONNEL

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| Lesley Rivers | Project Director | 50 % |

**6** AWARD PERIODS

BUDGET PERIOD    01/01/2024 - 12/31/2024
PERFORMANCE PERIOD    01/01/2024 - 12/31/2028

FUTURE BUDGET PERIODS

| BUDGET PERIOD | DATE | AMOUNT |
|---|---|---|
| 2 | 01/01/2025 - 12/31/2025 | $9,420,400.00 |
| 3 | 01/01/2026 - 12/31/2026 | $9,420,400.00 |
| 4 | 01/01/2027 - 12/31/2027 | $9,420,400.00 |
| 5 | 01/01/2028 - 12/31/2028 | $9,420,400.00 |

**7** AUTHORIZED FUNDING

THIS ACTION    N/A
BUDGET PERIOD    $9,420,400.00
PERFORMANCE PERIOD    $9,420,400.00

**8** ADMINISTRATIVE INFORMATION

UEI    PDNNR2MS6AX3
REGULATIONS    CFR PART 20 USC 7423-7423b
EDGAR AS APPLICABLE
2 CFR AS APPLICABLE
ATTACHMENTS    N/A

**9** LEGISLATIVE AND FISCAL DATA

AUTHORITY:    PL XXX V, PART D, SUBPART 1 EVERY STUDENT SUCCEEDS ACT,
TITLE IV, PART F SUBPART 2, SECTION 4625
PROGRAM TITLE:    INNOVATIVE APPROACHES TO LITERACY; FULL-SERVICE
COMMUNITY SCHOOLS - AND PROMISE NEIGHBORHOOD

StuAppsAN54

S215J230147



## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

CFDA/SUBPROGRAM NO:          84.215J

**10**

| | |
|---|---|
| PR/AWARD NUMBER: | S215J230147 |
| RECIPIENT NAME: | Metropolitan Family Services |
| GRANTEE NAME: | METROPOLITAN FAMILY SERVICES |
| | 101 N WACKER DR STE 1700, |
| | CHICAGO, IL 60606 - 7384 |
| PROGRAM INDIRECT COST TYPE: | Restricted |
| PROJECT INDIRECT COST RATE: | |

TERMS AND CONDITIONS

   (1)   THE RECIPIENT'S PROJECT DIRECTOR IS CHANGED TO THE PERSON NAMED IN BLOCK 3.

## JANE HODGDON
Digitally signed by JANE HODGDON
Date: 2024.04.26 09:48:52 -04'00'

**AUTHORIZING OFFICIAL**                                    **DATE**

Ver. 1

# EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**      (See Block 2 of the Notification)

**1. RECIPIENT NAME -** The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION -**   Unique items of information that identify this notification.

**PR/AWARD NUMBER -** A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

**ACTION NUMBER -** A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

**ACTION TYPE -** The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

**AWARD TYPE -** The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF -** This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

**\*RECIPIENT PROJECT DIRECTOR -** The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

**EDUCATION PROGRAM CONTACT -** The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

**EDUCATION PAYMENT CONTACT -** The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER -** Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL -** Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS -**   Project activities and funding are approved with respect to three different time periods, described below:

**BUDGET PERIOD -** A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

**PERFORMANCE PERIOD -** The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

**\*FUTURE BUDGET PERIODS -** The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING -** The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

**\*THIS ACTION -** The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

**\*BUDGET PERIOD -** The total amount of funds available for use by the grantee during the stated budget period to this date.

**\*PERFORMANCE PERIOD -** The amount of funds obligated from the start date of the first budget period to this date.

**RECIPIENT COST SHARE -** The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

**RECIPIENT NON-FEDERAL AMOUNT -** The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION -** This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

**UEI -** The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

Case: 23-2473    Document: 20    Filed: 08/06/2026    Pages: 494

**\*REGULATIONS -** Title 2 of the Code of Federal Regulations (CFR), Part 200 as adopted at 2 CFR 3474, the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS -** Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA -** The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS -**
The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award.
**AMOUNT -** The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS -** Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER -** The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME -** The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE -** The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE -** The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL -** The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award

**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF -** The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT -** The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT -** The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT -** The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE -** If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

\* This item differs or does not appear on formula and block grants.

# Exhibit 7

UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF PLANNING, EVALUATION AND POLICY DEVELOPMENT

*December 12, 2025*

METROPOLITAN FAMILY SERVICES

**<u>Notice of Non-Continuation of Grant Award</u>**

Dear Lesley Rivers:

This letter provides notice that the United States Department of Education has determined not to continue your federal award, S215J230149, in its entirety, effective at the end of your current grant budget period. *See*, *inter alia*, 34 C.F.R. § 75.253(a)(5) and (f)(1).

Continuation requires "a determination from the Secretary that continuation of the project is in the best interest of the Federal Government." *Id*. The Department has undertaken a review of grants and determined that the grant specified above provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds. The grant is therefore inconsistent with, and no longer effectuates, the best interest of the Federal Government and will not be continued.

During the review process, Department staff identified that the applicant has proposed project activities that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. Specifically, "Integrated student supports, such as social-emotional learning and physical and mental health services, professional development on equity and inclusion, and collaborative leadership practices will assist participating schools in building safe and inclusive spaces for all students, including those with disabilities. ACT Now is a statewide leader in providing trainings on gender and sexuality to educators, offering Gender and Sexuality in OST 101 and 102 professional development courses. ACT Now, as the statewide afterschool network, has access to a variety of partners and content experts that develop curriculum focused on inclusion, such as the 1619 project. Throughout the year, ACT Now also hosts a variety of trainings for educators focused on trauma-informed care and racial equity," page e50. Additionally, the GEPA states, "We will consider the following factors to ensure the equitable distribution of funds to school districts: Poverty rates, Equity factors such as race and ethnicity,..." page e195, and "ACT Now will also ensure equitable access to the resources and trainings we create to support community schools. All of our trainings are developed with a racial equity and cultural competency lens. Further, we have specific trainings on cultural competency, and we are working with nationwide experts, Thrive Paradigm, to develop racial equity and implicit bias training for our Coalition members," page e196. As a result of the information identified above, the Department has determined that the project would be in conflict with agency policy and priorities, and so is not in the best interest of the Federal Government.

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2110

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Supp. App. - 159

UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF PLANNING, EVALUATION AND POLICY DEVELOPMENT

Pursuant to 34 C.F.R. § 75.253(g), you may request reconsideration of this decision. To do so, you must submit information and documentation supporting your position, in writing, within 7 calendar days of the date of this non-continuation grant award notice. Requests for reconsideration must be sent by email and addressed to:

Kirsten Baesler
Assistant Secretary
Office of Elementary and Secondary Education
U.S. Department of Education
OESEGrants@ed.gov
400 Maryland Ave. SW
Washington, DC 20202

Your request for reconsideration should set forth your basis for disagreeing with the Department's decision not to make a continuation award and include any relevant supporting documentation. *See* 34 C.F.R. § 75.253(g) and 2 C.F.R. § 200.342. Grantees will not be offered a no-cost extension consistent with the Department's discretionary authority under 34 C.F.R. § 75.253(h) and 2 C.F.R. § 200.308(g)(2). For information about the reconsideration process, you may visit https://www.ed.gov/grants-and-programs/department-grant-review-processes.

You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-46 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking any other appropriate enforcement actions, which could impact your eligibility for future grants and may result in additional liabilities. *See id.* § 200.344(i). Additionally, under 2 C.F.R. § 200.344(b), you are required to submit all final reports by no later than 120 calendar days after the end of the grant period of performance. Finally, we also remind you of your responsibility to retain all Federal award records for three years from the date of submission of your final financial report. *See* 2 C.F.R. § 200.334.

Sincerely,

Murray Bessette, Ph.D.

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2110

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Supp. App. - 160

UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF PLANNING, EVALUATION AND POLICY DEVELOPMENT

Principal Deputy Assistant Secretary/Acting Assistant Secretary
Office of Planning, Evaluation and Policy Development
400 Maryland Ave. SW
Washington, DC 20202

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2110

*The Department of Education's mission is to promote student achievement and preparation for global
competitiveness by fostering educational excellence and ensuring equal access.*

Supp. App. - 161

UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF PLANNING, EVALUATION AND POLICY DEVELOPMENT

*December 12, 2025*

METROPOLITAN FAMILY SERVICES

## **Notice of Non-Continuation of Grant Award**

Dear Lesley Rivers:

This letter provides notice that the United States Department of Education has determined not to continue your federal award, S215J230147, in its entirety, effective at the end of your current grant budget period. *See*, *inter alia*, 34 C.F.R. § 75.253(a)(5) and (f)(1).

Continuation requires "a determination from the Secretary that continuation of the project is in the best interest of the Federal Government." *Id*. The Department has undertaken a review of grants and determined that the grant specified above provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds. The grant is therefore inconsistent with, and no longer effectuates, the best interest of the Federal Government and will not be continued.

During the review process, Department staff identified that the applicant has proposed project activities that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. Specifically, "ACT Now's mission has equity and racial justice at its core. We are driven to ensuring that all youth are prepared for success in school, career, and life, through participation in high- quality community schools programs. We know that this requires an intentional focus on historically marginalized populations to ensure this outcome. ACT Now commits to addressing inequity in our own work and within our organization, and we strive to advance the afterschool field's overall efforts to address inequities. We also recognize that this is an ongoing process that will require intentional thought, education, and action. As we move forward to actively ensure that equity is intentionally and sustainably integrated into all that we do, the following values will be at the core of our work: advocate for funding to reach the youth most in need, ensure providers have the skills and resources necessary to execute programming with an equity mindset, and incorporate diverse voices into our leadership and feedback on our work," page e50, "ACT Now is a statewide leader in providing trainings on gender and sexuality to educators, offering Gender and Sexuality in OST 101 and 102 professional development courses. ACT Now, as the statewide afterschool network, has access to a variety of partners and content experts that develop curriculum focused on inclusion, such as the 1619 project. Throughout the year, ACT Now also hosts a variety of trainings for educators focused on trauma-informed care and racial equity," page e51, and the GEPA statement includes, "ACT Now will also ensure equitable access to the resources and trainings we create to support

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2110

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Supp. App. - 162

### UNITED STATES DEPARTMENT OF EDUCATION

### OFFICE OF PLANNING, EVALUATION AND POLICY DEVELOPMENT

community schools. All of our trainings are developed with a racial equity and cultural competency lens. Further, we have specific trainings on cultural competency, and we are working with nationwide experts, Thrive Paradigm, to develop racial equity and implicit bias training for our Coalition members. ACT Now also makes sure to ask about cultural competency and equity barriers at each and every training so that we are always improving and ensuring that we meet the needs of attendees," page e197. As a result of the information identified above, the Department has determined that the project would be in conflict with agency policy and priorities, and so is not in the best interest of the Federal Government.

Pursuant to 34 C.F.R. § 75.253(g), you may request reconsideration of this decision. To do so, you must submit information and documentation supporting your position, in writing, within 7 calendar days of the date of this non-continuation grant award notice. Requests for reconsideration must be sent by email and addressed to:

Kirsten Baesler
Assistant Secretary
Office of Elementary and Secondary Education
U.S. Department of Education
OESEGrants@ed.gov
400 Maryland Ave. SW
Washington, DC 20202

Your request for reconsideration should set forth your basis for disagreeing with the Department's decision not to make a continuation award and include any relevant supporting documentation. *See* 34 C.F.R. § 75.253(g) and 2 C.F.R. § 200.342. Grantees will not be offered a no-cost extension consistent with the Department's discretionary authority under 34 C.F.R. § 75.253(h) and 2 C.F.R. § 200.308(g)(2). For information about the reconsideration process, you may visit https://www.ed.gov/grants-and-programs/department-grant-review-processes.

You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-46 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking any other appropriate enforcement actions, which could impact your eligibility for future grants and may result in additional liabilities. *See id.* § 200.344(i). Additionally, under 2 C.F.R. § 200.344(b), you are required to submit all final reports by no later than 120 calendar days after the end of the grant period of performance. Finally, we also remind you of your responsibility to retain all Federal award records for three years from the date of submission of your final financial report. *See* 2 C.F.R. § 200.334.

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2110

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Supp. App. - 163

UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF PLANNING, EVALUATION AND POLICY DEVELOPMENT

Sincerely,

Murray Bessette, Ph.D.
Principal Deputy Assistant Secretary/Acting Assistant Secretary
Office of Planning, Evaluation and Policy Development
400 Maryland Ave. SW
Washington, DC 20202

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2110

*The Department of Education's mission is to promote student achievement and preparation for global
competitiveness by fostering educational excellence and ensuring equal access.*

Supp. App. - 164

# Exhibit 8

 

**December 18th, 2025**

**Via Email**

Kirsten Baesler
Assistant Secretary
Office of Elementary and Secondary Education
U.S. Department of Education
OESEGrants@ed.gov
400 Maryland Ave. SW
Washington, DC 20202

Re: **Request for Reconsideration of Non-Continuation Determination**
**Discretionary Grant Number:** S215J230149
**Project Title:** Expanding Full-Service Community Schools in Illinois

Dear Assistant Secretary Baesler:

Metropolitan Family Services (MFS) received a *Notice of Non-Continuation of Grant Award* (Notice) related to our Full-Service Community Schools (FSCS) Grant, S215J230149, dated December 12, 2025.[1] The Notice provides that, pursuant to 34 C.F.R. § 75.253(g), MFS may request a reconsideration of the decision. To request reconsideration, MFS must submit supporting information and documentation within 7 calendar days of the date of the Notice. This letter serves as notice that MFS respectfully requests reconsideration of the non-continuation of our FSCS grant award.

*Notice of Non-Continuation*

The Notice states that the U.S. Department of Education (Department) has undertaken a review of grants and determined that the above-referenced grant:

> provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds.

The Department concluded that the grant is "inconsistent with, and no longer effectuates, the best interests of the Federal Government and will not be continued."

*Response to Evidence Provided by the Department*

The Notice indicates that "Department staff identified that the applicant has proposed project activities that conflict with the Department's policy of prioritizing merit, fairness, and excellence in

---

[1] Since 2017, Metropolitan Family Services has acted as the fiscal sponsor and partner of Afterschool for Children and Teens Now (ACT Now), a statewide organization that works to ensure that young people in Illinois have access to quality and affordable afterschool and youth development programs. ACT Now is a broad group of stakeholders supported by Illinois families, educators, business, leaders, community advocates, and youth organizations and policymakers from across the state. The Coalition believes that an increased commitment to young people beyond the traditional school day is a crucial part of their growth into healthy and productive individuals.

education." In support of this claim, the Department identifies three excerpts from MFS's application.

The first excerpt the Department indicates that

> Integrated student supports, such as social-emotional learning and physical and mental health services, professional development on equity and inclusion, and collaborative leadership practices will assist participating schools in building safe and inclusive spaces for all students, including those with disabilities. ACT Now is a statewide leader in providing trainings on gender and sexuality to educators, offering Gender and Sexuality in OST 101 and 102 professional development courses. ACT Now, as the statewide afterschool network, has access to a variety of partners and content experts that develop curriculum focused on inclusion, such as the 1619 project. Throughout the year, ACT Now also hosts a variety of trainings for educators focused on trauma-informed care and racial equity.

MFS notes that this language was in response to Competitive Preference Priority 1 – Meeting Student Social, Emotional, and Academic Needs, a priority that was established through notice-and-comment rulemaking and was in effect at the time of MFS's application.[2] MFS further notes that while we include students with disabilities in our work, our centers provide services to *all* students. Our focus on ensuring that our spaces work for all of our students is grounded in fairness and ensuring an excellent education for all.

Consistent with the priorities of this administration, MFS has never provided access to professional development courses on gender or sexuality as part of the FSCS grant. The trainings identified in the Notice were conducted for other programs in Illinois, and were either requested and funded by the state, or were contracted and provided by other organizations. The trainings were never funded by our FSCS grant and were never compulsory trainings for our staff or community partners.

Similarly, consistent with the priorities of this administration, MFS has never provided access to the 1619 project or any racial equity curriculum as part of the FSCS grant. In keeping with the Department's February 14, 2025,[3] we have not shown "preference [to] certain racial groups and teach students that certain racial groups bear unique moral burdens." Consistent with the President's January 2025 Executive Order,[4] MFS does not engage in "rational indoctrination," teach about "discriminatory equity ideology" or "gender ideology," or participate in activities that undermine patriotic education.

Second, the Department identified language in the application regarding the factors MFS weighs and considers in identifying school districts with the most need. The Department identified as concerning our inclusion of "poverty rates" and "equity factors such as race and ethnicity."

These factors are included in our discussion of how MFS identifies the students and families with the greatest need—those that the FSCS grant program is designed to support. We note in our application that:

> Schools eligible for Title I funding are already in need of more investment. The process for selecting specific schools to receive funding and support under this grant will be informed

---

[2] *Final Priorities and Definitions – Secretary's Supplemental Priorities and Definitions for Discretionary Grants Programs*, 86 Fed. Reg. 70612 (Dec. 10, 2021).

[3] U.S. Department of Education, Office for Civil Rights, Acting Assistant Secretary Craig Trainor, *Dear Colleague Letter: Title VI of the Civil Rights Act in Light of Students for Fair Admissions v. Harvard* (Feb. 14, 2025), available at: https://www.ed.gov/media/document/dear-colleague-letter-sffa-v-harvard-109506.pdf.

[4] Executive Order 14190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Feb. 3, 2025).

by data indicating which schools in each district are best positioned to take on this work and have the most need among students and families.[5]

As MFS was statutorily required to address factors such as equitable participation and barriers to access—and did not actually implement these trainings nor incorporate them into the grant curriculum—MFS respectfully disagrees with the Department's conclusion that these undermine any Department policies regarding fairness.

Additionally, while the Department is correct that we identify poverty rates and race and ethnicity as factors that may be considered, the full list of factors also includes standardized test scores, Kindergarten readiness, graduation rates, chronic absenteeism, dropout rates, homelessness rates, unemployment rates, and health indicators.[6] For each partner school, the advisory boards meet regularly to discuss which students to prioritize for certain services, based on where the highest needs can be met with relevant enrichment opportunities. We develop insight and data to determine what student and community challenges to prioritize based on surveys, focus groups, and interviews that solicit feedback from students, parents, and school staff, and school data. These data are reviewed throughout the year to enable us to highlight any newly developing student needs and respond in a timely and effective manner.

Finally, the Department cites to the following language from MFS's GEPA[7] Statement, which prompted applicants to respond to the following question: "Based on the barriers identified, what steps will you take to address barriers to equitable access and participation in the proposed project or activity?"

> ACT Now will also ensure equitable access to the resources and trainings we create to support community schools. All of our trainings are developed with a racial equity and cultural competency lens. Further, we have specific trainings on cultural competency, and we are working with nationwide experts, Thrive Paradigm, to develop racial equity and implicit bias training for our Coalition members

MFS notes that, as evidenced by the attached training plan, **it has not implemented the trainings identified above**, and never incorporated them into the grant curriculum.[8] MFS further notes that this language was provided in response to a statutorily required statement that all Department grantees are required to submit that it is

> to develop and describe in each applicant's application the steps such applicant proposes to take to ensure equitable access to, and equitable participation in, the project or activity to be conducted with such assistance, by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age.[9]

These statements are descriptions of MFS resources and policies at the time of application but are not proposed project activities and were never implemented as part of the FSCS project. Accordingly, we respectfully disagree that this excerpt demonstrates that MFS "has proposed project activities that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education" as the identified language proposes no project activities at all.

---

[6] *Ibid.*

[7] MFS's GEPA Statement, Attachment 5.

[8] MFS Training Plans for School Years 2024-2025, and 2025-2026 (through December), Attachment 1.

[9] Section 427 of the General Education Provisions Act, 20 U.S.C. 1228a.

### Full-Service Community Schools

Congress authorized the FSCS program in Title IV of the Elementary and Secondary Education Act,[10] as amended by the Every Student Succeeds Act, to "provide support for the planning, implementation, and operation of full-service community schools that improve the coordination, integration, accessibility, and effectiveness of services for children and families, particularly for children attending high-poverty schools, including high-poverty rural schools." Congress defined "full-service community schools" as public elementary and secondary schools that participate in "community-based effort to coordinate and integrate educational, developmental, family, health, and other comprehensive services through community-based organizations and public and private partnerships" and provide "access to such services in schools to students, families, and the community, such as access during the school year (including before- and after-school hours and weekends), as well as during the summer"[11] and authorized the award of federal grants, matched by non-federal funding sources, to develop and sustain FSCSs. The Department awards capacity-building and development grants, multi-location educational agency grants, and state scaling grants. FSCS grantees provide "pipeline services", with "coordinated supports, services, and opportunities for children from birth through entry into and success in postsecondary education, and career attainment" including: high-quality early childhood programs; high-quality school and outside of school programs and strategies; transitional support; family and community engagement and supports; activities to support postsecondary and workforce readiness; community-based support for students in the community; social, health, nutrition, and mental health services and supports; and juvenile crime prevention and rehabilitation programs.[12]

MFS is excited about the Department's continued commitment to the FSCS grant program, as evidenced by the conference held December 8–10, 2025, and the appointment of new grant officers to facilitate continued operations of this vital program.

### Background of MFS and MFS Accomplishments

MFS is a 501(c)(3) organization based in Chicago whose mission is "[t]o provide and mobilize the services needed to strengthen families and communities." Founded in 1847 as the Chicago Relief and Aid Society, MFS has served hundreds of thousands of families in the Chicago area. Its subsidiary organization, Afterschool for Children and Teens Now (ACT Now), is a coalition of afterschool providers, families, business leaders, community advocates, youth organizations, and policymakers from across the state of Illinois. As evidenced by letters in support of its FSCS application, MFS has earned, through reputation and sustained action in support of students and communities, broad backing from political and community leaders.[13]

---

[10] Sections 4621-4623, 4625 of the Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act, 20 U.S.C. 7271-7273, 4625.

[11] 20 U.S.C 7272(2).

[12] 20 U.S.C. 7272(3), 7275.

[13] Letters of Support from the following entities: Jeffery A. Aranowski (Executive Director for Safe & Healthy Climate, Illinois State Board of Education), Rep. Patrick Windhorst (Republican Floor Leader), Autumn Berg (Chicago Public Schools Office of College and Career Success), Katherine Buchanan (Illinois State Deputy Director, Council for A Strong America), Senator Richard J. Durbin (United States Senator), Patrick Brosnan (Executive Director, Brighton Park Neighborhood Council), Senator Karina Villa (State Senator, 25th District), Michelle Lamboley (Assistant Superintendent, McLean County Unit District No. 5), Rep. Theresa Mah (State Representative, 24th District), Rep. Aaron M. Ortiz (State Representative, 1st District), Rep. Eric Sorensen (State Representative, 17th District), Senator Celina Villanueva (State Senator, 12th District), Andrea Durbin (Chief Executive Officer, Illinois Collaboration on Youth), Suzanne Doornbos Kerbow, Jeethu Samuel (Youth Guidance). Attachment 4.

The FSCS project has made substantial progress toward its goals and objectives. Governance and oversight have been strengthened through the Community Schools Statewide Steering Committee's approval of chartered, time-bound workgroups, resulting in targeted Year 2 goals aligned to grant outputs and state priorities. All partner schools completed a comprehensive Asset and Needs Assessment process, which included focus groups, interviews, and data analysis. This process culminated in needs assessment reports and rubric-scored implementation plans that align local strategies with measurable outcomes such as kindergarten readiness, chronic absenteeism, discipline trends, academic achievement, and 5Essentials indicators.

Building on these accomplishments, the project has translated planning into early, observable impacts while setting clear, measurable goals for the next phase. Schools have already expanded services tied to documented needs, including the establishment of advisory councils and strengthened community partnerships involving dozens of local organizations. High-quality implementation plans demonstrate readiness to execute strategies such as increasing family engagement and reducing absenteeism. With the activation of a centralized data system and alignment with state administrative data, the project is positioned to track increases in service referrals, participation in out-of-school-time programs, family and community leadership engagement, and improvements in attendance, climate, and academic indicators over the coming years. Collectively, these accomplishments and clearly defined metrics underscore both meaningful progress to date and a credible pathway toward sustained, measurable improvements in student outcomes and community well-being statewide.[14]

### *Alignment with Current Administration Priorities*

As noted above, MFS did not implement any of the proposed activities identified by the Department as undermining the Department's policy of prioritizing merit, fairness, and excellence in education. In contrast, MFS's grant activities emphasize these values. For example, merit and fairness are advanced through the use of needs assessments, data-driven implementation plans, and clear performance metrics that align services with documented needs and measurable goals rather than assumptions or ideology. MFS promotes excellence by strengthening outcomes through academic enrichment, career and workforce readiness programs, and continuous improvement processes supported by technical assistance, evaluation, and cross-agency coordination.

The equity principles identified in the application reflect, in language aligned with the policies of the Department at the time of the competition, our organization's commitment to improving the academic achievement of Illinois students through improved coordination of community resources, access to expanded and enriched learning time opportunities, and increased family engagement.

To be clear: As we have previously communicated to the Department, MFS has not used racial metrics to determine need or partnership eligibility. We have not hired, and do not plan to hire a full-time employee to focus on cultural competency. All of our trainings have been carefully reviewed and, as necessary, revised to ensure that we are providing equal services to all providers and students, regardless of identity. In sum, our approach to community schools is hyper-local. Our mission, structure, and partnership models emphasize concentrating decision-making authority around school choice with our families and community partners. Furthermore, consistent with the Administration's emphasis on parental control in education, we have amplified parent voices by ensuring meaningful participation in school decisions through advisory councils.

---

[14] MFS Full-Service Community Schools Grant Performance Report Cover Sheet and Executive Summary (Aug. 2025), Attachment 3.

Since receiving our FSCS grant, MFS has sought, as a good steward of the federal funding we have received, to implement programs that effectively serve all of the students in our communities. We have consistently met all of our FSCS grant requirements. MFS remains committed to operating our programs in a manner that is consistent with Administration's priorities and all applicable federal laws, keeping the focus on serving the needs of the students and families in their community.

Supporting documentation includes:

- **Attachment 1:** MFS Training Plans for School Years 2024-2025, and 2025-2026 (through December)
- **Attachment 2:** MFS FY24 FSCS Title I Full Application Appendix A, Letters of Support (Aug. 2023)
- **Attachment 3:** MFS Full-Service Community Schools Grant Performance Report Cover Sheet and Executive Summary (Aug. 2025)
- **Attachment 4:** Letters in support of ACT Now's Reconsideration from Senator Richard J. Durbin (United States Senator), Congresswoman Nikki Budzinski (Member of Congress, IL 13th District), State Senator John F. Curran (Illinois Senate Republican Leader, 41st District), Congressman Raja Krishnamoorthi (Member of Congress, IL 8th District), Congressman Mike Quigley (Member of Congress, IL District 5), Congresswoman Delia C. Ramirez (Member of Congress, IL 3rd District), Congressman Eric Sorensen (Member of Congress, IL 17th District), State Representative Brandun Schweizer (State Representative, 104th District), Clete Winkelmann (President and CEO, of the Baby Fold McClean County), Congressman Mike Bost (Member of Congress, IL 16th District) and Congressman Darin LaHood (Member of Congress, IL 12th District)
- **Attachment 5:** MFS's GEPA Statement

These records conclusively demonstrate that MFS has not used federal funds for activities that conflict with the priorities and policy preferences of the Administration, that the budget is in full compliance with the Administration's guidance prohibiting the use of grant funds for activities that do not prioritize merit, fairness, and excellence in education, and remains consistent with—and effectuates—the best interests of the Federal Government. Accordingly, and pursuant to 34 C.F.R. § 75.253(g), MFS respectfully requests reconsideration of the Department's non-continuation decision and authorization of continued funding of the FSCS grant program under Award Number S215J230149. Continuation will ensure that federal objectives are not only met but advanced, without any misuse of federal funds.

We value the Department's partnership and the ability to demonstrate how MFS, in partnership with ACT Now, continues to work in partnership with state, local, and community leaders to ensure that young people in Illinois have access to quality, affordable afterschool and youth development programs. I welcome the opportunity to answer any questions or provide additional information and may be reached at **riversl@actnowillinois.org** or **(312) 273-8252.**

Sincerely,

*[signature: Lesley Rivers]*

**Lesley Rivers**
**Project Director**
**ACT Now Illinois**


**Attachments:**

**Attachment 1:** MFS Training Plans for School Years 2024-2025, and 2025-2026 (through December)

**Attachment 2:** MFS FY24 FSCS Title I Full Application Appendix A, Letters of Support (Aug. 2023)

Jeffery A. Aranowski (Executive Director for Safe & Healthy Climate, Illinois State Board of Education)

State Representative Patrick Windhorst (Republican Floor Leader, 117th District)

Autumn Berg (Chicago Public Schools Office of College and Career Success)

Katherine Buchanan (Illinois State Deputy Director, Council for A Strong America)

Senator Richard J. Durbin (United States Senator)

Patrick Brosnan (Executive Director, Brighton Park Neighborhood Council)

State Senator Karina Villa (State Senator, 25th District)

Michelle Lamboley (Assistant Superintendent, McLean County Unit District No. 5)

State Representative Theresa Mah (State Representative, 24th District)

State Representative Aaron M. Ortiz (State Representative, 1st District)

Congressman Eric Sorensen (Member of Congress, IL 17th District)

State Senator Celina Villanueva (State Senator, 12th District)

Andrea Durbin (Chief Executive Officer, Illinois Collaboration on Youth)

Suzanne Doornbos Kerbow (Polk Bros. Foundation)

Jeethu Samuel (Youth Guidance)


**Attachment 3:** MFS Full-Service Community Schools Grant Performance Report Cover Sheet and Executive Summary (Aug. 2025)


**Attachments 4:** Letters in Support of ACT Now's Reconsideration

Senator Richard J. Durbin (United States Senate)

Congresswoman Nikki Budzinski (Member of Congress, IL 13th District)

State Senator John F. Curran (Illinois Senate Republican Leader, 41st District)

Congressman Raja Krishnamoorthi (Member of Congress, IL 8th District)

Congressman Mike Quigley (Member of Congress, IL District 5)

Congresswoman Delia C. Ramirez (Member of Congress, IL 3rd District)

Congressman Eric Sorensen (Member of Congress, IL 17th District)

State Representative Brandun Schweizer (State Representative, 104th District)

Clete Winkelmann (President and CEO, of the Baby Fold McClean County)

Congressman Mike Bost (Member of Congress, IL 16th District) and Congressman Darin LaHood (Member of Congress, IL 12th District)

**Attachment 5:** MFS's GEPA Statement

 

**December 18, 2025**

**Via Email**

Kirsten Baesler
Assistant Secretary
Office of Elementary and Secondary Education
U.S. Department of Education
OESEGrants@ed.gov
400 Maryland Ave. SW
Washington, DC 20202

Re: **Request for Reconsideration of Non-Continuation Determination**
**Discretionary Grant Number:** S215J230147
**Project Title:** Expanding Full-Service Community Schools in Rural Illinois

Dear Assistant Secretary Baesler:

Metropolitan Family Services (MFS) received a *Notice of Non-Continuation of Grant Award* ("Notice") related to our Full-Service Community Schools (FSCS) Grant, S215J230147, dated December 12, 2025. The Notice provides that, pursuant to 34 C.F.R. § 75.253(g), MFS may request a reconsideration of the decision. To request reconsideration, MFS must submit supporting information and documentation within 7 calendar days of the date of the Notice. This letter serves as notice that MFS respectfully requests reconsideration of the non-continuation of our FSCS grant award.

The Notice states that the U.S. Department of Education (Department) has undertaken a review of grants and determined that the above-referenced grant:

> provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds.

The Department concluded that "[t]he grant is therefore inconsistent with, and no longer effectuates, the best interest of the Federal Government and will not be continued."

*Response to Evidence Provided by the Department*

The Notice indicates that "Department staff identified that the applicant has proposed project activities that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education." In support of this claim, the Department identifies three excerpts from MFS's application.

The first excerpt indicates that

> ACT Now's mission has equity and racial justice at its core. We are driven to ensuring that all youth are prepared for success in school, career, and life, through participation in high-quality community schools programs. We know that this requires an intentional focus on

> historically marginalized populations to ensure this outcome. ACT Now commits to addressing inequity in our own work and within our organization, and we strive to advance the afterschool field's overall efforts to address inequities. We also recognize that this is an ongoing process that will require intentional thought, education, and action. As we move forward to actively ensure that equity is intentionally and sustainably integrated into all that we do, the following values will be at the core of our work: advocate for funding to reach the youth most in need, ensure providers have the skills and resources necessary to execute programming with an equity mindset, and incorporate diverse voices into our leadership and feedback on our work.

MFS notes that this language was in response to Competitive Preference Priority 1 – Meeting Student Social, Emotional, and Academic Needs, a priority that was established through notice-and-comment rulemaking and was in effect at the time of MFS's application.[1] MFS further notes that this language is a statement on ACT Now's mission and values but does not propose any specific projects or activities. Accordingly, we respectfully disagree that this excerpt demonstrates that MFS has "has proposed project activities that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education" as the identified language proposes no project activities at all.

The Department goes on to identify two other proposed projects that it concluded conflict with the Department's policies. The first states that

> ACT Now is a statewide leader in providing trainings on gender and sexuality to educators, offering Gender and Sexuality in OST 101 and 102 professional development courses. ACT Now, as the statewide afterschool network, has access to a variety of partners and content experts that develop curriculum focused on inclusion, such as the 1619 project. Throughout the year, ACT Now also hosts a variety of trainings for educators focused on trauma-informed care and racial equity

Regarding these activities, MFS first notes that this section, too, was in response to the Supplemental Priorities in place at the time of the application. MFS further notes that, as evidenced by the attached training plan,[2] **the proposed activities were not implemented as part of this grant project**.

Finally, the Department cites the following language from MFS's GEPA Statement,[3] which prompted applicants to respond to the following question: "Based on the barriers identified, what steps will you take to address barriers to equitable access and participation in the proposed project or activity?"

> ACT Now will also ensure equitable access to the resources and trainings we create to support community schools. All of our trainings are developed with a racial equity and cultural competency lens. Further, we have specific trainings on cultural competency, and we are working with nationwide experts, Thrive Paradigm, to develop racial equity and implicit bias training for our Coalition members. ACT Now also makes sure to ask about cultural competency and equity barriers at each and every training so that we are always improving and ensuring that we meet the needs of attendees

---

[1] *Final Priorities and Definitions—Secretary's Supplemental Priorities and Definitions for Discretionary Grants Programs*, 86 Fed. Reg. 70612 (Dec. 10, 2021).

[2] MFS Training Plans for School Years 2024-2025, and 2025-2026 (through December), Attachment 1.

[3] MFS's GEPA Statement, Attachment 5.

As with the previously cited activities, MFS notes that **it has not implemented the trainings identified above.**[4] MFS further notes that this language was provided in response to a statutorily required statement that all Department grantees are required to submit that is

> to develop and describe in such applicant's application the steps such applicant proposes to take to ensure equitable access to, and equitable participation in, the project or activity to be conducted with such assistance, by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age.[5]

As MFS was statutorily required to address factors such as equitable participation and barriers to access—and did not actually implement these trainings nor incorporate them into the grant curriculum—MFS respectfully disagrees with the Department's conclusion that these undermine any Department policies regarding fairness.

### *Full-Service Community Schools*

Congress authorized the FSCS program in Title IV of the Elementary and Secondary Education Act,[6] as amended by the Every Student Succeeds Act, to "provide support for the planning, implementation, and operation of full-service community schools that improve the coordination, integration, accessibility, and effectiveness of services for children and families, particularly for children attending high-poverty schools, including high-poverty rural schools." Congress defined "full-service community schools" as public elementary and secondary schools that participate in "community-based effort to coordinate and integrate educational, developmental, family, health, and other comprehensive services through community-based organizations and public and private partnerships" and provide "access to such services in schools to students, families, and the community, such as access during the school year (including before- and after-school hours and weekends), as well as during the summer"[7] and authorized the award of federal grants, matched by non-federal funding sources, to develop and sustain FSCSs. The Department awards capacity-building and development grants, multi-location educational agency grants, and state scaling grants. FSCS grantees provide "pipeline services", with "coordinated supports, services, and opportunities for children from birth through entry into and success in postsecondary education, and career attainment" including: high-quality early childhood programs; high-quality school and outside of school programs and strategies; transitional support; family and community engagement and supports; activities to support postsecondary and workforce readiness; community-based support for students in the community; social, health, nutrition, and mental health services and supports; and juvenile crime prevention and rehabilitation programs.[8]

MFS is excited about the Department's continued commitment to the FSCS grant program, as evidenced by the conference held December 8–10, 2025, and the appointment of new grant officers to facilitate continued operations of this vital program.

### *Background of MFS and Accomplishments*

---

[4] *See*, Attachment 1.
[5] GEPA section 427.
[6] Sections 4621-4623, 4625 of the Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act, 20 U.S.C. 7271-7273, 4625.
[7] 20 U.S.C 7272(2).
[8] 20 U.S.C. 7272(3), 7275.

MFS is a 501(c)(3) organization based in Chicago whose mission is "[t]o provide and mobilize the services needed to strengthen families and communities." Founded in 1857 as the Chicago Relief and Aid Society, MFS has served hundreds of thousands of families in the Chicago area. Its subsidiary organization, Afterschool for Children and Teens Now (ACT Now), is a coalition of afterschool providers, families, business leaders, community advocates, youth organizations, and policymakers from across the state of Illinois. As evidenced by letters in support of its FSCS application, MFS has earned, through reputation and sustained action in support of students and communities, broad backing from political and community leaders.[9]

In its first two years, this project has both achieved measurable outcomes that demonstrate impact and momentum and established clear, data-driven goals for continued improvement. Participating school districts have documented outcomes such as a substantial reduction in exclusionary discipline, with one district decreasing suspensions and exclusions from 22 in FY 2024 to 2 in FY 2025. In addition, students in participating districts have seen increased academic performance among students participating in ACT preparation and tutoring programs. Districts have also seen successful workforce readiness results from a pilot summer internship program in which more than half of participating students received part-time job offers.[10]

Building on these early successes, partner schools have adopted implementation plans aligned to the project's logic model that establish measurable goals related to kindergarten readiness, reductions in chronic absenteeism and truancy, improved state assessment performance, stronger school climate indicators as measured by the Illinois 5Essentials Survey, increased family participation and leadership, and expanded community partnerships.

### Alignment with Current Administration Priorities

As noted above, MFS did not implement any of the proposed activities identified by the Department as undermining the Department's policy of prioritizing merit, fairness, and excellence in education. In contrast, MFS's grant activities emphasize these values. For example, merit and fairness are advanced through the use of needs assessments, data-driven implementation plans, and clear performance metrics that align services with documented needs and measurable goals rather than assumptions or ideology. MFS promotes excellence by strengthening outcomes through academic enrichment, career and workforce readiness programs, and continuous improvement processes supported by technical assistance, evaluation, and cross-agency coordination.

The equity principles identified in the application reflects, in language aligned with the policies of the Department at the time of the competition, our organization's commitment to improving the academic achievement of Illinois students through improved coordination of community resources, access to expanded and enriched learning time opportunities, and increased family engagement.

To be clear: As we have previously communicated to the Department, MFS has not used racial metrics to determine need or partnership eligibility. We have not hired, and do not plan to hire a

---

[9] Letters of Support from the following entities: Jeffery A. Aranowski (Executive Director for Safe & Healthy Climate, Illinois State Board of Education), State Representative Patrick Windhorst (117th District), Katherine Buchanan (Illinois State Deputy Director, Council For A Strong America), State Representative Mike Bost (12th District), Senator Richard J. Durbin (United States Senator), State Senator Karina Villa (25th District), Du Quoin Community Unit School District #300, State Representative Theresa Mah (24th District), State Representative Aaron M. Ortiz (1st District), State Senator Celina Villanueva (12th District), Herrin Community Unit School District No. 4, Andrea Durbin (Chief Executive Officer, Illinois Collaboration on Youth),  Suzanne Doornbos Kerbow, Vienna High School Attachment 3.

[10] MFS Full-Service Community Schools Grant Performance Report Cover Sheet and Executive Summary (Aug. 2025), Attachment 3.

full-time employee to focus on cultural competency. All of our trainings have been carefully reviewed and, as necessary, revised to ensure that we are providing equal services to all providers and students, regardless of identity. In sum, our approach to community schools is hyper-local. Our mission, structure, and partnership models emphasize concentrating decision-making authority around school choice with our families and community partners.

Since receiving our FSCS grant, MFS has sought, as a good steward of the federal funding we have received, to implement programs that effectively serve all of the students in our communities. We have consistently met all of our FSCS grant requirements. MFS remains committed to operating our programs in a manner that is consistent with the Administration's priorities and all applicable federal laws, keeping the focus on serving the needs of the students and families in their community.

Supporting documentation includes:

- **Attachment 1:** MFS Training Plans for School Years 2024-2025, and 2025-2026 (through December)
- **Attachment 2:** MFS FY24 FSCS Rural Full Application Appendix A, Letters of Support (Aug. 2023)
- **Attachment 3:** MFS Full-Service Community Schools Grant Performance Report Cover Sheet and Executive Summary (Aug. 2025)
- **Attachment 4:** Letters in Support of ACT Now's Reconsideration from Congresswoman Senator Richard J. Durbin (United States Senate), Nikki Budzinski (Member of Congress, IL 13th District), State Senator John F. Curran (Illinois Senate Republican Leader, 41st District), Congressman Raja Krishnamoorthi (Member of Congress, IL 8th District), Congressman Mike Quigley (Member of Congress, IL District 5), Congresswoman Delia C. Ramirez (Member of Congress, IL 3rd District), Congressman Eric Sorensen (Member of Congress, IL 17th District), State Representative Brandun Schweizer (State Representative, 104th District), Clete Winkelmann (President and CEO, of the Baby Fold McClean County), Congressman Mike Bost (Member of Congress, IL 16th District) and Congressman Darin LaHood (Member of Congress, IL 12th District)
- **Attachment 5:** MFS's GEPA Statement.


These records conclusively demonstrate that MFS has not used federal funds for activities that conflict with the priorities and policy preferences of the Administration, that the budget is in full compliance with the Administration's guidance prohibiting the use of grant funds for activities that do not prioritize merit, fairness, and excellence in education, and remains consistent with—and effectuates—the best interests of the Federal Government. Accordingly, and pursuant to 34 C.F.R. § 75.253(g), MFS respectfully requests reconsideration of the Department's non-continuation decision and authorization of continued funding of the FSCS grant program under Award Number S215J230147. Continuation will ensure that federal objectives are not only met but advanced, without any misuse of federal funds.

We value the Department's partnership and the ability to demonstrate how MFS, in partnership with ACT Now, continues to work in partnership with state, local, and community leaders to ensure that young people in Illinois have access to quality, affordable afterschool and youth development programs. I welcome the opportunity to answer any questions or provide additional information and may be reached at **riversl@actnowillinois.org** **or (312) 273-8252.**

Sincerely,



**Lesley Rivers**
**Project Director**
**ACT Now Illinois**


**Attachments:**

**Attachment 1:** MFS Training Plans for School Years 2024-2025, and 2025-2026 (through December)

**Attachment 2:** MFS FY24 FSCS Rural Full Application Appendix A, Letters of Support (Aug. 2023)

Jeffery A. Aranowski (Executive Director for Safe & Healthy Climate, Illinois State Board of Education)

State Representative Patrick Windhorst (Republican Floor Leader, 117th District)

Katherine Buchanan (Illinois State Deputy Director, Council for A Strong America)

Congressman Mike Bost (Member of Congress, IL 12th District)

Senator Richard J. Durbin (United States Senator)

State Senator Karina Villa (State Senator, 25th District)

Superintendent Steve M. Mayerhofer (Du Quoin Community Unit School District #300)

State Representative Theresa Mah (State Representative, 24th District)

State Representative Aaron M. Ortiz (State Representative, 1st District)

State Senator Celina Villanueva (State Senator, 12th District)

Superintendent Nathaniel L. Wilson (Herrin Community Unit School District No. 4)

Andrea Durbin (Chief Executive Officer, Illinois Collaboration on Youth)

Suzanne Doornbos Kerbow

Superintendent Joshua W. Stafford (Vienna High School)


**Attachment 3:** MFS Full-Service Community Schools Grant Performance Report Cover Sheet and Executive Summary (Aug. 2025)


**Attachment 4:** Letters in Support of ACT Now's Reconsideration

Senator Richard J. Durbin (United States Senate)

Congresswoman Nikki Budzinski (Member of Congress, IL 13th District)

State Senator John F. Curran (Illinois Senate Republican Leader, 41st District)

Congressman Raja Krishnamoorthi (Member of Congress, IL 8th District)

Congressman Mike Quigley (Member of Congress, IL District 5)

Congresswoman Delia C. Ramirez (Member of Congress, IL 3rd District)

Congressman Eric Sorensen (Member of Congress, IL 17th District)

State Representative Brandun Schweizer (State Representative, 104th District)

Clete Winkelmann (President and CEO, of the Baby Fold McClean County)

Congressman Mike Bost (Member of Congress, IL 16th District) and Congressman Darin LaHood (Member of Congress, IL 12th District)

**Attachment 5**: MFS's GEPA Statement.

# Exhibit 23

UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF ELEMENTARY AND SECONDARY EDUCATION

December 29, 2025

Metropolitan Family Services

RE: Response to Reconsideration Request of the Non-Continuation of Grant PR/Award Number S215J230149

Dear Lesley Rivers,

We have reviewed your timely request for reconsideration submitted on December 19, 2025 regarding the non-continuation of grant PR/Award Number S215J230149 in the Full-Service Community Schools Grants program. Upon the review and recommendation by the Office of Elementary and Secondary Education, I have concluded the review of your reconsideration request and your request is denied.

The U.S. Department of Education (Department) has provided this administrative reconsideration process, consistent with law (34 C.F.R. § 75.253(g)), to permit a grantee to challenge this decision to not continue a grant. As part of this process, the Department informed applicants in their non-continuation letter that they could submit a reconsideration request, and the Department would review the submitted materials to determine if the request is accepted or denied.

Upon review of your submitted reconsideration materials and documentation from your grant, I have determined that your grant provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflicts with those of the current Administration, in that the program: violates the letter or purpose of Federal civil rights law; conflicts with the Department's policy of prioritizing merit, fairness, and excellence in education; undermines the well-being of the students these programs are intended to help; or constitutes an inappropriate use of federal funds.

Specifically, in support of my conclusion, you state in your approved grant application, "ACT Now's mission has equity and racial justice at its core. We are driven to ensuring that all youth are prepared for success in school, career, and life through participation in high quality community schools programs. We know that this requires an intentional focus on historically marginalized populations to ensure this outcome. ACT Now commits to addressing inequity in our own work and within our organization, and we strive to advance the afterschool field's overall efforts to address inequities. We also recognize that this is an ongoing process that will require intentional thought, education, and action. As we move forward to actively ensure that equity is intentionally and sustainably integrated into all that we do, the following values will be at the core of our work: advocate for funding to reach the youth most in need, ensure providers have the skills and resources necessary to execute programming with an equity mindset, and incorporate diverse voices into our leadership and feedback on our work." (e49) Also, "Authentic family engagement will help to build a supportive, positive, identity-safe, and

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Supp. App. - 182

inclusive culture. By utilizing strategies such as engaging parent liaisons that identify with families in the school community in terms of race, ethnicity, culture, and/or language, we will build relationships and ensure that all voices are heard and needs recognized. Representation of families on Advisory Boards and in other decision-making arenas will add to this. We will require all partner schools to facilitate meaningful and consistent family engagement to meet our goals with regards to inclusion. ACT Now has already developed a variety of trainings and toolkits on family engagement to support this process." (e50) For choosing schools to assist, Grantee states, "We will weigh the following factors in identifying school districts with the most need: poverty rates; equity factors such as race and ethnicity; standardized test scores; Kindergarten readiness; graduation rates; chronic absenteeism; dropout rates; homelessness rates; unemployment rates; health indicators." (e78) Grantee also states in questionnaire, "We will require each school conduct a needs assessment of their community and base the selection of services on those needs. This will ensure that issues of equity are addressed by ensuring that services are delivered to those in need rather than by assumptions about certain classes of people. School districts will be required to consider gender, race, national origin, color, disability, and age when conducting their needs assessment." (e196) In addition, the information in your request for reconsideration was not sufficient to refute these findings.

As stated in your non-continuation letter, you are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-346 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. §200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking any other appropriate enforcement actions, which could impact your eligibility for future grants and may result in additional liabilities. *See* 2 C.F.R. § 200.344(i). Please note that costs incurred for prosecuting claims against the Federal Government, including costs incurred related to this reconsideration request, are unallowable. *See* 2 C.F.R. § 200.435(g).

Additionally, under 2 C.F.R. 200.344(b), you are required to submit a final report by April 30, 2026. Your program officer will provide specific instructions on additional closeout activities prior to the end of your project period. Please note that the Department is electing, consistent with 34 C.F.R. § 75.253(h), to not authorize further no-cost extensions for grant awards identified for non-continuation.

We remind you of your responsibility to retain all Federal awards records for three years from the date of submission of your final financial report. *See* 2 C.F.R. § 200.334. Please note that this determination represents the final decision of the Department.

Respectfully,

Lindsey M Burke

Page 2

Supp. App. - 183

Lindsey M. Burke, Ph.D.
Deputy Chief of Staff for Policy and Programs
U.S. Department of Education

UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF ELEMENTARY AND SECONDARY EDUCATION

December 29, 2025

Metropolitan Family Services

RE: Response to Reconsideration Request of the Non-Continuation of Grant PR/Award Number S215J230147

Dear Lesley Rivers,

We have reviewed your timely request for reconsideration submitted on December 19, 2025 regarding the non-continuation of grant PR/Award Number S215J230147 in the Full-Service Community Schools Grants program. Upon the review and recommendation by the Office of Elementary and Secondary Education, I have concluded the review of your reconsideration request and your request is denied.

The U.S. Department of Education (Department) has provided this administrative reconsideration process, consistent with law (34 C.F.R. § 75.253(g)), to permit a grantee to challenge this decision to not continue a grant. As part of this process, the Department informed applicants in their non-continuation letter that they could submit a reconsideration request, and the Department would review the submitted materials to determine if the request is accepted or denied.

Upon review of your submitted reconsideration materials and documentation from your grant, I have determined that your grant provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflicts with those of the current Administration, in that the program: violates the letter or purpose of Federal civil rights law; conflicts with the Department's policy of prioritizing merit, fairness, and excellence in education; undermines the well-being of the students these programs are intended to help; or constitutes an inappropriate use of federal funds.

Specifically, in support of my conclusion, you state in your approved grant application, "We will weigh the following factors in identifying school districts: poverty rates, equity factors such as race and ethnicity, standardized test scores, kindergarten readiness, graduation rates, chronic absenteeism, dropout rates, homelessness rates, unemployment rates, and health indicators" (e86). Grantee also states in GEPA questionnaire a response that, "We have also finalized a multiyear plan to improve and enhance diversity, equity, and inclusions in all aspects of our organization…c. Steering Committee: We will also ensure that the statewide steering committee is made up of diverse voices and perspectives. This group will provide strategic guidance and decision-making for this project. As such, it is important that this group reflect the communities we are serving. In creating this group, we will not only consider the entities that each person represents, but also make sure that we incorporate the perspective of various genders, races,

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

national origins, colors, abilities, and ages." (e196) In addition, the information in your request for reconsideration was not sufficient to refute these findings.

As stated in your non-continuation letter, you are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-346 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. §200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking any other appropriate enforcement actions, which could impact your eligibility for future grants and may result in additional liabilities. *See* 2 C.F.R. § 200.344(i). Please note that costs incurred for prosecuting claims against the Federal Government, including costs incurred related to this reconsideration request, are unallowable. *See* 2 C.F.R. § 200.435(g).

Additionally, under 2 C.F.R. 200.344(b), you are required to submit a final report by April 30, 2026. Your program officer will provide specific instructions on additional closeout activities prior to the end of your project period. Please note that the Department is electing, consistent with 34 C.F.R. § 75.253(h), to not authorize further no-cost extensions for grant awards identified for non-continuation.

We remind you of your responsibility to retain all Federal awards records for three years from the date of submission of your final financial report. *See* 2 C.F.R. § 200.334. Please note that this determination represents the final decision of the Department.

Respectfully,

*Lindsey M Burke*

Lindsey M. Burke, Ph.D.
Deputy Chief of Staff for Policy and Programs
U.S. Department of Education

# EXHIBIT 1

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| AFTERSCHOOL FOR CHILDREN AND TEENS NOW (ACT NOW) COALITION and METROPOLITAN FAMILY SERVICES<br><br>    Plaintiffs<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION and LINDA McMAHON, in her official capacity as Secretary, U.S. Department of Education,<br><br>    Defendants. | Case No. 25-cv-15704<br><br><br>DECLARATION OF SUSAN STANTON |

**DECLARATION OF SUSAN STANTON**

Pursuant to 28 U.S.C. § 1746, I, Susan Stanton, declare as follows:

1.      I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I submit this declaration in support of Plaintiff's Motion for a Preliminary Injunction.

3.      I am the Executive Director of Afterschool for Children and Teens Now (ACT Now), and I have served in this capacity since 2015. As Executive Director, I am responsible for the execution of ACT Now's mission, am the bridge between our Leadership Team and staff, and oversee strategic planning, fundraising, financial management, human resources duties, and public relations and community relationship building. I manage ACT Now's relationships with its fiscal sponsor, Metropolitan Family Services (MFS), subgrantee community partners, and

other partner organizations. I oversee ACT Now's budget and operations, including securing and maintaining funding, managing staff, ensuring legal compliance, and working with our Leadership Team to ensure that the actions of the organization are consistent with its mission.

4.    As Executive Director, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records gathered by my staff.

5.    I submit this declaration in connection with two letters[1] sent via email on the evening of Friday, December 12, 2025, to Lesley Rivers, ACT Now Director of Community Schools, by Murray Bessette, Principal Deputy Assistant Secretary, U.S. Department of Education (Department). In those letters, Principal Assistant Secretary Bessette announced that the Department had determined not to continue our two FY 2023 Full-Service Community Schools state scaling grants, effective at the end of our current grant budget period.

6.    Each of the notices of "non-continuation" cited to language from our grant application, including our statement of mission and values, and responses to questions related to the priorities of the prior administration, that the Department claims as evidence that the grants are inconsistent with, and no longer effectuate, the "best interests of the Federal Government".

7.    In the letters, Principal Assistant Secretary Bessette acknowledged that under 34 C.F.R. § 75.253(g), ACT Now could request reconsideration of this decision by submitting information and documentation within 7 calendar days. ACT Now submitted its requests for reconsideration on Friday, December 19, 2025.[2]

---

[1] Docket 3, Exhibit 7
[2] Docket 3, Exhibit 8

8. The grant budget period ended on December 31, 2025, meaning that ACT Now lost access to federal funds for purposes of implementing our grant programs less than three weeks after the Department first provided notice.

9. The Department denied ACT Now's request for reconsideration. In the initial notice of non-continuation letters, the Department indicated that ACT Now would not be given a no-cost extension to continue program operations using carryover funds, and would be required to begin to discharge our closeout responsibilities and promptly refund all unobligated funds that we are not authorized to retain.

10. Pursuant to negotiations with the Department, ACT has received reduced funding through short-term agreements since January 2, 2026. This short-term, reduced funding ends on June 30, 2026 and has not allowed ACT Now to carry out all grant activities.

**Background of ACT Now**

11. ACT Now is a statewide unincorporated organization based in Illinois that works to expand access to high-quality out-of-school time, community school, and youth development programs. ACT Now serves as a policy advocate, technical assistance provider, and intermediary. We support schools, districts, and community-based organizations to implement evidence-based programs that improve student outcomes, strengthen family engagement, and support workforce readiness.

12. ACT Now has a long-standing relationship with the Illinois State Board of Education, state agencies, school districts, and national partners. The organization has played a central role in scaling community schools and out-of-school time initiatives statewide, particularly in both rural and urban/suburban communities with the highest levels of need. ACT

Now operates with braided funding across program areas, meaning staff expertise and infrastructure are shared across multiple initiatives to maximize impact and efficiency.

13.     ACT Now is the statewide afterschool network for Illinois. The statewide afterschool networks were started with seed funding from the C.S. Mott Foundation.  Mott sought to make an investment in afterschool to support and expand afterschool programs when the 21st Century Community Learning Centers program began at the federal level. Illinois was one of the first networks beginning in 2002,[3] with networks established in each state by 2016. Over time, we expanded our work from just afterschool to community schools. This was a natural outgrowth of building on all of our excellent school and community partners.

14.     After an extensive statewide search, MFS became ACT Now's fiscal sponsor in 2017, providing fiduciary oversight, financial management, and other administrative services to help build the capacity of projects that have not yet been recognized as tax-exempt under Internal Revenue Code Section 501(c)(3). In essence, MFS serves as the administrative "home" of ACT Now. Given that ACT Now is a smaller organization, we utilize a fiscal sponsorship by outsourcing certain services to allow us to focus on our substantive work and supporting afterschool providers.

15.     ACT Now pays MFS a fiscal sponsor fee of ten percent of all incoming revenue, in order to cover the following services: accounting, audit, liability insurance, employment liability insurance, property and casualty insurance, workers' compensation insurance, unemployment claims, copier, scanning, fax, postage, full use of conference rooms and common area, payroll and benefits, senior management oversight, office furniture, human resources

---

[3] The Illinois network has changed names and fiscal sponsors over the years but has existed since 2002.

administration, and IT infrastructure.  The full cost of paying for all of these services as a separate organization is far more than the fee we pay.

16.     Outside of the services outlined in the fiscal sponsorship agreement, ACT Now also receives many in-kind benefits by partnering with MFS, one of the oldest social services providers in the state. MFS has over 1,500 employees and because of this size is able to provide in-house support in key areas, which have supported ACT Now efforts throughout the years, including with regard to grants management, communications, graphic design, email software, web development, fund development, and event planning. MFS also has offices throughout the Chicagoland area and has provided ACT Now space for trainings on multiple occasions.

**ACT Now Full-Service Community Schools Program**

17.     The FSCS program is a federal initiative administered by the Department that supports locally driven partnerships between schools and community organizations to provide integrated academic, health, social, and family services. The program emphasizes parent voice, local control, and alignment with workforce and community needs.

18.     ACT Now is the holder of two federal FSCS grants through its fiscal sponsor, MFS. These grants are state-scaling grants, designed to expand and sustain community school infrastructure across Illinois rather than serve a single district.

19.     ACT Now applied for the FSCS grants during the applicable federal competition period in 2023. We followed all Department of Education requirements and available guidance, and wrote our grant to be consistent with the statutory purpose of the FSCS program, other applicable statutory and regulatory authorities, executive orders, and final Department administration priorities in effect at the time of the application, and guidance that emphasized equity, family engagement, and community partnerships.

20. ACT Now received notices of grant awards on November 28, 2023, and was finishing up the second year of our five-year grant award when we received our notices of non-continuation.

21. During our application and throughout our award period, ACT Now has communicated with the Department through standard grant channels, including with Department staff, program officers, and regular written correspondence. This includes two APR reports submitted annually for each grant in August 2024 and August 2025. Prior to December 12, 2025, the Department had not expressed any concerns during the grant review, award, or early implementation phases that would have provided ACT Now with notice of and an opportunity to revise or cure any perceived deficiencies.

22. The Department's notice of non-continuation letters cite to language from the applications that are tied to ACT Now's mission statement, statutorily required GEPA statement,[4] and proposed activities that were not implemented as part of this grant project. The Department did not identify any concerns related to any of the programs implemented or run by ACT Now and its subgrantees using FSCS grant funds.

23. The combined total of ACT Now's two FSCS grants is approximately $18.5 million annually, with funding originally awarded for multiple years. Permanent loss of continued funding would eliminate more than $55 million in expected support over the remaining grant period.

24. ACT Now functions as the statewide intermediary and program lead. Key responsibilities include: selecting and supporting subgrantee school districts and community-

---

[4] Section 427 of the General Education Provisions Act, 20 U.S.C. § 1288a, requires applicant grantees to submit a statement as part of their grant application that they will "equitable access to, and equitable participation in, the project or activity to be conducted" using grant funds.

based partners; providing technical assistance, professional development, and continuous improvement support; coordinating statewide learning communities and data collection; and ensuring compliance, reporting, and fiscal oversight in coordination with MFS.

25.     The grants fund 16 school districts and 32 schools across Illinois, prioritizing communities with significant economic, academic, and social needs. Through these programs, ACT Now-supported community schools serve approximately 19,000 students and their families annually.

26.     As of December 12, 2026, there were 381 positions funded by the two FSCS grants (52 full time, 41 part time, and 288 hourly). However, there were 616 positions written into budgets total (53 full time, 18 part time, 545 hourly), as projects were still growing and many partners and districts were continuing to hire.

27.     ACT Now measures program impact by collecting and analyzing data from community partners related to a variety of factors, including: student attendance, engagement, and academic indicators; family participation and parent leadership development; stability of staffing and service coordination within schools; strength of school-community partnerships; and qualitative outcomes reported by districts and families.

28.     ACT Now's subgrantees include public school districts, individual schools, and nonprofit partners that are embedded in school communities. These partners provide: school-based mental health and behavioral health services; family engagement and parent leadership programming; expanded learning and afterschool programs; workforce-connected learning and career exposure; and coordination of wraparound services that are tailored to locally-identified needs.

**Immediate and Irreparable Harm**

29.     Losing access to federal program funds caused immediate and irreparable harm. FSCS funds are primarily used for direct program costs, not administrative expenses.

30.     Schools and community partner organizations cannot legally continue services funded by the grants without the ability to be reimbursed. Staff positions at schools and community partner organizations that are funded through the grant have been terminated due to lack of a long-term guarantee of funding. Once positions are terminated, the hiring and background process involved in restoring these positions could take months, effectively shutting down program operations beyond any final decision.

31.     At all times relevant to this matter, ACT Now has complied with the requirements and deliverables associated with the FSCS grant. The organization has met or exceeded required programmatic benchmarks, reporting obligations, and performance measures as outlined by the Department. In addition, ACT Now has consistently collected and submitted program data demonstrating the effectiveness of its services for participating children and youth. This data includes information on participation levels, program engagement, and other outcomes that reflect the positive impact of the program on the children served. Through these reports and data submissions, the organization has provided clear evidence that the services funded through the grant are achieving their intended purpose of supporting youth development and well-being.

32.     Data collected in December 2025 showed that ACT Now schools had 2.12 percentage point reduction in chronic absenteeism from the baseline year, which is more than double the statewide reduction of 0.94 percentage points. Further, these schools had a 2.61 point increase in the 5Essentials Supportive Environment score compared with a 0.94-point statewide decline and a 2.97 percentage point increase in 5Essentials Parent Response rate compared with

a 0.30-percentage point statewide decrease. Despite this demonstrated compliance and effectiveness, the Department's failure to follow its established processes has created uncertainty regarding the continuation and stability of these services.

33.     The Department's failure to follow its established processes for administering and reviewing grants has caused significant disruption and harm to ACT Now's grant. These processes exist to ensure transparency, consistency, and fairness in funding decisions and program oversight. When such procedures are not followed, it creates uncertainty that directly undermines the ability of grantees to effectively plan, staff, and implement services.

34.     As a result of the Department's actions, participating grantees have experienced substantial confusion regarding program expectations, performance evaluation, and the criteria used to determine continuation of funding. Organizations that participate in ACT Now's grants rely on clear and consistent guidance in order to plan programming schedules, enter into contracts, hire and retain qualified staff, and ensure continuity of services. When established processes are not followed, grantees are forced to make operational decisions without reliable information regarding program expectations or funding stability.

35.     The disruption has had concrete operational and staffing consequences for many organizations participating in the program. Community-based organizations often operate with limited administrative and financial reserves and must make staffing and programmatic decisions well in advance of program cycles. In some cases, organizations may divert staff time and organizational resources away from program delivery in order to respond to unexpected administrative requirements or unclear review processes. Even school districts that may operate on larger operating budgets create their budgets far in advance of the school year and do not have reserve funding when a funding source is lost.  Uncertainty regarding grant continuation or

evaluation processes may lead organizations to delay hiring staff, reduce staff hours, or refrain from expanding programming even where community need exists. In fact, over 227 positions have already been eliminated by partner districts since the original letter was sent.

36.     The Department's actions have also affected the continuity of programming and youth participation. Programs funded through FSCS are designed to provide consistent and stable services to young people and families over time. When organizations face uncertainty about funding continuation or evaluation outcomes, they may be forced to limit enrollment, postpone programming, or scale back services. These disruptions can interfere with the consistent participation that is essential for youth development programs to achieve their intended outcomes. Many partner schools have already had to eliminate these services: 78% have cut food and nutrition services, 68% have cut physical healthcare services, and 78% have lost onsite mental and behavioral health services. Schools have also reported cutting 19% of its planned hours for afterschool programs 8% of planned hours for tutoring programs. For the students and families using these services they were not just nice benefits. These programs were essential lifelines upon which they depended. Without these services, families and students were thrown into crisis mode trying to identify alternative resources.

37.     Many of the students this program serves are young elementary school students. These children are too young to understand grant agreements or administrative changes. Teachers report students having felt disappointed at losing their favorite clubs, and the reason they attend school. However, for some students this reality is much starker, and students have felt abandoned, losing a favorite teacher or an adult upon which they depended and trusted.

38.     This grant instability has had ripple effects throughout communities as well as partnerships dissolve. Half of our school partners are in rural communities where the economies

are much smaller. Most of those schools would never have had the capacity to apply for a large

federal grant without the support of ACT Now. Those communities have taken this funding and

used it to invest in vendors from the local community. Terminating a grant then has effects on

local businesses outside of just the school. Many of our schools had partnerships to support the

local workforce by preparing students for in-demand careers in their county. However, many of

those programs have now had to be terminated, which means that longstanding problems of

high-unemployment and a lack of a qualified workforce will continue to plague these

communities for years to come.

39.     Losing funding access on July 1, 2026, will cause an immense fiscal cliff for ACT

Now and its programs.

40.     The FSCS funding is 96% of the annual operating budget for ACT Now. If

funding ends on July 1st, we expect to lay off seven full-time staff members. As a state scaling

grantee, we have provided technical assistance services to not only our partners, but also our

other technical assistance grantees through the state-funded Teen REACH program and

federally-funded 21st Century Community Learning Centers programs. These grantees have also

benefited from the increased scope, scale, and quality of technical assistance services. These

grantees (approximately 150 organization and 400 sites) will also suffer when we must downsize

staff and services due to our inability to continue to braid funds.

41.     Outside of ACT Now's staff, there will be immediate harms on July 1st to schools

and students. As we saw right after the initial non-continuation notices, programs will begin staff

terminations immediately. ACT Now has no other funding source to support the programs we

service. Therefore, we will have to cut programs off immediately on June 30, 2026, and these

programs will not be able to submit a single expenditure or voucher to us after that time. Schools

and organizations worked hard to hire highly qualified staff to make the biggest impact possible for students. As we have already seen, many staff members that were terminated have found other positions, and staff that felt their job was in jeopardy have resigned and found other positions. It will be nearly impossible to rehire staff that are terminated because many will not want to re-enter this unstable environment or because they are so highly skilled, they will have found other positions.

42.     The harm that students and families will incur once staff leave is immense. I have seen similar situations occur previously in my professional career. During the Illinois state budget impasse in 2015, funding to the state-funded afterschool program Teen REACH was suspended. When this funding was finally reinstated a year and half later, programs faced massive costs to restarting. Their previous staff moved away or found other employment. These staff members had the institutional knowledge and trust of local families. Rebuilding staff and resources took years. We expect a similar situation will occur here.

43.     Outside of the real programmatic costs, the disruption in services will exacerbate already existing distrust of public systems that many students and families in the communities we serve have. Given the immense struggles these communities face to obtain basic needs such as clothing, food, housing, and health care, they often distrust those in places of public power. When constituents are robbed of these resources overnight, it will create deep seeded distrust that may never be repaired. We will be teaching students that instead of a place of structure, stability, and care, schools are places of inconsistency, chaos, and neglect.  Families will immediately be in a crisis. They will lose access to consistent food, nutrition, and laundry services, which could have untold health tolls. Further, for working parents, they will have a child care crisis during the summer, a time of year when children are most vulnerable with increasing community violence

and when there are limited options for enriching and safe care once school is out. Our rural partners will be especially hard hit as this has been once-in-a-lifetime funding that has been leveraged to build new systems and supports to end cycles of poverty that have lasted lifetimes. Given the small size of these communities, there is no industry or support to provide any cover, and not enough capacity will exist to apply for or run a grant on their own.

44.    In addition to a stable funding source that enables grantees to set up and implement large, scalable, and effective programming, status as a federal grantee confers many non-monetary benefits. For FSCS grantees, that includes: regular technical assistance from Department staff; participation in rural, regional, and state-scaling cohorts; collaborative identification and implementation of best practices around community-building, use of funds, and program implementation; guidance around data collection, which was used to improve programs; access to outside technical assistance and program-area experts; and development of and access to trainings for best practices on effective FSCS program implementation.

45.    In regards to the procedure used to target our grant, of the 32 schools with which we partner, 18 are in counties that voted for President Donald Trump in the 2024 presidential election, and a majority of our partner schools primarily serve white student populations. Our programs serve approximately 19,000 students overall, many of whom attend rural and downstate schools reflected in the declarations submitted in this matter. Based on the demographic and geographic composition of our partner schools, a substantial portion of the students served by these programs are white and reside in politically conservative counties. In fact, 59% of the students that receive services through our two grants are white. Accordingly, the termination of the program—apparently based on the presence of generalized DEI-related terms in grant applications rather than an assessment of whom the programs actually serve—did not

Supp. App. - 200

account for these realities. Even assuming, that the objective was to limit programs that targeted students of color, the decision-making process used here could not rationally distinguish which programs to retain or eliminate, as it disregarded the actual beneficiaries and instead relied on keyword searches, rendering the action arbitrary and capricious.

46.     In my professional assessment, the Department's failure to follow its established grant administration processes has created instability within ACT Now's grant that cannot easily be remedied once program operations have been disrupted. When organizations lose staff, reduce programming, or interrupt services to participants, those harms cannot be fully reversed simply by restoring funding at a later date. Youth participants may lose access to trusted mentors, structured activities, and supportive environments during critical periods of development.

47.     I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on April 27, 2026.

Susan Stanton

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AFTERSCHOOL FOR CHILDREN AND TEENS NOW (ACT NOW) COALITION and METROPOLITAN FAMILY SERVICES<br><br>        Plaintiffs<br>v.<br>U.S. DEPARTMENT OF EDUCATION and LINDA McMAHON, in her official capacity as Secretary, U.S. Department of Education,<br><br>        Defendants. | Case No. 25-cv-15704<br><br>DECLARATION OF LESLEY RIVERS |

## DECLARATION OF LESLEY RIVERS

Pursuant to 28 U.S.C. § 1746, I, Lesley Rivers, declare as follows:

1.      I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2.      This declaration is submitted in support of Plaintiff's Motion for a Preliminary Injunction.

3.      I am the Director of Statewide Initiatives at Afterschool for Children and Teens Now (ACT Now), and I have served in that capacity since February 2026. Between January 2024 and January 2026, I served as the Director of Community Schools. Between June 2021 and January 2024, I served as the ACT Now Program Coordinator.

4.      ACT Now directly partners with an external program evaluator, a group of coaches who train community school coordinators, and a company that builds and helps maintain

our extensive database system that collects and tracks comprehensive quantitative data points and quantitative measures of program success across all schools and partner organizations. e provide direct support to 32 schools, with each school having anywhere from 3 to 10 community partners that further facilitate Full-Service Community Schools (FSCS) program development and implementation.

5. As the Director of Statewide Initiatives at ACT Now, I primarily oversee the relationship that we, as a grantee, have with our evaluator, school coordinator coaches, our database contractor, and our relationship with each of our partner schools. My staff provides additional daily support to each of those partnerships.

6. A significant amount of ACT Now's operational budget comes from our two Full-Service Community Schools grants, administered by the U.S. Department of Education. ther sources of funding for our internal operations come from payment we receive as technical assistance providers for other state grants and some private and public grants, as well as small amounts of unrestricted funds raised directly by our organization. ur receipt of those other funding sources, and our ability to operate and provide services, is dependent on continued access to our FSCS grant awards.

7. The FSCS grant builds upon itself year after year. The first year of an FSCS grant involves a significant amount of administrative preparation work, foundation laying, and systems building. ur team executed an intentional, multi-stage selection process to determine our 32 school partners. e named our school and district partners in August of 2024. From there, schools spent several months building their own site-level structures for the grant, including hiring a Community School Coordinator and spreading awareness of the program to the school community. This planned growth period early in the grant prepares schools for long-

Now's

. These assessments identified each community's largest needs and assets,

M

providers to enhance early childhood learning and improve kindergarten readiness;

c.  Mental health services, including increasing numbers of counselors or available hours for counselors, with some schools partnering with community organizations to bring in mobile clinics and counselors;

d.  Food insecurity initiatives, including providing targeted meals or school-based food pantries to support students and their families;

e.  Transportation availability, particularly for rural schools who use funds to provide transportation to increase the availability of FSCS programming to a wide geographic area;

f.  Chronic absenteeism, including standing up task forces, home visits, and improving the culture and space at school to increase student engagement; and

g.  School safety initiatives, from providing safe pathways to school in urban areas to improving school safety infrastructure in rural areas.

10.    Losing full access to our FSCS funding has resulted in significant losses and harm across our partnership. Schools have not been able to address the identified needs of their communities because funding was interrupted in the middle of their budget year. The instability of funding caused staff to be laid off or seek alternative employment. Many schools had to make the difficult decision to cancel crucial programming. One of our school district partners informed us that they cannot continue the partnership due to program and funding instability. Two ACT Now staff have resigned to take positions elsewhere.

11.    In a typical grant year, schools would analyze the impacts of the programs and partnerships from their Implementation Plans. This analysis would have happened in March.

After reviewing the data, school coordinators would make small adjustments to their Implementation  lans for the next school year. ACT Now Technical Assistance Specialists would review and approve updated Implementation  lans in April. In May, schools would submit updated budgets for  uly 2026-  une 2027 based on adjustments to their plans.   udgets would then be approved and ready for grant expenses by  uly 1.

12.         e were already seeing positive impacts with this system and process. Schools in our grant have lowered chronic absenteeism and increased family engagement compared to similar schools not a part of our grant. School coordinators and staff have increased confidence in the community school model and in how to implement it due to our specific model of coaching and professional development trainings.

13.         The disruption of our grant status and access to funding has already damaged the progress we made in the first two years of the grant, and will exacerbate damage without long-term relief. Schools cannot properly plan and prepare for summer and beyond, meaning the programs and initiatives that lowered chronic absenteeism this year might not be around next year. The programs and initiatives that were meant to address other high-need issues, such as academic improvement, will not have time to establish positive gains.

14.         ACT Now's FSCS programs impact the schools and communities of approximately 1 ,000 students throughout the state of Illinois. One of the biggest strengths of the FSCS model is that all students at schools receiving services benefit from the programs, even if students are not directly receiving those services. For example, targeted mental health services for some students improve the school environment for all students.   fforts to reduce chronic absenteeism and improve school engagement for some students improve overall school engagement and the classroom environment for all students. Improvements to school facilities

term, sustainable path to having a qualified community school workforce.  Further, our statewide conference for this year had to be reduced in scope and scale, which is the largest professional development opportunity for community schools in Illinois.

18.    I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on April 27, 2026.

_Lesley Rivers_

Signed by

Lesley Rivers

# EXHIBIT 3

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AFTERSCHOOL FOR CHILDREN AND TEENS NOW (ACT NOW) COALITION and METROPOLITAN FAMILY SERVICES<br><br>    Plaintiffs<br>v.<br>U.S. DEPARTMENT OF EDUCATION and LINDA McMAHON, in her official capacity as Secretary, U.S. Department of Education,<br><br>    Defendants. | Case No. 25-cv-15704<br><br><br>DECLARATION OF DR. AAMINAH LONG |

**<u>DECLARATION OF DR. AAMINAH LONG</u>**

Pursuant to 28 U.S.C. § 1746, I, Dr. Aaminah Long, declare as follows:

1.      I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2.      This declaration is submitted in support of Plaintiff's Complaint and Request for a Preliminary Injunction.

3.      I am the Director of Data and Evaluation at Afterschool for Children and Teens Now (ACT Now), and I have served in that capacity since October 2025. As the Director of Data and Evaluation, I oversee ACT Now's data collection, performance monitoring, evaluation, and reporting functions. My responsibilities include managing systems and processes

used to collect and analyze programmatic and operational data; monitoring implementation and outcomes across ACT Now's initiatives; and preparing or contributing to reports used by organizational leadership, funders, and external stakeholders. I also oversee the review and interpretation of data related to program participation, service delivery, partner engagement, and outcome measurement. I hold a Ph.D. in Higher Education and Student Affairs from Indiana University-Bloomington and have extensive experience in data collection and evaluation in school settings.

4.      The two Full-Service Community Schools grants, administered by the U.S. Department of Education, serve as a significant source of ACT Now's operational budget.  Other sources of funding for our internal operations come from a conglomerate of private and public grants, payment we receive as technical assistance providers, and small amounts of unrestricted funds raised directly by our organization. Our receipt of those other funding sources, and our ability to operate and provide services, is dependent on access to our FSCS grant awards.

5.      ACT Now experienced substantial inconsistencies as a result of the FSCS grant discontinuation. These inconsistencies included delays in programs and services provided due to a lack of timely clarity sufficient to support stable operational and programmatic planning. The timing of these inconsistencies was particularly disruptive as the discontinuation occurred in the middle of the school year. Many affected programs and school communities received notice of funding-related disruption during or around winter break, such that students, staff, and partners returned to paused, reduced, or eliminated programming and services. As a practical matter, this did not provide ACT Now or its partners with adequate notice or sufficient operational clarity to adjust implementation plans in an orderly or minimally disruptive way.

6.      The disruption of our grant status and access to funding has already

Supp. App. - 212

undermined the progress made during the first two years of the grant and will worsen without long-term relief. Schools are unable to plan or prepare for the summer and the upcoming school year, putting at risk programs and initiatives that successfully reduced chronic absenteeism this year. Similarly, initiatives aimed at addressing other high-need areas, such as academic improvement, will lose momentum before positive gains can be realized. Without stable funding, the continuity of these services is threatened, and rebuilding lost capacity and trust will take months, if not years, further delaying progress for students and communities.

7.      These impacts were particularly acute for partners and communities with fewer alternative resources and for those already facing barriers to accessing high-quality educational opportunities and support. In such contexts, disruptions in grant-funded services are likely to produce significant downstream effects because the affected communities may have limited capacity to replace or absorb the loss of those supports. Several of the communities we serve are disproportionately affected by high rates of poverty due to the widespread lack of job opportunities.

8.      Accordingly, many of the viable employment opportunities within these communities were provided through community schools. Since the discontinuation of FSCS funding, all FSCS related positions have been eliminated or had their hours reduced across our schools and all schools reported providing less programming than initially planned. The following statistics summarize the resulting reductions in programming, services, and employment[1]:

**Staffing Impact** (percentage of staff affected through elimination, reassignment, or resignation by role type):

---

[1] Data represented through 3/29/2026, 15 out of 17 districts represented, some for partial time span

- 48.94% of full-time employees (FTE) were affected

- 46.34% of part-time employees (PTE) were affected

- 59.7% of hourly staff were affected

These figures indicate substantial disruption across all staffing categories, with hourly staff experiencing the greatest level of impact. Disaggregated data further indicates that full-time employees experienced the highest rate of role elimination, suggesting a disproportionate impact on positions most closely tied to organizational and programmatic sustainability. Accordingly, the breadth of these staffing changes will likely reduce institutional knowledge, and schools' capacity to effectively maintain services.

**Programmatic Impact** (percentage of hours reduced by program type):

- 43% reduction in out-of-school-time programming

- 34% reduction in tutoring and academic programming

- 52% reduction in health and basic needs support

- 14% reduction in family and community engagement programming

These reductions indicate that funding instability had profound consequences for direct service delivery, particularly in areas tied to health and basic needs support and out-of-school-time programming, suggesting that some of the most resource-intensive and relationship-dependent services were among the most vulnerable to disruption.

9.  The instability and discontinuation of FSCS grant funding also has material consequences for ACT Now's short- and long-term organizational planning. The potential loss of grant funding threatened staffing continuity and undermined ACT Now's capacity to plan effectively for organizational growth. This was particularly true within the organization's Data and Evaluation functions, where long-term strategy depends on consistent access to data systems,

and the ability to conduct multi-stage assessment, reporting, and evaluation work over time. Due to funding constraints, ACT Now was unable to maintain consistent external supports critical to its data and evaluation capacity, including collaboration with external evaluation partners and continuity with its primary data management system. These disruptions reduced the organization's capacity to conduct major analyses, sustain evaluation activities, and generate findings necessary to inform organizational direction and strategic planning, including work related to community schools.

10.      It is my professional assessment that the harms associated with these funding inconsistencies are compounding and escalating. The effects of instability in areas such as staffing, planning, or infrastructure tend to generate additional downstream effects in other areas, including implementation quality, partner coordination, and the organization's capacity for evaluation and strategic decision-making. The impacts I observed are consistent with what evaluation and implementation research would denote under conditions of funding instability. Specifically, disruptions in resources are associated with reduced implementation quality, weaker sustainability, and diminished capacity to maintain intended program benefits over time[2]. This is especially true in youth and community development contexts, where continuity, trust, implementation quality, and sustained engagement are central to program effectiveness[3].

11.      If ACT Now is unable to access or distribute FSCS grand funds after June 30th, 2026, our program partners will have no viable alternative means to sustain the services currently supported through this funding. Likewise, there are no other service providers with the capacity, infrastructure, or established community relationships necessary to fully absorb

---

[2] Chen, H. T., Morosanu, L., & Chen, V. H. (2024). Program Plan Evaluation: A participatory approach to bridge plan evaluation and program evaluation. American Journal of Evaluation, 45(4), 551–561.

[3] Gliske, K., Ballard, J., Buchanan, G., Borden, L., & Perkins, D. F. (2020). The components of quality in youth programs and association with positive youth outcomes: A person-centered approach. *Children and Youth Services Review*, *120*, 105696.

or replace these services. Consequently, many students, families, and community members would experience immediate disruptions in access to critical supports, leaving their needs unmet for an extended period of time.

12.     Effective outcomes of programming and services depend on strong relationships and trust within the communities they serve. The loss of funding and disruption of programming continues to threaten the level of trust between ACT Now and its partners. This is further exacerbated by the fact that many of the implementation challenges that accompanied the first year of the grant will now need to be addressed again, and institutional knowledge built over the life of the grant has been disrupted or lost. Rebuilding that trust and infrastructure will require substantial time and resources. This is particularly significant because ACT Now's Data and Evaluation Branch recently adapted a framework grounded in community-based educational research, which centers trust as essential to meaningful participation, valid data collection, and sustained collaboration. Abrupt funding interruptions directly weaken those conditions and make it more difficult to continue effective programming. As a result, we will likely need to shift our focus toward rebuilding trust and project infrastructure, rather than advancing impactful, efficient, and sustainable services.

13.     Accordingly, the principal conditions necessary for successful continuation or recovery would include: (1) restoration of dependable funding; (2) sufficient financial predictability to support staffing and operational planning; and (3) a stable implementation environment that would permit ACT Now and its partners to proceed without recurring uncertainty regarding program continuation. Under those conditions, ACT Now would be positioned to start the restoration process towards community building, service continuity, and rebuild operational stability.

14.       I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on April 27, 2026.

_____
Aaminah Long (Apr 27, 2026 14:33:26 CDT)

Dr. Aaminah Long

# EXHIBIT 4

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AFTERSCHOOL FOR CHILDREN AND TEENS NOW (ACT NOW) COALITION and METROPOLITAN FAMILY SERVICES<br><br>Plaintiffs<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION and LINDA McMAHON, in her official capacity as Secretary, U.S. Department of Education,<br><br>Defendants. | Case No. 25-cv-15704<br><br>DECLARATION OF MICHAEL GUILMETTE |

**<u>DECLARATION OF MICHAEL GUILMETTE</u>**

Pursuant to 28 U.S.C. § 1746, I, Michael Guilmette, declare as follows:

1.      I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2.      This declaration is submitted in support of Plaintiff's Motion for a Preliminary Injunction.

3.      I am the Data Specialist for Community Schools at Afterschool for Children and Teens Now (ACT Now), and I have served in this capacity since June 2024. I have served at ACT Now since June 2023, first as a Policy and Communications Intern, and then as a Policy and Advocacy Fellow. In my capacity as Data Specialist for Community Schools, I manage data systems that ensure programs operate efficiently and deliver measurable results. I oversee the collection and analysis of student and program data to track performance, identify areas for improvement, and support responsible use of resources. I develop clear, actionable reports and

dashboards for schools, districts, and community partners, helping them make informed decisions based on evidence. Additionally, I provide technical assistance to local partners to strengthen accountability and transparency, ensuring that community school initiatives are locally-driven and focused on improving student outcomes.

4.      ACT Now tracks data on a number of levels to track, analyze, and measure community needs and program success. We use output data to track numbers and participation levels in programs and activities, and unduplicated numbers of students, family members, and community members served across programs at all partner schools. We track data according to the U.S. Department of Education's pillars and pipelines,[1] meaning we organize information based on the four core pillars — Integrated Student Supports, Expanded and Enriched Learning Time and Opportunities, Active Family and Community Engagement, and Collaborative Leadership and Practices — and across the pipelines of services that support students from early childhood through postsecondary pathways. This approach helps us understand not only how individual programs perform within each pillar but also how they contribute to long-term outcomes across the entire educational continuum.

5.      For the 2024-2025 school year, ACT Now FSCS grant funds provided: 124 services or activities related to the Integrated Student Supports pillar; 377 services or activities related to the Expanded and Enriched Learning Time and Opportunities pillar; 398 services or activities related to the Active Family and Community Engagement pillar; and 217 services or activities related to the Collaborative Leadership Practices pillar.

6.      For the 2024-2025 school year, ACT Now FSCS grant funds provided services and activities by pipeline, including: 65 related to between school transitionary supports; 269

---

[1] https://www.ed.gov/grants-and-programs/grants-birth-grade-12/school-and-community-improvement-grants/full-service-community-schools-program-fscs

community-based supports for students; 16 early childhood education services and activities; 375 family and community engagement services and activities; 55 services and programs related to juvenile crime prevention; 169 school and out-of-school-time programs; 164 social, health, nutrition, and mental health services and supports; and 69 workforce and post-secondary support services.

7.      ACT Now disaggregates data in a number of different ways, including by student demographics and the types of services offered. ACT Now tracks metrics in line with our grant objectives, such as kindergarten readiness, that we use to demonstrate the impact of our programs over time. We also use a lot of state-level data to track larger impacts, from test scores to chronic absenteeism rates. This data allows us to evaluate the successes of efforts of different programs and schools and continue to improve programs and outcomes over time. For example, the community-led efforts to address chronic absenteeism and chronic truancy at some of our partner schools have shown remarkable between-year improvements:

   a.  Cedar Ridge Elementary School saw a drop in chronic absenteeism from 33.6% to 24.4% between the 2024 and 2025 school years;

   b.  Abingdon-Avon Middle School saw a drop in chronic absenteeism from 26.1% to 17.5% between the 2024 and 2025 school years;

   c.  Bernard W Flinn Middle School saw a drop in chronic absenteeism from 43.4% to 35.3% between the 2024 and 2025 school years; and

   d.  James Avant Elementary School saw a drop in chronic truancy from 64.8% to 44.2% between the 2024 and 2025 school years.

8.      Each spring, our external evaluator, PIE Org, conducts interviews with school communities to track qualitative metrics, including community awareness of the community

Supp. App. - 221

school model, and staff perceptions of community need and program impacts. PIE Org also interviews students, staff, and community members to gather feedback on how students have been served and the impacts of programs on the ground. These qualitative data provide meaningful insight into where the greatest needs are and how we and our community partners can best position our resources to address them in a meaningful and community-led way. Some of the responses received for our review included:

a. "There was a kid with a tooth that broke off in half and a nerve wasn't exposed [so insurance wouldn't cover it]. He didn't want to smile, it brought a lot of negativity to his self-esteem and being able to partner with a dentist he ended up actually just doing it for free and not having us pay for it with the grant, but just being able to partner with those people and being able to help those needs that we wouldn't have been able to before." – Partner

b. "It's difficult for a child to focus on being educated when their lights are getting cut off or they don't have a stable home, when they're couch surfing from home to home, or there's domestic violence in the home, which we know some [of] that doesn't just exist in our communities but we know there's a higher rate of it." – Partner

c. "I hope that we can continue to have this program because I worry about the future of [grant-funded employees'] employment because they're a huge asset here, having them in the building." – Faculty

d. "I feel like the model has really been supportive of inclusive practices but also providing voice not just within the school district, administrators, teachers,

students, but really more of an outreach within the community, stakeholders within the community that are supportive." - Faculty

9. Despite these documented successes, uncertainty and limitations related to FSCS funding have already created measurable challenges. Based on a recent survey of partner districts, respondents representing a subset of ACT Now's district partners reported reductions since January 1, 2026, including: a 19% reduction in out-of-school-time programming hours; a 10% reduction in tutoring and academic programming hours; a 50% reduction in health and basic needs support hours; and a 32% reduction in family and community engagement activity hours. These reductions represent thousands of hours of lost services for youth and families.

10. ACT Now also assists schools in their own site-level data collections. At the beginning of the FSCS grants, each school ran an Assets and Needs data campaign, evaluating archival data and running surveys to determine the particular needs of their communities. We have access to those survey results and provide partners with state-level views of their needs. We also assist schools in conducting interviews and focus groups, and in the preparation of their Assets and Needs Reports. We provided technical assistance to schools as they connected their reports to the development of larger plans with objectives and initiatives for the school year. This informed the creation of the school year budgets that were created to show program implementation and resource needs.

11. Collection of good data and its effective use is a sustainability strategy. ACT Now's data support includes significant technical assistance to subgrantees and community partners. Our partners are conveners and relationship-builders. We support their strengths by helping them develop expertise in conducting interviews and surveys and running focus groups with significant hands-on support. We meet consistently to ensure high-quality and consistent

data and develop an understanding of how data can be used to support their program development, implementation, and sustained success. Our support lets our program partners think hyper-locally and understand the needs of their communities. It allows them to talk about long-term needs and sustainability, achieve strong community buy-in, and identify focused funding. Essentially, our role is to take some of the burden off of our community partners by allowing them to focus on their roles. The extra capacity that we provide allows them to target their time and energy with their programs and students.

12.     Collection and analysis of high-quality data is also necessary to ensure that grant resources are being targeted and applied in areas and to programs that will have significant and measurable impacts. As a grantee, we have a duty to ensure the resources we have are being used responsibly and effectively. Working with our community partners to stand up robust data systems has allowed us to be good stewards of taxpayer resources.

13.     Data collected demonstrates the program efforts and impacts that the ACT Now FSCS grant funds have had. During the 2024-2025 school year, we found that:

a.  Partner schools showed a 2.12% decrease in chronic absenteeism, while the Illinois average showed only a 0.94% decrease;

b.  Partner schools increased their 5Essentials Supportive Environment score by 2.61, while the Illinois average reduced by 0.94; and

c.  Partner schools increased their 5Essentials Parent Response Rate by 2.97%, while the Illinois average reduced by 0.30% and near-peer match schools reduced by 2.96%.

14.     If we lose our ACT Now FSCS grant funding, we will both lose the critical data infrastructure that we have created and lose access to the data itself. Especially where

community school coordinators are fired due to budget constraints, we'll lose our touchpoint at the schools and will not have insight into what is happening in specific schools and where the greatest needs and best opportunities for impact are. Schools do not have another central person who can provide this information or receive technical assistance, and the loss of institutional knowledge will mean that our schools are no longer able to act with full information.

15.     These impacts are already occurring. Since December 12, 2025, districts reported the elimination of approximately 26% of full-time, 20% of part-time, and 27% of hourly FSCS-funded positions. An additional 11% of full-time, 17% of part-time, and 31% of hourly staff have been reassigned. These disruptions significantly undermine data continuity and continuous improvement efforts.

16.     Even where layoffs have not occurred, funding instability has led to ongoing staff resignations. Since December 12, 2025, respondents also reported that approximately 13% of full-time, 10% of part-time, and 1% of hourly employees across the project have resigned. These losses further weaken program capacity and demonstrate the importance of stable funding for both services and personnel.

17.     Even if funding is restored, the impacts of the loss of community school coordinators will be severe. If a site lays off a coordinator, they can't just go back to that coordinator months down the road and rehire them. They're people and will have to find other work. In my experience, it takes a long time to identify, hire, and train good and effective candidates for each community. This means that even with restored funding, we would be operating without meaningful data and insight for likely the rest of the school year, negatively impacting our ability to measure program impacts over the entirety of the year.

18.     The strength of the FSCS program is how locally focused and responsive community schools are. By engaging directly with community stakeholders and using high-quality and robust data, our programs can be very locally responsive and driven. Schools are excited about these programs, and we're already seeing positive impacts. Without this funding, we'll have to start over.

19.     Community schools as a strategy takes years of relationship and trust-building between schools and their communities, not to mention between the schools and ACT Now. Even a temporary loss of funding and the loss of our community partners would hinder the ongoing growth we'd been hoping to see over the life of the grant and cause us to have to significantly recalibrate our expectations of success.

20.     For the reasons described above, continued support for the ACT Now FSCS program is essential to maintaining the data infrastructure, staffing capacity, and community partnerships that make these outcomes possible. Where survey data is referenced in this declaration, it reflects responses received to date and does not represent all district partners; however, the impacts reported are consistent with trends observed across the project and reflect only a portion of the harm already occurring. The loss of funding would cause immediate and lasting harm to schools, students, and families by dismantling systems that took years to build and that cannot be quickly restored. Sustained investment is necessary to protect demonstrated gains, ensure responsible stewardship of public resources, and allow community schools to continue delivering measurable, locally driven impact.

21.     I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on April 28, 2026.

*Michael Guilmette*
Michael Guilmette (Apr 28, 2026 14:54:01 CDT)

Michael Guilmette

# EXHIBIT 17

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| AFTERSCHOOL FOR CHILDREN AND TEENS NOW (ACT NOW) COALITION and METROPOLITAN FAMILY SERVICES<br><br>Plaintiffs<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION and LINDA McMAHON, in her official capacity as Secretary, U.S. Department of Education,<br><br>Defendants. | Case No. 25-cv-15704<br><br>DECLARATION OF SYDNEY STIGGE-KAUFMAN |

DECLARATION OF SYDNEY STIGGE-KAUFMAN

Pursuant to 28 U.S.C. § 1746, I, Sydney Stigge-Kaufman, declare as follows:

1.      I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I submit this declaration in support of Plaintiff's Motion for a Preliminary Injunction.

3.      I am the Executive Director of Communications and Strategic Partnerships at East St. Louis School District 189.

4.      As the Executive Director of Communications and Strategic Partnerships, I serve as the primary administrator providing district oversight to the Community Schools implementation and grants management.

5.      Two of our district's high-need schools are partners under ACT Now's Full-Service Community School Grant. I manage the grant at the district level.

Supp. App. - 229

6. In July 2019, the East St. Louis School District held exploratory Community Schools meetings involving district leaders, community partners, and concerned East St. Louis residents. Together, we learned about how Community Schools incorporate student-centered, research-based strategies to achieve results that go beyond test scores and support the whole-child both in and outside schools. The group discussed aspects of Community Schools that were already being conducted and areas to expand and develop based on needs and available community resources. However, with the onset of the pandemic in early 2020, district plans to pursue a community school model came to a halt.

7. In early 2024, we learned that ACT Now was chosen to lead two Community Schools State-Scaling implementation grants in Illinois. School principals and assistant principals, school social workers, lead teachers, counselors, and district-level leadership, with support from the Local 1220 Teachers Union, applied and participated in an interview process. In late summer 2024, East St. Louis was selected to serve as one of the suburban district partners with ACT Now.

8. Since then, our school communities (including school administrative teams, staff, parents, and students) as well as community partners have embraced the Full-Service Community School model. I have engaged some of our most valued community partners in this work, including East Side Aligned, Community Development Sustainable Solutions, Little Bit Foundation, and St. Louis Area Foodbank and multiple health and wellness partners.

9. Through the Community School needs assessment process — including analysis of academic and attendance data, school climate information, and feedback from students, staff, families, and community partners — several priority needs were identified, such as a strong need for family engagement, access to basic resources, and social-emotional supports, as well as

opportunities to strengthen partnerships with community organizations that can provide wraparound services and enrichment experiences for students and families.

10.     As a result of our assessment at Officer Elementary (grades K-4), the goals identified for our Implementation Plan included:

a. Address student mental health and bullying concerns through universal tier 1 interventions in the classroom, with an eye toward reducing chronic absenteeism and alleviating SEL pressures.

b. To increase student achievement in reading and mathematics by expanding access to academic support services through the coordination of volunteer efforts and/or third-party tutoring partnerships, ensuring targeted intervention and enrichment opportunities for all students.

c. To expand whole child support systems by increasing access to essential resources, such as pantries and wellness items, while elevating student voice and leadership opportunities that promote ownership, advocacy, and holistic development.

d. To strengthen family-school partnerships by activating a family lounge as a hub for collaboration, launching a coordinated volunteer program, increasing PTO involvement, and implementing routine, inclusive family engagement events that build trust and shared responsibility.

e. To provide a safe, welcoming, and visually inspiring school environment by addressing compromised facility security concerns, improving physical spaces and aesthetics, thereby promoting stakeholder pride, increasing daily attendance, and reinforcing a culture of care and belonging.

11.     Through the needs assessment process and the ANA Report, several critical needs were identified within the James Avant Elementary School (K-grade 5) community:

a. Basic Needs & Family Support: High demand exists for utility and rental assistance, clothing support, transportation, childcare, food pantry access, and financial literacy programs. Housing instability is significant, as reflected in the school's high mobility and homelessness rates reported in the Illinois School Report. Additionally, there is limited access to healthy food, with no local grocery stores in the neighborhood.

b. Educational & Academic Support: Families have expressed interest in continued education and GED programs. Academically, equity gaps were identified across subgroups, including students with disabilities, English Language Learners (ELL) students, low-income students, and by gender, with notably low math scores in 5th grade. There is also a high unmet demand for afterschool programs, providing opportunities for enrichment and academic support beyond the classroom.

c. Social-Emotional & Mental Health Needs: The community has a need for mental health support for both students and families. The 5Essentials, a statewide school climate and culture survey, highlighted areas for growth in school culture and leadership collaboration, which are essential for building a supportive and inclusive learning environment.

12.     These findings highlight the complex and interconnected challenges facing our students and families. Addressing these needs will require coordinated efforts between school staff, families, and community partners to ensure students thrive academically, socially, and emotionally.

13.     Our programs and pipeline services are focused across the range of the four pillars of the Community Schools model: 1) Integrated Student Supports, 2) Expanded & Enriched Learning Time, 3) Active Family & Community Engagement, and 4) Collaborative Leadership and Practices.

14.     Here is a list of some of the activities that are shared across both school sites:

a.  Provide pipeline supports to students at the middle school level through our partnership with Community Development Sustainable Solutions: CDSS creates meaningful, structured opportunities for parents and caregivers to contribute their time, talents, and resources in support of school operations and student enrichment. Volunteers play an active role across a range of activities, including classroom assistance, event coordination, mentoring, fundraising, administrative support, and extracurricular programming.  Within our two Community Schools and their feeder middle schools, this engagement is both consistent and impactful. On a daily basis, 26 active parent volunteers support classrooms, contributing to more than 275 volunteer hours each week. Educator feedback underscores the program's value, with 99% of participating teachers reporting that it positively supports both students and the broader school community. Additionally, 100% of participating parents report building new or stronger relationships with teachers and administrative staff, and note that they feel more welcomed and connected when visiting the school.

b.  Provide school-based food pantries:  Both schools operate food pantries that serve families twice each month. These efforts require extensive coordination and a

committed team, including teachers and staff who help identify and connect families in need.

c.  Support families with resources, referrals, and more: The Community Schools Specialist plays a critical role in identifying community resources and connecting families to the supports they need. Without continued funding from ACT Now, this position cannot be sustained in the coming year. The loss would be significant, limiting families' access to essential resources, referrals, and coordinated support services that strengthen student success and overall well-being.

d.  Provide enrichment clubs and experiential learning: Without Community Schools funding, the district would be unable to sustain after-school enrichment opportunities such as robotics and other learning clubs. These programs carry real costs, including staff compensation in accordance with union agreements and transportation for students.  Likewise, experiential learning opportunities—such as field trips to institutions like the Saint Louis Science Center—would no longer be financially feasible, limiting students' access to hands-on, real-world learning experiences that extend beyond the classroom.

e.  Provide Positive Behavior Intervention Supports (PBIS) to increase school motivation, engagement, and school attachment: School-based PBIS initiatives employ a wide range of strategies to engage and motivate students to attend school consistently. These efforts span from small, immediate incentives to larger experiences, such as field trips and even a unique sleep-away camp opportunity, all of which have proven to be powerful drivers of student engagement.  The

impact of these initiatives is evident in improved attendance outcomes. Officer Elementary has achieved a 33% reduction in chronic absenteeism compared to last year, while Avant Elementary has realized a 28% decrease, reflecting the effectiveness of these targeted, student-centered supports.

    f.    Provide before and after-school programming: Our Community Schools offer high-quality before- and after-school programming multiple days each week, providing stability and a safe, structured environment for students in a community where safety remains a concern. These programs go beyond supervision—students are actively engaged in hands-on, collaborative learning that builds critical thinking and problem-solving skills in an energetic, supportive setting. The impact is clear in improved student attendance, engagement, and behavior, as well as gains in academic growth, school climate, safety, and family trust and involvement.

15.    Among our services, the out-of-school time programming is among the most critical. This programming provides both before- and after-school services to support kindergarten through 5th grade students through recreational, academic, and enrichment opportunities. Both of our schools offer 1 hour of before-school care from Monday through Friday. Officer Elementary offers 2 hours of afterschool programming for approximately 50-70 students per day on Mondays, Tuesdays, and Thursdays. Avant Elementary offers 2 hours of afterschool programming for approximately 67-70 students per day on Mondays, Tuesdays, and Thursdays.

16.     Overall, due to the programming and initiatives offered through the community school model, Officer Elementary has had a 30% decrease in chronic absenteeism from last year to this year.

17.     Through the Community School initiative, programming and resources are designed to support the entire school community, including students, families, and staff. Overall, Community Schools programming impacts each student at Avant and Officer schools. This is currently 353 students at Avant and 388 at Officer.

18.     In addition, the school collaborates with approximately 65 community partner organizations that contribute to expanded learning opportunities, family engagement initiatives, health and basic needs supports, and enrichment programming. These partnerships allow the school to connect students and families to a broad network of community resources that support both academic success and overall well-being.

19.     Officer Elementary serves approximately 388 students in grades K–4 and James Avant Elementary School serves 353 students in grades K-5. Officer Elementary is supported by a faculty of 27 certified teachers and James Avant Elementary has 35 teachers, many of whom hold a Master's degree or higher. James Avant is a hub for community engagement. The school supports over 137 families through multiple programs, creating meaningful connections with parents and caregivers.

20.     Due to high levels of poverty and trauma, nearly all students are "school dependent," relying heavily on their schools for support and opportunity. Our students rely on their schools not only for education but also for nutrition, social and emotional support, safety, security, stability, and consistency. Due to the spring 2026 Community Schools grant budget limitations and constraints, we had to halt key initiatives that had been planned and prioritized

from the needs assessment. Numerous spring activities such as experiential learning experiences and field trips, student attendance incentives with Positive Behavioral Intervention Supports, and more were eliminated.

21.     While we worked to minimize the strain on students and their families, it has been deeply felt by our school and district staff. They know the momentum that had begun through Community Schools was making a deep difference. To have this taken away, during the school year, has taken a toll on staff morale throughout these campuses.

22.     For example, because of Community Schools, Officer Elementary has had a 33% decrease in chronic absenteeism from last year to this year. Officer School has also experienced an influx of about 65 new students who have enrolled since October. Many of these students are academically behind their peers and require intense scaffolding support to support academic success as well as behavioral improvements. In fact, a number of these mid and upper elementary students have never been in a structured school environment before. School administration and staff were counting on the resources from the Community Schools grant to ensure intense intervention supports necessary for these students.

23.     One of the foundations of the Community Schools model is having a full-time staff member dedicated to coordinating and supporting the work. During the first week of January, one of our Community School Specialists voluntarily resigned amid uncertainty surrounding the potential elimination of program funding. She shared that the stress of remaining in a week-to-week "wait and see" situation would be harmful to her health. The Avant school is suffering from her loss.

24.     Due to the budget reductions, we decreased or halted some of the following:

      a.      Loss of enrichment programming (foreign language, entrepreneurship, media, financial literacy, community gardens, student clubs);

      b.      Loss of transportation services for summer enrichment programs, after-school programs, and school-related field trips for academic instruction, behavioral and attendance incentives and enrichment;

      c.      Summer programming, including Kindergarten Readiness Camp, to help close learning gaps;

      d.      Loss of enrichment clubs and experiential learning proven to engage students;

      e.      Reduced and eliminated planned family engagement activities such as evening workshops, resource-sharing events, and family-centered academic and enrichment activities.

25. Due to funding disruptions and limitations, critical programming designed to close learning gaps has been significantly impacted or eliminated. This includes summer initiatives, such as Kindergarten Readiness Camp, which were intentionally developed to address post-pandemic gaps in incoming students' social, emotional, and academic readiness, and help ensure a strong and confident transition to school. Broader summer enrichment opportunities that reinforce skills through engaging, hands-on experiences were also eliminated.

26. Student feedback underscores the value of these programs. Participants described last summer's experience as "fun" and highlighted meaningful activities such as field trips, Mad Science sessions, and engaging hands-on experiences like a petting zoo. More importantly, students demonstrated an understanding of the connection between attendance and success, sharing reflections such as: "Practice makes perfect," "If you don't come to school, you might

miss something important," and "If you come to school every day, you will succeed." These insights reflect not only enjoyment, but growth in mindset and habits that directly support academic achievement. The potential loss of these programs represents more than reduced summer options—it risks widening existing gaps and interrupting momentum in building consistent attendance, engagement, and readiness among our students.  These programs are not add-ons — they are foundational to student success.

27.     At Officer Elementary, chronic absenteeism dropped by 33%, and at Avant Elementary, it dropped by 28% in just one year.  At the same time, family engagement at Officer increased by 60%, strengthening the connection between home and school.  Both schools also earned a Commendable designation from the Illinois State Board of Education.  These results are clear, measurable proof that the Community Schools model works.

28.     The funding disruptions have also negatively affected our community partnerships. We terminated one contract early for enrichment programming. We did not proceed forward with grief counseling and other enrichment initiatives. We significantly reduced family engagement activities such as evening workshops, resource-sharing events, and family-centered academic and enrichment activities.

29.     I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on April 28, 2026.


*Sydney Stigge-Kaufman*
Sydney Stigge-Kaufman (Apr 28, 2026 13:29:28 CDT)

Sydney Stigge-Kaufman

# EXHIBIT 21

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| AFTERSCHOOL FOR CHILDREN AND TEENS NOW (ACT NOW) COALITION and METROPOLITAN FAMILY SERVICES<br><br>    Plaintiffs<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION and LINDA McMAHON, in her official capacity as Secretary, U.S. Department of Education,<br><br>    Defendants. | Case No. 25-cv-15704<br><br><br>DECLARATION OF REBECCA KINSEY |

**<u>DECLARATION OF REBECCA KINSEY</u>**

Pursuant to 28 U.S.C. § 1746, I, Rebecca Kinsey, declare as follows:

1.    I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2.    I submit this declaration in support of Plaintiff's Motion for a Preliminary Injunction.

3.    I am the Community Schools Supervisor at the Baby Fold.  We are the Lead Partner Agency for two schools in McClean County, Fairview Elementary and Cedar Ridge Elementary, as partners in ACT Now's Full-Service Community School grant.

4.    As Community School Supervisor, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records gathered by my staff.

Supp. App. - 241

5.	Implementation of the Community School model at Fairview and Cedar Ridge Elementary Schools was guided by a collaborative planning process that included school leadership, district partners, families, community partners, and The Baby Fold Community School team. The process began with a review of school-level data and an assets and needs assessment to identify key priorities related to student achievement, attendance, behavior, and family support.

6.	Stakeholders were intentionally engaged throughout the planning and implementation process. School principals, teachers, instructional staff, and student support personnel provided input through planning meetings and ongoing collaboration with the Community School Coordinators. Their feedback helped identify academic enrichment opportunities, student support needs, and strategies to better connect families with school resources.

7.	Our stakeholders included numerous community partners, including The Center for Human Services, Illinois State University, The Children's Discovery Museum, DuPage Children's Museum, Mid-West Food Bank, The Town of Normal, The City of Bloomington, Mid-Central Community Action, Boys and Girls Club, Western Avenue Community Center, University of Illinois Extension, The Center for Youth and Family Solutions, The Immigration Project, Normal Public Library, Bloomington Public Library, McLean County Health Department, Chestnut Family Health Systems, PATH, YMCA,  local businesses, and multiple local faith-based institutions.

8.	Families were engaged through surveys, family events, and regular interactions with Community School staff. These opportunities allowed caregivers to share barriers their families face, identify needed supports, and suggest topics and activities for family engagement

programming. Feedback from families helped inform the development of parent discussion groups, school events, and connections to community resources.

9. Community partners were also involved in shaping program implementation. Local organizations, service providers, and community groups collaborated with the Community School team to provide enrichment programming, wellness activities, and access to integrated student supports such as mental health services, basic needs assistance, and family resource connections.

10. At each school, the Community School team works closely with school leadership and staff to review data and stakeholder feedback on an ongoing basis. Attendance data, behavioral data, academic indicators, program participation, and survey feedback from students, families, and staff are regularly reviewed to assess effectiveness and guide continuous improvement.

11. This collaborative and data-driven approach ensures that Community School programming reflects the specific needs and strengths of each school community while remaining aligned with the four pillars of the Community School framework: Integrated Student Supports, Expanded and Enriched Learning Time, Active Family and Community Engagement, and Collaborative Leadership and Practices.

12. The assessment identified several key areas of need. Stakeholders highlighted the importance of expanded academic support, including tutoring, small-group instruction, and additional enrichment opportunities to support both struggling learners and students performing at or above grade level. Families and staff also emphasized the need for increased after-school programming, clubs, and experiential learning opportunities that extend learning beyond the classroom.

13.     Additionally, behavioral and mental health supports for students emerged as a significant priority, with families and staff emphasizing the importance of trauma-informed practices and accessible school-based services. Families also expressed a strong desire for increased communication and engagement with the school, as well as more opportunities to connect with teachers and better understand their children's academic progress.

14.     Finally, the assessment highlighted the need for wraparound supports that address non-academic barriers to student success, including assistance related to housing stability, food access, transportation, and connections to community resources. These findings reinforce the importance of a comprehensive Community School approach that integrates academic, social, and family supports to promote student success and family well-being.

15.     The Community School programs and services at Fairview and Cedar Ridge Elementary Schools are designed to address the needs identified through the Asset and Needs Assessment and to support the whole child and family through the Community School framework. Programming is implemented in partnership with The Baby Fold and McLean County Unit 5 and focuses on expanding academic support, enrichment opportunities, behavioral health services, and family engagement.

16.     To support student learning and academic success, the Community School teams coordinate tutoring, small-group academic support, and targeted learning opportunities both during the school day and through out-of-school time programming. Schools also provide academic enrichment opportunities, including writing and reading clubs, STEM programming, and experiential learning activities that extend learning beyond the classroom. Students participate in field trips and hands-on learning experiences designed to reinforce classroom instruction and increase engagement.

17.　　The program also emphasizes expanded and enriched learning opportunities through after-school clubs and enrichment activities that expose students to new interests and skills. These opportunities include arts, recreation, leadership activities, and other enrichment programming that supports both academic growth and student engagement. Families and students identified these opportunities as an important part of creating a positive and connected school environment.

18.　　Community Schools at both sites also provide integrated student supports, including access to behavioral and mental health services, trauma-informed practices, and coordination with community partners to address student and family needs. Through referrals and coordinated services, families are connected with resources such as mental health support, basic needs assistance, and other community services that help reduce barriers to learning.

19.　　The program prioritizes active family and community engagement by providing family events, parent education opportunities, and consistent communication between families and school staff. These efforts help caregivers stay connected to their child's education, access resources, and build stronger relationships within the school community. Together, these programs and services create a coordinated system of academic, social-emotional, and family supports that strengthen student outcomes, increase family engagement, and build a supportive and connected school community.

20.　　Between both of our FSCS sites, we serve approximately 800 students and their families. There are 145 staff members.

21.　　In addition to these large-scale supports, community school staff are trusted adults whom both students and their families frequently rely on. Our whole team, including myself,

interacts directly with students and/or families served by the program every single day. We are fully embedded within our school sites.

22.     One of our families was fairly transient. The family had a hard time getting one of their kids the specialized education services he needed because the family moved so much. My team connected them to stable housing, moving them from their car to permanent housing. We connected their child to vision services to help him get the correct glasses. The community school team ensured he had two pairs so that one pair could stay at home and the other at school. Once he had those glasses, he was able to read and improve his academics. Our team also helped him get an IEP that will guarantee the services and supports he needs to be academically successful, even if his family moves again. Having stable housing, the ability to read and see, and supportive adults in his life is leading to tremendous academic and behavioral growth for this student. His New Year's resolution was to participate more in school because now he can see, and he has been way more engaged. All of this would not have been possible without our community school model.

23.     Our community school space at Cedar Ridge is known as the "Launch Pad" (because their mascot is the Rockets). One student uses the sensory space and supportive adults who staff the Launch Pad when he needs to regulate his nervous system. Because of these additional tools and supports, he can engage more in school-day activities and afterschool enrichment activities. He is spending less time outside of his classroom due to behavior issues.

24.     We had another student who needed help being medically compliant to attend school. The community school funds paid for her medical services and connected her to community partners. She is now able to attend school regularly.

25. Our community school team hosts monthly laundry events for families. We partner with a local laundromat and use community school funds to rent it out for the day. While waiting, our staff uses that time to bond with families, provide mediation, and connect them to local services. We do around 300 loads of laundry each month and have received very positive feedback from the folks and families who attend. Many of the apartment buildings in our area do not have reliable, accessible laundry machines. Through this event, families can access laundry supplies and facilities while building community connections. It has turned laundry day from a chore to something families look forward to. Further, lack of clean clothes can be a barrier to school-day attendance and an issue for family workplace preparedness. Offering these services removes these barriers and makes students and families successful.

26. The FSCS funds have paid for dedicated, embedded community school staff. It has become a part of our school culture to share resources and connections. Things like dedicated mental health workers, a 24/7 micro-pantry, and IEP experts help us to address problems before they become crises. Parents and families can see the opportunities they have and engage with them. Teachers and principals no longer have the burden of managing and sharing community events and resources, so they have more capacity to do their jobs. With community schools, there is always a person on staff who can talk to families. Family engagement is not about separate events; it is simply how our school runs.

27. Without community school funding, families face additional barriers in accessing necessary services. Language is a barrier, as there is a shortage of bilingual providers in our community. Our bilingual Community School Coordinator helps provide translation services for families when navigating social services, utilities, and housing. She researched the bilingual providers in our area who can provide outside services to families. Transportation is always an

issue, especially for families that live more on the fringes. The community school team advocated for expanded access to public transportation.

28.     After receiving notice of the funding discontinuation on 12/14, we informed staff that three of our six full-time positions would be eliminated, effective 1/28/26. Utilizing emergency funds, we were able to extend employment beyond the original FSCS funding end date of 12/31/25, allowing staff to remain in their roles through 1/28/26. The remaining three full-time positions were projected to continue through the end of the school year, though their continuation would depend on securing alternative funding.

29.     Following temporary funding extensions, we have been able to delay the planned terminations. However, the uncertainty surrounding the program's future has created significant stress and anxiety for staff. At the time of this declaration, the full Community School team remains in place, though the long-term sustainability of these positions remains uncertain.

30.     The termination or reduction of services significantly impacts the students, families, and school communities served by Fairview and Cedar Ridge Elementary Schools. The Community School model relies on consistent, coordinated supports to address both academic and non-academic barriers to learning. When services are reduced or eliminated, we lose critical capacity to provide the integrated supports that many students and families rely on to remain stable and engaged in school.

31.     Beyond the loss of services themselves, reductions also lead to a breakdown in trust and relationships within the school community. The Community School model is built on strong relationships between families, school staff, and community partners. When programs that families have come to rely on are suddenly reduced or discontinued, families feel uncertain about whether supports will remain available in the future. This creates frustration and erodes the sense

of stability and partnership that has been intentionally built over many years. Trust takes time to develop, and when services are interrupted, it weakens the confidence families have in the system's ability to consistently support their children.

32.    For our families, the Community School serves as a trusted hub where they know they can receive support, information, and connection to resources. When those supports are reduced, the ripple effects extend beyond programming, they impact the relationships, trust, and sense of belonging that are essential to a strong and supportive school community.

33.    The funding disruptions have significantly impacted our ability to engage in responsible long-term budgeting and strategic program planning. The Community School model is built on sustained coordination of staffing, partnerships, enrichment programming, and family supports. When funding becomes uncertain or is interrupted mid-cycle, it disrupts the stability required to plan and implement these efforts effectively.

34.    The unexpected discontinuation and subsequent uncertainty surrounding funding has made it difficult to plan staffing structures, secure community partnerships, or schedule programming beyond the immediate term. Many Community School activities, including after-school clubs, tutoring programs, experiential learning opportunities, and family engagement events, require advance planning, coordination with partners, and commitments of time and resources. Without reliable funding, these efforts have been paused, scaled back, or reconsidered while we assess what services can realistically be sustained.

35.    The uncertainty has also required leadership to shift focus away from strategic growth and continuous improvement identified through the needs assessment and instead devote significant time to contingency planning. Rather than expanding supports or

strengthening programming, we have been forced to prioritize short-term operational decisions and preservation of core services.

36. Ultimately, this instability undermines the long-term planning and coordinated implementation that are essential to the Community School model. Consistent funding is necessary to maintain staffing stability, sustain partnerships, and provide the predictable programming and services that students and families rely on.

37. The funding disruptions have had a significant impact on our ability to maintain and strengthen partnerships that support Community School programming. The Community School model relies heavily on coordinated relationships with community organizations that provide enrichment opportunities, student supports, and family resources. When funding becomes uncertain, it is difficult to sustain these collaborative efforts.

38. Many of our partners require advance planning and clear expectations regarding scheduling, staffing, and program commitments. The uncertainty surrounding funding has made it challenging to confidently plan programming such as after-school clubs, enrichment activities, family engagement events, and experiential learning opportunities that depend on partner participation. In some cases, planned activities have had to be paused or adjusted while we determine whether sufficient staffing and resources will remain available to coordinate these efforts.

39. Funding instability also creates challenges in maintaining strong partner confidence. Community partners invest time, staff capacity, and resources to collaborate with schools, and consistent funding helps ensure that these efforts are well coordinated and sustainable. When funding disruptions occur, partners experience uncertainty about whether

programs will continue, which make it more difficult to secure commitments and maintain long-term collaboration.

40.     Over time, these disruptions weaken the momentum that has been built through years of relationship development. The Community School model depends on trust, consistency, and shared planning among schools and community partners, and funding instability makes it more difficult to sustain these collaborative relationships that directly benefit students and families.

41.     Without FSCS funding, student attendance will drop off again. Behavior issues will ramp up. Families will experience food instability. Community school staff and providers will just become another unreliable adult in these kids' lives when we take these things away. Teachers will experience increased burdens to meet student social service needs. Classroom learning will be directly impacted when students in crisis cannot get help when they need it but have to wait. For some kids, waiting means they are more likely to self-harm. If afterschool and summer programming are cut, families will struggle to find alternatives to care at a much higher cost to them. Families come into our schools every day experiencing a variety of challenges. Without the community school staff, there is no one to help them navigate complex social situations and services. When they come in now, they are seen and validated.

42.     I don't believe this is controversial work. This is what every school should be doing, and every parent should be fighting for their school to be a community school.

43.     I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on April 27, 2026.

*Rebecca Kinsey*
<span style="font-size:smaller">Rebecca Kinsey (Apr 27, 2026 13:39:22 CDT)</span>

Rebecca Kinsey

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AFTERSCHOOL FOR CHILDREN AND        )  Case No. 25-cv-15704
TEENS (ACT) NOW, et al.,            )
                                    )
                   Plaintiffs,      )
          v.                        )
                                    )
UNITED STATES DEPARTMENT OF         )
EDUCATION, et al.,                  )  Chicago, Illinois
                                    )  December 31, 2025
                   Defendants.      )  9:41  a.m.

TRANSCRIPT OF TELEPHONIC PROCEEDINGS - EMERGENCY MOTION
BEFORE THE HONORABLE MARTHA M. PACOLD
APPEARANCES:

For the Plaintiffs:    SLIGO LAW GROUP PLLC
                       BY:  MS. JOCELYN E. SKINNER
                       1717 K Street, NW, Suite 900
                       Washington, DC 20006


For the Defendants:    HONORABLE ANDREW S. BOUTROS
                       UNITED STATES ATTORNEY
                       BY:  MR. PATRICK W. JOHNSON
                            MR. THOMAS WALSH
                       219 S. Dearborn Street
                       Chicago, Illinois  60604




Court Reporter:        KATHLEEN M. FENNELL, CSR, RMR, FCRR
                       Official Court Reporter
                       219 South Dearborn Street, Room 2328A
                       Chicago, Illinois  60604
                       Telephone:  (312) 435-5569
                       Kathleen_Fennell@ilnd.uscourts.gov

                  *    *    *    *    *

             PROCEEDINGS REPORTED BY STENOTYPE
     TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard via telephone:)

(Call to order.)

THE CLERK:  Calling Case No. 25-cv-15704, Afterschool for Children and Teens Now, et al., v. United States Department of Education, et al., for motion hearing.

Counsel, please state your name for the record, starting with plaintiffs' counsel.

MS. SKINNER:  This is Jocelyn Skinner on behalf of plaintiffs.

MR. JOHNSON:  Good morning, Your Honor.  This is Patrick Johnson on behalf of the defendant.  I also have my co-counsel, Tom Walsh, here, too.

THE COURT:  Good morning.  We're here for a hearing on the motion for temporary restraining order, and I'm here as the emergency judge.

Let me just ask the parties for any update and arguments on the motion.  Maybe -- you know, before people actually get into the substance of arguments, maybe it makes sense to start with more of an update, and since it is the plaintiffs' motion, perhaps it makes sense to start with the plaintiff and then turn to the defense.

MS. SKINNER:  Yes, Your Honor.

We are before you today on an emergency motion because plaintiffs' Full-Service Community School grants were canceled just two days before the end of the grant period.  Without the

immediate relief available through a temporary restraining order, the plaintiffs are going to suffer certain and irreparable harm.

The first time they received any notice that their multi-year grant continuation was in question was on December 12th, then with final denial letters being delivered just two days ago on Monday.

This is an emergency now because if these grants are terminated, the plaintiffs and the programs they facilitate with technical assistance and program development alongside dozens of sub-grantee partner schools and community organizations will immediately lose staff, suffer immediate and irreparable damage to their infrastructure and relationship.

And so this is really a straightforward question about preserving the status quo to correct some of the procedural defects in the decisionmaking surrounding this case and the termination of these grants.

So we are asking for just a short-term temporary restraining order to maintain the status quo and give our plaintiff -- the plaintiffs the opportunity to have a fair and meaningful opportunity to contest the findings of the Department.

THE COURT:  Okay.  Thank you.

From the defense?

MR. JOHNSON:  Yes, Your Honor.  Patrick Johnson.

Your Honor, if it's okay with the Court, I'll delve into a little bit of an update about the sort of availability of funds.  It's sort of one of, I think, the jurisdictional issues, but that isn't addressed anywhere in the, you know, motion or the complaint, and as you know, we haven't filed anything.

So is the Court okay if I address that first?

THE COURT:  Yes.  Thank you.

MR. JOHNSON:  Okay.  And I obviously welcome plaintiffs' counsel to correct anything I'm saying that's incorrect.  I'm just still getting on top of the case.

But here's my understanding.  The exact reason we're here today is the relief plaintiffs are asking for looks like it's twofold.  It's saying both to extend -- I'm going to back up a second, Your Honor.

The grant here is essentially $150 million for the entire program.  I think plaintiff -- plaintiffs are saying that they are entitled to 18 million for the next year, and that's what they're asking for, and as the plaintiffs --

THE COURT:  I'm sorry, the 150 million for the entire program, meaning the community schools, like, the F --

MR. JOHNSON:  That's correct, Your Honor.  That amount, 150 million, was obligated by Congress for the next --

THE COURT:  Okay.

MR. JOHNSON:  -- the next year.  And what the

appropriations also says is that all of that 150 million needs to be obligated by midnight tonight. And what plaintiffs are asking for, I think, today is twofold in terms of preserving the status quo.

One is to extend that window, that obligation period set by Congress.

And then the other is to, I guess, preserve at least enough of that $150 million so that there would be 18 million left for plaintiff. I think that's what they're asking for today.

And that's what I'll update the Court a little bit on as best I can.

Let me see. So my understanding is there's -- the Court may already know this. There's a similar case filed in the district court of D.C., and I believe that one was filed by a subcontractor to the plaintiffs in our case. That's also being heard as we speak. I think that hearing or TRO was up today at 9:00 Central Time.

In that case, the plaintiff in that case, who's the subcontractor to our plaintiff, is asking for the relief that all of the money, all $150 million be obligated, and it makes sense if it's not obligated, there's potential impoundment problems, et cetera, and Congress, as I mentioned, set a deadline of tonight at midnight to obligate all that money. So that's the relief they're requesting.

And the relief plaintiffs here are requesting is slightly different and arguably inconsistent with that. But I'll just say in terms of -- I'll start off the easy one is the Department of Education, the defendants in this case, don't have authority, and I'm not sure the Court has authority to, you know, direct or mandate that Congress extend the appropriations period. That's instituted by statute. I think I'm relatively comfortable with that.

The other relief plaintiffs are asking for is to essentially preserve, not to do anything with at least 18 million of the money. I'll address two or three different points on that.

First of all, that is actually inconsistent with not only the appropriations period, the obligation window, it's also inconsistent with the relief being sought in the district court of D.C., where that plaintiff is asking for the Department of Education to actually obligate, to make sure it obligates everything by today. So the relief there is inconsistent.

I think in terms of the factual matter of what money is still outstanding, I'm not entirely sure because, as I mentioned, DOE is under a deadline to obligate this money, you know, today, and it's been working to obligate the money, and it's got to obligate all of it, and I can't tell the Court as I stand here today how much of that is not obligated because it

may be obligated an hour ago, it might have been obligated in the next 30 minutes. I just don't know.

I know they plan, Department of Energy -- excuse me -- Education, the plan is to obligate all of it, and it's made decisions about how to obligate all of the money. And so decisions have been made. Whether the button's been pushed, whether the emails have been sent, I just don't know as I sit here today, Your Honor.

I can give you one example of one $6-1/2 million grant. This is to a grantee that was originally denied the continuation much like plaintiffs are complaining about here. They motioned and sought reconsideration. The Department of Education did reconsider, and it decided it would grant the continuation for that grantee. So that's where $6-1/2 million will be going once Department of Education sends that money and sends the award, the continuation letter.

So I just -- I say all that I guess to summarize I'm not a hundred percent sure as I stand -- sit here today how much of that $150 million is still outstanding and has not been obligated. I know the Department of Education needs to and has plans to obligate it all today. It's made decisions. It's in the process of sending that money out, sending the email, sending the award letters out.

I don't know exactly where that stands, but I do know that the relief sought here is inconsistent with the relief

sought by the subcontractor plaintiff in the D.C. case, and I also know that if the relief is somehow granted here, it would create problems for Department of Education in order to meet the congressionally imposed deadline of midnight tonight.

I'm not addressing any of the real merits, as the Court I'm sure is aware of by now, but I wanted to put that out there, and I welcome the Court's questions on that or plaintiffs' counsel's clarifications.

MR. WALSH:  Your Honor, this is Tom Walsh.

I just want to add one more thing in case it wasn't clear.  Both cases, although they're brought by different parties, they're brought by the same plaintiffs' lawyers.  So the fact that there's been inconsistency in what they're asking for in D.C. versus what they're asking for in Chicago is not an accident.

MS. SKINNER:  Your Honor, we are not -- they're not represented by the same attorneys.  We are representing ACT Now and Metropolitan Family Services.

MR. WALSH:  If that's the case, Your Honor, I apologize, but that was my understanding.

MS. SKINNER:  No.  We are -- we are representing ACT Now and Metropolitan Family Services.

A couple other just quick clarifications.  The plaintiffs are not arguing that they are entitled to these continuation funds.  They are arguing that there were serious

procedural defects in this process, that there was not fair, meaningful consideration either of the decision to issue a continuation award or the reconsideration of their -- their request for reconsideration.

They are asking for a couple things in the TRO.  One is to preserve the funds that -- be held available beyond the statutory lapse date, which the Court -- it's a situation that is rare, but this type of situation doesn't come up very often so it has not been addressed by the Court very often.

But the Court does have the equitable power to order that funds be held available beyond the statutory lapse date as equity requires.

There's also the question of the other piece of relief that we are seeking, which is the extent -- the no-cost extension, which the Department has the authority to grant. That would allow the plaintiff to continue their program operations using carryover funds, no new funding, while these procedural defects are addressed.

THE COURT:  Okay.  So I guess a couple questions.  One is about, first of all, just the relationship between the D.C. D.D.C. case and this case, so there's -- I did look at the docket of that case, and it appeared to me that one distinction is that the plaintiffs in this case are the actual grantee and the fiscal entity, the actual -- I don't -- maybe I'm not getting this quite right, but MFS is the formal grantee and is

also the fiscal support for ACT Now, and so essentially the plaintiffs in this case are the actual grantee or affiliated with the grantee, whereas the plaintiffs in the D.D.C. case are -- it looked to me one of the plaintiffs there was receiving ultimately -- it was kind of downstream of the direct grantee itself.

MS. SKINNER:  That's correct, Your Honor.

THE COURT:  Is that fair?  Okay.

MS. SKINNER:  That's correct.

THE COURT:  Okay.  And then I did want to make sure I understand what the relief is that the plaintiffs are seeking here.

So from what you both just said, I think I heard one part of the relief that seemed to overlap between the two parties that you both believe the plaintiffs are seeking, but then there were maybe some differences.  So one or part of the relief was an extension of the appropriations period.  I think that would be the first thing that the defense mentioned.  That sounds different from preserving funds to be held available beyond the statutory lapse date.

So that sounds like the difference between those two forms of relief is can I actually extend the statutory lapse date on the one hand versus can I preserve funds to be held beyond the statutory lapse date on the other hand.  Those two things sound a little bit different.

MS. SKINNER:  Yes.  We're asking for the period of availability of the funds to be extended.  So the funds become unavailable for new obligations on January 1st, but they don't actually expire or revert to Treasury.  So what we're asking is that that period of availability for new obligations be extended so that these procedural defects have an opportunity to be corrected and so that there is relief that can be granted because without that, even if the Court were to go through a full hearing and determine that the plaintiff was correct, that there were these procedural defects that denied them their due process rights that were arbitrary and capricious, even if they were to succeed on all of those, there may not be a remedy available to them.

So this is merely preserving the opportunity for there to be a remedy at any point in the future by extending the period of availability.  And as I noted before, you know, there isn't a lot of case -- case law on this matter because it's an extremely rare situation for this to occur or for this to be warranted, but there is precedent in the courts for extending that period of availability when it's necessitated, when the only equitable solution would be for that period of availability to be extended so that relief can be available to the plaintiff.

THE COURT:  Do the defendants have a view on that issue?  I guess I -- it would be helpful to have some

authority, or does someone have a case or just something or even just the statute that I could look at?  Because I don't -- either to organize exactly what the problem is or what the issue is, is the request extend a deadline that's set by statute?  I just don't know that -- that sounds difficult to me.  I mean, I can't rewrite the statute.

But is there some other form of relief that is somehow different from actually kind of rewriting the statute, I guess?  Does somebody have a case or something that would help think about this?

MR. JOHNSON:  Yeah, Your Honor, this is Patrick Johnson.  And I think if you give me about 15 seconds, I can address your question.  I'm just reading something that will help.

THE COURT:  Okay.

MS. SKINNER:  Your Honor --

MR. JOHNSON:  I --

MS. SKINNER:  There's also --

MR. JOHNSON:  I was actually just going to, I think, agree with plaintiffs' counsel on this, and so I clarify my earlier statement, Your Honor.

I do think the Court has equitable relief to do what plaintiff is asking for.

THE COURT:  Okay.

MS. SKINNER:  And then again, Your Honor, we're also

seeking the no-cost extension which, as I stated before, simply allows the plaintiffs to use their carryover funds to continue operations while the case is pending.  We don't -- the immediate and irreparable harm that we've identified here is that if these -- if funding is yanked from these programs, you know, mid school year, mid program without any, you know, time to prepare, anything like that, you know, these services are just going to be cut off, these relationships are going to be severed, and there's not going to be a way to easily repair that.

Again, about preserving the status quo, preserving the opportunity for the plaintiffs to receive relief from the courts if they were to succeed on their claims after a hearing, and that is what they're seeking is a fair process, a fair procedure and opportunity to contest what the Department has said because they haven't had that opportunity yet.

And the TRO is not about demanding the release of funds or making any statement about entitlement.  The TRO step is about just making sure that if they are to succeed that they have relief, that it's still available to them.

MR. JOHNSON:  Your Honor, Patrick Johnson for defense.

I am -- I mean, I take issue with counsel's statement that they're not asking, you know, for any funds.  It sounds like they're asking for two types of funds, not only to use I guess this -- the no-cost extension, not only to be allowed to

continue to use funds that otherwise they couldn't use, the relief they're just speaking about now, but ultimately in their complaint, you know, they're ultimately asking for the continuation award as well.

And as this Court knows from some of the cases that it dealt with specifically, that of course brings up the jurisdictional issue about the Court of Federal Claims. I won't launch into that now, but that's obviously an issue that the Court would have to deal with before granting any of the even emergency relief.

MS. SKINNER: Yes, that's correct, and that is why our plaintiffs are not asking for the release of funds. They are asking for the process to be carried out, the determination process of whether or not they meet the criteria for a continuation award to be conducted in a fair manner where they have the opportunity to hear the government's reasoned explanation and respond to it because what they have gotten so far is they received a letter notifying them that they were not going to receive their continuation award that cited some excerpts from the application for funding but nothing about grant activities, anything they had actually done with the grant, no allegations that they had misused funds or engaged in activities that were prohibited, and then a conclusory statement that they were therefore -- this was somehow in violation of the agency's priorities and then it was therefore

not in the best interests of the federal government to continue this -- this grant.

My client is in full compliance with the program. This is not a policy dispute over whether or not the government policies are correct. You know, we don't -- we don't know what those policies are. We don't know how our client is not in compliance.

We did submit the requests for reconsideration. We received a response from the Department that pretty much just restated exactly what was in the original letter. It quoted -- it included a couple excerpts from the application that weren't in the original denial letter. It did not respond to any of plaintiffs' statements about how much of these things were activities, they didn't engage in activities that were prohibited, they were not sure what exactly the claims are.

One of the -- some of the language that the government cited was from a statutorily required statement on equitable access, so that is something required under the General Education Provisions Act where all applicants have to include a statement on how they will ensure equitable access to funding activities.

So they -- you know, they received this simple restatement conclusion that they were -- continuation of their award was not in the best interests of the federal government. But, again, they didn't receive any sort of response to what

they had said in their letter.  They didn't receive any reasoned explanation.  They didn't -- there was no evidence that the government even looked at their grant activities.

And, you know, we just take issue with the fact that a decision to abruptly cut off funding for -- that is providing services to 19,000 students across the state of Illinois is something that should be done just with a statement, a simple conclusion that it's not in the best interests of the federal government, no explanation, no citations to activities, no evidence they reviewed progress supports, budget reports, performance reports, just some language from the application, and that's not -- that's not enough to justify terminating a grant mid-process.

But, again, we're not at this point asking that the funding be restored.  We're asking that our clients have the opportunity to know what these claims are that -- what exactly the government takes issue with and to be able to address those and potentially amend the application or -- I mean, none of these things that are in the application reflect -- are reflected in grant activities.

I mean, they could change the language in the application theoretically without even hinting what they're doing with the grant funds.  So it's just -- we're having a little bit of trouble understanding how this is a process that can be upheld.  And so what we're asking for is the opportunity

to get into the merits and to have relief preserved so that we can challenge this.

And to the extent timing is an issue, the Department waited until 19 days before the end of the budget period to notify plaintiffs that their -- that their grant was not going to be continued and then gave them only 7 days to respond.

After that, they -- they issued reconsiderations -- just reconsideration letters, the response was just two days before the 31st.  It could have made this determination months ago and chose to wait until the last minute, which denied our clients the opportunity to respond and have a thorough and meaningful reconsideration of their request.

MR. JOHNSON:  Your Honor, Patrick Johnson for defense.

The only thing I'll say in response is all of the argument plaintiffs' counsel just made is essentially a contract violation, a contract claim argument, which should properly be raised in the Court of Federal Claims.

MS. SKINNER:  Except that we're not relying on the terms of the grant agreement.  So in some other -- so in the cases, for example, the *NIH* case from August, the California case both heard on the emergency docket of the Supreme Court, in both of those cases the respondent's injury and alleged right to payment stemmed from the government's refusal to pay promised grants according to the terms and conditions that accompanied them.

That is not the basis of the claim.  We're not looking at the terms and conditions of the grant.  We are looking at the statute, the regulation.  We are looking at the APA, at the Constitution.  That's the basis of our claim.  We haven't asked for the issuance of payment.

So this is not at this point about the award of funds.  Maybe we'll get there at some point depending on how the process plays out, but right now, all we're asking for is preservation of the status quo, and at no point are we referring back to the terms and conditions of the grant.  We have not alleged that plaintiffs are automatically entitled, according to those terms and conditions, to a continuation award, but we are saying that they're entitled to a fair process, a fair procedure, in determining whether they're eligible for a continuation award.

MR. JOHNSON:  Your Honor, defendants, I won't keep arguing, disagree but just state for the record we disagree.

THE COURT:  Can I just ask the parties for arguments on the other factors?

So, you know, a lot of the factors or, I'm sorry, a lot of the argument so far sound to me like they get to either, you know, the parties' positions on the merits, where in this posture where it's a TRO we're looking at the *Winter* factors.  So it's not the actual merits itself, it's the likelihood of success on the merits, and then there are other factors, of

course, for the TRO test.

So, so far, it sounds to me like both the plaintiffs' arguments on the merits and the government's arguments on jurisdiction and the Tucker Act, all of those fall under the likelihood of success of the merits prong of the TRO standard.

Can I just ask the parties to list the other TRO factors?

MS. SKINNER:  Absolutely, Your Honor.

As Your Honor knows, the TRO is a subcategory of a preliminary injunction.  So it has the similar factors but not identical, and here the TRO factor, what we have really been trying to communicate is the fact that the harm here is not only irreparable but immediate and certain.

So this is not a speculative harm.  This is not something that might happen if relief isn't granted.  If relief isn't granted as of tomorrow, these grant sums aren't available for new obligations, which means that these programs are going to immediately shut down.

So the plaintiffs will be forced to immediately lay off staff members.  They will lose critical relationships, which are key to the entire community school model, which is essentially a network of school districts, community organizations, parent groups that come together to provide supports to high-need schools, high-need students.

So this is going to result in the immediate loss of

jobs, funds, critical programming that affects dozens of schools, 19,000 students. These funding cuts come midyear. School districts have already approved their budgets. They don't have all this flexibility to absorb new costs after losing funds.

A number of the sub-grantee school districts have already fired or given notice to staff, have announced plans to cancel existing programming. Because of cuts to the plaintiffs' infrastructure and program capabilities, they won't be able -- available as a resource to support these schools and students.

And these funds are braided with other grant community and school funding partnerships. So once that disappears, it's an immediate domino effect that is catastrophic to not just the grantee but the organizations and student base served.

So it's not as simple as receiving funds. This isn't a monetary harm that can be remedied later. Once these harms occur, they're irreparable. There's the harm to the organizational capacity to carry out its mission, and there's the irreparable harm to relationships and reputation.

These projects are based on collaboration, relationships between organizations, building trust, and the courts have recognized that the loss of good will, reputational injury, damage to longstanding collaborative relationships constitute irreparable harm because those cannot be easily

quantified or repaired after the fact.

So in contrast to this enormous domino effect of irreparable harm, the harm to the government is minimal. We're asking them to maintain the status quo for a little bit longer. This is as if it were just a month earlier in the year that they had decided to issue these letters, we're asking for time for the process to be carried out meaningfully in the way that it should have been carried out.

MR. JOHNSON: Your Honor, Patrick Johnson.

I think a couple points are worth responding to. I do think there's some aspect of, you know, monetary relief is available afterwards, and I think the harm to the government is really the harm that it will suffer because of trying to run a congressionally obligated appropriated program where it -- where it provides -- you know, it must obligate certain funds at a date certain and that date being today, it's already made decisions, you know, about how all those funds will be obligated, and, you know, any kind of injunctive relief is going to interfere with that, and, you know, cause compliance problems with the appropriations period.

I guess that's all I'll say, Your Honor.

MS. SKINNER: Well, Your Honor, in response to that, a couple points.

First of all, we didn't say that there was not monetary relief available after the fact. We said that it

wouldn't be a remedy. It's not going to remedy these harms simply to get money after the fact without any interim relief. It's not going to address the harms, and that's the challenge here.

But in response to the statements about the Department's responsibilities to obligate funds by a certain date, they also have an obligation to carry out the continuation, decisionmaking process and the grant management process in accordance with governing statute and regulations, which they failed to do.

So I don't know how they can argue that needing to comply with one particular aspect of the law for which they have already acknowledged the Court has the power to grant a TRO based on equitable relief, they can use that one aspect of the law, compliance with that law, as a reason for not letting the plaintiff have the process to which they're entitled under other statutes and regulations. You know, they waited until the last minute to make this decision.

We would also point out that the clients -- our clients filed the complaint and the request for TRO on the same day that they received their denial letters denying them their request for reconsideration. So -- and those were submitted to defendants' counsel. So they knew Monday that this was being challenged.

I would also say that there is not, in the time

between Monday and today, time to make a reasonable decision about tens of millions of dollars, which grants should receive supplemental awards.  That's not an instant decision.  That is something that should be carried out thoughtfully and meaningfully and should be carried out in a way that doesn't deny our plaintiffs their rights to have this fair process.

MR. JOHNSON:  Your Honor, Patrick Johnson.

I think a lot of what counsel is referring to are likelihood of success on the merits.  I'm happy to get into that if you want, but I think just going back to the point counsel made about the equitable relief, the Court does have, you know, does have equitable authority to extend the deadline as I mentioned earlier and as plaintiffs claim.

I don't think the Court should utilize that because it's really inconsistent -- let me back up.

I think largely because there's potentially a mootness issue here.  As I mentioned, I don't know where we stand.  I know DOE is in the process of obligating all the funds, and those funds may have been obligated even while we're on the phone.  I just don't know.

And so I think that -- that exercise of equitable authority to extend the deadline, you know, doesn't -- shouldn't be used in this case because it runs into a mootness issue.

MS. SKINNER:  It potentially runs into a mootness

issue, but the mootness issue would be the result of the Department having not complied with a number of other statutory and regulatory obligations.

MR. JOHNSON:  I'll just add one more thing if counsel is finished.

It's not just a mootness issue.  It's interfering with other grantees and the work they want to do and they're trying to do.

As I mentioned, there's one grantee who asked for 6-1/2 million as a continuation award which was originally pulled back, which -- and the Department of Education reconsidered that, is now intending or maybe already has granted that continuation award for $6-1/2 million.

So I'm not sure what the Court's equitable relief, injunctive relief, here would do other than to I guess tell Department of Education the money you were obligating to other grantees, you now can't obligate; and where does that leave that grantee who is waiting for $6-1/2 million or the other grantees who were otherwise going to be receiving some of the $150 million appropriated by Congress.

MS. SKINNER:  Well, they would be receiving the amount of their continuation awards, which still leaves tens of millions of dollars left that would have gone to the continuation awards for the grantees who were discontinued.

They would still be getting the funds that they were

entitled to as a continuation award.  What they wouldn't be receiving is a supplemental award.

MR. JOHNSON:  Your Honor, I can't probably respond to all of that. The only example I'm referring to is the one I mentioned, and that's not an additional or supplemental award. That was the original continuation award.

MS. SKINNER:  But that is also 6-1/2 million out of the tens of millions in question though.  So I don't think that asking for this relief is going to affect that one particular grantee necessarily.  That's only 6-1/2 million out of the tens of millions of dollars that were not issued in continuation awards that were anticipated to be and budgeted for issuing in continuation awards, so there is still tens of millions of dollars remaining.

THE COURT:  I thought that the defense said that although they don't know precisely where the process of the obligation stands in terms of they don't know whether the button has been pressed or the email has been sent or the obligation has been finalized for any given grantee, I thought that the defense said that, you know, most of the 150 million, you know, either has been obligated or they've made decisions about where it's going to be obligated.

So I don't know if I -- how can there be tens of millions of dollars remaining?

MS. SKINNER:  So, Your Honor, I was responding to the

claim that this would negatively impact other clients who would not receive their continuation awards because what we are asking for is not for them not to receive their continuation awards.  We are asking for the government to put a pause on issuing supplemental awards or otherwise obligating the funds remaining after those continuation awards were made.

And my understanding from government's counsel is that they don't know what stage it is.  It's an unknown.  So the Court could say pause the process now, you know, wait on this, let's see where we are because right now, we're just speculating that this issue is moot or that we don't know where things are.  They haven't provided any indication of the status.

And I -- I don't -- I don't think it would be fair to deny our plaintiffs the opportunity for this aspect of relief because we think maybe the funds are gone but don't know.  You know, the government should pause the process and allow a meaningful review to take place.

THE COURT:  You know, I do have some concerns about pausing the process.  It just feels very -- it just has too much of a feel of kind of a supervision or assuming almost like a management of the disbursement of funds in a grant-making process that I just -- it strikes me as beyond the role of a court.

So that is one concern I have about this is even if

there were a pause with respect to one individual grant, how can that not have implications for the entire program? And it just is not something that I have ever really seen nor can I envision it being appropriate for a court to just sort of assume the grant-making role.

It just -- that's just such a quintessential Executive Branch function. That I do have some concerns about. I mean, and, again, if it's -- I understand the plaintiffs are not representing all grantees, but I am pretty sure it requests in the requested relief that I enter an order on behalf of all similarly situated --

MS. SKINNER: Uh-huh.

THE COURT: -- parties or entities, and that just sounds way more to me like please assume kind of supervision or, again, kind of a management of the program that is just not as -- it doesn't strike me as consistent with a court's role.

MS. SKINNER: Yes, Your Honor. I -- I agree this is a very unusual situation, but I think the alternative, though, to pausing these operations to continue this review is that the -- the Department of Education is permitted to essentially break the rules to such an extent that the process is beyond review. It doesn't -- there needs to be some kind of oversight for the fundamental protections under the APA and the Constitution. You know, it's not a question of just assuming management, micromanaging. We're not -- we haven't even had the

opportunity to really challenge the Department's decisionmaking, the evidence they used to make the decision because we haven't even had that process yet. It's a very fundamental process that is being taken away, and this is an unprecedented situation.

You know, one of our declarations, an attorney who was at Ed for 45 years, says in the entire time that he was there, he has never seen grants discontinued for this reason, never seen grants discontinued for any reason other than performance and after working back and forth with the grantee to resolve performance issues.

I mean, this is a new situation. The government is creating a new interpretation, a new use of the law, and it's creating a new crisis. So, you know, to the extent that this is not something that's typically done, it's not. It's not something that's typically done either on the side of the government or on the side of the courts because this just doesn't happen.

THE COURT: Okay. Are there other arguments that the parties would like to make on any of the *Winter* factors?

MR. JOHNSON: Your Honor, are you inviting discussion on the merits or not? I'm a little confused. Sorry.

MS. SKINNER: Yes.

THE COURT: I mean, yes, I guess if you would like to make those sorts of arguments. I mean, it sounds to me like so

far the parties have each addressed certain aspects of likelihood of success on the merits, including the government raised the jurisdictional issue, which I, again in the TRO context, think of as an aspect of likelihood of success on the merits.

Then the parties addressed the irreparable harm factor or prong, and so I guess I -- I'm just asking does anybody have anything else to add on any of these points?  Because of the time frame, I didn't set, you know, I didn't attempt to set a briefing schedule.  I could have tried, but it just struck me that it was so tight, I just wasn't confident that it would, you know, be feasible or reasonable.

So we're going to have to work with arguments, you know, in this setting instead of written submissions.  So this is really me asking do you have other points you would like to make that you otherwise would have raised in briefs?

MR. JOHNSON:  Not sure, Your Honor -- go ahead, counsel.

MS. SKINNER:  Go ahead.

THE COURT:  Sorry, one other -- one other quick thing.

If you have ideas -- I know so far we've been kind of going free form, but if you have thoughts on how to structure it in a way that would make it more organized, I'm very much open to that.

It's just that I also want to give everybody a chance

to make all your points, and so I'm -- yeah, just going with the order that you would like to address it, too.

MS. SKINNER:  We're happy to run through an overview of what our arguments are and why we believe we're likely to succeed on the merits if that would be helpful.

First of all --

THE COURT:  Anything from defense?  Does that sound okay?

MR. JOHNSON:  Yeah, that's fine, Your Honor. Obviously, I just want to respond briefly since we don't have anything in writing, I think what plaintiffs' counsel is going to do, and I'm fine with that, is to sort of summarize the arguments in their papers.

THE COURT:  Okay.

MS. SKINNER:  So first as I mentioned, the agency violated the Administration Procedure Act because this decision was arbitrary and capricious.  The Department offered no reasoned explanation for the decision, departed from established practice without any justification.  It did not provide fair notice or a meaningful opportunity to be heard.

That alone is sufficient to meet the arbitrary and capricious standard, but the plaintiffs complied with all grant conditions.  The Department failed to identify any performance deficiency, misuse of funds, statutory violations.  They provided no evidence at all except for some few statements from

the application without any indication that these were tied to actual activities.  And this goes into a really important distinction, I think, between what a person says and what they do.

So the government and -- attached conditions to how federal funds are used, we aren't questioning that, but there's a difference between, you know, what's the Department -- what the grantee says in an application and the actual activities that they do.

So, you know, an entity says, you know, we, as an organization, value this or that, but -- and the government says we don't like that you said this in your application.  We're going to pull it out of your application.  We're going to put it in a letter, and we're going to say because we don't like this, we're not going to continue your award.

But the fact is is that they haven't tied that to any actual activities, any actual parts of the program, any actual funded activities, nothing.  They just said we don't like that you made these statements in your application, and that is enormously problematic.

There is -- there are free speech implications there.  There are APA issues there.  There are due process issues there, you know, to suggest that a grantee does not deserve to receive a continuation award because they said things in an application that the government doesn't like.  And, you know, I

think that is just a really -- a really important sort of strong point. It really ties in together all the other pieces that we mentioned. You know, for example, due process. They did not have a reasonable opportunity to challenge this. They did not have a reasonable opportunity to be heard because they weren't given an actual reason. They weren't given any activity that they had done that was incorrect. They weren't given an opportunity to say, oh, we'll stop doing this activity.

There was nothing offered to them at all. They were simply told that you used some words that we didn't like in an application, and now you don't get continuation funding.

So, you know, this is something that is, we think, hugely problematic, and, you know, to allow this kind of action to move forward without any procedural oversight is essentially granting government agencies free rein to make any decisions on any basis they want without having to explain them in any way, and then to use the consequences of having waited to the last minute, not offered process as a reason to further deny relief to the parties.

So, you know, we are happy to -- we have tried to craft our request for relief in a way that would cause the least amount of harm but still preserve the opportunity of the plaintiffs to receive relief, to potentially receive relief after the procedural defects are corrected.

And so we're open to discussing how to do that, but, you know, the No. 1 concern here is really just protecting the status quo so that this process can be done in a fair way.

MR. JOHNSON:  Your Honor, Patrick Johnson for defense.

A couple different points, and I'll make this quick. The first thing I'll mention is I've already talked a little bit about the jurisdictional issue, the Court of Federal Claims.

I'll just ask, if it's okay with the Court, there was a brief filed in the D.C. case late yesterday, and that has essentially our arguments on the jurisdictional issue.  And if it's okay, I'll just, for the record, identify the case as 25 C 4523 in the District Court of District of Columbia, and that's Docket No. 13.  And I'd ask if we can just incorporate those arguments at least that would apply in this case, and that certainly would include the Court of Federal Claims.

I'll just briefly address a couple different issues that go to the merits.  I mean, you know, one of -- one of the issues that's not really been talked about is that a term or provision in the contract itself is essentially this best interests.  The government has the authority to not continue this grant if it determines that it's not in the government's best interests.  That's a term and provision in the contract itself, which, again, is another reason why I think it should be in the Court of Federal Claims.

But the reason I bring that up now is that it relates I think, to two other issues here. This is a -- this grant program is a discretionary competitive grant program, and it, among other things, allows -- gives the government a lot of discretion about how to spend this money. The only limitation really is that you've got to spend it for the purpose identified in the congressional statute, which it does, but it doesn't tell Department of Education who to spend it on, how to spend it.

The Department of Education looks at a lot of different grants and decides every year who -- who should receive funding, and one of the things it looks at is how the proposed funds would be used for a particular proposal and whether that's in the best interests of government.

That's in the contract itself. And the reason I bring that up is that, first, it goes to the -- all the APA claims because of the discretion. There's such discretion built in here that the APA would not be reviewable, not applicable, and there would be no APA jurisdiction to review this, and that's, of course, the *Lincoln v. Digital* case, 108 U.S. 182.

Sticking with the APA for a second, also, I disagree with counsel's sort of characterization of the back and forth in the letters. The letters are attached. They're exhibits, and they're pretty detailed in terms of generally what the reason the Department of Education gave was for not continuing

this award.  And it specifically cites the provision I just referred to that it's not in the best interests and it gives examples of why it doesn't think it's in the best interests.

But all of that is to be said that the first issue the Court must address is whether it's got APA jurisdiction.  I don't think it does given the *Lincoln v. Digital* case and its application here.

The constitutional claims I'll just briefly touch on because they're distinguishable here.

You know, the *Rust* case, which is 500 U.S. 173, really talks about First Amendment issues in the context of funding and that it's a very different analysis what otherwise might be a First Amendment conduct or statement, the *Rust* case, you know, it explains that when funding, the government doesn't have to fund every type of speech or every type of conduct, and it's that analysis that I think undermines their First Amendment claim here.

In terms of the due process claim, the vagueness challenge, I think that's the *Finley* case, 524 U.S. 569, which similarly draws the distinction between the kind of vagueness challenges that usually come up in statutes and, you know, criminal statutes in particular, enforcement.  And it just points out that when the government is acting as a patron, meaning funding, you know, due process requirements are much different than when they're acting as sovereign.  And I just

point that out to the Court, and that's why I think their due process claims fail.

And then finally the Separation of Powers and spending. Again, that goes to the issue -- apologize for the background noise if you can hear it, Your Honor, but that goes to the issue of whether the Department of Education has discretion here to decide to continue some grants and not others, and I think it clearly does.

You know, this is essentially -- the appropriated amount by Congress again was essentially a lump sum amount, just saying make sure you use it for this general purpose, but I'm not telling you, Education, who to pick and how to pick and what to look at.

And so there's really no Separation of Powers claim here available simply because the Department of Education is deciding it will award some grants, some proposals, and not others. And I think there's been a couple cases in this jurisdiction where the courts have issued decisions on these generally supporting what I said. The *Chicago Women In Trade* case is one of those, and that's actually a case that counsel was on as well.

So I think that's it unless the Court has additional questions, but for all those reasons, in addition to the Court of Federal Claims issue I raised earlier and that I'd ask the Court to incorporate the documents out in D.C., but for all of

these additional reasons, I think there's no likelihood of success on the merits.

MS. SKINNER:  I'd like to just jump in and correct a couple of things.

First of all, the best interests determination is referenced in the grant award notifications in the sense that statutes and regulations are incorporated into that agreement, but it comes from regulation.  It doesn't come from the grant agreement.

So it's not based on the grant agreement.  It's based on a regulation, and, you know, to the extent that these are discretionary programs, the only limitation isn't who, how. There's actually a lot of specificity about this program in terms of -- and in the statute and regulation about the grant-making process generally.  It's, you know, the statute outlines who's eligible for the funds, what kind of things it can be used for, and the governing law also requires that the Department give priority to existing grantees continuing multi-year grants over new grantees.

But it also establishes that the applications are reviewed and grants are selected for funding in that first year during the competitive process where there's peer review and, you know, a whole ranking and selection based on different criteria.  The application is not reviewed on an ongoing basis because the application doesn't reflect the progress of the

grantee, the activities they're doing, their management of funds. It doesn't involve those things. That's just the first year. It's not looked at later on.

And so, you know, this isn't -- this also isn't a lump sum amount. I mean, just -- it's designated for certain programs.

But on the issue of not funding every type of speech, as I said before, you know, there's this difference between speech that is related to an activity undertaken by the grantee and speech that is not related to an activity. And, again, no actual activities were cited in these letters. They just mentioned some statements from the grant applications. No evidence that there's any connection to any activities. Nothing. Just some statements in there.

And the government does not have the right to condition funding on the content of speech and whether it likes or does not like that speech without any sort of correlation to activities or actions.

MR. JOHNSON: Your Honor, Patrick Johnson.

I agree with counsel's last comment about what the government does not have the right to do.

In this case, the decision was not based on non-funded activity but rather on what was intended to be used for the funds. That's all I have to say.

THE COURT: Okay. I would like to just take a

probably 30-minute break, and then we can reconvene and I can at that point either give you a ruling or tell you whether I will need a little bit more time if that's okay.

MS. SKINNER:  Yes, Your Honor.

MR. JOHNSON:  Of course, Your Honor.

THE COURT:  Okay.  So if we could just reconvene at why don't we say 11: -- why don't we just say 11:30.  That will be a little bit, just in case it takes a little bit more time.

MS. SKINNER:  Yes, Your Honor.

MR. JOHNSON:  That sounds good.  Just call in to the same number, Your Honor?

THE COURT:  Yes.  Please.

MR. JOHNSON:  Thank you.

THE COURT:  All right.

MS. SKINNER:  Thank you.

THE COURT:  Bye.

(Recess at 10:48 a.m., until 11:51 a.m.)

THE COURT:  Good afternoon, it's Martha Pacold, and I'm just resuming here.

Let me just ask the parties to please enter your appearances once more.

MS. SKINNER:  This is Jocelyn Skinner for the plaintiffs.

MR. JOHNSON:  This is Patrick Johnson for defendants.

And, Your Honor, if I could, I know this is unusual,

but I'd like to just even preempt you.

The parties have been talking a little bit, and the parties are in agreement that if it's okay with the Court, we would like to continue this for about one hour based on recent updates and communication the parties have been having that would impact certainly any kind of decision the Court would have to make.

THE COURT:  Okay.  Sure.

I am prepared to make a ruling, but I -- and my apologies because I know I took somewhat longer than I had anticipated, but I think it's also fair if the parties would like to discuss, certainly.

MR. JOHNSON:  That would be great and appreciated, Your Honor.  Thank you.

THE COURT:  Okay.  So, I'm sorry, how long do you need?

MR. JOHNSON:  Maybe an hour if the Court's available we could call back in at 1:00?

THE COURT:  Sure.  That works fine.  Sounds good. We'll talk then.

MR. JOHNSON:  Thanks, Your Honor.

MS. SKINNER:  Thank you, Your Honor.

THE COURT:  Bye.

MR. JOHNSON:  Bye-bye.

(Recess at 11:53 a.m., until 1:02 p.m.)

THE COURT:  Good afternoon.  It's Martha Pacold.

MS. SKINNER:  Good afternoon, Your Honor.

MR. JOHNSON:  Afternoon, Your Honor.  Patrick Johnson for the defendants.

MS. SKINNER:  And Jocelyn Skinner for plaintiffs.

THE COURT:  Good afternoon.  We're here just to resume the hearing.

Did the parties have a chance to confer?

MR. JOHNSON:  We did, Your Honor, and I'll provide an update, and then I'll obviously welcome plaintiffs' counsel to clarify or correct anything.

The one is just a general update.  You may already be aware of this, about the D.C. case.  My understanding is that that case is being resolved.  At least the TRO will be dismissed based on the condition, as requested by the plaintiffs in that case, that all of the money be obligated by 5:00 today, and that's in the process of being done.  So that's an update on the D.C. case, which I think obviously has some bearing on this case.

On the other one, I'll just address, you know, plaintiffs' counsel discussed another issue this morning about the Department of Education's denial of plaintiffs' request, what they called the no-cost extension request, and to be clear, that's the request they made of Education to be allowed to use old funds that weren't used from past contract years

going forward, to extend those money and use them going forward.

And that, it was originally a denial by the Department of Education. And to be clear, there's roughly in the neighborhood of $17 million in those old unused funds.

The Department of Education is willing to reconsider that and is willing to sit down and talk with plaintiffs about whether and how it can use those funds going forward and willing to sit down and talk with them as early as next week.

And that's not in exchange for anything. That's just an offer by the Department of Education to reconsider.

And those are the only updates I have. We obviously think that that offer by the Department of Education to reconsider moots out largely the other request plaintiff made earlier today about enjoining the Department with regard to its denial of the no-cost extension.

With that, I'll turn it over to plaintiffs' counsel to see if she has anything to add.

MS. SKINNER: Yeah, thank you for that.

So just to -- we are not -- we don't feel that the opportunity to discuss with the Department next week really addresses our concerns about the immediate and irreparable harm here.

You know, the no-cost extension is something that they could have -- they have the authority to grant. They could

have granted. It really just preserves the status quo for however long it takes to get to a hearing, and so, you know, we're -- it doesn't get at our -- our concerns.

We are just, you know, again, to reiterate, you know, we're not -- we're not asking for micromanagement of the grant. We're just asking for a pause to preserve the status quo to prevent this imminent irreparable harm and, you know, just protect the plaintiffs so that they can at some point get relief on the merits.

And, again, I mean, we are open, also, you know, as I said, we tried to craft our request in a way that preserved everyone's rights going forward but with narrow relief that allows, you know, the parties not to suffer this imminent and irreparable harm while these procedural defects are being addressed. This, you know, wouldn't foreclose either side opportunity to continue to challenge moving forward.

THE COURT: Can I just go back to the request for relief? So the place -- I mean, there's a couple places where it's discussed in the plaintiffs' filings. One is in Docket 5-1, which is the proposed temporary restraining order.

MS. SKINNER: Uh-huh.

THE COURT: And the next is I think just, you know, discussion in the TRO motion itself, Docket 6. But maybe it would be helpful just to walk through the proposed TRO just so that I can make sure I'm following.

So Docket 5-1 -- and, again, this is the plaintiffs' proposed order.  It's saying it's the plaintiffs are proposing obviously that the TRO motion be granted, and then starting with paragraph 2, plaintiffs are proposing that defendants be temporarily restrained and enjoined from enforcing, implementing or giving effect to the notices of non-continuation issued to plaintiffs or any similarly situated grantees regarding the Full-Service Community Schools grants.

So it's -- that to me -- what is that supposed to -- that's basically saying, okay, these notices of non-continuation that happened, I think this was the December 12th --

MS. SKINNER:  Uh-huh.

THE COURT:  -- initial notice.

So this paragraph 2 in the proposed TRO is basically saying enjoin the enforcement of these non-continuations, and that would be with respect to plaintiffs or any similarly situated grantee, so almost like those non-continuations were vacated or void or something, that's what this -- or paused.

And then going to the next paragraph, defendants are ordered to maintain the status quo by continuing the availability of federal funds for plaintiffs' existing FSCS grants and for the FSCS grants for all similarly situated grantees and by refraining from taking any action that would cause those funds to lapse, expire, be de-obligated or

otherwise become available during the pendency of this temporary restraining order.

So to me that sounds like basically just freeze the ob- -- well, I don't know what that -- what does that mean? Like, if they're in the middle right now of completing the obligation of all of the funds and they're intending to do so by today and, in fact, now have been -- the D.D.C. case has been -- or the TRO in that case has been withdrawn on the basis that they are about to finish obligating all of that by today, then, like, what is this -- I don't know what this paragraph 3 would do, or would it be consistent with what happened just now in D.D.C.?

MS. SKINNER:  I think it would because what this is essentially asking for, just a pause so that they don't -- they either stop the obligation process temporarily while we resolve this or, if they've already completed it, just put a pause on the next steps in the process.

So the distinction between that and that second paragraph, so by asking that the Court not enforce the non-continuation, we're basically just saying even if we're not asking for a continuation award at this time or we don't -- you know, we're not getting a continuation award at this time, it would keep the grant as an active grant, especially with the ask for the no-cost extension that would allow them to maintain operations rather than have to enter into that close-out

period.

And then the ask about the funding, you know, to just pause at least until we get to a preliminary injunction. Again, this is just very short-term, very short-term relief. So, you know, just a temporary pause on where we are in the process, which is still very, very unclear, but, again, just a very short-term pause to just get a -- get our grantees to the next step without, you know, going through this irreparable harm, just to maintain the status quo again.

THE COURT:  Okay.  I just want to look more at paragraph 4 and paragraph 5 of this proposed order.

So defendants are further ordered to provide such administrative relief as is necessary, including the granting of a no-cost extension or equivalent mechanism to preserve plaintiffs' access and the access of all similarly situated grantees to continuation funding pending further order of the court.

So this is saying -- this is the no-cost extension that --

MS. SKINNER:  Yeah.

THE COURT:  -- everyone was just referring to, which means, if I'm hearing correctly, that plaintiff and other similarly situated grantees, not totally clear who would be similarly situated, but plaintiffs and some other group of people would be able or grantees would be allowed to access

prior years' funding -- well, actually, this says continuation funding, so this is not about the spending of unspent prior years' funding.  This is about a no-cost extension for future funding it looks like because it's saying continuation funding.

MS. SKINNER:  Yeah, just to clarify, Your Honor.  I apologize.  This is a very confusing -- confusing situation.  I apologize for not being as clear as we should have been.

So the no-cost extension, the reason that we are saying that that is preserving access to continuation funding is because if the no-cost extension isn't granted to use those carryover funds from prior years, the grant enters the close-out process, which is, you know, the stage at which it becomes very difficult to just resume funding even if the, you know, the case were decided later in plaintiffs' favor, it would be very difficult for them to just restart if they had already had to stop the fundamental grant operations.

So this is not intended to say you are ordering that the courts be granted -- you know, be granted the continuation funding itself.  It's saying that we want to preserve that status quo, where they're still in an active grant status using carryover funds, can still carry out the grant activities just in the short-term to ensure that they don't shut down completely, in which case the relief of even issuing a continuation award would be meaningless.

THE COURT:  Okay.

MS. SKINNER:  And as to the similarly situated, we are not aware of exactly which grantees did or did not receive these letters.  But we have seen a number of them, and they are all virtually identical except for the paragraph that includes the quotes from the application.

And so we believe that they -- all of them have been treated -- it appears they have all been treated in the same -- in the same manner.  So this intention is just to preserve their rights as well going forward, ensure that their grants and their programs don't lapse similarly to -- to ours.

THE COURT:  And let me just make sure -- let me keep going through the rest of this --

MS. SKINNER:  Okay.

THE COURT:  -- proposed order.

So it also is in paragraph 5 saying defendants are enjoined from initiating or continuing any grant close-out, suspension, termination, or reallocation actions with respect to the challenged FSCS grants during the pendency of this temporary restraining order.

So I guess -- and that's what you were referring to by if there's no no-cost extension --

MS. SKINNER:  Uh-huh.

THE COURT:  -- or, yeah, if there's no no-cost extension, then the plaintiffs have to immediately start shutting down or have to stop using funds at all and,

therefore, they'd have to --

MS. SKINNER:  Yeah.

THE COURT:  -- initiate the --

MS. SKINNER:  They would not be able to use funds for any new activities.  They would enter the wind-down process where they're able to liquidate funds and use funds under very limited circumstances for administrative costs related to close-out, but they wouldn't be able to carry on the grant operation.

So the grants would effectively be terminated, which is something that typically grantees are given a lot more notice of, time to wind down in an appropriate manner, as opposed to just abruptly -- abruptly cutting off.

But, again, this is really just a maintaining the status quo request, just saying keep it as currently for just a little while longer as if this process had been started a little bit earlier than it was.

THE COURT:  One other question just about I guess it's paragraph 2, where it's -- it's enjoining the enforcement of the notices of non-continuation, does that require the defendants to pay the grants?

MS. SKINNER:  No, no.

THE COURT:  Okay.

MS. SKINNER:  No, it would -- no.  We're not asking for the payment of the grants.  We're asking them to pause

the -- again, it's a little bit -- it's a little bit repetitive, and I apologize for not being as clear as we could have been, but that again is really we're not asking for the issuance of funds.  We're just saying please don't have the grant close out before we have had the opportunity to meaningfully challenge the process by which this decision was made.

THE COURT:  And looking back at paragraph 3.

MS. SKINNER:  Yes.  This was, of course, written before we had any sort of updates about what was happening at the Department.  But, again, this is just -- it's just a pause just to maintain the status quo very short-term while we, you know, figure this out, have a chance to go more in-depth on the merits.

You know, maybe this would or would not stand going on -- you know, after a more involved hearing, but, again, just a pause, just preserving the status quo short term.

THE COURT:  Okay.  Let me give the defendants a chance to comment.

MR. JOHNSON:  Thanks, Your Honor.

Well, I think as I mentioned before, you know, we're -- defendants have essentially already agreed to reconsider what seems to me the most challenging part of plaintiffs' obstacles, which is the no-cost extension.  And we're willing to reconsider and see if there's a way to work

out where plaintiffs can use some of their past funds.  And during those discussions, obviously there would be no close-out process, which is what I mentioned earlier.  I think that part is moot.

In terms of broader relief, to the extent that the Court is considering that, the relief should not be broader than plaintiffs here.  You know, plaintiff is the only plaintiff.  There's been no argument or assertions by any other grantee about any harm whatsoever.

So to the extent the Court's interested in granting any relief, it should certainly be limited to the plaintiff in this case.

And otherwise, as I mentioned earlier, I think anything regarding future, you know, the continuation awards itself is essentially mooted out by the D.C. case and the resolution there.

So, you know, ultimately what plaintiff spent a lot of time this morning talking about is that it's nervous it will have no money to go forward to either gradually close out or to just continue its operations going forward.  And now the plaintiff actually has that opportunity, given the reconsideration by the Department in terms of outstanding or past unspent funds of $17 million.

And as I mentioned earlier, the Department's willing to sit down as early as plaintiffs would like to to resolve

that.

MS. SKINNER:  Just to respond on that, the Department offered to reconsider but did not ensure that there would be any sort of guarantee, and this also wouldn't be on the timeline that plaintiff needs it to be at.

Right now, the grant is effectively canceled at midnight.  You know, saying we can sit down, you know, next week and discuss it doesn't get at the immediate and irreparable harm, which is the very reason that we are here on New Year's Eve discussing this is because this is an immediate harm.  It's an immediate and irreparable harm.  This isn't something that we want to defer and negotiate on.  That is why we are seeking the TRO.

MR. JOHNSON:  Yeah, I'll just add, Your Honor, you know, I'm counsel for the Department of Education.  We're willing to reconsider that, which essentially means that that decision is being held in abeyance to the extent that the decision to deny the no-cost extension is held in abeyance.  So I don't think there's any immediate irreparable harm given that.

MS. SKINNER:  But holding that in abeyance is not the same as granting the no-cost extension, which we were told was not what was happening.

MR. JOHNSON:  I'm not sure what to say in response, Your Honor --

THE COURT:  I mean --

MR. JOHNSON:  -- other than -- I'm sorry, Your Honor, I didn't mean to interrupt you.

THE COURT:  I mean, it sounds like if the Department is willing to at least reconsider the no-cost extension -- I mean, so reading through the exhibits to the TRO motion and those letters from the Education Department, I think, you know, the letters say, at least some of the letters, I don't know if it was both the December 12th and the December 29th, but some of those letters said that there will be no no-cost extension. And what I'm hearing is that the Department is willing to reconsider that question, will there be a no-cost extension.

If there were a no-cost extension, the plaintiffs would have the opportunity potentially to use the past $17 million of unspent funds.  I mean, if -- I understand the plaintiffs are saying, well, we need a guarantee.  But I don't -- I think as long as the defendants have offered to reconsider, I mean, it wouldn't be -- it seems like it would be trickier for the defendants to then turn around and say, well, how come you, you know, if we're still discussing it, then why -- why are you, the plaintiffs, under an obligation to start winding down so long as that is a live issue.

MS. SKINNER:  Well, because we would need to have the no-cost extension granted today in order for the wind down not to start.  So just saying we are open to discussing whether to

grant it to you is not the same thing as saying you have access to the funds available today, which is what we're asking for.

If we don't have the no-cost extension in place by tomorrow, we can't act upon the no-cost extension because all the Department has offered to us is to discuss it.

MR. JOHNSON:  Yeah, Your Honor, I'll just add fair enough.  They don't have the no-cost extension.  Given the timing, it won't happen tomorrow, but I can assure the Court and plaintiff that there will be no close-out procedures because those go hand-in-hand.

In other words, to reconsider the denial of the no-cost extension means there are no close-out procedures, and the agency's willing to sit down as soon and as quickly as possible to work this out.

MS. SKINNER:  There would be no close-out procedures, but that is the not the same as the grant being allowed to continue operation.  So the no close-out procedures means they would not start actively shutting things down, which is part of the our request, but we're also requesting them to be able to access these prior-year funds to carry out operations, and it does not happen if the no-cost extension is not granted today.

MR. JOHNSON:  Well --

MS. SKINNER:  Maybe they are starting shutdown -- the shutdown process tomorrow, but they aren't actively carrying out the grant, which means they are effectively shutting down

whether or not the Department considers them to be in active close-out or not.  So the crux of the matter is they need the no-cost extension today to prevent the imminent and irreparable harm.

MR. JOHNSON:  Your Honor, actually I'll just add one more thing.

You know, assuming discussions on this start Monday and they take a couple days, plaintiffs can use the past money and seek reimbursement for that, and there's no guarantee it would be reimbursed, but they're allowed to use that and seek reimbursement, and with any luck, this whole thing will be, you know, mooted out by the time the reimbursement claim comes in.

So in other words, let me be clear.  If plaintiff on Monday, January 4th or 5th, whatever that Monday is, decides it needs to use some of the past money to continue operation, it doesn't -- it's not violating anything by using that money. It's another issue of whether they'd be reimbursed, but that would be, I think, part of what would be expedited discussions between the Department and plaintiffs to try to work out an agreement as soon as possible.

MS. SKINNER:  Without the no-cost extension, they don't have the authority to spend funds, and they don't have the funds available to spend.

MR. JOHNSON:  Well, respectfully --

THE COURT:  I think --

MR. JOHNSON:  Yeah.

THE COURT:  No, no, no.  Sorry.  Go ahead.

MR. JOHNSON:  I was just going to say I disagree with that, Your Honor.

MS. SKINNER:  Well, school districts are legally prohibited from obligating new funds that they can't get reimbursed for.  So if they don't know that they're going to be able to get reimbursed, they can't spend them.

And the grantee, I'm not sure what this, the reimbursement process is or what the authority is for that, but, I mean, the basic rules are that without the no-cost extension, they cannot incur new obligation.  So they would not be able to carry out the grant program.

MR. JOHNSON:  Yeah, I'm not sure how to respond to that, Your Honor.  I'm not familiar with the regulations that school districts are under.

I am familiar with the fact that the Department of Education would allow a request for reimbursement even before the no-cost extension is granted.

THE COURT:  Yeah, I mean, I think on this issue, it sounds to me like what the Department is offering is sufficient to alleviate any immediate irreparable harm, and so I -- as to the no-cost extension, I'm denying the TRO on that basis because that's -- what they've offered, they, the Department, has offered is sufficient to avoid immediate harm.

I don't -- I mean, I -- the Education Department has represented that they're not violating, the plaintiffs are not violating anything by using the past money to continue operations, and they're free to submit requests for reimbursement.

It's a separate issue of whether they would be reimbursed, but I think that's -- that's, you know, so long as they're free to continue to use the money and then request reimbursement, I just don't see the irreparable harm.

MS. SKINNER:  I'm -- I'm sorry, I -- I don't understand what -- they aren't -- they can't -- they aren't using the prior-year funds then.  I mean, they can't -- they are prohibited from using them without the no-cost extension. I'm just -- I'm very confused about how this reimbursement case comes into play here.  I don't understand.

They can't access the funds.  They can't obligate the funds.  Are they saying they should use their own money and then submit for reimbursement?

MR. JOHNSON:  Your Honor, I guess I don't know the specific -- yeah, I don't know the specific answer to that.  I just know based, you know, on my conversations with the Department of Education that the old funds would be available to use.  The mechanics of it I don't know, and the only thing left that would be uncertain is whether there would be a reimbursement.

I don't have any more details than that, and my hope is that discussions, you know, as soon as the next couple days could clarify all of that and hopefully clarify much more and grant the no-cost extension.

MS. SKINNER:  I'm just -- I'm very concerned that this leaves my clients in a position where the law is saying one thing and then the Department is saying something that conflicts with that.

If they're able to use their prior-year funds, that's a no-cost extension.  And if they're not able to access their prior-year funds, then they can't operate and need to shut down, but there isn't -- I don't know what the in between is. They're either able to access that funding or they're not able to access the funding.

MR. JOHNSON:  I don't have a great answer for that, Your Honor, although I will clarify one thing, and I think plaintiff might be correct on this.  I mean, the term I've been using is not my own term.  It's a term I came up with in discussion with Education, which is reimbursement.

So to the extent that, you know, is it actually the past funds that are originally being expended or not, I'm not sure.  I mean, the reimbursement would suggest otherwise.  I just don't know.

MS. SKINNER:  It sounds -- I mean, it sounds like what they're saying is that you can use your own funding and then

submit a request to be reimbursed from prior-year funds which doesn't get at the firm, but, again, I'm just not clear on what this situation would be because our understanding from the statutes and regulations is that they're either granted the no-cost extension and have the authority to use prior-year funds or they're not granted it and don't have that authority.

I mean, if -- if the Department wants to reconsider, they could just simply say we'll issue the no-cost extension for a few days, and then we'll discuss next week.

MR. WALSH:  Your Honor, this is Tom Walsh.

Sorry to have one more person add something that may be more confusing than anything else.  Maybe we ought to call the Department of Education and clarify this before we take another step.  My understanding --

THE COURT:  Okay.

MR. WALSH:  -- there's no -- there would be no guarantee that the plaintiffs could use the money.  It's just that they're -- a denial of their request has been withdrawn unilaterally by the Department of Education, which means that they don't have to go through the close-out procedure, but they'd still have to ask the Department of Education to be able to use the money for specific things, if that helps.

MS. SKINNER:  But that -- okay.  I'm open to getting clarification from the Department.  What -- what I think is maybe being lost here, too, is that the process of obligation

is not the same as making -- asking them to potentially not be reimbursed for costs. I mean, they're not just going to be the costs of the few days. They're entering into agreements -- I mean, they need to be able to access that funding in order to operate. If they can't access that funding, they can't continue to operate.

So withdrawing the notice that they're denied a no-cost extension isn't the same as granting it. It sounds like they want to go back over after the fact what the funds were used for, but that's -- that puts the plaintiffs in the same position, where they have to spend money that they don't know if they have access to or they don't know that they have.

MR. WALSH: So could we take a 10-minute break to clarify this and call right back, say, at --

THE COURT: Sure.

MR. WALSH: -- at 1:50?

THE COURT: Sure. Okay. Call back in at 1:50.

Although actually before we break, can you say again what is the status of the D.D.C.? So the plaintiffs there agreed not to pursue the TRO as long as the funds are obligated today; is that correct?

MR. JOHNSON: That's my understanding, Your Honor.

Patrick Johnson.

THE COURT: So then any request here that funds not be obligated or that -- I guess, I'm still kind of confused about

how the requested relief here is consistent with that because it sounds like this request is to basically freeze or pause the granting, you know, the granting of funds or the obligation of funds, but that relief is that the funds be obligated.  So I -- I'm not sure what to make of that.

MR. JOHNSON:  Your Honor, defendants think it's inconsistent, but I'll defer to or allow plaintiffs' counsel to chime in.

MS. SKINNER:  I am not familiar with what -- what legal agreement was reached in the D.C. case, but, again, you know, we're asking for a pause, which is -- you know, again, we don't -- we haven't heard yet what the status is, but we just want -- we're trying to get the pause in the process to maintain the status quo for very short period of time.

THE COURT:  Okay.  I mean, I guess I -- I still am not sure how a pause is consistent with obligation -- like, complete, you know, finishing the obligation of all the funds because it sounds like the process is about how to allocate or obligate the funds, and so if their relief is finish obligating all the funds and the request for relief here is to pause that process, then I just -- I don't -- maybe there's something I am missing, but I'm not really sure how those two things --

MS. SKINNER:  My understanding --

THE COURT:  -- are consistent.

MS. SKINNER:  My understanding from D.C. and, again, I

have not looked at any of the decision documents, but my understanding was that the agreement was that the funds would be obligated, and if they weren't, the period of availability would be extended by 5:00 Eastern Time, but I don't -- that is, again, I don't know what happened.  I was not -- I was not there, but that would not be in conflict.

And, again, I mean, even if the funds are obligated, we're asking for just a short-term pause on whatever point they're at in the process, whether they -- you know, if they've all been obligated, which is possibly the case, then we would just say just pause the process for just a short-term while we -- you know, to get through this short period to prevent that irreparable harm.

And I'm not sure that it necessarily matters what point in the process it is.  It's this very short-term pause, and, you know, maybe we just need clarity about what the status is.

MR. JOHNSON:  Your Honor, this is Patrick Johnson.

I'm fairly certain the agreement did not include an option to extend the obligation period, but if we're going to reconvene in 10 or 15 minutes, I can confirm my suspicion.

THE COURT:  Okay.  All right.  So, yeah, let's reconvene in -- at, like, five till.

MS. SKINNER:  Okay.

MR. JOHNSON:  Great.  Thank you, Your Honor.

MS. SKINNER:  Thank you, Your Honor.

THE COURT:  Thanks.  Bye.

(Recess at 1:41 p.m., until 1:56 p.m.)

THE COURT:  This is Martha Pacold.

MS. SKINNER:  Jocelyn Skinner on behalf of the plaintiffs.

MR. JOHNSON:  Patrick Johnson on behalf of the defendants.

MS. SKINNER:  And, Your Honor, we have been -- I did have an additional formal update, but we wanted to propose if we could a sort of modified TRO request, and we would be -- we can submit a proposed order as well in a few moments, but basically we recognize there's a lot of confusion with the D.C. situation right now.

So we would drop the request for the obligation pause, just set that portion aside, and really just ask for that pause of the discontinuation process and the no-cost extension to be granted with respect to plaintiffs only, and if that is amenable to everyone, as I said, we would be happy to submit a proposed order for review.

MR. JOHNSON:  Your Honor, Patrick Johnson.

I have some clarification on that point, which is why we broke.

The -- as I mentioned, the Department of Education is unilaterally reconsidering that, and as I mentioned and

confirmed just now, willing to meet as early as Monday morning to start those discussions.

It is true that I don't know what kind of expenses or expenditures plaintiff needs Monday and Tuesday, but if they need them, they will either need to request them and get permission beforehand from Education to spend that, have the money sent over, or spend their own money and seek reimbursement.

But I think that's exactly why we're meeting Monday morning, you know, and I assumed first thing on the agenda is what kind of immediate needs do you need first and make sure those are okay, and if so, Education gives approval. And then hopefully work, you know, within a very short period of time, with a couple days, to talk about a longer structure where they can use the entire 17 million.

And, you know, the hope is that any real immediate needs can be taken care of on the first day and longer-term needs over the course of the year with the 17 million might take a few extra days.

I'll add, again, I don't know what kind of immediate needs plaintiff needs, they're going to need starting Monday, but I know as of yesterday, there was a significant drawdown request by plaintiff from the past funds. I don't know if those are enough to cover its initial expenses the first couple days or not, but, again, I think --

UNIDENTIFIED SPEAKER:   No, you can't drive down.

MR. JOHNSON:  Oops.

Anyhow, that's -- I'm just telling you what we just learned from Education, and I think all of this, again, supports the point that there is no imminent emergency that's going to occur before the beginning of next week even, so no need for any kind of temporary emergency relief.

MS. SKINNER:  So this is in our exhibits.  I believe it's in 18, 19, 20, 21 and 22.  The 600 positions are currently set to be terminated tomorrow morning because there is not a guarantee that they will be able to be paid out of the funds, the continuation funds.

It's not a situation where, you know, a few days doesn't make a difference, it's only the costs they incur during those few days.  They have to have the guarantee of the funding availability, and I believe that is -- that is an Illinois state law.  So I'm not as familiar with it as with the federal requirements, but they have to have a budget guarantee of reimbursement is my understanding and the -- so having -- the positions are terminated tomorrow.  I mean, it doesn't -- they don't have other money to use.

That's why, you know, we filed this emergency request.  There isn't other money to use.  They can't draw down -- they can't draw down funds and then spend them for new obligations tomorrow.  The obligations incur at different times for

different type of expenditures for some of them. Travel, it occurs when the travel takes place. For certain types of services, it happens when you enter into a contract. Other types, it happens when the activities take place.

I mean, these -- it's not a simple matter of just delaying the funds. They can't use any grant funds for any of those activities regardless of when they were -- you know, whether they were moved from one account to another. They can't spend those funds. So they either have to use their own funds, which they don't have, to offer to all of these people.

I mean, this isn't something that typically works on that reimbursement basis, they're not going to have the funds in their account to access. And so I'm just -- I guess I'm not sure why, if the Department is considering this, you know, another few days or a week of the no-cost extension is problematic on their end, that's just what the status quo is now. And by Monday, they're going to have terminated all of these people that they can't just immediately rehire and restart the process.

MR. JOHNSON: Your Honor, I don't know how to respond to most of that other than what I mentioned, which is I get that plaintiff is saying that they can't use their own money. I understand that, and it sounds like they may not have to, depending on what kind of conversation ensues Monday morning.

And I'll just add I don't know how any kind of

emergency injunction today helps that. Even if there's a stay, a stay is very different from you've granted authority for a no-cost extension.

But, again, all of that, I think, would be addressed in short order starting Monday morning.

MS. SKINNER: The no-cost extension simply puts them in the same position that they are in today for a few more days or however long it takes to get to the hearing. There is no -- no harm to the government has been articulated here. The harm to the plaintiffs, however, is immediate and immense.

They are going to have to -- they are immediately from the plaintiff and their sub-grantees going to lay people off, 600 positions is what is in one of the declarations. They're going to have to immediately shut down operations.

The TRO would simply maintain the status quo, the position we're in today, for a few more days, and I'm not sure -- the government's negotiations and the government's offer to discuss it next week don't do that.

The layoffs are going to happen and the shutdown is going to happen, and I'm not sure what -- I don't see on the balancing of the equities the harm to the government here outweighing this immense harm to the plaintiffs.

MR. JOHNSON: Your Honor, I disagree, but I think I've said everything that I've mentioned.

THE COURT: Okay. I -- so, first of all, the

plaintiff has proposed a modified TRO request so is no longer seeking the pause of the obligation process.  Rather, the plaintiff is seeking a pause in the discontinuation process and a no-cost extension.

I just -- you know, in light of this additional discussion in the last couple times we've reconvened, I mean, the government's explained that it's open to reconsidering the denial of the no-cost extension and is willing to discuss very promptly starting immediately next week and -- and in the meantime the plaintiffs are -- they would either need to request and get permission beforehand from Education to spend the prior-year funds, or they would need to spend their own money and seek reimbursement.

So, yes, there is definitely -- there are constraints on that, but, again, the Department's offered to meet very promptly on -- at the beginning of next week.  Of course, you know, tomorrow is a holiday, and then there's also Saturday and Sunday between now and the beginning of next week, but there's, you know, at most, it's two business days from now and I just -- under those circumstances, I understand the, you know, the issues that the plaintiff has described about -- about the, you know, the ramifications for the plaintiffs, but I just think that that rapid -- or the offer to meet so quickly to try and resolve this, I just -- I don't see under that -- under those circumstances in that context, I just don't see the

irreparable harm or at least the -- just the -- it's not sufficiently clear to me that there is going to be irreparable harm, given all that, that I think a TRO is warranted.

A TRO, just stepping back, it turns on the *Winter* factors:  The likelihood of success on the merits, irreparable harm, balancing the equities and the public interest.  And, you know, on the likelihood of success on the merits there's obviously a lot of different issues the parties have raised. You know, a lot of different legal issues.

I think here, it just -- I would say that the overwhelming factor is less that, given the government's offer to meet quickly next week.  I think in light of that, the irreparable harm factor takes more precedence.  But even on the likelihood of success, going back to that factor briefly, I think there's at least a significant jurisdictional issue involving the Tucker Act and whether this is a contract claim or effectively contract claims that belong in the Court of Federal Claims.

So that, you know, to some extent, reduces the likelihood of success on the merits.  But I guess I'm acknowledging there are still a lot of legal issues that have been raised, and so -- but I'm also just saying that considering the meaningful issue with respect to jurisdiction, that factor doesn't really clearly tilt in favor of a TRO. It's just sort of murky and doesn't cut really either way very

strongly.

On the irreparable harm, I've just discussed that and the parties have been discussing it in the last couple parts of this hearing today, and I just find that in light of the government's willingness to meet and confer about that on -- you know, as promptly as possible once, you know, it's another business day, I just don't find that there is enough of a likelihood of irreparable harm to warrant a TRO.

On the balance of the equities, I do think that -- I mean, I know the plaintiff has been saying that this is such a short pause and I agree that a TRO, that's what it's supposed to do, I do think that on the balance of the equities, though, the government has a strong interest as well in the administration of its grant programs, and I -- so I don't -- I don't know that even if a quite short pause, setting aside the fact that sometimes the pauses turn out to be not short because litigation is, you know, it's slow, and so I don't know that, you know, to characterize it as a short pause, I -- I'm not so confident about that.

But even if it were a truly short pause, I think that it's important not to underweight the interest of the government's interest in administering the grant programs and, you know, using the -- it does have significant discretion in, you know, every granting agency has significant discretion in -- in the administration of the grant program. And so --

and that's also true of the no-cost extension in particular.

And so I, in balancing the equities, I think it's important not to lose sight of that very substantial interest that the government also has.

And so, again, the balance of equities does not cut strongly in favor of a TRO.

As to the public interest, it merges with the balance of the equities in a case involving the government, so I don't really have more to add than what I've already said about the balance of the equities.

So for those reasons, I'm going to deny the TRO.

And I am the emergency judge, of course, so this case will continue before Judge Durkin, when he's available.  I -- so I guess I'm just now thinking about how to, you know, whether we need to set any follow-up status.

I guess does either party request any follow-up at this point, or would you prefer to just raise that before Judge Durkin?  I'm not sure exactly -- I believe he is -- you know, why don't I just leave it to the parties to either file anything new if you need -- I'll just leave it to the parties to choose when to file something if you need.

MS. SKINNER:  Thank you, Your Honor.

Would the government be open to stating on the record that they will discuss possibly pre-approving costs since they indicated that was a possibility, to have those discussions

today to possibly alleviate some of the irreparable harm?

MR. JOHNSON:  Yeah, I mean, the government is interested in talking about all aspects of the no-cost extension for use of past funds and is willing to do that as soon as possible and --

MS. SKINNER:  Would they be willing to do that today to preapprove?

MR. JOHNSON:  I don't know because I haven't talked to my client.  I can certainly call you directly after this, and we can discuss it.

THE COURT:  Okay.  Does anyone request any further, I guess, status report or status hearing?

MS. SKINNER:  Would it be possible to set a status hearing for next week to ensure that the government has set that meeting for Monday as -- as they have offered here?

THE COURT:  Yes.  I don't know yet -- so I'll need to talk with Judge Durkin and just see what makes sense as far as, you know, is he going to be available then or at what point -- yeah, how are we going to handle it.

So I am happy to set it.  I just don't know whether I'll be presiding over it or whether Judge Durkin will be or whether, you know, if he is back at that point he would want to handle it some other way.

So I think it's fine to go ahead and set it, but it is -- I'm just trying to give you a heads up that I may -- or

it may be changed depending on what we -- where we land.

MS. SKINNER:  I understand, Your Honor.  Thank you.

MR. JOHNSON:  Thank you, Your Honor.

THE COURT:  Okay.  So what time on Monday are you requesting?  I think actually -- you know what, I realized I would be able to do it first thing in the morning, but then later in that day would be difficult for me, but I -- you know, first thing in the morning, I don't know if there will be much to report because you're supposed to be meeting on Monday.

So, I mean, perhaps we should set it for Tuesday instead, or at the end of the day.  I could ask Judge Durkin.

MS. SKINNER:  Either end of the day Monday or early Tuesday would work for us.

MR. JOHNSON:  Yeah, my preference would be Tuesday, but if the Court needs Monday afternoon, that's fine.

THE COURT:  Okay.  Let me -- why don't we set it for Tuesday at -- bear with me one second.

Sorry.  Just one more minute.

Okay.  Could we set it for Tuesday at 11:30 a.m.?

MR. JOHNSON:  Yes, Your Honor.

MS. SKINNER:  Yes, Your Honor.

THE COURT:  Okay.  And, again, I may be presiding over that or possibly Judge Durkin, and if Judge Durkin is, the time may change.

Okay.  Anything further we should discuss at this

point?

MR. JOHNSON:  No.  Thank you, Your Honor.

MS. SKINNER:  No.  No, thank you.

And we appreciate the time and consideration that you gave to this case especially on New Year's Eve.  I hope all of you have a wonderful New Year's Eve.

THE COURT:  Okay.  Same to you.  Thank you both very much for all the time that you're taking.

MS. SKINNER:  Thank you.

THE COURT:  And also Happy New Year and best wishes to you both.

MR. JOHNSON:  Thanks, Your Honor.

MS. SKINNER:  Thank you so much.

THE COURT:  Thank you.  Take care.

MR. JOHNSON:  Bye-bye.

THE COURT:  Bye.

(Concluded at 2:18 p.m.)

                        *   *   *   *   *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Kathleen M. Fennell*              *July 6, 2026*
Kathleen M. Fennell                Date
Official Court Reporter

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AFTERSCHOOL FOR CHILDREN AND    ) Case No. 25-cv-15704
TEENS (ACT) NOW, et al.,        )
                                )
                Plaintiffs,     )
                                )
        v.                      )
                                )
UNITED STATES DEPARTMENT OF     )
EDUCATION, et al.,              ) Chicago, Illinois
                                ) June 8, 2026
                Defendants.     ) 10:06 a.m.

TRANSCRIPT OF PROCEEDINGS - PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE MARTHA M. PACOLD

APPEARANCES:

For the Plaintiffs:    SLIGO LAW GROUP, PLLC
                       BY:  MS. JOCELYN E. SKINNER
                            MS. EMILY K. MEROLLI
                       1717 K Street, NW, Suite 900
                       Washington, DC 20006

                       CHICAGO LAWYERS' COMMITTEE FOR CIVIL
                       RIGHTS
                       BY:  MR. ANEEL L. CHABLANI
                            MR. MICHAEL R. ORTEGA
                       25 E. Washington Ave., Suite 1300
                       Chicago, Illinois  60602

                       EIMER STAHL LLP
                       BY:  MR. ALEC J. SOLOTOROVSKY
                            MS. ELIZABETH M. HADY
                       224 S. Michigan Avenue, Suite 1100
                       Chicago, Illinois  60604

For the Defendants:    HON. ANDREW S. BOUTROS
                       UNITED STATES ATTORNEY
                       BY:  MR. THOMAS CULL
                            MR. PATRICK W. JOHNSON
                       219 S. Dearborn Street
                       Chicago, Illinois  60604

Court Reporter:            KATHLEEN M. FENNELL, CSR, RMR, FCRR
                          Official Court Reporter
                          219 South Dearborn Street, Room 2328A
                          Chicago, Illinois  60604
                          Telephone:  (312) 435-5569
                          Kathleen_Fennell@ilnd.uscourts.gov

                          *    *    *    *    *

                  PROCEEDINGS REPORTED BY STENOTYPE
        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

(Call to order.)

THE CLERK:  Calling Case No. 25-cv-15704, Afterschool For Children and Teens Now, et al., v. United States Department of Education, et al., for preliminary injunction hearing.

Counsel, please state your name for the record.

MR. SOLOTOROVSKY:  Good morning, Your Honor.  Alec Solotorovsky, Eimer Stahl LLP, on behalf of the plaintiffs.

MS. HADY:  Good morning, Your Honor.  Elizabeth Hady also from Eimer Stahl LLP on behalf of the plaintiffs.

MR. ORTEGA:  Good morning, Your Honor.  Michael Ortega from Chicago Lawyers Committee For Civil Rights on behalf of the plaintiffs.

MR.CHABLANI:  Good morning, Your Honor.  Aneel Chablani, Chicago Lawyers Committee on behalf of the plaintiffs.

MS. MEROLLI:  Good morning, Your Honor.  Emily Merolli from Sligo Law Group on behalf of the plaintiffs.

MS. SKINNER:  Good morning, Your Honor.  Jocelyn Skinner, Sligo Law Group, on behalf of the plaintiffs.

MR. CULL:  Good morning, Your Honor.  Thomas Cull for the Department and the Secretary.

MR. JOHNSON:  Good morning, Your Honor.  Patrick Johnson also for defendants.

THE COURT:  Good morning, everyone.

We're here for the preliminary injunction hearing. Are the parties ready to proceed?

MR. SOLOTOROVSKY:  Yes, Your Honor.

MR. CULL:  Yes, Your Honor.

THE COURT:  Okay.  Can you just maybe give a brief overview of the format and how you were envisioning the day?

MR. SOLOTOROVSKY:  Sure.  I'd be happy to start, Your Honor.

If it please the Court, we've got five witnesses here who are going to speak to the irreparable harm that the plaintiffs are going to suffer if a preliminary injunction were denied.  Their direct testimony is going to be in the neighborhood of two-and-a-half hours in total, so depending on the length of the cross and the Court's questions, I think their testimony might take us to a natural lunch break, and then after that, we'd be prepared to present legal argument.

We've got perhaps 15 or 20 minutes of legal argument just to kind of sum up the issues as we see them, and then we'd be happy to respond to whatever the defendants may present or answer the Court's questions.

MR. CULL:  Your Honor, the Department and the Secretary do not have any witnesses that we intend to present today.  We've also probably got probably 15 to 20 minutes of argument following the witnesses' presentation.

THE COURT:  Okay.  Sounds good.

One thing I wanted to mention before everybody starts presenting is just that obviously, as you know, the jurisdictional issue is pending before me.  I haven't issued an opinion on it.  I have been giving it thought.

I am obviously interested in any facts or evidence or law the parties want to present today.  I would appreciate especially hearing the parties' presentations on any First Amendment issues.  So I would just make sure, please, to address any factual or legal issues related to the First Amendment claims.

And with that, I'll let the parties proceed.

MR. SOLOTOROVSKY:  Thank you, Your Honor.

I should add our five witnesses are all in the courtroom today.  I've spoken with defense counsel, and they don't object to them being here during each other's testimony, but I just wanted to mention that to the Court.

THE COURT:  Okay.  Any issue from the defense?

MR. CULL:  No, Your Honor.

THE COURT:  Okay.

MR. SOLOTOROVSKY:  Well, with that then, the plaintiffs call Susan Stanton.

THE COURT:  Okay.  You may proceed.

(Witness sworn.)

SUSAN STANTON, PLAINTIFFS' WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. SOLOTOROVSKY:

Q.   Good morning, Ms. Stanton.  Please introduce yourself to the Court.

A.   Good morning.  My name is Susan Stanton, and I am the Executive Director for Afterschool For Children and Teens Now, or ACT Now.

Q.   What is ACT Now?

A.   ACT Now is a statewide organization that supports and promotes afterschool programs and community schools throughout the State of Illinois.

Q.   Tell the Court a bit about your background and how you came to be the executive director of ACT Now.

A.   I started off my career as a classroom teacher.  I taught middle school, and I taught the school day portion, and then I also taught afterschool clubs.  Then I went on to go to grad school and worked at a variety of non-profits before coming to ACT Now.

Q.   Where does ACT Now get most of its funding from?

A.   Our funding comes from a variety of sources.  Some of them are state contracts, some of them are private donations and foundation funds, but the majority of our funding comes from the U.S. Department of Education.

Q.   And are those the grants that we're here talking about today?

A.   Yes.

Q.   When you say the majority comes from those grants, what's the percentage?

A.   Over 90 percent.

Q.   What did ACT Now do prior to getting these FSCS grants and running the programs that we're talking about today?

A.   Before this funding, we were certainly a much smaller organization, but our work really focused on our state contracts, supporting a lot of the state-funded afterschool programs in Illinois.

Q.   And just for context, what is the relationship between ACT Now and Metropolitan Family Services, the other plaintiff in this case?

A.   So Metropolitan Family Services is our fiscal sponsor, and in the non-profit field, fiscal sponsors are incredibly common because they are used to offer back-end support to smaller organizations so that way they can stay mission driven.

     So Metropolitan provides things like accounting, HR support, and then we use their 501(c)(3) status.

Q.   Would it be efficient for an organization like ACT Now to have its own back-office functions all by itself?

A.   No, it would not.

Q.   What is the Full-Service Community Schools program?

A.   Full-Service Community Schools is a competitive federal grant program, and so a competition is issued and a variety of organizations can apply, and then they are funded to bring the

community schools model to schools throughout the country.

Q. What is the community schools model?

A. So community schools aren't really a place. They're more of a model of education. It's the idea that when a student walks into the classroom, especially in low-income communities, they might be facing a lot of barriers to learning. It's really hard to get a B in math class if you're hungry or you don't have clean clothes or you're worried about your mom and dad's job.

So community schools really look holistically at the children and figure out what are those barriers, how can we mitigate them, and make sure that students are set up for success in school and in life.

Q. So I understand the decisions about programming are made at the local level, but give the Court a few examples of types of programs that a school might implement in an FSCS program.

A. That's exactly right. These are hyper-local programs. So every community school looks slightly different, and that's because all services have to be based on data-driven needs assessments that are conducted at the local level.

But what we often see is that community schools offer things like laundry services, food pantries, counseling services, physical health services, and before and afterschool care.

Q. When did ACT Now start participating in the FSCS program?

A.    Our grant started on January 1st, 2024.

Q.    And how did ACT Now get those grants?

A.    We applied through the competitive grant process in 2023.

Q.    Tell the Court about the application process.

A.    The application process is incredibly rigorous.  Each of our applications, because at issue here today are two different grants, was over 100 pages plus supportive materials from community members and elected officials and education leaders within Illinois.

Q.    What topics do you cover in those hundred-plus pages?

A.    So part of what we look at are the needs of the communities we intend to serve, to make sure that the funding goes to students who really need it.

       But then the other portion of it outlined are grant objectives and deliverables and really outlined how we would achieve the grant goals over a five-year period.

Q.    When you're applying for a grant like these FSCS grants, how do you know what topics you're supposed to address in the application?

A.    The application is actually pretty structured, and a lot of the application is based on statutory language and regulatory language as well, and so you have to comply with those measures and address certain question prompts in the application.

Q.    So what were the grants that you received at the end of that process?

A.   So we applied for specific grants that allowed for state scaling, and state scaling meant that we weren't just going to implement community schools in one school or one district.  We were going to do it throughout the State of Illinois.

     And there were specific priorities you could apply for in state scaling.  For us, we applied for and won one grant that allowed us to scale statewide in Title 1 schools, and then another grant allowed us to scale statewide specifically in rural schools.

Q.   What does Title 1 mean?

A.   Title 1 is a federal funding stream that goes to schools by formula to serve low-income students.

Q.   So it sounds like one grant was for low income and one was specifically for rural; is that right?

A.   Yes, but all of the rural schools we served also were serving low-income students.

Q.   Between the two grants, how much money were you expecting to receive and over what time period?

A.   We were expecting about $94 million over a five-year period.

Q.   And is there a process for having those continued year to year within that period?

A.   Yes.  So your first grant award year in your award letter, you are given an award amount for the first year.  But then every year after that, you have to wait for a continuation

award, and then that sets out the amount of money you have for the next year of funding.

Q. What are the factors that in your experience the Department considers in deciding whether to continue year to year?

A. So certainly one of the factors could be if there is a federal appropriation for it, if there's funding available.

But outside of that, what they normally look at is if you spent the amount of money you were given in the previous year and then also if you have met grant performance standards.

Q. How did ACT Now decide what school districts to work with in its FSCS programs?

A. So the application did require us to name at least one school partner for each grant, so we certainly complied with that. But outside of that, we knew that to scale statewide, we really needed more school partners and districts on board.

So we conducted a statewide search for school programs where we asked for information related to their students and their need as well as their readiness to implement the community schools model.

Q. Were the racial demographics of the schools a factor in your decision?

A. We collected racial data, but it ended up not being -- it wasn't a factor in our decisionmaking process.

Q. Why not?

A. At the end, once we looked at the data -- and we really

looked at it to make sure that all of the factors weren't having a disparate impact on one race over the other. But racial data ended up not being super-instructive in the decisionmaking process anyway. Most of the school communities we served were rather homogenous to begin with.

Q. How many school districts participate in your FSCS programs?

A. Between the two grants, we serve 16 school districts.

Q. And how many schools total?

A. Between all of those districts, we serve 32 schools.

Q. So an average of two per district?

A. Correct.

Q. Where are those school districts located?

A. In every corner of Illinois. We serve students here in Chicago, all the way to the western part of the state to the very southern tip of the state.

Q. So of the participating school districts, how many are in the Chicago area, meaning the city and its suburbs, as opposed to everywhere else in Illinois?

A. We serve -- in Chicago, we only have two schools, and then we serve three additional school districts in the suburbs, and that's six schools. So of the schools that we serve, all 32, only 8 of them are in Chicago and the suburbs.

Q. How many students do your programs serve in Illinois?

A. Total, all across the state, we're serving 19,000 youth.

Q.   And let's talk a bit about the demographics of those statements.  What's the breakdown as between white students and non-white students?

A.   In terms of our services, about 60 percent of the students receiving services are white.

Q.   And what's the breakdown between rural and urban or suburban students?

A.   So urban and suburban students make up about 60 percent of our -- of our student population, and about 40 percent are rural.

Q.   Who decides what to do with the FSCS funds within each district?

A.   So statutorily, it is required that these be collaborative and really local decisions for the school districts.  So all of the school districts have final say in how they plan to spend their money, and then when they make those plans, they have to engage parents and students and community members in those decisions.

Q.   What role, if any, does ACT Now play in those decisions?

A.   So what we do is we set up an initial process where we help walk schools through their needs and assets and create a plan for how to spend the money, but the decisions ultimately are all on the schools.

Q.   How do you make sure the FSCS funds are being spent properly if all the decisions are being made at the school

district level?

A.   The Department requires and we heavily track student data in all of the schools that we're serving, and this way we're able to tell if the services being offered are really making an impact on students and improving student outcomes.

Q.   And how do the school districts get paid for the services they provide or the programs they fund?

A.   So in the beginning of the grant process, schools all went through a databased needs assessment and created an implementation plan, and then every year the schools we partnered with had to submit a budget to us.

So all of their expenditures have to be in that budget, and then monthly they submit vouchers to us for -- to be reimbursed for any expenses they incur.

Q.   And does ACT Now make sure the expenses are consistent with the plan and the budget before giving the reimbursement?

A.   Yes, exactly.  Every single voucher is approved in a four-step process, it has to go through four approvers.  And so we have to make sure every single expense was not only within the budget and based in data but also permissible under regulation to be reasonable and allocable.

Q.   Besides making sure the money is being spent for what it's supposed to, how do you make sure that the FSCS programs are helping kids learn?

A.   So as I said, we are tracking student data in every single

school, and so at the end of the school year, we are able to see if the students who received services actually had some level of improvement.

And even within just our short period starting this grant, we were able to make huge changes in students' lives.

Q. So let's talk about what happened after ACT Now began participating notice FSCS program.

In 2024, the first year of the grant, what did you do to set up the programs?

A. So we received the grant in January 2024, and the grant program allows for a six-month planning period, which we took advantage of in order to hire staff and build infrastructure and gain statewide support.

And then we selected our schools and began the asset and needs assessment process with schools so they could come up with their implementation plans for services.

Q. What happened in 2025, the second year?

A. So by 2025, all of our schools really knew what the assets were in their communities and what the biggest points were for need, and so they were able to start delivering services in their communities based upon their implementation plan.

Q. Now, I know you only have essentially one year of the programs really being up in running, but how well were they working as far as you could tell?

A. We were making amazing progress and, quite frankly, it

was -- we were making more progress than you would expect this early in a grant program.

For example, our schools were decreasing chronic absenteeism faster than the statewide average and faster than peer schools.

We were improving things like family engagement and school climate, again, faster than the state average and faster than peer schools, and these are some of the biggest indicators that will lead to long-term academic success.

Q.   Did you have any interaction with the Department of Education regarding these grants in 2024 and 2025?

A.   Yes.  We would often participate in individual calls with our grant officer and in group calls and webinars.

Q.   What feedback did you get regarding your programs?

A.   We got a lot of questions, but a lot of positive feedback. You know, our -- our grant was really doing some of these things for the first time in the country.  No one else had ever run simultaneous state scaling grants together.

Q.   Prior to receiving the notices of non-continuation from the Department, did you hear anything negative from the Department about how you were performing as a grantee?

A.   No.

Q.   I understand that ACT Now received notices of non-continuation from the Department of Education on December 12, 2025; is that right?

A.   Yes.

Q.   What is a notice of non-continuation?

A.   A notice of non-continuation is a letter from the government letting us know that we won't be getting a continuation award for our next grant year.  So in this situation, our grant year would end on December 31st, and there would be no continuing contract starting on January 1st, 2026.

Q.   And just to be totally clear, if you don't have a contract, do you get any funding?

A.   No.

Q.   What was the basis for the non-continuation that the Department gave in the notices?

A.   In the notices, they cited some -- a few sentences from our 100-page application, and then they cited to reasoning about these aspects of the application no longer being within the best interests of the government.

Q.   Did the Department say anything about ACT Now's performance as a grantee in the notices of non-continuation?

A.   No.

Q.   I want to take a look at the two notices of non-continuation and ask you a few questions about the specific statements that the government focused on.

     This is Exhibit 7 to the complaint, and I think we can put it up on the screen.

     MS. HADY:  Yeah, she's got --

THE COURT:  We should be able to.

BY MR. SOLOTOROVSKY:

Q.  There we are.

Can you see Exhibit 7 on your screen?

A.  I cannot.

THE CLERK:  Is it on now?

THE WITNESS:  Yes.  Thank you.

MR. SOLOTOROVSKY:  Okay.  Good.  And just to confirm, can the Court and its staff see the exhibit?

THE COURT:  I can see it.

Actually, let me just -- can I just ask though where is it on the docket?

MR. SOLOTOROVSKY:  Certainly, Your Honor.  This is Exhibit 7 to the complaint.

THE COURT:  Okay.  So it's Docket 3-7, page 2 of 7, page ID number 405?

MR. SOLOTOROVSKY:  That's right.

THE COURT:  Okay.  Thanks.

MR. SOLOTOROVSKY:  Okay.  Thank you, Your Honor.

BY MR. SOLOTOROVSKY:

Q.  Ms. Stanton, is Exhibit 7 the two notices of non-continuation that you received on December 12th, 2025?

A.  Yes.

Q.  And in the big paragraph that appears at the bottom of the first notice, is that where the Department laid out its

rationale, such as it is, for discontinuing these grants?

A. Yes.

Q. Okay. I want to focus on a few sentences, and we've got some highlighting on the document for the convenience of the Court.

Let's begin with the sentence that says: "Integrated student supports, such as social-emotional learning and physical and mental health services, professional development on equity inclusion, and collaborative leadership practices will assist participating schools in building safe and inclusive spaces for all students, including those with disabilities."

Ma'am, what does that mean?

A. So part of this is paraphrasing requirements in the statute and for the grant program, but basically what we're saying is we want to make sure that we mitigate any barriers students have to participating in school so that way every single student can succeed.

Q. I want to focus on the phrase "professional development on equity and inclusion." Do you see that?

A. Yes.

Q. Did ACT Now do any programming like that as part of this grant program?

A. No.

Q. And when you applied for reconsideration, did you say that

to the government?

A.   Yes.

Q.   Let's take a look at the next sentence.  It says:  "ACT Now is a statewide leader in providing trainings on Gender and Sexuality to educators, offering Gender and Sexuality in OST 101 and 102 professional development courses."

First, what does that mean?

A.   So this was in response to question prompts that asked about our ability to be inclusive in delivering services.

So what we were stating is that we were able to mitigate any barriers schools might have in addressing needs related to gender and sexuality.

Q.   In implementing the FSCS programs, did you actually provide trainings on gender and sexuality?

A.   No.

Q.   And when you sought reconsideration, did you say that to the government?

A.   Yes.

Q.   Let's take a look at the next sentence.  It says:  "ACT Now, as the statewide afterschool network, has access to a variety of partners and content experts that develop curriculum focused on inclusion, such as the 1619 project."

Ma'am, what does that mean?

A.   What we were stating is that we, again, in response to the question prompts which required an ability to be inclusive,

Q. that we had access to curriculum partners were that need to arise.

Q. Did you in fact conduct any programming relating to the 1619 project?

A. No.

Q. And when you sought reconsideration, did you say that to the government?

A. Yes.

Q. In the next sentence, it says: "Throughout the year, ACT Now also hosts a variety of trainings for educators focused on trauma-informed care and racial equity." Do you see that?

A. Yes.

Q. What does that mean?

A. Again, we were showing our ability to be inclusive as per the statute were that need to arise.

Q. And did you actually conduct any training on racial equity as part of this program?

A. We did not.

Q. Did you tell that to the government when you sought reconsideration?

A. We did.

Q. In the next sentence, it says: "Additionally, the GEPA states, we will consider the following factors to ensure the equitable distribution of funds to school districts: Poverty rates, equity factors such as race and ethnicity," and then

there's an ellipses and a quote to end it.  Do you see that?

A.  Yes, I do.

Q.  Ma'am, what does that mean?

A.  So this is in response to a required statement that grantees are required to submit with Department of Education grants related to the GEPA statute, and so a lot of this is actually restating the question prompt.

But it is, again, ensuring that the funds that are distributed are equitable and done so equitably so you're not excluding a certain student.

Q.  Did ACT Now in fact consider race or ethnicity as a factor in deciding which school districts to partner with?

A.  No.

Q.  And did you say that to the government when you sought reconsideration?

A.  We did.

Q.  The next sentence says:  "ACT Now will also ensure equitable access to the resources and trainings we create to support community schools.  All of our trainings are developed with a racial equity and cultural competency lens."  Do you see that?

A.  Yes.

Q.  What does that mean?

A.  We want to ensure that if someone's attending one of our trainings or using one of our resources that just like the

students we serve, there's no barriers to understanding them or accessing that.  So, again, it's just stating our ability to reduce barriers.

Q.   And so did you, in fact, conduct any training specifically related to racial equity or cultural competency?

A.   No, we did not.

Q.   And did you say that to the government in seeking reconsideration?

A.   Yes, we did.

Q.   The last sentence I want to talk about says:  "Further, we have specific trainings on cultural competency, and we are working with nationwide experts, Thrive Paradigm, to develop racial equity and implicit bias training for our coalition members."  Ma'am, do you see that?

A.   Yes.

Q.   What does that mean?

A.   So, again, the application prompts asked for your ability to be inclusive, and so we were sharing our infrastructure and ability to be able to honor those needs should they arise.

Q.   Did you do any programming with Thrive Paradigm as part of the FSCS program?

A.   No, we did not.

Q.   Did you do any programming related to racial equity and implicit bias training as part of the FSCS program?

A.   No, we did not.

Q.   And did you say that to the government when you asked for reconsideration?

A.   We did.

Q.   Let's take a look at the second notice of non-continuation that's also part of Exhibit 7 to the complaint.

And just to be clear, ma'am, why are there two notices of non-continuation instead of just one?

A.   There's two notices because we had two different state scaling grants.

Q.   So one notice related to one grant, and the other to the other grant?

A.   Correct.

Q.   So let's take a look at the second notice that appears on page 5 of 7 of Exhibit 7 to the complaint.

In the middle of the page, there's a big paragraph. Do you see that?

A.   Yes.

Q.   And is that where the government laid out its rationale, such as it is, for non-continuing the second grant?

A.   Yes.

Q.   Okay.  There's a big piece of text in the middle that I believe comes from ACT Now's mission statement; is that right?

A.   Yes.

Q.   Take a minute and read that to the Court, starting with where it says, "Specifically" on the third line.

A.   Sure.

Specifically, ACT Now's mission has equity and racial justice at its core.  We are driven to ensuring that all youth are prepared for success in school, career, and life through participation in high-quality community schools programs.  We know that this requires an intentional focus on historically marginalized populations to ensure this outcome.  ACT Now commits to addressing inequity in our own work and within our organization, and we strive to advance the afterschool field's overall efforts to address inequities.  We also recognize that this is an ongoing process that will require intentional thought, education, and action.  As we move forward to actively ensure that equity is intentionally and sustainably integrated into all that we do, the following values will be at the core of our work:  Advocate for funding to reach the youth most in need, ensure providers have the skills and resources necessary to execute programming with an equity mindset, and incorporate diverse voices into our leadership and feedback on our work.

Q.   In practical terms, how did that mission affect ACT Now's work through the FSCS program?

A.   So our mission is very much in line with what community schools do every day.  We recognize that there's a lot of barriers to accessing education at all levels, whether that's entering a school building or an afterschool program or even being a teacher accessing our trainings.

And so, again, we are driven to just making sure that every single person has access to and can succeed in the programs we work with.

Q. There's a footer, some italicized text at the bottom of these non-continuation notices.

A. Yes.

MR. SOLOTOROVSKY: Ms. Hady, can you blow this up?

BY MR. SOLOTOROVSKY:

Q. It says: "The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access."

How does that compare to ACT Now's mission?

A. Those are very similar statements. So similar to what the Department is saying here, we want to make sure that our students are ready for success not only in school but in career and life and making sure that every single student has equal access.

MR. SOLOTOROVSKY: Let's refocus on the text paragraph. Thank you.

BY MR. SOLOTOROVSKY:

Q. Okay. So the next sentence after the big chunk related to the mission statement is familiar from the prior non-continuation notice, but just for the record, I want to ask you about it.

It says:  "ACT Now is a statewide leader in providing trainings on Gender and Sexuality to educators offering Gender and Sexuality in OST 101 and 102 professional development courses."

Do you see that?

A.   Yes.

Q.   Did you do any programs on that topic as part of the second grant?

A.   No.

Q.   The next sentence says:  "ACT Now, as the statewide afterschool network, has access to a variety of partners and content experts that develop curriculum focused on inclusion, such as the 1619 project."  Do you see that?

A.   Yes.

Q.   Did you do any 1619 project programming as a part of this second grant?

A.   No.

Q.   The next sentence says:  "Throughout the year, ACT Now also hosts a variety of trainings for educators focused on trauma-informed care and racial equity."

Do you see that?

A.   Yes.

Q.   Did you do any racial equity programming as part of this second grant?

A.   No.

Q.   It goes on to say:  "The GEPA statement includes ACT Now will also ensure equitable access to the resources and trainings we create to support community schools.  All of our trainings are developed with a racial equity and cultural competency lens."

Do you see that?

A.   Yes.

Q.   Did you do any programming specifically related to racial equity and cultural competency as part of the second grant?

A.   No.

Q.   There's another reference to the Thrive Paradigm in the following sentence.  It says:  "Further, we have specific trainings on cultural competency, and we are working with nationwide experts, Thrive Paradigm, to develop racial equity and implicit bias training for our coalition members."

Ma'am, do you see that?

A.   Yes.

Q.   Did you do any programming with Thrive Paradigm as part of this second grant?

A.   No, we did not.

Q.   Did you do any racial equity or implicit bias programming as part of the second grant?

A.   No, we did not.

Q.   The last sentence I want to ask you about says:  "ACT Now also makes sure to ask about cultural competency and equity

barriers at each and every training so that we are always improving and ensuring that we meet the needs of attendees." Do you see that?

A.   Yes.

Q.   What does that mean?

A.   So after each training, we make sure to ask our participants if there were any barriers to learning that day or to absorbing our content.

So just like a student might face a barrier in a classroom, we know that sometimes, you know, even adult learners might face those barriers.  So we ask about things like whether or not the content was accessible or understandable as well when we do our trainings.

Q.   With respect to the second notice of non-continuation, we just went through several sentences where you said that you had not conducted any programming on that topic.  Do you recall that?

A.   Yes.

Q.   And when you asked for reconsideration of this non-continuation, did you tell that to the government?

A.   We did, yes.

Q.   Now, across these two notices of non-continuation, it appears that you made a bunch of statements in the grant applications about capabilities that you have but where you didn't ultimately use those capabilities or do those

activities; is that right?

A. Yes.

Q. Why did you make those statements in the grant applications if you weren't going to do those activities?

A. Again, the grant application was very lengthy. So each application was over a hundred pages, and this is just a few sentences from those.

However, the Department requires that you be prepared to mitigate barriers for students and school communities, so we wanted to ensure and assure the government that we had the infrastructure and capacity to be able to do that.

However, at the end of the day, our services and activities had to be based on what grantees needed, and these types of services weren't what our data and needs assessments showed us.

Q. How did ACT Now respond to the notices of non-continuation?

A. After we received the notices of non-continuation, we followed through with a letter of reconsideration for each grant that was a process outlined in the initial non-continuation letter.

Q. The notices or the requests for reconsideration are also in the record. They're Exhibit 8 to the complaint.

Just in summary, what did ACT Now say and argue in the request for reconsideration?

A. In the request for reconsideration, we shared that we did

not engage in any of these activities that were stated in the application, but we also pointed out that we had strong performance on both grants and that nothing in the initial letters actually cited to any of our grant performance.

Q.   How did the Department respond to your request for reconsideration?

A.   Both letters of reconsideration were denied.

Q.   In denying the requests for reconsideration, did the government address anything you had said in the requests?

A.   No.   They didn't cite to any language from our letters of reconsideration.   In fact, they only cited to additional examples from the application that weren't even in the initial non-continuation letter.

Q.   In denying the requests for reconsideration, did the Department dispute the truth of anything you had said in the requests for reconsideration?

A.   No.

Q.   How is ACT Now paying the bills right now with the grants having been discontinued?

A.   So we're under a short-term agreement with the Department, which started off as a few days at a time and then a week at a time, and then in March, we were able to reach a four-month agreement that will end on June 30th, 2026.

Q.   How does that few days at a time, week at a time, or even a couple of months at a time budgeting affect an organization

like yours?

A.   It's been incredibly destabilizing.  We have had two staff members resign because of grant funding and grant instability, and then we also a few weeks ago had to lay off five other staff members.

Q.   What about planning programs; how does uncertainty about funding impact that?

A.   It's been difficult to almost impossible to plan, especially on reduced funding and not stable funding.  So our schools aren't able to plan for the future, and, in fact, once that first non-continuation was issued, they weren't able to hire back staff because it wasn't sure whether or not that grant funding would be long term.

So students just aren't getting the same level of services anymore.

Q.   So -- so besides ACT Now itself having uncertain funding, has the non-continuation made the funding uncertain for the schools you partner with?

A.   Yes.

Q.   How so?

A.   So now that these schools don't have their full grant funded amount and they don't know if they're having any funding past June, they weren't able to continue with the same level of services.  So they weren't able to plan for summer camps.  They weren't able to plan into the next school year.

This is actually the time of year where school districts are proposing their budgets for the next year. So without this funding, they're not able to propose activities related to this grant anymore.

Q. A minute ago you mentioned that back in March, you reached an agreement with the government to continue the funding through June 30th; is that right?

A. Yes.

Q. As part of that agreement, did you or ACT Now ever agree that you would use those funds to wind down the FSCS programs?

A. Absolutely not.

Q. If the FSCS grant money is not restored, when is ACT Now going to run out of money?

A. On June 30th.

Q. What's going to happen to the FSCS programs at that point?

A. We will not be able to give any of our school partners any further funding. They will have to complete the rest of their layoffs and eliminate services, and then as an organization, we're also going to have to continue layoffs.

Q. This may be obvious, but how will that impact the ACT Now organization and the schools it serves?

A. It's going to be catastrophic. We've built this strong statewide institution that's focused on helping students to achieve, and that's all going to be dismantled.

We're going to have to have way fewer staff and won't

be able to be make an impact for students.  Schools are going to have to eliminate services that have been life lines for students.

Q.   Now, let's say hypothetically you lose all the FSCS money on June 30th, but then at the end of a trial on the merits in this case, you get it back.  So let's say, perhaps, in July of 2027, you get the funding restored.

Let's start with ACT Now.  Could you rebuild ACT Now at that point?

A.   It would be incredibly difficult.

Q.   Why?

A.   What we've been doing with FSCS is -- is the first time anyone's done it in the country.  Once we lost staff related to this project, it's going to be impossible to replace them because they were the ones that built this infrastructure.

We're going to lose institutional knowledge.  We're going to lose trust with our partners, and gaining that back is going to be so much harder than the first time we built it.

MR. SOLOTOROVSKY:  Thank you, Ms. Stanton.  Nothing further.

THE WITNESS:  Thank you.

MR. CULL:  Your Honor, the Department doesn't have any questions for this witness.

THE COURT:  Okay.  You may be excused.

MR. SOLOTOROVSKY:  Shall we call our next witness?

THE COURT:  Yes, please.

MR. SOLOTOROVSKY:  Thank you, Your Honor.

Plaintiffs call Amy Vogue.

(Witness sworn.)

AMY VOGUE, PLAINTIFFS' WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. SOLOTOROVSKY:

Q.  Good morning, Ms. Vogue.  Please introduce yourself to the Court.

A.  Good morning.  I'm Amy Vogue.  I am the Director of Curriculum and Instruction at Trico Community Unit School District 176.

Q.  What do you do as the Director of Curriculum and Instruction for Trico Community Unit School District 176?

A.  I work with teachers on curriculum and instruction, obviously.  I also help the district with professional development, and I manage many of the federal grants that the district has.

Q.  I understand that besides being an administer of the Trico School District, you're also an alumni.

A.  Yes.  I'm in my 30th year of teaching there.  I graduated from the school, as did my husband, my in-laws, my kids.  I live in the community, so I bleed blue and gold.

Q.  What is the Trico School District?

A.  So we are located in the northwest corner of Jackson

County, which is in Southern Illinois.  We're probably about 35 minutes from Carbondale.

That's a large 250 square miles of farm fields and small towns.  Not a stoplight around anywhere.  Very rural and very conservative area.

Q.  How many students are in your district?

A.  We serve approximately 800 students in grades kindergarten through 12.

Q.  Tell us about the racial demographics of the Trico School District.

A.  Say approximately 80 percent of our students are white and 20 percent non-white.

Q.  And what about the economics of the district?

A.  Approximately 65 percent of our students are considered low income.

Q.  I understand that two of your schools participate in ACT Now's FSCS programs; is that right?

A.  Yes.  Our junior high, which serves the students in grades 6 through 8, and our high school, which is our 9-12 students.

Q.  How did you come to participate in that program?

A.  Our elementary school, our K-5 school, has a -- or had, this was our last year of a 21st Century grant, which is another federal grant for afterschool programs, and that's how I became familiar with ACT Now.

So I was on a mailing list, got their monthly

newsletter that they were looking for partners for the community schools.  And after talking to other administrators and teachers within the district, we felt like it was a really good fit for some things we wanted to do for our students.

Q.   How did you start implementing the FSCS programs after you were selected to participate?

A.   Once we were selected, we hired community schools coordinators, one for each school, so that they could lead the district in the year-long asset needs assessment.

Q.   So who are the community schools coordinators and what do they do?

A.   So they are a person for each school that wrangles all the aspects of community schools implementation, kind of the go-between between the school sides of things and the community and parent sides of things.

Q.   Tell us about the needs assessment that they led.

A.   So the needs assessment was, as I said, almost a year-long process, where they gathered input from all of our stakeholder groups.  That means students, families, teachers and staff, community members, local community organizations, and just to get a feel for what we were already able to offer in our community and what our community felt they needed us to offer to help move our students forward.

Q.   What were the biggest needs you identified?

A.   So we really identified three big things.  First would be

meeting basic needs of our students.  In a large rural area with very few community partners and a high low-income, there were basic needs that needed to be met.

We also realized that family engagement, for a rural school like ours that sits out not in any of the communities and everybody has to be transported to the district, getting families engaged in the process was important for us.

And, lastly, for our students we found that college and career readiness was our key goal for them.

Q.  So let's talk about the programs you created to meet those needs, starting with basic needs.

So first of all, when you say basic needs, what kind of needs are we talking about?

A.  So for a low-income community like ours, we have obviously food insecurity, we have transportation issues, just general employment within the area is -- is low, so we were trying to meet those basic needs.

Q.  And what did you do to meet those needs?

A.  So in our first year, we focused on two things.  First was we expanded a partnership with a local hospital.  They had a mobile clinic that visited our area a couple days a week, and through the community schools, we were able to strengthen that partnership and bring them on, on school campus in a mobile clinic for four days a week.

Q.  And how did that impact the students in your school

district?

A.   It made the care more accessible.  We weren't sending our students out there ourselves.  It wasn't like this was replacing our school nurse or anything, but it allowed families to have access to healthcare within the community.  In our 250 square miles, I think there was one doctor's office that was open a few days a week.

Q.   What about food?  What did you do to help students who were hungry?

A.   So that project took a little longer.  Community schools coordinators developed a relationship with the St. Louis Food Bank to provide food for our community, and we were able to eventually set up an on-site food pantry.  Again in our rural area, we had one food pantry within our district that was open one day a month.  So we are able to now provide a food pantry that's open weekly.

Q.   And this may be obvious, but how does having easier access to food impact students' performance in school?

A.   Well, students don't learn very well when they're hungry.  They come to us, you know, the school offers a breakfast program and obviously a school lunch program.  We offer -- a community organization has a weekend like food-in-the-backpack program, but this was able to offer more substantial food support for families than any of those programs were able to.

Q.   You mentioned that family engagement was one of the needs

you identified. What did you do to meet that need?

A. So in our first year, it was -- our focus was really on just getting families to the campus. As I said, for many families, it was a transportation issue, and some it was just how do we get involved in our kids' lives at school.

So we did some fun activities that were communitywide that we ended up with attendance around 3 or 400 at each event. We did other smaller events that were targeted for let's say our high school students. We even had one event that was a career fair that not only was it open to our students, it was opened to other members of the community. So we had parents come to the school to meet prospective employers.

Q. Now, I want to talk about the programs you created to prepare the kids for life after high school.

Let's start with the kids who were interested in going to college, and then we'll focus on the kids who were interested in pursuing a career straight out of high school.

So what did you do to support the kids who were interested in college?

A. So in a rural area like ours where there aren't a lot of businesses within our community, students don't know what they don't see.

So we implemented multiple career days, where we brought in guest speakers to introduce the kids to a wide variety of careers that they could pursue and that were -- a

lot of them were alumni of our school.  So they realized someone from our school could do those things.

Q.   What types of speakers did you bring?

A.   We had several in the healthcare field.  We had many in the local, like, laborers union, plumbers and pipefitters, electricians.  We had a lot of steel erectors in our area that they brought in presenters as well.

Q.   What was the role of the community schools coordinators in arranging all this?

A.   They were the ones that were contacting the speakers, coordinating the events with the school day staff, making the schedules, making sure everybody was there and able to present.

Q.   What about career training programs, did you offer any programs for career training for the FSCS program?

A.   Yes.  With our existing career and technical education department, we found ways to expand on the offerings within those courses.

Q.   What types of things did you expand and offer?

A.   So for our agriculture department, we were able to use some of the community schools funding to secure a pack of classroom drones so that we could start introducing those interested in that agriculture to the new drone technology that's being used in farming today.

Q.   What about OSHA certifications, did you help any students obtain those?

A.   Yes.   In our industrial arts courses, and this was in direct response to some of the community partner input during our needs assessment, is our students who were leaving who weren't college bound going directly into the workforce in our area, many of those jobs required OSHA certifications.   So if there was something that the school could do to provide that training to the students ahead of time, we kind of gave them a leg up when they left us.

So our industrial arts teacher started using the OSHA certification course as part of his courses.

Q.   What about internships?   Were you able to help students get internships through the FSCS program?

A.   Yes.   In our -- our internship program started as a summer internship.   So in the summer of 2025, we were able to offer internships for the first time.

Our community schools coordinator was again the person contacting the businesses, finding out the careers that students were interested in, and then matching them for those approximately six-week internships in the summer.

Q.   And besides having a coordinator to arrange these internships, what else did the FSCS program do to help these kids participate in internships?

A.   So we also tried to use our funds to address barriers.   As I said, in our area, transportation is a large barrier.   So we were able to use community schools funding to provide

transportation to the internships for the students who needed it.

We also had one student in particular who he was assigned an internship with a local business that required professional dress, and he had none.  So we were able to use our community schools money to provide clothing so that he could participate fully in that internship.

Q.  What about the kids who are college bound?  What did you do through the FSCS program to support them?

A.  So we used it to support academic tutoring starting in grade 6 going all the way up through grade 12 for just general help for coursework.  But then we also offered our juniors an ACT prep course that they could participate in.

Q.  Who gets to participate in all these great programs you've been describing?

A.  Well, the ACT prep was limited to juniors, but other than that, we had no limitations.

Q.  Just to be totally clear, are there any limits on who can participate in the FSCS programs based on race or income or other factors like that?

A.  No.

Q.  Have you conducted any FSCS programs related to racial justice or racial equity?

A.  No.

Q.  Have you conducted any FSCS programs related to gender or

sexuality?

A.   No.

Q.   Have you done any FSCS programs that you would consider even remotely political?

A.   No.

Q.   How well did your FSCS programs work through the end of 2025?

A.   So we were really starting to experience success.  With our internship program, the first year, we had approximately 9 students.  We're up to at least 12.  This coming summer, that was growing.

Our ACT prep program, the juniors who went through it the first year were able to, on average, raise their ACT scores by two points, from fall to spring.  And we just -- it's all -- the CT offerings have been very popular with the students as well.

Q.   Is there a particular student who stands out to you as really having benefited from the FSCS programs?

A.   Yes.

Q.   Without saying his name, who is it and what happened?

A.   So he is a recent graduate.  He graduated this year.  He began participating in activities his junior year.  He was one of the students who chose to participate in the ACT prep, and he had an amazing 5-point increase in his ACT score from fall to spring, which is almost unheard of.

He then also went on to participate in the internship program his junior year, between his junior and senior year. And that was for him, in his exit interview he even said it was so eye opening to see what was available in his community, and that it really built his confidence in what he felt like he was able to do.

Q.   Did that student bond with the FSCS coordinator in the school?

A.   Definitely.  After his internship and coming into his senior year, again, that confidence, he built confidence in himself, he found a research internship on his own with one of the Big 10 universities in the Midwest.

So he went to the community schools coordinator and asked her could she please help him with his application for this program.  So she did support that, and he was accepted and able to participate.

Q.   I understand that student graduated earlier this spring; is that right?

A.   Yes.

Q.   And what's he doing next fall?

A.   He will be enrolled at the University of Illinois.

Q.   And when you first met this student, would you have thought that was possible?

A.   No.  His home life was what we would say is rough, low income for sure, single mother.  He was pretty well helping

raise his younger sibling, and we would have been super excited for him, after hearing his conversations, that if we could have gotten into a junior college, we would have felt successful. But his potential when he participated, he just took it and ran.

Q.   I understand you got some bad news about your FSCS programs in December of 2025; is that right?

A.   Yes.

Q.   What happened?

A.   We found out just a few days before we left for Christmas break that as of December 31st, we would no longer receive funding.

Q.   How did you react to that?

A.   That was very upsetting obviously.  It was immediate panic, chaos, how do we continue to offer and provide our students with these fabulous programs if we had no funding.

Q.   What have you done?

A.   Well, school district budgets run a little different than other budgets.  We are a July 1 to June 30th.  So we had hired people on -- with the community schools funds that they were under contract until June 30th.

     So then the district had to figure out we're still obligated to employ these people under contract.  How do we then find other funding, and what do we trade off in order for that to happen.

Q.   Right.

Have you, in fact, received some FSCS funding this year?

A.   Yes.

Q.   Has it been consistent or in bits and pieces?

A.   It's definitely been in bits and pieces.  Initially, a few days at a time, then a week at a time, until March when it was through the end of June.

Q.   How does inconsistent funding affect a program like yours?

A.   It makes it very difficult to offer programming or to make any plans because we don't know when our funding was going to run out or even what level we were going to be funded.

Q.   I understand you've had to cut back some of the programming you offered due to the funding uncertainty; is that right?

A.   Yes.  The afterschool or -- yes, the afterschool tutoring for our junior high and high school, we stopped immediately in January when we came back.  We were able to reinstate it in March when we felt like our funding was a little more stable.  So we lost out on several months of afterschool tutoring.

We've had, you know, to start preparing to let staff go and other things like that.  We had community events that didn't happen because we didn't have funding.

Q.   I understand you were working on a CNA training program with a local hospital before the funding got disrupted; is that right?

A.   Yes.

Q.   Tell the Court what you had in mind.

A.   So the CNA, Certified Nursing Assistant, program was going to be in partnership with the hospital who provides the on-site mobile clinic four days a week, and the relationship was going to be they were going to hire the certified nursing instructor.

That instructor was going to work in the clinic for them in the mornings and then come in and teach the CNA courses to our students in the afternoon, and then we were going to have a cost share for that program.

Q.   What's been the impact of the funding disruption on that planned program?

A.   The partnership fell apart when -- the uncertainty of the funding, it was not something that the hospital could move forward with.

Q.   What about the food pantry, has that been impacted by the funding disruption?

A.   Yes.   The initial thought was to try to get the food pantry up and running shortly after the beginning of the year, and with the uncertainty with the funding, it was actually June 2nd before we were able to open our food pantry.

Q.   How have all these programming disruptions impacted the students you serve?

A.   Well, obviously they're lacking all of those potential experiences, exposure to college and careers, academic support

and tutoring.

Q. What about the relationships between your schools and the people who participate in the FSCS programs, for example, local businesses, other community partners?

A. It definitely takes a big hit to trust in that relationship and just moving forward how reliable is that relationship. I mean, places in the community want to support the schools, but the level of support that we were getting from the community had exponentially grown under the community schools model.

Q. What's going to happen to Trico's FSCS programming if the funding is completely cut off on June 30th?

A. It will stop.

Q. What if the funding is hypothetically restored a year from now and you get to have it back again in July of 2027. Could you rebuild these programs?

A. Possibly.

Q. What challenges would you face in doing that?

A. Well, we've lost -- we would have lost a lot of the relationships, and with that trust with those partners. Many of them may have moved on to other partnerships and may no longer be available to us.

We will have lost our community schools coordinators who were with us from the beginning, so we will have to start from scratch in building those positions.

Q. What about the kids you serve? If they have to go a year

without all these programs, could you fix the damage from that?

A.   No.

Q.   Why not?

A.   Well, for our high school students especially, they will have graduated.  We will have lost them.  They are no longer with us.  They will lose out on those opportunities.

     And for the others, as I said earlier, you don't -- you don't know what you don't see.  We will have fallen down in exposing them again to all of those eye-opening paths that we were able to open up through the community schools.

     MR. SOLOTOROVSKY:  Thank you, Ms. Vogue.  Nothing further.

     MR. CULL:  We have no questions for the witness, Your Honor.

     THE COURT:  Okay, thank you.  You may be excused.

     MR. SOLOTOROVSKY:  Shall we call the next witness?

     THE COURT:  Yes, please.

     MR. SOLOTOROVSKY:  Thank you, Your Honor.

     Plaintiffs call Rebecca Kinsey.

   (Witness sworn.)

     REBECCA KINSEY, PLAINTIFFS' WITNESS, SWORN,

                    DIRECT EXAMINATION

BY MR. SOLOTOROVSKY:

Q.   Good morning, Ms. Kinsey.  Please introduce yourself to the Court.

A.    Good morning.  I'm Rebecca Kinsey, and I'm the community school supervisor at The Baby Fold.

Q.    What is the Baby Fold?

A.    The Baby Fold is a non-profit child and family serving agency in the Bloomington-Normal area.

Q.    How long has The Baby Fold been helping people in the Bloomington-Normal area?

A.    Since 1902.

Q.    Does The Baby Fold have any religious affiliation?

A.    Yes.  We are accredited through the Eagle Commission, which is affiliated with the Methodist Church.

Q.    What do you do as the community school supervisor at The Baby Fold?

A.    I provide the day-to-day on-site direct supervision of our community school team and oversee the implementation of the FSCS framework.

Q.    How long have you lived in the area where you work?

A.    I moved to Bloomington when I was in fourth grade, so nine, I think.  Moved away; decided there was no better place to be and came back in 2010, I believe.

Q.    Where is Bloomington?

A.    Depending on the day, it is two-and-a-half, sometimes four-and-a-half hours south of Chicago straight on 55.

Q.    How many students do you serve?

A.    In our FSCS programs or the district as a whole?

Q.  Well, let's start with the district.

A.  The district as a whole has around 13,000 students.

Q.  And how many schools participate in the FSCS program?

A.  We are in two elementary schools.

Q.  And how many students are in those schools?

A.  Approximately 800.

Q.  Tell us a bit about the racial demographics of those schools.

A.  Between the two schools, we are about 60 percent white, 40 percent non-white.

Q.  And what percentage of your students are low income?

A.  About 60 percent.

Q.  When did those two elementary schools start participating in the FSCS program with ACT Now?

A.  2024.

Q.  And what are those two schools called?

A.  Fairview Elementary and Cedar Ridge Elementary.

Q.  What was the first thing you did to implement those programs after you were chosen to participate?

A.  We looked at existing data, and then we hired staff to begin the assets and needs assessment.

Q.  Who were the staff you hired?

A.  We hired two full-time enrichment coordinators, one for each building, a community school coordinator for Cedar Ridge, and then my position moved into a supervisory role.

Q.   Tell the Court about the needs assessment you conducted at the beginning of the program.

A.   It was very comprehensive.  We -- we talked with anybody that might interface with our school in different surveys.  We did focus groups, one-on-one assessor -- one-on-one interviews with caregivers, extended family members because often it's the grandmas or aunts or uncles that are involved with our students, so we talked to them as well.

Q.   What needs did you identify?

A.   The needs that came out were -- were pretty clear.  We also saw some consistent messaging that came from our families, that they are proud Fairview and Cedar Ridge families.  They love being a part of our schools.  They loved being part of our assets and needs assessment, that they were asked what they wanted for their students' schools, and that we were coming up with a plan to meet those needs.

     The needs that came out from our staff initially were more support to manage challenging behaviors, some specialized professional development.

     From our families, they wanted more family engagement, more ways to engage with school and administrators and teachers.  They wanted more opportunities for their students in afterschool and to get out of the building on field trips.

     Or students loud and clear above and be-all wanted more clubs and afterschool programming and field trips.

Q.   Let's talk about the programs you built to meet those needs.

First, I want to talk about where the afterschool programming happens.  Did you build any physical spaces in your schools to do the FSCS programs?

A.   We did.  Not through construction.  We repurposed existing spaces within the schools.

At Fairview, we are the proud Fairview Falcons, so we developed the Nest at Fairview, which is our community school space.  And Cedar Ridge is the rocket, so we have the Launch Pad is our space at Cedar Ridge.

Q.   Let's talk about what happens at the Nest and the Launch Pad.  Describe the afterschool tutoring programs that you built using the FSCS funding.

A.   Yeah, we went beyond afterschool tutoring because some of our students wanted tutoring, some of them wanted more enrichment.  They're meeting or exceeding grade level, and so they wanted to push themselves even farther.

So not only do we have -- we call it brain boosters, which is reading and math assistance, but we have reading clubs that were more like book clubs for accelerated reading.  We have STEM clubs.  We have soccer and basketball and gardening and art clubs.

We met with our students again after they said they wanted all these clubs and then what clubs do you want, so

really listening to our students, and those are the ones they wanted.

Q.   Did the students like the clubs?

A.   Yes.  Every day was "Mrs. Kinsey, it's STEM club day. That's why I came to school today."

Q.   What about family engagement.  What did you do to increase family engagement?

A.   We hosted monthly whole school events, reading nights, game nights, movie nights, those types of things.  Smaller events, grade-level kindergarten pop-ups for families to really engage with each other.

At Fairview specifically something that came through was caregivers wanting more access to administration and being able to be proactive in those conversations, so we started something called What's Up Wednesday, and it's just a time for families to come meet with our principals on Wednesdays and have coffee and donuts and connect.

Q.   How do family engagement programs like that help a student do better in school?

A.   When families, when caregivers know their teachers, when they have -- when it's not an intimidating place to be when you walk through the halls and staff know your name, you're more involved in your child's education.

Q.   What about basic needs.  Did you do anything to help meet students' basic needs as part of the FSCS program?

A.   Yes.   That came out as a part of our needs assessment as well, that families were having a hard time meeting basic needs.

At Fairview we started in partnership with one of our Methodist partners a food pantry we called the Falcon Market. It's also located in the Nest, and it is stocked by our Methodist partner, but it is overseen and operated by our community school coordinator.

Q.   What about laundry?

A.   We -- again, in addition to our needs assessment, we are embedded in the fabric of the school, so we're walking the hallways, we hear the conversations.

When students aren't coming to school, it's my team making those attendance calls to find out why students aren't at school.

And something we kept hearing over and over was, well, my son didn't have clean clothes.   The apartment complex laundry went down, so we couldn't wash clothes.   The jeans were all dry because the dryer broke.

Time and time again, that was a reason of absence.   Or students were coming to the Nest to change clothes because their clothes were not clean, and they were having social issues.

So that became a need, and so our community school coordinator went to work to fill that need and met with a local

business owner of the laundromat that's down the street from our school, and we host monthly laundry events where we provide the supplies and financial support for families to do laundry and come in once a month.

Q.   Do you do anything other than laundry at those gatherings at the laundromat?

A.   We do.  It's been a great place to connect.  We're all kind of there for several hours together, so it's a good time to talk about other issues or concerns that might be happening in families' lives.

The manager has been very accommodating and pleased with his increase in business, so he provides pizza for our families now.  He looks forward to those monthly events that we have with him.

Q.   Who gets to participate in all these programs?

A.   Anybody that signs up.

Q.   Are there any limits based on race or income or other demographic factors?

A.   No.

Q.   Have you ever done any FSCS programming related to racial justice or racial equity?

A.   No.

Q.   Have you ever done any FSCS programs related to gender and sexuality?

A.   No.

Q.   Have you ever done any FSCS programmings that you would consider even remotely political?

A.   No.

Q.   How have these FSCS programs affected your students and their families?

A.   The impact we've seen in such a short amount of time has been incredible.

Q.   Do you track any data on particular metrics of concern at the two schools?

A.   We do.

Q.   What are those data?

A.   At both schools, we track what we call school connectedness.  So we do surveys after events, where we just ask families did this help you be more connected to your school community.  A hundred percent of those have come back yes.

     At Fairview, we were also looking at discipline data was an area of need, and at Cedar Ridge we were looking at chronic absenteeism.

Q.   So what did the data show about the disciplinary cases at Fairview?

A.   Fairview this year had a 68 percent decrease in major behavior referrals.

Q.   And what about attendance at Cedar Ridge?

A.   We had an improvement of 10 percent in chronic absenteeism.

Q.   Are there any particular students who stand out to you as

really having benefited from the FSCS program?

A.   I can talk about several, but I'll focus on one for you.

Q.   Let's pick one, and let's give him a made-up name to protect his privacy.

Who's the student you're thinking of?

A.   Mark.

Q.   What challenges was Mark facing in school?

A.   Mark was having difficulty staying focused in class.  He was often disruptive, disrupting others so that they were not learning, ended up in the office quite a bit with several behavior referrals.

Q.   How old is Mark or how old was he when this started?

A.   He's in first grade.

Q.   Okay.  What was holding Mark back?

A.   My office happens to be in the front office, so oftentimes when Mark would come visit the office, he would spend time with me and, once we spent some time together, realized that Mark really couldn't see very well and was having a hard time.  He also had attendance struggles, so when he was coming to school, he couldn't see the material.

Q.   So what did you do to fix the vision problem?

A.   I met with his mom, and we talked about it, and we were able to get him to a local eye doctor.

Q.   Did you get him some glasses?

A.   We did.  Our assumption was correct, that Mark needed

glasses.

Q.   And were you able to pay for those using FSCS funds?

A.   Yes.   We ended up getting him a couple pairs so he can leave one at home because kids lose glasses.   It was easier to get two the first time.

Q.   How much did it cost?

A.   $200.

Q.   What was the second major problem Mark was facing that was affecting his performance in school?

A.   We realized that his attendance struggles were due to housing insecurity.   The family was at the time sleeping in their car and so oftentimes couldn't make it to school.

Q.   Were you able to help them with that through the FSCS program?

A.   Yes.   Our community school coordinator was able to meet with mom in the short term, because it was wintertime, get them into a hotel so that they were no longer in their car and provide bussing to school.   And then in the more longer term were able to connect her to community agencies to help navigate some housing challenges, and then through FSCS, we were able to help with security deposit and first month's rent.

Q.   How much did that cost the FSCS program?

A.   Around $2,000.

Q.   It sounds like about 2,000 for the housing problem and a couple hundred for the vision problem?

A.   Correct.

Q.   So how's Mark doing now?

A.   Mark's great.  Mark is one of the happiest first graders. You'll see him bounding into school every day with high fives ready to learn.

Q.   Did he have a New Year's resolution last year?

A.   He did.  Our first grade class had New Year's resolutions that they put on the wall, and his was to participate more in class.  So he drew himself raising his hand, and he has been able to live up to that New Year's resolution.

Q.   I understand you got some bad news around New Year's related to the FSCS program; is that right?

A.   Yes.

Q.   What happened?

A.   On December I believe it was 14th, we received word from ACT Now that the FSCS grants were being discontinued.

Q.   How did you react?

A.   It was devastating.  I cried; initially thought about our kids and this momentum that we've been making; secondarily, to my staff that I was then going to have to notify.

Q.   So what did you do in response to that information that you weren't going to have funding as of New Year's?

A.   Again, I cried, and then we had to have staff layoff meetings.  We were getting ready to go on winter break.  We had a couple days before we went on break, and then when were

coming back, there was going to be no funding.

Q. Did you, in fact, get some FSCS funding this year?

A. Yes.

Q. How has that happened?

A. Initially, a couple days at a time, and then a week at a time we were able to access I believe it was our carryover unspent money, and then sometime I believe in March we got the June 30th extension.

Q. How does uncertainty of funding impact an organization like yours?

A. It's very difficult. The Baby Fold is a non-profit. We don't have money laying around to make up this shortfall. It is hard to maintain partnerships when you have to take back -- we had programs planned that we had to then rescind at the impacted local partners of ours that might not want to partner with us again.

Q. What programming cutbacks have you made this year in response to the funding disruption?

A. We had to significantly reduce afterschool programming, so all the fun clubs that the students were excited about. We eliminated transportation to all of our clubs. We were able to maintain a couple.

Previously, FSCS funds was providing bus transportation for students because that's a barrier. We had to eliminate all transportation assistance.

Q. And real quick in a district like yours, if have you to eliminate transportation, how does it affect the program the kids are being transported to?

A. Our students can't come. That's not a walkable area.

Q. What other cutbacks have you made?

A. We've had to reduce staff and future programming for next school year.

Q. What staff reductions have you made?

A. Our two enrichment coordinators, those positions will be eliminated as of June 30th. One, her last day was this past Friday, so that position is eliminated as of now. And then we will lose half of a community school coordinator at Cedar Ridge.

Q. And maybe this is obvious, but how does losing those staff impact the programs you're able to offer, even assuming you didn't have any problem with having money?

A. Sure. They have the institutional knowledge. They have been building this program with us. They have been developing the partners. The students are used to seeing them in the Nest, in the Launch Pad every day as they start their day or end their day. They are in the fabric of our schools, so when you pull the strand out of the fabric, there are holes.

Q. Yeah. What's going to happen to your FSCS programs if the funding is completely cut off as of June 30th?

A. They will end.

Q. How is that going to impact the students in your district?

A. It will have a tremendous negative impact. We become another adult that our students can't trust or rely on.

Q. What if the funding is restored a year from now, say mid-2027; could you rebuild those programs at that point?

A. I don't know, but I would certainly try.

Q. What challenges would you be facing at that point?

A. As we mentioned, the loss of institutional knowledge, the break in partnership. We would have a break in data collection that we've been sustaining to see what's working and what's not.

You also have a year of unmet needs that we've been addressing, so not only are you trying to rebuild a framework and an infrastructure, you're trying to meet unmet needs of students and families that have now compounded for a year.

Q. Yeah, I mean, let's focus on the damage to the students' education and their development over that hypothetical year of no money. If you got the money back in a year, could you fix that damage?

A. No.

Q. Why not?

A. Because you can't get time back. You can't get a year of reading assistance, of afterschool programming back. That's just not how time works.

MR. SOLOTOROVSKY: Thank you, Ms. Kinsey. Nothing

further.

MR. CULL:  No questions, Your Honor.

THE COURT:  Okay.  Thank you very much.

THE WITNESS:  Thank you.

THE COURT:  You may call your next witness.

MR. SOLOTOROVSKY:  Thank you, Your Honor.

Plaintiffs call Kimberly David.

(Witness sworn.)

KIMBERLY DAVID, PLAINTIFFS' WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. SOLOTOROVSKY:

Q.  Good morning, Ms. David.  Please introduce yourself to the Court.

A.  My name is Kimberly David, and I'm the CEO of Project Success of Vermilion County.

Q.  What is Project Success for Vermilion County?

A.  So we are an organization that provides afterschool programs, family supports.  We do some violence prevention programming and parent mentor program, and then, of course, the FSCS program with Georgetown-Ridge Farm School District.

Q.  Where is Georgetown-Ridge Farm School District?

A.  So it's located in East Central Illinois.  We're about two-and-a-half hours south of Chicago.

Q.  How long have you lived and worked in that area?

A.  Most of my life.

Q.   What sort of area is your district in?  Describe it for the Court.

A.   So Georgetown-Ridge Farm is a very large geographical area, very rural.  We have a lot of -- the poverty rate is 13 percent, and our students are facing a lot of challenges.

Q.   How many students are in your district?

A.   846.

Q.   What are the racial demographics of the district?

A.   So 86 percent white and then 14 percent other races.

Q.   And what percentage are low income?

A.   73 percent.

Q.   When did you start participating in the ACT Now FSCS program?

A.   In the fall of 2024.

Q.   How did that happen?

A.   So we've had a longstanding partnership with ACT Now.  They provide a lot of training to our afterschool staff, and then we also had a very good relationship with the Georgetown-Ridge Farm School District.  So it made sense to apply for the funding.

Q.   What did you do to implement the program after your school was chosen to participate?

A.   Sure.

     So we had a lot of meetings with administration and talked about some of the needs of our community, and then we

prepared to implement the needs assessment.  We brought community school coordinators on and began the process of looking at staff and how we were going to structure the program.

Q.  Describe the needs assessment for us.

A.  So we made sure we got input from our whole community, from our students, our parents, from community members, and also from our senior citizens.

Q.  Tell us about the senior citizens.  Why did you reach out to them?

A.  Because we know they have a lot of knowledge of the community.  It's a very small community, so we wanted to make sure we got input from them.  And also a lot of grandparents are raising their grandchildren, so we knew that was a very important part of the population to get input from.

Q.  What insights did you get from the senior citizens?

A.  So they talked a lot about how the district used to be and how close knit the community was, and they were really wanting to see that again, more community supporting the district.

Q.  What were the major needs that you identified through the needs assessment?

A.  So we identified mental health supports and basic needs, again, afterschool programs, summer programs, more educational opportunities for our students, truancy and chronic absenteeism, and, yeah, those were the three major ones we

identified.

Q.  Let's talk about the programs you built to address those needs.

First, what did you do with regard to basic needs, things like food and health?

A.  Sure.

So we helped develop the food pantry.  It was already at the high school.  It wasn't very well developed.  We realized that a lot of families were not accessing it either because they were embarrassed or they didn't have time to come shop.

So we worked with our high school students to start bagging the items that they wanted, where they could just come pick them up, and so we really just helped promote the food pantry throughout the district.

Q.  What about healthcare?

A.  So we partnered with a local hospital to bring the mobile health clinic to our students for immunizations, basic physical things like that; and along with that when they came, they brought their mobile market so our families could get fresh produce as well.

Q.  Were you able to offer any housing assistance to families that needed it?

A.  Yes.  We also developed the family hardship assistance fund with the funds, and we set up a process, of course, for that to

help meet families' basic needs, such as food, clothing, if students need glasses, things like that.

Q.   Have you done anything with regard to behavioral and mental health?

A.   Yes.  We did hire two SEL counselors that were in our school buildings every day, as well as a substance abuse counselor.

Q.   What is an SEL counselor?

A.   Social-emotional learning.

Q.   And what do those people do to help the students?

A.   So they would come in and work in small groups with our students or individually when they were struggling with behaviors or mental health issues.

Q.   Let's talk about the afterschool programming that you implemented.  What kinds of programs did you do?

A.   So with our students, we did cooking clubs, our students really love, of course, eating, and then we're teaching them healthy options, things they can help cook for their own families after school because a lot of our parents are working two or three jobs.  A lot of STEM programming, art programming and also we just try to expand the opportunities for our students, taking them on field trips, places they would normally not ever get to visit.  A lot of our kids haven't been out of Vermilion County.

Q.   Did you offer transportation to those programs through the

FSCS programs?

A.   Yes.  We are able to offer bussing so our students could get home after school.  Without that, it's such a big district. A lot of parents don't have cars and especially don't have money for gas, so we are able to serve the students that wouldn't be able to be served without bussing.

Q.   Who gets to participate in all these great programs?

A.   Anyone that signs up.

Q.   Are there any restrictions based on what color you are or how much money you have?

A.   No.

Q.   Have you conducted any FSCS programming related to racial justice or racial equity?

A.   No.

Q.   Have you done any FSCS programming related to gender or sexuality?

A.   No.

Q.   Have you done any FSCS programming that you would consider even remotely political?

A.   No.

Q.   How have these FSCS programs been working through the first two years of the grant?

A.   We've been very successful, able to bring in a lot of resources.  Again, because Georgetown-Ridge Farm is so rural, we are able to bring in community partners and just make those

things happen with the relationships with our staff and a lot of great student outcomes as well.

Q.   Do you track any data on student outcomes, how the programs are impacting their performance?

A.   We do.  We track grades, we track their attendance during the school day.  We have also -- we look at their behaviors during the school day, too, turning in their homework on time, and just their basic school day behaviors and seeing how have changed when they participate in our afterschool programs.

Q.   What do the data show?

A.   Improvements in everything, and one of the things I think is they're working with school day teachers after school and our school day staff with extra support, so they know what they need and they know how to help them improve in school.

Q.   Can you think of a particular kid that you were particularly happy to be able to help through the FSCS program?

A.   Yes.  Through our family hardship assistance, we had a mom and her son who were in a trailer with very unstable wiring, so it was unsafe.  They were -- they have two lawn chairs as furniture, and then they also were sleeping on the floor sharing a couple of blankets.

So our community school coordinator met with the mom, worked with her.  She had a little bit of money she'd been saving up because she knew she needed to get into a safer environment.  And so then we were able to help her with the

deposit and first month's rent to get her into a safer apartment, and then our community school coordinator also worked with the community to bring in donations of furniture and food and clothing and things.

Q. How much did that cost the FSCS program?

A. So we paid $1,000 to help her.

Q. How did that affect the student's performance in school afterward?

A. He had just a better connection and concentration during the school day. His mother -- him and his mother had a better relationship, and he also got out of an environment where he was getting into some trouble with the law. So that also helped that just by moving.

Q. Yeah.

I understand that your funding was disrupted around December of 2025; is that right?

A. Yes.

Q. Tell the Court what happened.

A. So we were notified I believe around December 14th that the funding was going to end the end of December, which, of course, is not much time to plan and figure out what you're going to do to keep -- keep things going for the community.

Q. How did you react?

A. I was just shocked and also very scared just for our students not having the supports that they had been getting and

our parents as well and then again for our staff who we'd built.

Q.  So what cutbacks have you had to make in response to the funding disruption?

A.  So we've had to lay off two full-time afterschool coordinators, as well as a part-time family liaison who was focusing on chronic truant -- chronic absenteeism and truancy.

Q.  How does that impact the programs?

A.  Definitely less supports for our students, less supports for our families.  There were events that we had planned we were not able to have, and no bussing, which was huge for us.

Q.  I understand that you have received some FSCS funding, but it's come in bits and pieces, say a week at a time or a couple of months at a time; is that right?

A.  Yes.

Q.  How does that impact your ability to plan and make commitments and hire staff?

A.  It's very, very hard to plan.  You know, we had a lot of families calling us just nervous that they're not going to have the program for their kids.  And, again, it really affects just the trust with community partners and our families.

Q.  What's going to happen to your FSCS programs if the funding is completely cut as of June 30th?

A.  So we will lose everything.  We'll be able to have a very, very small afterschool program for only one of the schools with

only about 30 to 40 students, and we'd only be able to sustain that through December.

Q.   And just to be clear, how would you fund that very, very small afterschool program if you lost the FSCS money?

A.   It's through a very small grant that the district has received for afterschool.

Q.   How would it impact the students in your district to lose all these good programs that you've built?

A.   So the students wouldn't have the supports for homework, tutoring, all the enrichment opportunities, all of the things that we take our students to see, such as on field trips, or bringing in community partners, such as the fire department to teach families about safety.  So we would lose all of those supports for our students.

Q.   Let's say hypothetically you lost the money on June 30th but then in a year or so it was restored.  Could you rebuild your FSCS programs at that point?

A.   It would be very, very difficult.

Q.   Why?

A.   Because we would have lost our staff with the institutional knowledge and our staff that have built these programs, that have formed these relationships with families.  It's hard sometimes with some of the families we serve to really form those strong relationships.  So we would lose all of that. Community partner relationships as well who have probably at

that point moved on to do other projects with other agencies.

Q. What about the harm that the students suffer in that year of no programming? Could you fix that if you got the money back later?

A. No.

Q. Why not?

A. Just a year without homework help and supports and trusted adults in their lives, we know our students need that so much, and it would definitely affect them.

MR. SOLOTOROVSKY: Thank you, Ms. David. Nothing further.

THE WITNESS: Thank you.

MR. CULL: Nothing from the Department, Your Honor.

THE COURT: Okay. Thank you.

THE WITNESS: Thank you.

THE COURT: You may call your next witness.

MR. SOLOTOROVSKY: Thank you, Your Honor. Plaintiff calls Sidney Stigge-Kaufman.

(Witness sworn.)

SIDNEY STIGGE-KAUFMAN, PLAINTIFFS' WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. SOLOTOROVSKY:

Q. Good morning, Ms. Kaufman. Please introduce yourself to the Court.

A. Good morning. My name is Sidney Stigge-Kaufman, and I

serve as the Executive Director of Communications and Strategic Partnerships for the East St. Louis School District in East St. Louis, Illinois.

THE COURT REPORTER:  Could you spell your last name, please.

THE WITNESS:  S-T-I-G-G-E-K-A-U-F-M-A-N.

BY MR. SOLOTOROVSKY:

Q.   What do you do as the Executive Director of Communications and Strategic Partnerships for the East St. Louis School District?

A.   I'm the lead grant writer for our school district, and I also support some grant management, which includes the ACT Now community schools grants.

Q.   Where is East St. Louis?

A.   East St. Louis is located in the southern region of the State of Illinois, close to the Mississippi River by St. Louis, and we have -- we have about 3,700 students that we serve in the East St. Louis School District.

Q.   How long have you been working in the district?

A.   I've been there for nearly 14 years.

Q.   How did you come to be in that role?

A.   So years ago, about 14 years ago, I applied for a grant writing position that was opened at that time, and it turned out to be the right, the perfect fit for me.

And since that time, my role has expanded and grown,

and my love for the East St. Louis community and students has grown even deeper.

Q. Tell us a bit about the district. How many students do you serve?

A. About 3,700 students, and that started at age 3 all the way up through 12th grade. So we're preschool through grade 12 school district.

Q. Tell us about the racial demographics of the district?

A. It's about 99 percent black, and we have a small portion of our students that are Hispanic and some that are even English language learners.

Q. What about economically, how many of your students are low income?

A. 99 percent qualify as low income. 100 percent of our students receive free breakfast and free lunch, which is often an indicator for low-income status, and we -- across the community, over -- or approximately 54 percent live below the poverty line, which means a deep level of poverty in the community.

Q. I understand that two of your elementary schools participate in the FSCS program; is that right?

A. Absolutely. Avant Elementary, which is a K through grade 5 campus, and Officer Elementary, which is a kindergarten through grade 4 campus.

Q. When did they start participating in the FSCS program?

A.   Fall of 2024.

Q.   And how did that come about?

A.   So for us, it's actually been a long journey.  Our school district first started learning about community schools in 2019, and so we had actually applied for a Federal Community Schools grant but were not funded.  So we've known about ACT Now for years and have done some professional development over time with them.

So when the opportunity presented itself and we knew that they were one of the awardees, we reached out to them first to see if we could jump in.

Q.   So what did you do after you were chosen to participate?

A.   Yeah, so like many of the other communities, we were highly engaged in an asset and needs mapping process, where we're bringing in diverse stakeholders to really get their feedback, as well as looking at existing data points within our community.

Q.   What stakeholders did you talk to in the needs assessment?

A.   Students, parents, and caregivers, also our school staff and community partners.  We really wanted to make sure we were assessing current needs, not something that was lagging data.

Q.   What were the biggest needs that you identified?

A.   I would highlight three as very interconnected and complex.  One is around student attendance.  A second one is around student achievement and academic outcomes, so really around

79

reading and math. And then third, making sure that we are providing safe and secure environments that are also welcoming learning environments.

Q. Let's talk about the programs you implemented to meet those needs.

First, let's talk about afterschool programming.

A. Yes.

Q. What did you do?

A. So high-quality afterschool programming, as well as before-school programming. So four days a week for before care and multiple days a week for afterschool programming for two hours after school in those days, and this becomes critical for working families, single parents, grandparents who are guardians to really meet those needs of the families.

And it also included a lot of fun activities, enrichment as well as tutoring supports.

Q. Who runs the afterschool programs, interacting with the students in the classrooms?

A. Sure.

At the classroom level, we engage our teachers. So these are school staff that already know and have relationships with our students, and they are the ones leading these activities. A lot of hands-on projects that really engages the students.

Q. And who organizes the programs?

A.   We have community school specialists is what we call them. So we have one per school campus that their full-time role is to be that facilitator that can help with all of the programming initiatives.

Q.   How did the before and afterschool programs help you meet the need for more safety in your district?

A.   I will use the example of Officer Elementary in particular. There's a homeless shelter just very close.  There's a lot of transients in the neighborhood.  Actually that campus multiple times this winter had break-ins, where equipment and resources were stolen from the school campus.  So safety and security becomes a real challenge for our students.

One of the other unique things about our school district is we actually offer free bussing across the school district, and the reason for that is because there are so many challenges, physical challenges, within the community that to ensure the safety of students, we need to have transportation. And so bussing is included for our students after school as they get home safely.

Q.   Let's talk about the parent volunteer program.  Describe that for the Court.

A.   Yes.  We have a wonderful partnership with Community Development Sustainable Solutions, which actually on a side note, we were very thrilled that they won -- got second place, excuse me, last year with the Governor's Hometown Award for

service recognition.

But our -- that organization supports our parents with mentoring initiatives, and so we've got about 26 parent volunteers that serve in our schools on a daily basis, performing at least 10 hours of volunteer service per week, and it's been a transformational opportunity for them.

Q.   What sorts of things do the volunteers do?

A.   They're engaged in the classrooms.  They help with small groups, with students.  They help lead PTO and PTA activities that are occurring within the schools, and they are often the bridge to help bring in other parents to get really engaged in school.

Q.   Of those 26, do any stand out as having been particularly successful volunteers?

A.   Yes.  So at Avant Elementary, we had one particular parent who had had a challenging relationship with the school system prior to her involvement with this parent mentoring project.

Q.   And what happened when she joined the parent mentoring project?

A.   I will just say that our principal had some strong concerns with bringing that into -- that program into the school and that particular parent, knowing that that parent was going to be involved with it.  But it was truly transformative, and now she has been one of the biggest advocates of bringing additional parents into that school community.  So it's been a

healed relationship because of it.

Q.   How do parent volunteers help the students engage and succeed with school?

A.   So a lot of reading supports, a lot of supports throughout the school building, just with transition times, behavioral challenges, things of that nature.

Q.   I understand that you created school-based food pantries through the FSCS program.

A.   Yes, we did.

Q.   Tell the Court about that.

A.   So both of our campuses, it started at Avant Elementary and so at least twice a month, families can receive additional food services directly through that program, and often these are identified by our teachers and other staff who become aware of some challenges happening with the families.

Q.   Did you do any programs for kindergarten readiness?

A.   We did last summer.  And so for kindergarten readiness, this is pivotal and important.  Oftentimes our children come to kindergarten for the first time without any prior experience leaving home or having an organized like preschool or day care even support.

So a kindergarten readiness camp involves the students for a few days coming to their actual school campus, and they learn some of the routines, just how to walk down the hallway, how to not be intimidated, how to go through the cafeteria

line, how to go to the bathrooms.  So it really helps them prepare for success on the first day of school.

Q.  How does kindergarten readiness even just for a few days impact kids' performance in kindergarten?

A.  It matters, and the research shows that's very much the case to really make sure that these students are starting on the right footing and that they're feeling confident and capable in a safe and nurturing environment at school.

Q.  What about behavioral health services.  Have you been able to provide that through the FSCS program?

A.  Yes.  So we've established a number of partnerships, comprehensive behavioral health, Hoyleton Youth & Family Services, bringing in supportive services that provide direct counseling to students at the school.

Additionally, we've even offered grief counseling supports that families can participate in as well.

Q.  And how do those programs help the kids succeed in school?

A.  It helps them be able to focus on feeling nurtured and to help with self-regulation, to help understand that they're not alone in some of the emotional traumas and challenges that they've been experiencing, and they feel supported so that they can then focus on school.

Q.  I understand your district faces a lot of challenges in terms of poverty and everything that goes with it.  Have you been able to do any fun stuff using the FSCS funds?

A.   Absolutely.  Field trips, which are really pivotal for our students.  We live -- from East St. Louis, you can see across the Mississippi River to the St. Louis Arch.  There's an unobstructed view.  It's one of the best views of the St. Louis Arch, but even though there's such close proximity, most of our students can never go into the arch or go to the museums around that location except through school.  Their families simply do not have the resources and the abilities to take them through that.

Q.   What about camp?  Have you sent any kids to camp using the FSCS program?

A.   In spring of 2025, we had a wonderful new experience that Officer Elementary provided students.  So third- and fourth-grade students who had attendance incentives as they participated with tutoring and supports in preparation for the Illinois state test, they had an opportunity to go to a sleep-away camp, and this was the first opportunity that these students have experienced that.

They got to ride horses.  They got to do rock climbing walls.  They got to do archery.  So it's a standard sleep-away camp that these students again had never experienced before, and the excitement that they brought back to campus was really invigorating because then they were telling their peers, like, oh, next year you can do this, too, if you really work hard and make sure you come to school.

Q.   Who gets to participate in all these programs?

A.   It's open to all students.

Q.   Have you ever conducted any FSCS programming related to racial justice or racial equity?

A.   No.

Q.   Have you ever conducted any FSCS programming related to gender and sexuality?

A.   No.

Q.   Have you ever conducted any FSCS programming that you would consider even remotely political?

A.   No.

Q.   What is the point of your FSCS programs?

A.   It's to serve every student and to help them achieve success for -- through academics and through their lives.

Q.   As far as you could tell, were the programs working through the end of last year?

A.   I'm very thrilled to share that chronic absenteeism has really decreased in both of those participating schools.

        So at Avant Elementary just in a one-year time frame, we had a 28 percent reduction in chronic absenteeism, and at Officer Elementary, it's 33 percent reduction in chronic absenteeism.

Q.   And, again, this may be obvious, but how does coming to school help kids succeed in school?

A.   Yes.  We can't -- we can't do our job as educators, we

can't teach our students when they are not physically present, and that means being in school all day every day.

Q. I understand that your FSCS funding was disrupted around the end of 2025; is that right?

A. Correct.

Q. What happened?

A. We received the notice just a few days before the end of the semester before winter break that the programs would be ending December 31st.

Q. How did you react?

A. It was devastating. There were a lot of -- a lot of tears from staff members, a lot of just apprehension on how we move forward.

Q. How did you move forward?

A. One of our Full-Service Community School specialists, she -- she quit. So she voluntarily ended her position in early January because of the instability of the grant funding, and she actually ended up moving out of the State of Illinois completely. She moved to Texas to seek stable job security.

Q. Have you had to make any cutbacks in programming?

A. Yes. So both of the camps that I referred to earlier, the sleep-away camp that was going to happen in the spring of this year did not occur because we didn't have time to know and plan accordingly.

Additionally, we have not been able to do the

kindergarten readiness camp, which had been planned for this summer.

Q.   I understand you've been receiving some money this year, but it's come in bits and pieces, like a week at a time or a few days at a time; is that right?

A.   That's correct.

Q.   How does that impact your programs?

A.   It's been very challenging.  I feel like our school district has done a really great job to mitigate the impact directly on our families and our students.  But the pressures that the staff, the school staff, have been feeling through that has been very overwhelming.

I'll just give a quick example.  Officer Elementary had an influx of 65 new students since the month of October. Many of those students had never been in school before, so you're suddenly getting this big burst of new students that have no formal -- never been in a formal education setting.

They were behind their peers in reading and in math, and so now the pressure is on all the teachers, like, how do we scaffold these students up while still meeting the needs of our existing students.

Q.   Is it sustainable to have the regular school staff, say, the principal or the teachers, try to run support programs long term if you lose the coordinators that you hired --

A.   Absolutely not.

Q.   -- through the FSCS program?

A.   No.  Our principal's responsibility should be as the educational leader of that school campus, the instructional leader, and that's their primary focus.  It takes a lot of coordination efforts to operate the food pantry and many of these other outside providers that are coming in.

And one of the benefits of community schools is really how much those external partnerships and resources are coming into the schools.  That all gets leveraged because of that community school's position.  Without it, those resources don't come into our campuses.

Q.   What's going to happen to your FSCS programs if the funding is completely cut off as of June 30th?

A.   The programming I've described will end.

Q.   How is that going to impact your students and families?

A.   It will have a devastating impact.  We have worked very hard to close the educational gaps in East St. Louis, and without additional staffing after school to support academic supports for students, as well as integrated in-school supports that we were able to provide through the community schools grants, those resources will dry up.  They'll go away, and our academic scores will probably drop again.  Our student attendance will drop again.

Q.   What if the funding is restored, say, a year from now, sometime in mid-2027.  Could you rebuild your programs at that

point?

A.   That would be an extremely tall order.  There are just too many challenges.  As reflected earlier, they would be ringing true for us as well, that our community school specialists, we've already lost one.  Our other one would have to leave.  We would not be able to sustain them within the school district's budget.

      And so that institutional knowledge, those relationships that had been built that were so core with community partners, as well as with our parents and our students, all of that would go away.

Q.   Tell us about the loss of trust you're worried about, for example, with the parents or the other community partners who have been participating.  How would a year with no programming affect the trust they've put in you?

A.   If we said that we would now have an afterschool program, I don't know how many families would choose to participate because they would feel like it might go away the following month or the following year.

      So the trust is really critical when you're talking about families who are just trying to meet their basic needs every single day or week, and it's been something hard that we've been trying to build within our school district through these programs, and so it would just be a devastating effect without it.

Q.   Let's focus on the kids.  If they had to go a year without all these programs, could you fix that damage if you got the money back in a year?

A.   No.

Q.   Why not?

A.   I'll use the example of these 65 students that just came in to Officer Elementary a few months ago.  They are going to need critical scaffolding help for their math and their reading levels.

Many of them were second and third graders, and research shows that if you are not reading at the third-grade level as you should be, then it's hard to ever catch up because there's so foundational for those skills.  So this is really a pivotal time.

I don't want to be the one to have to tell those students or those families that, oh, we're not going to be able to support your tutoring needs this year.  Maybe next year we can do that.

MR. SOLOTOROVSKY:  Thank you, Ms. Kaufman.  Nothing further.

THE WITNESS:  Thank you.

MR. CULL:  No questions from the Department, Your Honor.

THE COURT:  Okay.  Thank you.

THE WITNESS:  Thank you.

MR. SOLOTOROVSKY:  Thank you, Your Honor.  That's our final witness.

THE COURT:  Okay.  Do you want to proceed to arguments now or take a break?

MR. SOLOTOROVSKY:  Your Honor, I think we'd like to take a quick break if that's all right with the Court.

THE COURT:  That works fine.  Any preference?

MR. CULL:  Short break works for us as well, Your Honor.

THE COURT:  Okay.  I mean, I'm pretty flexible, so, I mean, any requests?  Do you want anywhere from 30 minutes to an hour?

MR. CULL:  I'm thinking like 10, 15 minutes.

MR. SOLOTOROVSKY:  I think 15 works for the plaintiffs.

THE COURT:  15?

MR. CULL:  That sounds good for us.

THE COURT:  Okay.  Sounds good.

Okay.  So, I guess, that will be 12:20 -- why don't we just say 12:30.  Let's just do that.

MR. SOLOTOROVSKY:  Great.  Thank you, Your Honor.

THE COURT:  All right.  Thanks.

(Recess at 12:05 p.m., until 12:32 p.m.)

THE COURT:  All right.  Ready to resume.

MR. ORTEGA:  Good afternoon, Your Honor.  Michael

Ortega for the plaintiffs.

Earlier today, you heard five uncontested witnesses speak to the certain irreparable harm plaintiffs will face without preliminary relief.  Plaintiffs have raised eight distinct legal grounds to challenge the Department's non-continuations, four under the Administrative Procedure Act and four under the Constitution, all supported by circuit precedent, district courts enjoining materially identical conduct on these grounds, and the undisputed factual record.

To warrant preliminary relief, plaintiffs must show a reasonable likelihood of success on at least one of their eight claims.  Plaintiffs respectfully submit that they have met that burden as to all of them.

Plaintiffs would like to correct an oversight in their reply brief as to the standard for the merits analysis.

Plaintiffs asserted on page 2 of their reply that they need only show a better-than-negligible chance of success on the merits, citing *Ty, Inc. v. Jones Group*.  In *Mays v. Dart*, the Seventh Circuit noted that the Supreme Court retired that standard in *Winter v. NRDC* and *Ken v. Holder* and that those cases require showing "some likelihood of success, not merely a better-than-negligible chance."

Because the Seventh Circuit applies a sliding scale approach to the *Winter* factors, how strong that showing must be depends on the balance of harms from the denial of an

injunction, which as you heard today here weighs entirely in plaintiffs' favor.

Plaintiffs' four legal challenges under the APA are likely to succeed.  First, the Department exceeded its statutory authority when it treated plaintiffs' mandatory application statements addressing barriers to equitable participation in their programs as grounds for not continuing those programs.  That's Part 1 c. in the PI briefing alleged in Count III of the complaint.

Through the General Education Provisions Act, or GEPA, Congress requires applicants to develop and describe in their applications the steps they propose to take to ensure equitable access to and equitable participation in federally funded education programs, and it requires those steps "to assist the Department in implementing the Department's mission to promote educational excellence throughout the nation.

The Secretary then had no authority to consider such statements as evidence against the government's interest, especially when purporting to advance a policy of prioritizing merit, fairness, and excellence in education.

Defendants effectively concede this point in their briefing, and so plaintiffs are reasonably likely to succeed in their claim that the Department exceeded its statutory authority.

Second, the Department failed to follow procedures

required by law when it non-continued plaintiffs' grants under new generally applicable guidelines without notice and comment. That's Part 1 b. in the PI briefing alleged in Count II of the complaint.

The APA requires agencies to acknowledge and explain when their actions effect a change in policy, and GEPA requires notice and comment for any new guidelines or interpretations that impact education grant making.  The record is replete with undisputed evidence that the non-continuations applied new generally applicable policy to plaintiffs' grants.

Plaintiffs allege that the Department has never discontinued grants under the best interest standard based on application language or a shift in administration priorities and proffered in support a sworn declaration from a veteran Department attorney who oversaw education grant making for 45 years.  Defendants offer no evidence to the contrary.

Plaintiffs proffered Department's January press release stating that it would "review all agency programs and services that may be advancing a divisive DEI agenda," and the Secretary's 2025 memo to be implemented by all Ed. personnel directing a review of grants targeting "programs or organizations that promote or take part in diversity, equity and inclusion initiatives" to ensure alignment with the Department's priorities.

Defendants' response does not mention either, or

contest, that it established new generally applicable policy. Plaintiffs also cited the Department's 2024 statement in the Federal Register that "In general, we do not deny a large number of non-competing continuation awards," and submitted evidence of 17 other Full-Service Community School grants that were non-continued at the same time as plaintiffs and on the same bases.

Defendants respond to a straw man, that the non-continuations themselves must go through notice and comment.  No one is arguing that.  Rather, the Department's own words and conduct demonstrate a 2025 change in grant-making policy across the Department, which must be acknowledged, explained, and adopted through notice and comment rulemaking under GEPA and the APA.

Because that did not happen, plaintiffs are reasonably likely to succeed on their claim that the Department failed to follow procedures required by law.

Third, the Department violated its own regulations by reading its best interests standard, its sole legal basis for non-continuation, as a self-grant of unfettered discretion to discontinue any grant for any reason.  That's Part 1 a. of the PI briefing alleged in Count II of the complaint.

Agencies that violate their own regulations act contrary to law under the APA.  The best interests standard is the fifth in a series of performance-based criteria for

continuation which are determined according to "relevant information regarding grantee performance," including performance reports, financial information, and "any other relevant information."

The Department's failure to consider plaintiffs' performance evidenced by its sole reliance on statements made before the grants began renders their actions unlawful under the APA.

In response, the Department adopts an interpretive approach foreclosed by circuit precedent and rejected by contemporaneous district courts.  In *City of Chicago v. Barr*, a case absent from defendants' opposition brief, the Seventh Circuit declined the same ask defendants make of this Court to read a clause in a catch-all provision, any other relevant information, as a sweeping power to impose any conditions on any grants.

And the *Washington* court, on the same day plaintiffs submitted their request for reconsideration, permanently enjoined the Department's non-continuations of other grants on these grounds, holding that "Nothing in the existing regulatory scheme comports with the Department's view that multi-year grants may be discontinued whenever the political will to do so arises."

This legal precedent supports finding that plaintiffs are reasonably likely to succeed on their claim that the

Department's conduct violated its own regulations.

Fourth, even accepting its --

THE COURT:  Sorry, what was the Seventh Circuit case you just mentioned?

MR. ORTEGA:  *City of Chicago v. Barr.*

THE COURT:  Okay.  Thanks.

MR. ORTEGA:  Fourth.  Even accepting its reading, the Department acted arbitrarily and capriciously when it failed to connect the facts it found with the choice it made.  That's Part 1 d. of the PI briefing alleged in Count I of the complaint.

Under arbitrary and capricious review, courts determine whether an agency acted within a zone of reasonableness -- and here's the part of the standard defendants omit from their brief -- in particular, reasonably considered the relevant factors and reasonably explained its decisions.  The notices of non-continuation provide only a disjunctive list of potential criteria for determining the government's best interest and book-end quotes from plaintiffs' applications with two conclusory assertions that plaintiffs' programs conflict with agency priorities.

Even accepting the Department's criteria, there is simply no explanation in the notices for how or why, for example, integrated student supports, collaborative leadership practices, and ensuring equitable access to community school

resources and trainings conflicts with the Department's policy of prioritizing merit, fairness, and excellence in education.

Accepting the Department's response requires ignoring plaintiffs' undisputed evidence to the contrary and cutting off the relevant legal standard.  Because this complete lack of explanation is textbook arbitrary and capricious conduct, plaintiffs are reasonably likely to succeed here as well.

Plaintiffs' four legal challenges under the Constitution are also likely to succeed.  These are independent from plaintiffs' APA claims and not foreclosed by *Dalton v. Specter*, which rejected APA review of the president's conduct on the theory that every statutory violation was also a constitutional one.

The *Dalton* court recognized that courts frequently review action alleged to violate both the APA and the Constitution, and in *City of Chicago v. Barr*, the Seventh Circuit rejected *Dalton*-based arguments that would shield the Executive Branch from review of conduct alleged to violate the Separation of Powers.

First, the Department violated the Separation of Powers by wielding the power of the purse to advance Executive Branch priorities regardless of the will of Congress.  That's Part 2 a. in the PI briefing alleged in Count IV of the complaint.

Congress authorized Full-Service Community School

grants for up to a maximum of seven years, necessarily spanning multiple administrations, to significantly improve the academic and developmental outcomes of children living in the most distressed communities of the United States.  And as the Seventh Circuit held in *City of Chicago v. Barr*, allowing Executive Branch officials to hijack legislatively approved funds to advance their own priorities strikes at the heart of the Separation of Powers.

The Department's only response is that the Spending Clause, vesting sole spending power in Congress, has no bearing on the Executive's arrogating that power to itself.  That argument doubles down on the Separation of Powers violation without any mention of binding circuit precedent to the contrary.  That supports plaintiffs' strong showing that a likelihood of success -- of a likelihood of success on their Spending Clause and Separation of Powers claim.

Second, the Department violated the Due Process Clause of the Fifth Amendment by subjecting plaintiffs to arbitrary enforcement under a standard void for vagueness because it provides no fair notice of prohibited conduct.  That's Part 2 b. in the PI briefing alleged in Count V of the complaint.

The Department does not contest that its reading of the best interests standard was vague as applied to plaintiffs or that they subjected plaintiffs to arbitrary enforcement strongly supporting plaintiffs' likelihood of success.

Instead, the Department contends its regulation's vagueness is supported by *National Endowment of the Arts v. Finley*, a case in which the Supreme Court rejected a facial challenge to a statutory grant of discretion in awarding arts funding.

That reliance again runs roughshod over the Separation of Powers.  References to the government's freedom to set spending priorities in that case speak consistently to Congress's authority, not the Executive's.  Nothing in *Finley* supports the Department's view that agencies can adopt vague funding standards without congressional approval and then use them to frustrate congressional intent.

Accordingly, *Finley* supports plaintiffs' reasonable likelihood of success on their as-applied, void-for-vagueness claim.

Third, the Department violated the Due Process Clause by depriving plaintiffs of their interest in being fairly considered for continuation without adequate notice or an opportunity to be heard.  That's Part 2 c. in the PI briefing alleged in Count VI of the complaint.

Based on the governing legal framework for continuation, the Department's decades-long adherence to that framework and their application of that framework to plaintiffs to grant continuation in 2025, plaintiffs have a property interest under *Perry v. Sindermann* in being considered accordingly for 2026.

The Department's 11th-hour non-continuations, its abandonment of longstanding practice to apply new standards retroactively, and its total lack of engagement with plaintiffs' request for reconsideration deprived plaintiffs of that interest.

The Department responds that plaintiffs are not entitled to continuation of their grants, which it likens to procurement contracts terminable by convenience.

Again, the Department is tilting at windmills. Plaintiffs do not claim a legal entitlement to continuation but rather to the right to be fairly considered, akin to the regulatory rights and remedies the Seventh Circuit distinguished from contract-based claims in *Evers v. Astrue*. Accordingly, plaintiffs are likely to succeed on their procedural due process claim.

Fourth and finally, the Department violated the First Amendment by non-continuing plaintiffs' grants because they embraced viewpoints the Department now disfavors. That's Part 2 d. in the PI briefing, alleged in Counts VII and VIII of the complaint.

Hornbook First Amendment law dictates that even when a person has no entitlement to a government benefit, the government may not withhold that benefit to either coerce the beneficiary to give up a constitutional right or to penalize the exercise of that right.

It is beyond dispute that the Department targeted plaintiffs for non-continuation based solely on their application statements discussing diversity, equity, and inclusion, viewpoints this administration has openly targeted since day one.

The Department provides no additional context or argument refuting that basis, its January press release, or its February memo ordering a review of organizations and programs on that basis.

Defendants respond that they non-continued plaintiffs' grants based on their specific grant activities, not their speech, a contention amply refuted by the record, every witness you heard today, and the defendants have known to be false since plaintiffs' request for reconsideration on December 19th.

Defendants also contend that the First Amendment allows them to decide not to subsidize plaintiffs' speech, another response to an argument no one is making.  Plaintiffs' claim is not one of expressive conduct.

Plaintiffs do not purport to speak through their grant activities and are not contending that the denial of 2026 funding for their programs suppresses their 2026 speech. Rather, plaintiffs allege retaliation for and discrimination against the viewpoints they expressed in 2023 that the Department now disfavors and that conditioning future funding on plaintiffs' self-censoring similar statements going forward

is unconstitutional.

Defendants again mis-rely on *Finley*.  At issue there were grants funding arts programs implicating expressive conduct, not direct services programs providing for the basic needs of children and families living in poverty.

To the contrary, *Finley* supports plaintiffs' likelihood of success on their First Amendment claim.  The *Finley* court distinguished the facial challenge before it from the as-applied challenge plaintiffs raise here.  "If the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then we would confront a different case in which relief could be appropriate."

In the *American Council* case entered last month in New York, the district court granted plaintiffs' summary judgment and a permanent injunction of mass grant terminations on First Amendment grounds.  The court held that while the government retains some discretion in administering grant programs, that discretion is bounded by the First Amendment, and it may not deny or withdraw funding because it disagrees with the ideas expressed.

Because that is exactly what happened here, plaintiffs are reasonably likely to succeed on their First Amendment claims.

In sum, Your Honor, plaintiffs allege eight distinct

legal challenges to the Department's conduct, each amply supported by case law and the undisputed record. At every turn, the Department repeats mischaracterizations of plaintiffs' claims and requested relief, ignores binding and persuasive precedent, rejecting its arguments, and offers no evidence whatsoever to refute plaintiffs' allegations, sworn statements, the documentary record and the testimony you heard today establishing the unprecedented nature of these non-continuations.

The Department has produced no emails or internal memos discussing the non-continuations, no testimony from program staff defending its process, not a single page supporting any alternative account of what happened last December.

On this record, plaintiffs respectfully submit that they have well met their burden to establish a reasonable likelihood of success and welcome the Court's questions.

THE COURT: Okay. A couple questions.

Do you have any cases finding that the Tucker Act does or does not apply to the First Amendment claims?

MR. ORTEGA: Yes. So there are -- I can point you to several cases. Six in this court rejecting the Tucker Act's arguments. So *Chicago Women In Trades* and *Chicago Transit Authority against Department of Transportation*, which plaintiffs submitted as their first supplemental authority.

Those cases apply *Megapulse* and *Evers* to hold that an action does not fall within the exclusive jurisdiction of the Court of Federal Claims simply because it implicates a contract in some way.

*Freedom Network USA* rejects the government's Tucker Act position because it overlooks the fact that the Court of Federal Claims lacks jurisdiction to award the equitable relief plaintiffs sought there.

*City of Chicago against Department of Justice* and *City of Chicago against Noem* applied Justice Barrett's concurrence in *NIH* to reject Tucker Act challenges to funding conditions, and *City of Chicago against DHS* has a close reading of *Bowen*, *Great-West*, *California* and *NIH* and concludes that enjoining the government from relying on its stated reasons to withhold payment would be exactly the type of relief that the Supreme Court affirmed in *Bowen*.

The government's stated reasons here are plaintiffs' statements of diversity, equity and inclusion.  That's a textbook First Amendment viewpoint discrimination claim that is not barred by the Tucker Act.

THE COURT:  Are those six cases analyzing the First Amendment claim specifically?

MR. ORTEGA:  So plaintiffs in those cases raise a lot of different claims, and the Tucker Act analysis kind of comes above all of the substance of the merits.

I'll say as to the Tucker Act on the First Amendment claim, the Tucker Act is a grant of jurisdiction and a waiver of sovereign immunity for money damages claims.  The only way that it can displace jurisdiction here is under the Administrative Procedure Act's waiver that says that only -- that statutes that impliedly forbid the relief sought in those proceedings are precluded from the waiver of sovereign immunity.

So as to the First Amendment claims, the Tucker Act does not -- does not bar them.  It just -- it doesn't speak to them.  And the Federal Circuit has consistently for decades held that the lack of a money-mandating source is fatal to the Court of Federal Claims jurisdiction under the Tucker Act, and that the First Amendment does not mandate money.  And so it cannot provide a basis for jurisdiction in that court.

If there's no jurisdiction in the Court of Federal Claims, there cannot be exclusive jurisdiction in the Court of Federal Claims.

THE COURT:  Okay.  You are asking for vacatur of a contract action and including a request to release funds.  Is that -- why is that not contractual?

MR. ORTEGA:  We're not asking for that, Your Honor. As to the final determination on the merits, what we're asking for is a vacatur of the notices of non-continuation and an order that the Department considers plaintiffs for

consideration according to the lawful standards and regulations that I've laid out.

In this hearing, what we are simply asking for is a preliminary injunction against enforcement of the notices of non-continuation, which would restore plaintiffs to active grantee status. Plaintiffs would be put exactly back in the position that they were in just before the notices of non-continuation. They would be active grantees with a performance period through 2028 and no continuation determination past 2025.

That act of grantee status comes with a host of downstream benefits. So it would allow ACT Now to rejoin the cohorts of state scaling grants, rural Full-Service Community School grants all over the country. It would give them access to data collection guidance and further implementation, sharing knowledge of best practices of their novel one-of-a-kind program in the country, and give them access to program experts that would allow them to augment the services that they provide to their schools that you heard today.

It also -- sorry. In addition to that, to those non-monetary benefits, under the Department's regulations, an active grantee that has unexpended funds going into the next budget period can use those funds consistent with the project application performance measures that the Department accepted in 2023 and that the Secretary can issue a -- can ask for a

written explanation of how those funds will be spent.  That's at 34.753(i), I believe -- (e).  My mistake.  34 C.F.R. Section 75.253(e).

So we're not asking for vacatur of a contract.  There is no contract for 2026 funding.  The only thing that the preliminary injunction would do is temporarily pause enforcement of this -- of this -- of these non-continuations, which would, under the Department's regulations, allow for the lifting of restrictions that the Department imposed on plaintiffs' carryover funds during -- during negotiations in this litigation.

THE COURT:  So in your complaint, it does request on page 26:  Order the Department to, consistent with applicable statutes and regulations, review plaintiffs' eligibility for a continuation award and, if necessary, to release such funding.

And so how is that -- how is that request not a contractual remedy?  And it's true that a preliminary injunction is different from the ultimate merits, but if there is a jurisdictional issue, if I lack jurisdiction, then I can't entertain the claims at all even for, you know, regardless of the precise relief that you're requesting for the PI stage.

MR. ORTEGA:  Sure.

So in the complaint, we ask for that consideration. We're not asking the Court for an order that releases funding. Admittedly, we could have drafted that a little more clearly;

but it was a few days before the budget period was going to end, there were extreme circumstances and so that what we meant to convey in that provision is that all we're asking for in this order is that the -- the Court order the Department to consider continuation -- consider plaintiffs for continuation according to the lawful standards and, if necessary, the Department can issue that funding.

This is not a dispute at this stage about funding for 2026. And even if we win all of the relief here, we would still need to go to the Department, and the Department would have to conduct a continuation determination according to the lawful standards.

And ACT Now believes, plaintiffs believe that when the Department conducts a lawful review process, it will find that plaintiffs have met or exceeded all of their performance requirements; that none of the statements that the Department identified were at all implemented in the -- in the programs. And so their stated reasons for denying non-continuation have no basis in fact.

THE COURT: Okay. On *Rust*, switching topics a little bit, and this is from *Rust v. Sullivan* quoted in *Finley*, it says, "Congress may selectively fund a program to encourage certain activities it believes to be in the public interest without at the same time funding an alternative program which seeks to deal with the problem in another way. In doing so,

the government has not discriminated on the basis of viewpoint. It has merely chosen to fund one activity to the exclusion of the other."

I guess, what's your -- what's your response to that principle that goes back to *Rust* and then it's articulated again in *Finley* which -- it allows selective funding in the way that's described there.

MR. ORTEGA:  Two responses, Your Honor.

First is that in *Rust v. Sullivan*, that case concerned a facial challenge to regulations that implemented a statutory prohibition on funding abortions as part of grant programs that funded family planning services.  The court said that the challenged regulations implement the statutory prohibition. They are designed to ensure that the limits of the federal program are observed.

*Finley* similarly quotes that language and another case relied on here, *AID v. Alliance For Open Society International*. In that case, the Supreme Court considered a facial challenge to a statute conditioning funding on organizations having a policy explicitly opposing sex trafficking.  And the court highlighted the distinction between conditions that define the limits of the government's spending program, those that specify the activities Congress wants to subsidize, and conditions that seek to leverage funding to regulate speech outside the contours of the program itself.

That distinction between the First Amendment having nothing to say about the government establishing a program to promote a viewpoint is carried through in *Chicago Women In Trades* and in *Freedom Network* and a few of the other cases in this district.  There, the -- this court found that the -- found that plaintiffs had not established a likelihood of success as to their First Amendment claims against the termination provision of the anti-DEI executive orders because there the government was establishing a funding priority, a funding program, and choosing not to fund DEI activities or equity activities.  And that is lawful.

What's not lawful is the Department leveraging speech outside of the program to punish a disfavored viewpoint, and that's what Judge Kennelly found in *Chicago Women in Trades* and in *Freedom Network*.

In those cases, the government conceded that the provisions that were challenged, the certification provisions, requiring grantees to certify to receive funding that they don't operate any programs promoting diversity, equity and inclusion, that that impacted speech or restricted speech outside the contours of the federal funding itself, and that was the First Amendment violation.

Here, all of the evidence points to one conclusion, that the 2023 statements that plaintiffs made, including terms about diversity, equity and inclusion, were the sole basis for

non-continuation here and that those statements were made outside of the federally funded program.  They were made before the grant began, before any federal funding started to flow.

So I think that is the distinction on the First Amendment grounds.  And I'd also add that -- that -- the line of cases that the defendants point to here are all speaking about congressional authority to determine funding priorities or funding policy.  And so when Congress establishes a program, it can choose to fund one viewpoint and not fund another, and that does not raise a First Amendment concern.

But if the implementation of that program, if in the implementation of that program an agency starts to use that discretion over funding to disfavor -- to target viewpoints it disfavors, that violates the First Amendment, and *Finley* held that, Agency versus -- *Agency For International Development* held that, all the cases that the defendants cite point in the same direction.

THE COURT:  Okay.  I don't have any more questions.

MR. ORTEGA:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. CULL:  Good afternoon, Your Honor.  Thomas Cull for the Department of Education and the Secretary.

I'd like to start right where you picked up, with Tucker.  Of course, as we stated in our motion to dismiss, Your Honor, the claims that are, in essence, contractual belong

before the Court of Federal Claims, and this case is no different.

Now, you asked if they're different if it's a First Amendment claim, if that differs than under the APA or some other provision.  And Judge Kennelly addressed this issue in *City of Chicago v. DHS*, and he essentially looked at the essence of the case and said fundamentally, this is a contract dispute.  This is a -- this is seeking a -- fundamentally you look at whether this is a contract dispute, not whether, you know, ultimately these are contractual remedies that we were seeking, payment, release of funds as we discussed today, the right, the source of the rights being the grants themselves and no other source.  That ends the inquiry.

We can attach other claims, whether we call it First Amendment claim, a Fifth Amendment claim, no matter what we describe it as, if fundamentally what's being asked here is for -- is for release of funds or a contractual obligation to pay, then that does trigger the Tucker Act.

And now ACT Now has asserted that that is not the case here.  They're just seeking reconsideration or proper consideration of the relevant factors under existing law.  But if you look at the Court's order in *Department of Education v. California*, Your Honor, the plaintiffs were seeking precisely the same relief.

On appeal, the Supreme Court found that

notwithstanding how it's framed, that relief was contractual in nature and belonged before the Court of Federal Claims.

And the same is true here if you compare the relief requested in the complaint and the relief requested at the lower court in *California v. The Department of Education*.

Your Honor, irrespective of that issue, the plaintiffs are unlikely to succeed on the merits and, therefore, are not entitled to injunctive relief.

As an initial matter, I was going to say the same point regarding *Ty, Inc. v. Jones Group* and the standard not being better than negligible, but beyond that, in *Bevis v. City of Naperville*, the Seventh Circuit affirmed that the plaintiff or the movant must make a strong showing in revealing how it proves its case.

And so in acquiring entitlement to extraordinary remedy of preliminary injunction, plaintiffs face a significant hurdle here.

Now, as to the APA claims first, starting with notice and comment. Plaintiffs assert that the Department has adopted a general anti-DEI policy without notice and comment and in doing so violated the APA and other regulations. But if you look at the complaint, Your Honor, this anti-DEI policy, that is not the theory they've pled in the complaint. They've not sought the invalidation of an anti-DEI policy in the prayer for relief. They don't allege other grant terminations outside of

their own as being subject to this general DEI policy.

The Department issued the non-continuation decisions pursuant to its existing authority under 34 C.F.R. 75.253. That, of course, was subject to notice and comment, both when it was promulgated 50 years ago and also again in 2023. And indeed the Department's interpretation of its existing regulations are interpretive rules which are exempt from notice and comment rulemaking categorically under the APA.

These are not legislative rules, and they're not required to go through notice and comment. And as a result, the claim based on the Department's failure to comply with notice and comment requirements is unlikely to succeed.

Second, Your Honor, plaintiffs assert that the Department acted in excess of authority in that it -- that essentially considered -- excuse me, that it acted contrary to law by basing non-continuation decisions on grant applications, grant performance as we understand it. They assert that the Department interpreted the regulation beyond considerations of performance in making a determination for non- -- for continuation or non-continuation.

The relevant regulation here, 34 C.F.R. 75.253, is broad, and it allows the Secretary to make non-continuation decisions on -- based on the best interests of the federal government as she determines it.

Now, plaintiffs assert that has to be limited only to

performance of the grant, but that doesn't prohibit the Secretary from considering the agreement as part of that. The agreement that the representations that ACT Now made about the services that it was providing, it's against course of performance, we believe certainly that would fall within the Secretary's authority as a basis for non-continuation. But this is not an unlimited grant of authority that the Department is exercising here.

The Department considered the application, the representations that ACT Now made about the services that it was providing, and it made a decision having -- having reviewed those.

As I said, that's not a limitless grant of authority. There are -- there are limits to what that could entail. If the Secretary were making determinations about non-grant activity and activity not in the application, about representations about the actual programs themselves, the capabilities of the programs themselves, that may be a different story.

But here, the ACT Now's grant applications were answering questions regarding the services that they provide, the capabilities that they have, and the Secretary determined based on those representations that they were not in the best interests of the federal government.

Next, Your Honor, the -- ACT Now asserts that the

Department violated the Administrative Procedures Act by acting arbitrary and capriciously.  Of course, this is a highly deferential standard, and the agency need only act within a zone of reasonableness.

And in this regard, the agency identified four priorities as the basis for its decision:  Advancing civil rights, merit, fairness and excellence in education, student well-being, and appropriate use of federal funds.

The Department ID'd the programs as well that were identified in the applications that gave rise to concern and the -- ultimately the determination that those programs were no longer in the government's best interest, including the use of gender and sexuality training studies, 1619 project-related programming.

And the plaintiffs have asserted that the government's use of the word "or" in identifying those relevant priorities is -- is dispositive, that had they said advancing civil rights, merit, fairness and excellence in education, student well-being and appropriate use of federal funds, the analysis may be different.  Their use of "or" creates some sort of confusion as to what is, in fact, the individual determination, which priority is actually involved.

And I think the proper reading of this, the only reading that makes sense is that it's all four priorities, any one of which would be dispositive.  Only one priority is

needed.  In this case, all four are, and the Department identified those priorities.  They identified the program goals that the -- and priorities and other activities that ACT Now identified in the application and -- and issued a decision consistent with the APA and its -- the agency's actions as required under that statute.

As to the constitutional claims, Your Honor, the -- oh, I'm sorry.  Let me go back to an APA claim that I overlooked.

Plaintiffs assert that the Department violated the APA because GEPA, or GEPA, requires applicants to make certain representations about equitable activities and their interest in pursuing equitable access for services, and because the Department discontinued based on what was represented by ACT Now, that's contrary to law.  That is a false choice.

There are plenty of applicants even in the FCS -- FCFS program who have submitted grants, whose grants were -- complied with GEPA who made those representations, and those were continued.

I believe, and counsel can correct me if I'm wrong, of the 60 grants in FSCS, 19 were non-continued, and the remaining were.  All those remaining grantees, each of them complied under GEPA, made statements under GEPA, and that -- simply asserting that the Department violated the law by -- by identifying the specific programs that ACT Now identified is

not a violation of GEPA, the APA, or any other legal standard.

Very briefly, Your Honor, going to the constitutional claims, I would like to start with the First Amendment claim that Your Honor identified this morning.

It is undisputed that funding decisions are fundamentally subject to a lesser First Amendment scrutiny standard than other forms of First Amendment speech, expression, association.

The Department declined to fund -- to issue a non-continuation decision, declined to fund these programs not because of outside activities, activities that are not associated with it, but because of activities that are identified in the -- in the grant applications themselves.

And they've said today, in fact, they in fact didn't actually engage in any of the programs they identified in the applications.  But that goes to whether or not -- that's an APA claim, whether or not the decision by the agency was arbitrary and capricious.

As a First Amendment matter, the government, as you pointed out, is not required to fund certain viewpoints.  Grant funding is not an entitlement.  Judge Kennelly reached this very same decision in I believe it was -- I believe it was *Freedom Network* and *CWIT* when he found that the court is unlikely -- the plaintiff was unlikely to prevail on claims under the First Amendment for this reason, the one exception

there being a certification provision claim, which is not at issue here.

And so, again, fundamentally, Your Honor, the government doesn't prohibit the plaintiffs from engaging in speech, doesn't penalize speech, and it doesn't -- it doesn't otherwise restrict plaintiffs from engaging in speech. This is not concerned with activities by ACT Now outside of the grant agreement. This is based on solely what ACT Now has asserted in the grant agreements that it submitted to the federal government.

THE COURT: Sorry, just pausing on that for a second.

Are you saying there that if the would-be grantee, the applicant, says in the application that they intend to use funds for a certain activity, then the government -- you know, then that is sufficient to allow the government to deny funding, as opposed to checking the actual uses to which the funds are ultimately put?

Is that -- is that what I'm hearing or --

MR. CULL: No, Your Honor. That is a great point. That is an APA analysis. The extent to whether they're actually using these funds for the stated purpose, whether the non-continuation was based on their actual activities, that is solely an arbitrary and capricious analysis.

But whether the government is able to non-continue or discontinue funding based on the stated representations of the

grantees is a different issue. That is permitted under the First Amendment because it's related to the grants themselves.

The statements about the 1619 project, about gender-affirming care were provided in the context of receiving these grants and about services that would be provided, about the capabilities of ACT Now. And so it's not a criticism of activity that's outside the grants or outside what is actually at issue here, and that's why *Finley* controls and dictates that there's no First Amendment violation.

THE COURT: And also just coming back to what -- so what is -- what's the record evidence that you're relying on? So what in the record shows that ACT Now planned to use the grant funds for these purposes?

Is it -- is it the same statements in the -- I'm just trying to make sure I understand what is the record evidence on, you know, are the applications themselves in the record, or is it the statements that are excerpted or quoted from the applications as relayed and quoted in those non-continuation notices?

MR. CULL: So the non-continuation notices were issued based on the statements that ACT Now made in the application. They've said today that they have not actually engaged in that conduct. We are not -- we've not presented evidence to the contrary.

Based on the applications on the services that ACT Now

said that it was capable of providing, that were relevant to being provided, that could be provided in this context, that was the basis for refusing funds.

Now, to the extent that those were not offered or were offered or to the extent that the determination of whether to non-continue funding is reasonable based only on those non-continuation notices, that is an APA arbitrary and capricious standard that fails for -- I think for other reasons we've described, but it is not relevant to the First Amendment analysis in our view because this is not denying funding or limiting speech based on outside activity. It's related to the grants themselves. That's why they were included in the grant agreements.

Speaking to vagueness, void for vagueness both under the First Amendment and the Fifth Amendment. The best interest standard is vague as applied. It is a vague standard that has been vague since it was promulgated in 1980.

But here, as Judge Kennelly has recognized again in *Freedom Network* and *Chicago Women in Trades*, when this is about funding and there's no risk of criminal sanctions, there's no risk of regulatory sanctions, there's no risk of civil sanctions under the False Claims Act, for instance, there is -- there's no real risk of danger associated with vagueness.

That was the reason that the court declined or found that the plaintiffs were unlikely to succeed on void for

vagueness claims in those two cases, and we think the Court should do the same here.

In that regard, this void for vagueness challenge kind of overlaps with the First Amendment claims in that the -- in that *Finley* controls and that lower scrutiny is governed here. Again, this would be a different matter if these were retaliatory based on stuff that had nothing to do with the grants themselves, but these are based on the grant agreements themselves, and that is dispositive.

As to the Spending Clause, we noted in our response brief that the Spending Clause is only implicated when Congress imposes spending conditions. Congress has taken no such action in this case, and there's no Spending Clause claim.

Now, plaintiffs have cited to a number of cases where the -- where the Department or another government agency has imposed conditions on future funding, and the issue there has been whether or not the future funding would have implicated Congress's authority under the Spending Clause to -- to condition the award of funds spent and potentially to compel the grant recipients to conform their conduct in certain respects.

Here, there are no conditions that the government has applied to -- to funding. This was an individualized non-continuation determination based under 34 C.F.R. 75.253. The government isn't attempting to compel them to agree with

certification provision to only engage in certain conduct. It's not seeking to compel their speech in any respect.

And so this is -- it fundamentally differs from those spending cases as well.

And finally, Your Honor, just to briefly discuss the Separation of Powers issue. The continuation -- the condition of funding argument extends there, but just to briefly, *Dalton* does preclude these claims in that this is an APA challenge as to agency action and the determination of whether or not to continue funds based on the best interests of the federal government and the other grounds identified in the existing regulations.

The -- I think simply asserting that the government has exceeded its authority, the executive has exceeded its authority in entering a non-continuation order does implicate *Dalton,* and it does foreclose these claims. These are, again, these are APA claims, and whether it's with the First Amendment or the Fifth Amendment, void for vagueness or -- or otherwise, it doesn't -- the analysis is fundamentally whether the agency followed its regulations, provided notice, and otherwise complied with all required regulations in issuing its opinion.

Finally, Your Honor, there was one other issue that I wanted to address. Just one moment.

Your Honor, as to procedural due process, plaintiffs have asserted that a procedural due process claim --

essentially, they've asserted that they're entitled to -- they were not given enough time to respond, there wasn't enough time for the Secretary to consider their submissions given the tight timeline, and as to the substance itself of that -- of the response that the government provided.

Those are -- again, those are not procedural due process claims. The -- there's no notice that they're entitled to that they didn't receive. Under regulations or statutes, they're not entitled to -- they're entitled to challenge the opinion -- the decision, which they did, to seek reconsideration, which they did, and it's unclear what other process could have been provided.

They certainly are not entitled to a hearing, a pre-non-continuation hearing, under any statute or certainly the Constitution, and we're not aware of any decision in any jurisdiction that has found otherwise. Had this been brought under another -- another statute, there may be a case for a hearing, there may be a basis for a hearing. There is none here under the APA. And for those reasons, plaintiffs' claims fail.

Your Honor, again, ultimately, this is a contract dispute, in the Department's view, seeking ultimately, no matter how it's characterized, a release of funding. Whether that's to -- you know, to enjoin the non-continuation decisions or however it's framed, this is fundamentally to restart

payment, and I think that's consistent with what we heard today as to the effect of the loss of federal funds being the -- and the impact, the corollary impact that that has on students.

And so for those reasons, for the reasons we identified in our briefing and for those we've identified in our motion to dismiss on the Tucker Act, the government would respectfully request that Your Honor deny the motion for preliminary injunction.

THE COURT:  Okay.  Thank you.

I do have some questions.

So on -- on the issue of selective funding, is there evidence that the funding decision was made about the use of funds or the planned use of funds, as opposed to the general viewpoint of the grantee or applicant?

MR. CULL:  I'm sorry, Your Honor, I'm not sure I followed.

THE COURT:  So if -- I guess I'm not -- I'm not saying that this is for sure the correct understanding of the case law because there's a lot of case law, it's complicated.

But assuming for a second that the case law on the First Amendment essentially has a principle that the government can make selective funding decisions as long as it is choosing to fund a particular use of funds and not another particular use of funds, that's fine, the government can do that, but the government cannot look at the general viewpoint of an

applicant, you know, look at all the other things that the applicant is doing outside of the intended use of the funds or the planned use of the funds and then make funding decisions based on outside activities, et cetera.  Then it becomes more of a, okay, the government's considering the general viewpoint of an applicant.

So let's just assume for a second that's the principle that's running through the First Amendment funding or the First Amendment/funding case law.  But, again, it's complicated, so not committing to that, but just assume that's the idea.

Then what is the evidence that in this case, the funding decision was made based on the use of funds in this -- for the planned program activities versus a more general viewpoint?  Yeah.

MR. CULL:  Yes, Your Honor.  The government is not contending that ACT Now -- well, let me -- let me rephrase that.

The government's position, Your Honor, is that the representations made in the agreements themselves related -- they related to the actual funding.  And to that extent, they related to the actual intended use.

Even if they didn't ultimately provide that, it was connected to the initial funding, the initial program and the representations about what they said they would be doing with the funding, not based on outside considerations or outside

activity or general views of ACT Now.

Again, the fact that they did not ultimately engage in that behavior, that they didn't ultimately fund that is relevant in an arbitrary and capricious analysis, but not -- not otherwise. This is -- the statements were made in the context of an application for funding, and that's how the Department has interpreted it.

THE COURT: Okay. Is -- and just in terms of the evidence in the record that's going to that point, is it those same non-continuation notices that we looked at before, or is there somewhere else in the record that there's, like, the full grant application or just -- if I'm looking for where in the record are the statements that are relevant to this issue, would it be those couple paragraphs that we looked at in the -- on the docket, or is there somewhere else?

MR. CULL: Yes, Your Honor. The non-continuation decisions that we saw earlier captures the relevant language. I don't know that the grant applications themselves have been filed or in the record, but I don't know of anything that's in there that's not in the non-continuation decisions that we would say would -- would be relevant on that specific point.

THE COURT: Okay. And what's the -- so it sounds like the plaintiffs are saying, okay, at the end of the day, funds were not used for these purposes, but your response is there were statements in the application that funds would or could --

I guess, which -- is it would, could, is it we are ready, willing and able to use funds for these purposes should the need arise and there's going to be this individualized assessment process and that, in the context of the individualized needs assessment, a statement that we are prepared to -- we are ready, willing and able to use funds for these purposes amounts to essentially a, you know, funds will be used or are, at least there's a pretty reasonable likelihood depending on the individual needs assessment process of each district?

MR. CULL:  No, Your Honor.  The statements are only based on the statements in the non-continuation decision, which are admittedly -- are somewhat vague in terms of whether it was actively setting aside specific funds.  They don't say that.

I think it was -- they're articulating priorities for equitable access in identifying programs that would be responsive to that, relevant to that under GEPA, and those include the projects that ultimately plaintiffs did not fund, but stated that were consistent with those grant capabilities. And in theory, they certainly left open the opportunity or the prospect of performing as they indicated they would under the grant agreements.

And, I'm sorry, I don't mean to be vague here.  We don't really have like an administrative record just at this stage, so the Department is relying on the non-continuation

decisions as the basis.  It states the basis for the Department's decisions, both in identifying the relevant priorities, but also identifying the concerns that it had.

THE COURT:  Okay.  Any thoughts on why the -- you know, ACT Now responded, okay, we're not using funds for these purposes.  Any -- any response to that?

Okay.  So now, you know, the government gets that response from ACT Now.  We're not using funds for these purposes.  Any response to that point by ACT Now?

MR. CULL:  Well, Your Honor, I think that in the context of the APA reasonable analysis and the deferential standard whether or not at the time they made the decision of non-continuation before they made that statement, whether it fell within the zone of reasonableness, it -- certainly it does.  We've heard a lot of testimony today about they actually have not actually done that.

They indicated in a subsequent filing in a request for reconsideration that they were not.  There were a number of letters that were submitted, and a number of those said they were not.  But other than those letters before the non-continuation decision, I'm not aware of any other instances that they made any of those representations about the scope of services provided.

THE COURT:  Okay.  I think you mentioned earlier there were some grants that were continued.

Is there any evidence in the record about which grants were continued?

MR. CULL:  Not at the preliminary injunction stage. All of these were associated with the Full-Service Community Schools Act.  It's all associated with, there were 60 in total and, again, counsel can correct me if I'm off on the numbers, but I believe either 18 or 19 were discontinued, and the remaining were continued.

THE COURT:  Okay.

Okay.  Going to the -- I guess back to the, when I was trying to ask earlier about the general principle of funding, does -- do you believe there are any limits on the government's ability to make selective funding determinations?

So do you -- so they can choose to fund -- I think, you know, we looked before at that quote from *Finley* and *Rust*, but are there any boundaries or limits to the government's ability to make those sorts of selective funding determinations?

MR. CULL:  Absolutely, Your Honor.  Judge Kennelly addressed this in his decision, I believe it was *Chicago Women In Trade*, when he was distinguishing between what is public speech, expressive speech, and government speech.  And essentially the question becomes whether the government is funding -- the government is itself the speaker, is itself providing services here, afterschool services, or if the

government funding goes to expressive conduct, so like grants for the National Endowment For the Arts or the Humanities.

If the government were making non-continuation decisions based on viewpoints, whether it was expressive conduct, that would not be government speech. That is not like here, where we're talking about afterschool programs, that is making a viewpoint-based decision, and that does reach a different result under the First Amendment.

Again, Judge Kennelly recognized that distinction in *Chicago Women In Trade*, and I believe the Southern District of New York made the same decision recently in the *NEH* opinion.

THE COURT: Okay. And can the government regulate the grantee generally when the grantee is expressing its own viewpoint, you know, like outside of the funding, the program that's being funded?

MR. CULL: So I don't think -- if the -- if the grantee was engaging in political -- political speech, was engaged in things that are unrelated to the grant, unrelated to the grant application, then that may implicate -- that very well may implicate the First Amendment and would be -- would fall outside of the distinction that Kennelly drew in terms of government speech versus expressive speech.

But here, the -- the language that was relied upon was the language in the grant agreement themselves. It was associated with and relevant to the grant agreements, and

that's why ACT Now included this information in the -- in the grant applications.

GEPA requires applicants to make representations about the equitable access to services and other similar issues, but there are plenty of applicants who comply with GEPA and whose grants have been continued.  This is limited to -- the question I guess becomes whether this is within the scope of what was provided, what was actually the representations that were made in the initial grant applications themselves and how those relate to the grant.

And the government's position is that's government speech, and the First Amendment is not implicated.

THE COURT:  Okay.  And when you said the language that was relied upon was the language in the grant agreement, you're saying the grant application?

MR. CULL:  Application, Your Honor, I'm sorry.

THE COURT:  And when the government -- so earlier I was asking can the government regulate the grantee when the grantee is expressing the grantee's own viewpoint, but switching to what about when the government is expressing its viewpoint?

So can the government regulate the grantee when the government is expressing its own viewpoint?

MR. CULL:  Without question, Your Honor.  That is precisely the type of speech referred to in *Finley*, the same

type of speech where the government is the -- is the actor when here in afterschool programming, these are services, it's not expressive conduct like we see with the National Endowments For the Arts or the National Endowments For the Humanities, these are -- this is afterschool programming, and that is government speech.  That is not expression by ACT Now in a private or personal capacity, and for that reason, this claim fails.

THE COURT:  And so you would say that this speech at issue here is public as opposed to private speech?

MR. CULL:  Yes, Your Honor.  When -- just when comparing the types of speech on one hand, whether we have expressive speech in their own private capacity, whether we have grants that are awarded for the purpose of private expressive speech and for the purpose of art, restricting based on viewpoint there would certainly violate the First Amendment. Where there's actually services that are being provided, the government is not funding speech.  When it's not funding expression, the analysis is different, and that's the case here, which is why the claim is unlikely to succeed.

THE COURT:  Okay.  In the Seventh Circuit case *Camelot Banquet Rooms v. United States Small Business Administration,* so that's 24 F.4th 640 (7th Cir. 2022), and it's quoting the Supreme Court's *Agency For International Development* case, it says, "To distinguish between permissible limits on spending programs and unconstitutional conditions, the court" -- and

here the Seventh Circuit's referring to the Supreme Court -- "the court clarified that the relevant distinction is between conditions that define the limits of the government's spending program, those that specify the activities Congress wants to subsidize, and conditions that seek to leverage funding to regulate speech outside the contours of the program itself."

So I don't know if -- sorry, I know I just read a chunk of text, but any reaction to that?  I can try to read it again if that would be helpful.

MR. CULL:  Yeah, reading again, that may help.  I'm not familiar off the top of my head with *Camelot*, and I'm certainly happy to submit a supplemental briefing on the issue if Your Honor would prefer, but if you'd like to read it, I can --

THE COURT:  Sure, that's fine -- I get it.  It's a lot to just sort of deal with on the spot.

But, okay, so it's talking about permissible limits on spending programs versus unconstitutional conditions, so it's saying, okay, the government can put some limits on spending programs and those can be permissible in certain situations. There are other times where it's an unconstitutional condition, and it's saying to distinguish between those things, permissible limits on spending programs versus an unconstitutional condition, the Supreme Court clarified that the relevant distinction is between conditions that define the

limits of the government's spending program, those that specify the activities Congress wants to subsidize and conditions that seek to leverage funding to regulate speech outside the contours of the program itself.

So it's seeming to draw this distinction between it's okay to define the limits of the government's spending program on the one hand, but it is not okay to have a condition that leverages funding to regulate speech outside the program.

MR. CULL: Yes, Your Honor. And, again, I can take a look at *Camelot*, I don't want to get over my skis here. I think what they're referring to is a condition on funding that the government places which affects future speech, and so whether the government is essentially coercing speech or is adopting conditions so that the grantee would either -- would be coerced or have actual notice of -- sufficient notice of the activities that were within the scope of that or the speech itself.

I think that is a conditions-based issue. I'm more than happy to -- to brief that in a supplemental filing if you'd want, but I can't say more without knowing specifically about the *Camelot* decision.

THE COURT: Okay. I think maybe on the general concept of trying to regulate the program, which is permissible, and trying to regulate the grantee broadly including whatever the grantee is doing beyond the program,

which is not permissible, I think.

MR. CULL: Yes, Your Honor, and there's certainly no other conduct that the government is attempting to coerce ACT Now to engage in, to limit them from engaging in. There's no -- this is exclusively associated with the grant. It's not a -- it's not a viewpoint discrimination based on non-grant considerations.

The grant applications themselves are related to the grants and, therefore, fall within the scope of matters that the Department can consider in its non-continuation decisions.

THE COURT: Okay.

Okay. Going back to the Tucker Act, so there's the *Megapulse* test where we're looking at the rights and the remedy and whether either of those or both of those are contractual. So focusing in on the First Amendment claims, or I guess, you know, it actually -- you could think about it more -- more generally than that, but do you know of a case where the *Megapulse* -- the outcome of the *Megapulse* test was driven more by the remedy as opposed to the right?

So if -- you know, where the remedy was contractual and, therefore, even though the right in the abstract -- so, you know, the right could be, the at least nominally asserted right could be on its face a breach-of-contract claim, in which case it's very clear that right is contractual.

On its face it could be invoking, you know, the

Constitution, and under *Megapulse*, that test is looking to the substance of the claim regardless of how the plaintiff pleads it, that's the whole concept of *Megapulse*, is like looking to the substance as opposed to allowing creative pleading to take over.

But just looking at *Megapulse* case law or cases applying the *Megapulse* test, are there cases where it is the remedy? This is more about, like, what's driving the *Megapulse* test. Is it the remedy, or is it the right, or is it both of them equally, and is there any particular case where it's the remedy being contractual that meant the case was Tucker Act barred even though the right might have seemed non-contractual? I don't know if that makes sense.

MR. CULL: Yes, Your Honor.

The *Megapulse* test is conjunctive, and so it must consider both, you know, the -- fundamentally the question, again, it just comes back to the -- ultimately what they're -- what they're asking for. But I don't know offhand where one is given -- a case where one is given more weight or one is disregarded. I think they're both, you know, equally important.

But that does not mean that, you know, First Amendment cases are, you know, exempt from the Court of Federal Claims.

THE COURT: Okay. Because it is conjunctive, but what if -- what does that -- is there case law that sheds light on

what to do if, you know, it's conjunctive and one of them is not present?

MR. CULL:  *City of Chicago v. DHS* I think addresses this issue most clearly, Your Honor, where the court is considering how those, you know, constitutional claims kind of factor in and are trying to kind of engage with the analysis the same kind of question that you're asking and trying to reach a conclusion there, and the -- the best way that I understand Judge Kennelly's opinion is -- is to take a holistic approach.

But he does engage with that kind of same question in that decision.  I think that may be kind of what you're looking for.  Other than that, I don't know of anything offhand.

THE COURT:  Okay.  Also, are there irreparable harms to the government going to the injunction factors?

MR. CULL:  Yes, Your Honor.  The irreparable harms to the government are those identified in our briefing, and the same ones that the Supreme Court identified in *Department of Education v. California* and the *NIH* decision.  And that is, you know, if the Court were to issue an injunction that had the effect of releasing funds and then in two, three years reaches a final judgment in favor of the government, there would be no way to recoup those taxpayer funds.

That's what the Supreme Court found significant in again both those two cases.  It's significant here as well.

THE COURT:  Okay.

Okay.  I don't have further questions.  Thank you.

MR. CULL:  Thank you, Your Honor.

MR. ORTEGA:  Good afternoon, Your Honor.  I'd like to start with a few words on jurisdiction, move to the record questions that you had, and then march through the merits.

So on jurisdiction, the Department repeats its arguments that this is a contract claim that belongs in the Court of Federal Claims.  As defendants like reminding us over and over again, the grants do not entitle ACT Now to continuation funding.

If we walked into the Court of Federal Claims with this complaint, it would be dismissed for lack of jurisdiction based on decades of consistent Federal Circuit opinions holding that the lack of a money-mandating source is fatal to the Court of Federal Claims jurisdiction under the Tucker Act.  And the APA, the Separation of Powers, the Due Process Clause of the Fifth Amendment and the First Amendment do not mandate money and so cannot provide a basis for jurisdiction.

That's discussed in our opposition brief on the motion to dismiss at pages 7 and 8.  We cite *Fisher*.  We cite *LeBlanc*.  Those are two seminal cases from the Federal Circuit on this topic.  We cite *Columbia Regional Hospital*, a more recent Federal Circuit case, explaining that the Court of Federal Claims has jurisdiction over contract actions insofar as

claimants seek excess of $10,000.

We're not doing that here. All we're doing is seeking a vacatur of the non-continuation decisions which would restore plaintiffs to active grantee status.

I'd point you to the case that we submitted as supplemental authority, second supplemental authority, which rejected the Department's raising this argument. In *New York City Public Schools v. Department of Education* entered about three months ago, the court permanently enjoined the Department's grant non-continuations and held that the defendant's Tucker arguments "fall flat" because while the non-continuation of the grants caused the harm, that only proves that the injury is tied to the grants, not that the right that the claim predicated -- that the claim is predicated on is contractual.

As for the opinions of this court that the defendants cite in support, they all cut in our favor. In *Chicago Women of Trades*, the court applies *Megapulse* and says that an action does not fall within the exclusive jurisdiction of the Court of Federal Claims simply because it implicates a contract in some way.

In *Evers*, the claimant there raised a due process claim about the right to be fairly considered for future contracts, and he was claiming that he could not do that because his prior contract was terminated, and the Seventh

Circuit held that that was a regulatory right, the right to be fairly considered, and that *Evers* sought regulatory remedies that placed them outside the bounds of a contract dispute.

In terms of *City of Chicago v. DHS*, plaintiffs agree that case -- that case, I think, is this court's most thorough reading of *Bowen*, of *Great-West*, and the two emergency docket cases that are relevant here, *Department of California* and *NIH*, and there he concludes that challenges to past grant terminations, terminations that cut funding in the middle of a budget period are claims for money past due that belong in the Court of Federal Claims, but, I'm quoting, "enjoining the government from relying on its stated reasons to withhold payment would be exactly the type of relief that the Supreme Court affirmed in *Bowen*."

In *Department of Education v. California*, the Supreme Court added that flag of *Bowen* as well, that the possibility that downstream funds would be issued does not deprive district courts of jurisdiction from considering APA or constitutional claims.

In *Bowen*, there were two questions there which the Supreme Court in *Great-West* characterized *Bowen* as both an action for money past due and an action for calculating the correct rate of payment going forward. And *Bowen* actually held that even that money judgment, even that grant of money past due was not within the Court of Federal Claims because it was

money pursuant to a statute.  It wasn't Congress- -- it wasn't contractual money damages or it wasn't money damages for a breach of contract.  It wasn't compensatory.  It was statutorily mandated, and the government was withholding it.

We're not saying that's what happened here because, again, we are not making a claim that we are entitled to this continuation funding.  And, of course, the grant agreements and the disruption of this five-year program is the source of the harm for plaintiffs.  You heard five witnesses uncontested today speak to that.

But you're right that the *Megapulse* and the *Evers* analysis controls here.  And so to determine whether these claims are actually disguised contract claims, you look to the source of the rights and the -- and the remedy for -- and the remedy sought.

In terms of the source of the rights, again, the Federal Circuit has established that these kinds of claims are outside of the Court of Federal Claims.  Put differently, if there is a contract here and the Department breached it, it breached it by violating the APA, the First Amendment, the Separation of Powers, and the Due Process Clause.

If they didn't violate those laws, they didn't breach any contract, and so the gravamen of the issue is the rights that determine the bounds of the Department's conduct, not any term in the grant agreements themselves.  You can make a

determination as to the merits of this case without looking at a single term in the grant agreements.

And on the -- so that's what I'd say on jurisdiction.

In terms of your questions about the record, the plaintiffs in this case are the only ones that have provided an administrative record here.  We have as complaints in the exhibit the grant applications, the notice -- the notices of non-continuation, the requests for reconsideration, and the denials of those requests.

That is all the record evidence that we have because the defendants have not proffered any evidence of their own.  They have not brought up a witness to create a record that could testify to what the application said, how they -- whether there was any sort of inquiry into the way that the funds were actually used.  They could have done that here, and they did not.

We are the only ones that have provided any sort of record in this case, and they don't provide any assertion -- any evidentiary basis to the contrary.

Speaking to quickly before the merits, I want to touch on the -- actually, let me back up.

On the record in the record, you'll find plaintiffs' applications, and they're long, but I invite you to read through them.  The applications go page after page after page describing all of their -- all of ACT Now's capacity to

implement these programs in ways that nobody else could.  They are the only full-service community grants in the country that are managing two Full-Service Community School grants that are state scaling, which means according to the notices inviting applications that the Department issued in 2023 had -- they had to meet criteria above and beyond the typical grantees for these kinds of programs, and that is what allowed other school districts to join in and build this statewide network.

If you read through that application, you'll find the things that Congress requires in 20 U.S.C. Section 7275(a), including a comprehensive plan that includes descriptions of the student, family, and school communities to be served, including demographic information; a needs assessment that identifies the academic, physical, non-academic, health, mental health, and other needs of students, families and community residents; annual performance -- annual measurable performance objectives and outcomes, including an increase in the number and percentage of families and students targeted for services each year of the program in order to ensure that children are prepared for kindergarten, achieving academically, and safe, healthy, and supported by engaging parents.

You heard testimony from five witnesses today the Department did not cross, testifying to all of those things and none of the statements that the Department says are the basis for -- for their decision.

In terms of irreparable harm before moving to the claims on the merits, the Department contends that it will suffer irreparable harm -- that it may suffer irreparable harm if it cannot a few years down the line recoup its -- its funding.

First, that doesn't come anywhere close to outweighing the certain irreparable harm that plaintiffs will face after June 30.  Without -- without access to the remainder of their carryover funds, they will not be able to continue the programming.

The only case they cite in support of this proposition that they might suffer some harm for not being able to recoup funds, again, cuts off the analysis.  That case, *State v. Department of Education*, is a First Circuit case that denied a stay of grant terminations on these grounds.

The very next sentence after the one defendants quote reads:  "But the Department has not yet shown that recoupment is implausible, and at bottom, the funds will go to programs Congress intended to fund in amounts that in total do not exceed Congress's direction consistent with priorities previously published by the Department in accordance with applicable regulations."

So, too, here.  As plaintiffs argued in our opening brief, an order preventing the immediate dismantling of programs built at considerable public expense while this Court

determines the legality of the Department's conduct imposes no meaningful burden on the government and avoids irreversible harm to the plaintiffs, their partners, and the communities they serve.

Now, on the First Amendment points, I'll start there. Defendants keep citing to *Chicago Women in Trades* as supporting their position, but Judge Kennelly took the exact opposite approach.

Judge Kennelly said that the plaintiffs were not likely to succeed on their First Amendment challenge to the termination provision, that is, the government saying what kinds of programs it will or will not regulate. The court was persuaded at that preliminary juncture that the termination provision concerned funding and does not prohibit equity-related activities outside of the funded programs.

But then he went on to say that the government cannot impose a condition on its funding that affects protected conduct outside the scope of a federally funded program, citing *AID*, which quotes *Rust*.

So the analysis for First Amendment claims in this -- in this space cuts in this direction. You heard the defendants say that the only basis they have for non-continuation were the statements that they made in their -- the plaintiffs made in their applications. They again assert that they don't have to subsidize our speech, but that's not an argument that we're

making.

We're arguing that we were penalized, that we were retaliated against and discriminated against on the basis of viewpoints expressed in 2023.  There's no speech that is being subsidized in 2026 if we -- if plaintiffs ultimately get 2026 funding.  And going back to jurisdiction for a second, there's no 2026 funding award to reinstate.

And so it's -- I'm having a difficult time understanding how this case both belongs in the Court of Federal Claims because we're seeking specific performance and the contract expressly disavows any sort of entitlement to future funds, which is fatal in that court.

Going through the arguments that the defendants raised.  On the APA exceeding statutory authority claim, the fact that defendants chose not to discontinue other grants that made similar statements has no bearing on whether they discontinued this grant on -- these grants on the basis of the viewpoints expressed.

They point to no other reasons.  They conceded in argument that the application language is the sole basis for their non-continuation decisions, and that analysis, to the extent that it is, is just quotes from the plaintiffs book-ended with an intro sentence that says it conflicts with agency priorities and a concluding sentence that says, therefore, this conflicts with agency priorities and is the

best interests of the government.

That's just not an explanation, and there's no argument for the challenge that the Secretary exceeded her statutory authority when she non-continued plaintiffs' grants and 17 others on statements -- based on statements that Congress requires the Secretary to require of applicants. That is contrary to law, in excess of statutory authority, and so we're likely to succeed on the APA claim.

On the notice and comment claims. The defendants wrongly assert that we didn't raise this argument in our complaint. I'd point you to paragraph 67 in the complaint. That says, "Through the notices and denial letters, the Department appears to have interpreted the best interest requirement to create from whole cloth a *de facto* second review of approved grant applications for alignment with new, unpublished, and previously undisclosed grant priorities, priorities that conflict with the published FY 2023 notice against which these applications have already been awarded and priorities of which the applicants could not have been aware."

There is no answer to the notice and comment argument that plaintiffs are actually making, which is that if the government wants to do any sort of federal education program and speak through that, it needs to follow the notice and comment procedures that GEPA requires when new guidance or guidelines or regulations are implemented.

So that's on that point.

And, again, defendants offer no response to the Department's January press release stating that it would review all agency programs and services that may be advancing a divisive DEI agenda.  No response to its February 2025 memo that specifically says it's going to target programs and organizations that promote or take part in diversity, equity and inclusion initiatives.

It doesn't -- it doesn't refute the fact that prior to 2024, they did not deny a large number of non-competing continuation awards.  And yet here we are, two and 17 others on the same day on the same bases getting denied.

In the *Washington v. Department of Education* litigation, I find that particularly instructive here because the Department issued the same disjunctive list of potential factors for finding that those grants were not in the government's best interest before non-continuing them.  And that court said that -- that court -- the district court there preliminarily enjoined the grant non-continuations, rejecting the plaintiffs' -- the defendants' Tucker Act claims after finding likelihood of success on the plaintiffs' arbitrary and capricious claim because the Department's decisions non-continuing dozens of grants "are generic and identical, were all issued the same day, and recited disjunctive lists of reasons that the grants are not in the best interests of the

federal government."

Just to give a quick example, if I showed up late to work and my supervisor asked me why I was late and I said construction, rain, traffic, or a flat tire, I don't think -- I think my boss would have a follow-up question, like, which one of those is it? And so the compounding -- compounding that harm or rather furthering the instructiveness of *Washington*, the Department sought a stay of that preliminary injunction, which the Ninth Circuit denied on December 4th, 2025, a week before the Department issued the non-continuations here.

And on remand, the district court permanently enjoined the non-continuations on APA grounds on December 19th, the day that plaintiffs submitted their requests for reconsideration. And what they got back 10 days later was new statements in their application that were not present in the notices of non-continuation and a one-sentence line that says the information in your request was not sufficient to refute the allegations.

I don't know how -- I don't know -- if that's not arbitrary and capricious conduct, if that's -- if that total lack of engagement of explanation is not arbitrary and capricious conduct, I don't know what is.

In terms of the actual application language, the whole point of the Full-Service Community School grants as you heard today is that the grantees are positioned to support local

communities making decisions about what needs they have, what assets they have, and how the grantee can move resources to meet those needs and augment those assets.

You heard the witnesses testify about how most of their programming is building upon the things they already have. It's expanding the ability to do things. It's letting them do things they were never able to do before. That is -- in order to show that the plaintiffs could do that, they had to say a lot in their application about what they could do, and the Department approved in 2023.

And the Department has plaintiffs' 2024 annual progress report, 2025 annual progress report. The Department has evidence in its possession that details very minutely how these funds are being spent, what the programs are achieving, and the Department chose not to bring those here.

We also during negotiations submitted to the Department an amended application that removes the targeted language that they -- that they suggested, and that doesn't seem to have -- have moved the needle very much.

We submitted a budget in order to gain use of that carryover funding during the course of this argument. That seemed fine for defendants.

Defendants also allowed every expense that plaintiffs asked for from carryover funding outside of the restrictions that they set which further undercuts their irreparable harm

argument.

And as to -- as to how -- as to how plaintiffs get relief in this preliminary injunction without any order of money from the government, without any remedy that's ordering the government to pay money, because ACT Now is so early in the grant process, it has about a year -- or had, as of 2025, about a year's worth of carryover funds left over. That's perfectly normal.

The statute allows for a lower use of carryover funds in the first six months of the year to allow for the kinds of planning that will make possible this -- this statewide implementation, and in 2026, plaintiffs have been able to use some of that funding because the department allowed it.

If the -- if the non-continuations are preliminarily enjoined, then ACT Now would be able to -- then what that would do is not order the government to pay money but lift the restrictions that the Department imposed during negotiations.

The Department has the gall to assert that the reason these carryover funds were allowed here is to allow for a structured wind down of the program. That's in a footnote at the end of their brief.

You heard five witnesses today testify that these -- these funding non-continuations have been detrimental to their communities, and they will fall off a cliff on June 30th. We would not be here if we were all in agreement that we were

trying to get to a structured wind down of the process.

All we are asking for this Court is, while it considers our arguments on the merits, to preliminarily enjoin enforcement of these actions which we believe we are reasonably likely to show -- or have shown a reasonable likelihood of success in challenging and to prevent the irreparable harm to ACT Now, the 32 school districts that they serve, the 19,000 children that are right now living in a kind of limbo with access to some but nowhere near the level of programming that they -- that they had under these programs.

And so for all of those reasons, I urge the Court to issue a preliminary injunction. We have a draft preliminary injunction order.

We understand that the Court needs time to consider all of the arguments and the case law here is dense and confusing, and time is of the essence.

THE COURT: Okay. A couple other questions.

So going back to what was the language that we looked at earlier from the non-continuations, which is in turn quoting language from the application.

MR. ORTEGA: Uh-huh.

THE COURT: How would you describe that? Is that language from the grant applications? Is that saying we would use funds for DEI programming? Is it saying we could use funds for DEI programming if a need arose?

Like, how would you describe -- is it -- how definite is the, I guess, the statement of, you know, what will happen to the funds that are --

MR. ORTEGA:  Yeah.  I refer you to Ms. Stanton's testimony earlier where she testified to the fact that those statements talk about ACT Now's ability to produce these trainings or these professional developments if that need arose.  After the needs assessments they conducted, they determined that those needs -- that those programs were not necessary for those -- for those needs, and so did not -- did not approve them.

THE COURT:  Okay.  So it's -- is it fair to say that those statements in the grant application are essentially saying, you know, we could do this if we needed to if that turns out to be a need in the -- as we go through this individualized assessment in a particular area, and if that's a need, then we're prepared to use -- we're prepared to use funds to do that sort of training or activity?

Does it -- I mean, so does the grant application give ACT Now the ability to use funds for one of those purposes even if they didn't actually follow through?

MR. ORTEGA:  Only if after a needs assessment, the needs and assets assessment that was conducted, if that community determined that those kinds of programs were necessary, that were necessary to meet the program objectives I

mentioned earlier, kindergarten readiness, making sure that kids have a safe, healthy place to go to school, if the community determined that that was necessary, then they may be able to do that.

But, again, all of the statements that were made here, like, there's no evidence in the record that plaintiffs actually did any of that programming under the grant, and so the statements that they are -- the statements that are the basis for non-continuation here are all statements that happened outside of the federal funding program.

THE COURT:  Okay.  But outside in what sense?  Because it is -- they are clearly statements from the grant application, so it's not as though this is some statement that was issued unrelated in any way, shape or form to the grants. It's not as though this was some non-grant-related statement that's in some different press release or different context. It is in the grant application for these grants.

So I -- how is that consistent with -- so this point that we went through from *Finley* and *Rust*, that Congress may selectively fund a program to encourage certain activities it believes to be in the public interest without at the same time funding an alternative program which seeks to deal with a problem in another way.  In doing so, the government has not discriminated on the basis of viewpoint.  It has merely chosen to fund one activity to the exclusion of another.

So if different applicants are proposing different capabilities for meeting the needs of the FSCS program, and, you know, some applicants are proposing or at least in their application are identifying things that they are willing -- you know, ready, willing and able to do if that need becomes apparent through the individualized needs assessment process of a particular area, then why doesn't it fall within that principle from *Finley* and *Rust* that the government can selectively fund certain ways of doing -- you know, it's not about there's no -- in other words, like different programs are -- or ways of using funds are all trying to achieve -- to deal with a problem. Everybody agrees there's ultimately a purpose for the program.

It's just about, okay, there's different ways of going about remedying the problem, and the government's free to fund one way of doing it to the exclusion of another. Why doesn't it fall within that?

MR. ORTEGA: Two responses, Your Honor.

First is that if the government -- if the Department of Education wants to make that choice and have different priorities for its competition for Full-Service Community School grants, then it needs to promulgate those in a notice inviting applications.

It didn't do that here for continuation. The notice inviting applications in 2023 said that this is -- you know,

that administration, this is how they are deciding to do these things.  And so the ACT Now -- the plaintiffs submitted statements responsive to the published and promulgated notice inviting applications that said this is the way we're going to solve the problem.

If the Department wants to change those priorities, then it needs to do so through another notice inviting application, and if it's going to use its continuation -- its regulations governing continuation awards to effect that change in policy, then it needs to enact a notice and comment rulemaking process to make clear what the guidelines or the interpretations that they're using of their regulations are when those implicate federal education funds.  That is the notice and comment requirement in GEPA.

And I'd also point out that the -- in addition to these kinds of specific things that ACT Now said in its applications that it was prepared to do, the Department also cited ACT Now's mission statement.  ACT Now's mission statement, which is, like, central to who they are, was placed in the application as a way of demonstrating that they are able to meet the needs of the Full-Service Community School programs because they intentionally seek to provide resources to all students on an equitable basis.

And so on that basis, they're not describing any sort of grant programs, they're proposing to do grant programs.

There's no evidence in the record that they did any of these programs. There's all -- there's five witnesses speaking to the fact that they didn't do these programs in there.

And so the fact that the Department is taking these statements from an application responding to things that -- responding to questions it asked of applicants through the proper procedures to now turn around and say that those are the bases for not continuing the grant is just effecting a change in grant-making policy without the procedures that Congress required.

THE COURT: Can -- or why can't they make a determination under the reg. that some methods or ways are in the best interests of the government and others aren't? Why can't that just be a determination under the regulation as opposed to requiring a new statute or new notice and comment or --

MR. ORTEGA: They can. They just didn't here. So in the notices of non-continuation, they give those four potential reasons why this thing isn't in the best interests of the federal government and then quote plaintiffs' application back at them. There's no analysis of why those things are in the best interests of the federal government, what the -- what the connection is between those things and the best interests of the federal government.

The Department asserted here in its argument that all

of those conditions or criteria were met here, but if they were, then that opens up a host of other procedural protections that they didn't -- that they didn't provide plaintiffs.

So if they're actually asserting that plaintiffs violated civil rights law, then they have to go through -- under Title VI, they have to go through a lengthy process informing Congress, the relevant committee heads of the action, the amount that they're taking, they have to provide an opportunity to be heard before they make that determination.

And so if they're right about all of these things and they're able to change "or" to "and" in the notices of discontinuation, then that just doubles down on all of the procedural violations that we've discussed.

THE COURT: Okay. Do you -- I guess going to the -- back to the Tucker Act.

MR. ORTEGA: Uh-huh.

THE COURT: And, I'm sorry, you may have mentioned this before, but are there any cases that you would cite for what happens when the source of the rights is not contractual but the remedies are?

MR. ORTEGA: I'm not aware of any case that speaks to that distinction.

THE COURT: Okay.

MR. ORTEGA: But I do know that every case to consider *Megapulse* and *Evers* in cases where plaintiffs do not seek an

order pursuant to a contract to pay money has bounced in our favor, has been held in our favor.

The one -- all of the cases that the Department cites using *Megapulse* and *Evers* to take the case to the Court of Federal Claims are cases involving grant determinations in which there is -- in which the amount that plaintiffs -- in which plaintiffs are seeking a monetary amount, and that amount is in excess of $10,000, and the specific amount that they're seeking is the grant amount in the budget period that the defendants -- that the Department issued and then withdrew.

We're not making that claim here because we can't. The grant non-continuations are different than terminations, and we discussed that in our opposition to the motion to dismiss. Because the non-continuation just says that the Secretary intends not to fund in the future, there are no 2026 funds to reinstate. All the preliminary injunction would do is enjoin -- is restore plaintiffs to active grantee status.

Vacatur of those non-continuations would not order the government to issue a 2026 continuation award. It would just mean that the Department then has to conduct that continuation determination anew lawfully in the first instance.

And in terms of support for that, I point you to Justice Barrett's conclusion -- concurrence in the *NIH* case, where she distinguished between challenges to grant terminations in which the plaintiffs sought money pursuant to

their contract and challenges to agency guidance in which vacatur of that guidance does not reinstate any sort of grants terminated under that guidance.

Similar action here. Non-continuations, vacating them does not reinstate any money. There's no money there to reinstate that plaintiffs are entitled to. And two courts in this -- two cases in this court applied Justice Barrett's concurrence in *NIH* to reach that conclusion, as did the *Washington* courts.

If I may, I'd just like to point back to the Department's regulations, which say -- again, that's 34 C.F.R. Section 75.253(e) that an active grantee may expend funds at the end of a budget period in the next one for allowable costs within the approved scope and objectives of the project, and the Secretary may require the grantee to submit a written statement describing how the funds will be used.

Throughout negotiations, plaintiffs submitted all sorts of written descriptions about the use of the funds to get funding to, for example, pay a year-long contract of the data evaluator, the firm that helps the grantees meet their data quality requirements under the grant. Those kinds of -- we are happy to submit those and further ones if this Court grants a preliminary injunction that lifts those conditions.

Because plaintiffs have -- because plaintiffs have a significant sum in carryover funds that are now subject to the

Department's restrictions and will end on June 30th, plaintiffs have been able to mitigate some of the harms from these non-continuations.

But if those restrictions are still in place, then ACT Now won't be able to -- to -- ACT Now won't be able to do its programming. None of the schools that you heard from today will be able to do -- to do their programming.

And the Department's -- in the Department's handbook on discretionary grant awards, which we cite in our PI briefs, says that, "Unexpended funds at the end of one budget period can be used in the next budget period without any action by Ed. or the grantee."

Nothing -- nothing this Court orders, can order in this case, could compel a contractual obligation to pay money because there isn't any.

THE COURT: Okay. Thank you very much.

I don't think I have any further questions unless there's anything else you'd like to mention.

MR. ORTEGA: I would just like to reiterate the irreparable harm that the plaintiffs, the schools that they serve and the 19,000 children that depend on these services will face without these restrictions being lifted.

THE COURT: Okay. Thank you very much for your arguments to both counsel.

I would just, I guess, conclude the hearing here

unless anything else from any counsel at all?

MR. CULL:  Nothing from us, Your Honor.

MR. SOLOTOROVSKY:  Nor from the plaintiffs.  Thank you, Your Honor.

THE COURT:  Okay.  Well, thank you all for all of your presentation today and the arguments.

I really appreciate all of your time and attention.  I know it's a lot of work to prepare for something like this, so I really appreciate it.  Thank you.

MR. SOLOTOROVSKY:  Thank you, Your Honor.

MR. CULL:  Thank you, Your Honor.

(Concluded at 2:33 p.m.)

*   *   *   *   *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Kathleen M. Fennell*                    *June 11, 2026*
Kathleen M. Fennell                         Date
Official Court Reporter

I N D E X

WITNESSES                                                    PAGE

SUSAN STANTON

Direct Examination By Mr. Solotorovsky                         5

AMY VOGUE

Direct Examination By Mr. Solotorovsky                        35

REBECCA KINSEY

Direct Examination By Mr. Solotorovsky                        50

KIMBERLY DAVID

Direct Examination By Mr. Solotorovsky                        65

SIDNEY STIGGE-KAUFMAN

Direct Examination By Mr. Solotorovsky                        75