26-2473

# In the United States Court of Appeals
## FOR THE SEVENTH CIRCUIT

AFTERSCHOOL FOR CHILDREN AND TEENS (ACT NOW) and METROPOLITAN FAMILY SERVICES,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES DEPARTMENT OF EDUCATION and LINDA MCMAHON,

*Defendants-Appellees*.

On Appeal from the United States District Court for the Northern District of Illinois
No. 1:25-cv-15704 (Honorable Martha M. Pacold)

**APPELLANTS' REPLY BRIEF**

Jocelyn (Josie) E. Skinner
(*application for admission pending*)
Emily K. Merolli
(*admission for application pending*)
SLIGO LAW GROUP, PLLC
1717 K St. NW, Suite 900
Washington, DC 20006
Telephone: (202) 888-2084

Scott C. Solberg (No. 6204487)
Elizabeth M. Hady (No. 6316542)
EIMER STAHL LLP
224 S. Michigan Ave., Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718

Aneel L. Chablani (No. 6242658)
Michael R. Ortega (No. 6339469)
CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS
25 E. Washington St., Suite 1300
Chicago, IL 60602
Telephone: (312) 630-9744
Fax: (312) 630-1127

*Attorneys for Plaintiffs-Appellants Afterschool for Children and Teens (ACT) Now and Metropolitan Family Services*

**TABLE OF CONTENTS**


I. The Factual Premise for the District Court's Decision—that the Department Refused to Continue ACT Now's Funding Because of a Risk of Future DEI Programming—Is Refuted by the Record. ........ 1

II. Plaintiffs Are Likely to Succeed on their First Amendment Claims. ........ 5

A. The Selective-Subsidy Cases Do Not Condone the Department's Actions Because the Department is Enforcing Its Own Policy, Not a Funding Condition Congress Imposed. ........ 7

B. Even if the Department Was Enforcing a Funding Condition Imposed by Congress, Such a Funding Condition Is Viewpoint Discrimination Prohibited Under the Selective-Subsidy Cases. ........ 9

C. Plaintiffs Did Not Waive Their Argument. ........ 11

III. The Court Erred in Failing to Make any Findings of Irreparable Harm. ........ 11

IV. Conclusion ........ 13

## TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ................ 6, 8, 9

*Anderson v. Bessemer City*, 470 U.S. 564 (1985) ........................................................ 10

*Argyropoulos v. City of Alton*, 539 F.3d 724 (7th Cir. 2008) ........................................ 4

*California, et al. v. Dep't of Ed., et al.*, No. 25-CV-10548, Mem. and Order, ECF No. 176 (D. Mass. Sept. 17, 2026)........................................................................................ 2

*Camelot Banquet Rooms v. U.S. Small Bus. Admin.*, 24 F.4th 640 ................................ 8

*FKFJ, Inc. v. Village of Worth*, 11 F.4th 574 (7th Cir. 2021) ....................................... 5

*Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancokc Life Ins. Co.*, 582 F.3d 721 (7th Cir. 2009) ........................................................................................................ 12, 13

*Ill. Republic Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020)......................................... 13

*Illinois Tamale Co. v. LC Trademarks, Inc.*, 164 F.4th 648 (7th Cir. 2026)................................ 12

*Legal Services Corporation v. Velazquez*, 531 U.S. 533 (2001) ....................................... 9

*Mays v. Dart*, 974 F.3d 810 (7th Cir. 2020) ................................................................. 12

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998)................................... 6, 8, 9

*Nieves v. Bartlett*, 587 U.S. 391 (2019) ......................................................................... 5

*Rust v. Sullivan*, 500 U.S. 173 (1991) ................................................... 1, 5, 6, 7, 11

*Speech First, Inc. v. Killeen*, 968 F.3d 628 (7th Cir. 2020)........................................... 12

*Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891 (7th Cir. 2001) ......................................... 12

**Statutes**

15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa) ........................................................................ 8

20 U.S.C. § 954(d)(1) ...................................................................................................... 8

**Other Authorities**

Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) .......................................................... 6

Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025) ........................................................ 6

Defendants' Response Brief confirms, rather than answers, the flaws in the district court's ruling. The Department never actually embraces on appeal the rationale the district court ascribed to the Department's decision to sever ties with ACT Now—that it feared ACT Now might someday use grant funds for DEI-related projects—and for good reason: the Department disclaimed that rationale at the hearing and has since admitted, in a filing in a related case, that it discontinued grantees' funding not because of anything they had done or proposed to do, but because those grantees were "committed to the support of diversity, equity, and inclusion ('DEI') initiatives." Similarly, rather than answer Plaintiffs' prima facie showing on their First Amendment claims, the Department retreats to the selective-subsidy line of cases. As ACT Now has explained throughout this litigation, *Rust* and its progeny do not help the Department because those cases relate to Congress's decision on which types of activities to fund and not, as is the case here, the Executive's decision to restrict funding based on the recipients' viewpoint. Compounding all of this, the district court never weighed ACT Now's undisputed, irreparable harm. These defects in the district court's decision warrant vacatur.

## I. The Factual Premise for the District Court's Decision—that the Department Refused to Continue ACT Now's Funding Because of a Risk of Future DEI Programming—Is Refuted by the Record.

Appellants' Opening Brief sets forth undisputed record evidence showing that the Department's decision to discontinue ACT Now's grant funding was based on certain "DEI-related" language in ACT Now's original grant applications. (Br. 9–12, 20–23.) The Department's Notices of Non-Continuation themselves make this plain: rather than identify anything ACT Now actually did or proposed to do with grant funds, the Department quoted isolated excerpts from ACT Now's applications describing ACT Now's equity-centric mission statement, its description of professional-development trainings it had hosted in the past, and the statutorily-mandated discussion of barriers to equitable access. (Id. 9–10 (citing Dkt. 3-7 at 2, 5–6).) It then asserted,

without further explanation, that these snippets reflected "proposed project activities that conflict with the Department's policy."[1] (Id.) In its order, the district court relied on five isolated statements taken from ACT Now's 200-plus page application, none of which describes any proposed DEI-related project: four describe past trainings ACT Now conducted or has access to without federal funds, and the fifth truncates a general statement of ACT Now's mission.[2] (Id. 20–21 (citing Dkt. 62 at 2; Dkt. 3-4 at 40, 53, 63, 144).)

The testimonial record further confirms this. At the preliminary injunction hearing, five witnesses offered testimony that ACT Now never conducted, proposed to conduct, or had any plan to conduct any of the "activities" the Department flagged—testimony the district court itself acknowledged was not controverted by anything in the record. (Id. 21–22 (citing PI Hr'g Tr. at 19:19–20:2, 20:13–18, 26:22–27:9, 21:3–8, 27:10–17, 21:16–21, 27:18–25, 22:11–16, 23:4–9, 28:1–10, 23:23–24:3, 28:23; Dkt. 62 at 14 ("The record contains nothing to cast doubt on the veracity of th[e] claim" that Plaintiffs "have not used funds for such [DEI] activities.").) As ACT Now's Executive Director testified, the application language the Department seized on was nothing more than the kind of statements the grant-authorizing statute and General Education Provisions Act (GEPA) *require* applicants to make and not a proposal to provide any particular program activities. (Br. 22 (quoting PI Hr'g Tr. at 29:22–30:15).)

---

[1] This is consistent with the Department's February 2025 Directive prioritizing viewpoint-driven review of "organizations that support diversity, equity, and inclusion . . ." (Dkt. 49-22 at 2.) Last week, a district court granted summary judgment to plaintiffs challenging that Directive, vacating it and declaring it substantively unlawful under the APA. *California, et al. v. Dep't of Ed., et al.*, No. 25-CV-10548, Mem. and Order, ECF No. 176 (D. Mass. Sept. 17, 2026).

[2] That truncated mission statement—"[E]quity is intentionally and sustainably integrated into all that we do[.]"—was the district court's *only* record cite with regard to ACT Now's rural grant. (Br. 21 (citing Dkt. 62 at 2).)

The Department has not disputed these facts in the district court or on appeal. In the district court, the Department never argued that its decision was based on a concern over future grant-funded programming, and counsel for the Department flatly rejected the district court's proffered rationale at the preliminary injunction hearing. When the court asked defense counsel whether the excerpts from the grant application mean that "funds will be used or are, at least there's a pretty reasonable likelihood[,] depending on the individual needs assessment process of each district" could be used for DEI programming (PI Hr'g Tr. at 129:6–10), counsel replied, "No, Your Honor," and agreed with ACT Now that the statements the Department relied upon in discontinuing funding of Plaintiffs' grants "articulat[ed] priorities for equitable access in identifying programs that would be responsive to that, relevant to that under GEPA, and those include the projects that ultimately plaintiffs did not fund, but stated that were consistent with those grant capabilities." (Id. 129:11, 129:15–22.)

The Department's position on appeal is no different. In the Response Brief, the Department does not address any of this evidence, let alone cite any contrary evidence, in arguing that the district court "made no clear error in its factfinding" when it concluded that the Department's decision to discontinue the grants was based on its concern that ACT Now *might* use grant funds for future DEI-focused projects. (Resp. Br. 1; *see also id.* at 22–27.) Indeed, in defending the district court's decision, the Department still does not adopt or endorse the district court's finding as its own position. (*See, e.g.,* Resp. Br. at 14 (arguing only that the court's finding is "a permissible inference").)

The reason for the Department's silence, at every stage, is now clear. After the district court issued its ruling in this matter, the Department filed a memorandum in a related case that confirms the district court's error. In *Brighton Park Neighborhood Council v. McMahon*, seven plaintiffs

(including one Illinois-based organization that receives its FSCS funding from ACT Now) sued the Department after receiving materially identical notices of non-continuation of their FSCS grant funding based on DEI-related language in their applications, including the two notices at issue here. *Brighton Park Neighborhood Council, et al. v. McMahon, et al.*, No. 1:25-cv-04523-SLS, Am. Compl., ECF No. 27, at ¶¶ 11–17, 61–63 (D.D.C. Feb. 27, 2026). In its memorandum opposing summary judgment, the Department admitted what the record here establishes: it targeted grantee organizations because they expressed support for DEI and *not* because they used, or proposed to use, grant funds to provide DEI programming. The Department told the court that it "fails to see what other alternatives, *besides discontinuing grants awarded to entities committed to the support of diversity, equity, and inclusion ('DEI') initiatives* deemed unlawful by the new presidential administration, were available to it." *Id.*, Def's Mem. ISO Def.'s Partial Motion to Dismiss and Cross-Motion for Summ. J., ECF No. 46 (D.D.C. Sept. 2, 2026) (emphasis added). In other words, the Department chose to discontinue grants based not on what grantees had done or proposed to do but because those organizations were "committed to the support of [DEI]."

The district court's inference cannot stand. There is no evidence in the record supporting the district court's assumption that the Department discontinued ACT Now's funding out of concern that ACT Now might begin providing DEI-related programming at some point in the future. Defendants offered no such evidence, and the evidence Plaintiffs provided refutes it. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (what constitutes "reasonable inferences" does not "extend to drawing inferences that are supported by only speculation or conjecture" (citations omitted)). The Department had a full opportunity during the four-hour preliminary injunction hearing to explain its reasoning, yet offered no witness and no testimony on the point. And now we know why: the Department has since admitted, in *Brighton Park*, that

the true reason it decided to discontinue funding was to target entities that support DEI initiatives, not the prospective programming rationale inferred by the district court.

For all of these reasons, the district court clearly erred in finding that the Department declined to continue ACT Now's funding because of a risk of future DEI-related programming.

## II. Plaintiffs Are Likely to Succeed on their First Amendment Claims.

The Department largely concedes Plaintiffs' prima facie case for both of the First Amendment claims. (Resp. Br. 15–20.) On retaliation, the Department does not contest that Plaintiffs engaged in protected First Amendment speech when they made statements in their grant applications, or that any reasonable grant applicant would be deterred from making similar statements on threat of non-continuation. (Id. at 15–16.) On unconstitutional conditions, it gives no answer to the actual chill Plaintiffs faced on their speech: denial of funding even after they offered to submit revised applications omitting the language the Department disfavors. (Id. at 19–20.) Defendants merely assert without argument or record support that Plaintiffs' arguments conflict with the district court's (erroneous) factfinding,[3] begging the question at the crux of this appeal. (Id. at 27–28.)

Rather than engage with this analysis, the Department switches focus to the selective-subsidy line of cases. But the line drawn by those cases between permissible and impermissible funding decisions only underscores the likelihood of ACT Now's success. *Rust* and its progeny

[3] Defendants attempt to collapse Plaintiffs' affirmative arguments into a factual dispute subject to clear-error review. (Resp. Br. 22–28.) But the district court did not err only in the facts; it erred in failing to apply the relevant constitutional law at all. (Br. 13–14 (describing how the court's "false premise" regarding "DEI-related projects" led it to apply the selective-subsidy cases and reach the wrong conclusion.).) The district court never mentioned in its memorandum denying ACT Now's preliminary injunction, let alone analyzed, ACT Now's likelihood of success under the three-part test that governs retaliation claims: *Nieves v. Bartlett*, 587 U.S. 391 (2019) and *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574 (7th Cir. 2021) do not appear in its opinion. That is an error of law that requires reversal.

explain that Congress can decide which activities to subsidize, but it cannot use its authority to make funding decisions as a pretense to regulate a recipient's viewpoint. *Rust v. Sullivan*, 500 U.S. 173, 193, 197 (1991). As the Supreme Court has explained, "the relevant distinction that has emerged from our cases is between conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013).

This case presents the latter, impermissible type of funding decision. As discussed above, the record admits only one conclusion: the Department decided not to continue ACT Now's funding because ACT Now is "committed to the support of [DEI]" and not because of any objectionable conduct or proposed conduct using grant funds. That reasoning does not reflect a value judgment made by Congress about whether to spend money on certain programming (e.g., programs to provide food assistance at elementary schools) over others (e.g., programs to provide food assistance at day cares). Rather, that reasoning makes plain the Department's goal—as made explicit in the Executive Orders[4] and internal guidance[5]—to drive "DEI-committed entities" from the marketplace. The selective subsidy cases prohibit this exact conduct. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (cautioning against "Government funding [that]

---

[4] *See* Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) (ordering agencies to terminate "illegal DEI" programs and grants); Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025) (ordering agencies to "review discretionary grants to ensure" that they do not fund "diversity, equity, and inclusion and other far-left initiatives").

[5] *See* Dkt. 49-22, U.S. DEP'T OF EDUC., Directive on Department Grant Priorities (Feb. 5, 2025) (The Department is "ensuring that the Department's grants do not support…organizations that promote…[DEI] initiatives…"); *see also* U.S. DEP'T OF EDUC., *U.S. Department of Education Takes Action to Eliminate DEI*, Press Release (Jan. 23, 2025) (The Department "has taken action to eliminate harmful [DEI] initiatives" and "review[ed] all agency programs and services…that may be advancing a divisive DEI agenda…").

result[s] in the imposition of a disproportionate burden calculated to drive certain ideas or viewpoints from the marketplace" (internal citations omitted)).

Two further points drive this conclusion home. First, the Department relied on its own regulations as its authority for discontinuing ACT Now's funds, not a statute Congress enacted, meaning this is the Department's own policy judgment, not Congress's. Second, even if Congress had imposed this very condition itself, it would still be unconstitutional viewpoint discrimination, which the selective-subsidy cases forbid no matter which branch imposes it. The Department's response to each of these points is unavailing, as further explained below.

### A. The Selective-Subsidy Cases Do Not Condone the Department's Actions Because the Department Is Enforcing its Own Policy, Not a Funding Condition Congress Imposed.

Defendants repeat the sleight-of-hand that led the district court to err. They assert that *Rust* and other selective-subsidy cases broadly permit "the government" to make selective funding decisions about "programmatic activities," and that the non-continuations thus "rest[] squarely within the Department's authority to define and update programmatic priorities." (Resp. Br. 17–18; *compare with* Br. 23–25.) But those cases turn on *Congress's* authority—not the Department's—to make value judgments via its Spending Power, as Defendants appear to concede.[6] (*See* Br. 23 n.4 (collecting cases).) And they make plain that neither Congress nor the

[6] Resp. Br. 16 ("In *Rust*, . . . [t]he Supreme Court upheld the implementing regulations because they reflected *Congress's prerogative* to define the program's contours….") (emphasis added); *id*. at 17 (quoting *Finley*, 524 U.S. at 587–88) ("So long as *legislation* does not infringe on other constitutionally protected rights, *Congress* has wide latitude to set spending priorities.") (emphasized added); *id*. at 20 ("The Supreme Court [in *Rust*] upheld the regulations as valid interpretations of *statutory* authority…") (emphasis added); *id* at 21 ("In [*Finley*], the National Endowment for the Arts *was directed by Congress* to consider 'general standards of decency and respect' in issuing grants. . . . [T]he Supreme Court held [that] the agency could constitutionally exercise 'substantial discretion' in applying those broad *statutory* criteria.") (emphasis added)).

Department may use federal funds to penalize expression made without those funds. (Br. 23–24 (discussing *Agency for Int'l Dev. v. All. for Open Soc'y Int'l.*, 570 U.S. 205 (2013)).

The selective-subsidy cases thus provide no support to the Department here. The Department asserts without argument that the non-continuations merely "identif[ied] the metes and bounds of a government funding program." (Resp. Br. 21.) But unlike the challenged provisions in the selective-subsidy cases, the general grantmaking regulations the Department used to discontinue ACT Now's grants do not implement any statutory condition, let alone one from the Full-Service Community Schools program. *See Finley*, 524 U.S. at 572–77 (reviewing statutory arts funding criteria, 20 U.S.C. § 954(d)(1)); *Camelot Banquet Rooms v. U.S. Small Bus. Admin.*, 24 F.4th 640, 644–45 (reviewing statutory Paycheck Protection Program criteria, 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa)). Nowhere have Defendants suggested a statutory basis for their viewpoint-based policy. They are therefore different in kind from the funding criteria upheld in the selective-subsidy cases.

Indeed, the selective-subsidy cases cut the other way. The *Finley* Court warned that agencies leveraging *statutory* funding restrictions "into a penalty on disfavored viewpoints" may violate the First Amendment. 524 U.S. at 587. That logic applies *a fortiori* here for two reasons. First, the Department relied solely on an admittedly vague[7] regulatory standard that applies to every multi-year grant the Department awards, one that Defendants have never used to effect a shift in Administration priorities. (Br. 8 (citing Dkt. 3-3 at ¶¶ 28–29).) If even statutory conditions can give rise to First Amendment violations, the Department's novel use of a vague *regulatory* provision untethered from any spending program cannot escape review. *Cf. All. for Open Soc'y*

---

[7] PI Hr'g Tr. at 122:14–17 (Counsel for Defendants: "The best interest standard is vague as applied. It is a vague standard that has been vague since it was promulgated in 1980.").

*Int'l*, 570 U.S. at 215 ("Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise." (quoting *Legal Services Corporation v. Velazquez*, 531 U.S. 533, 547 (2001))).

Second, multiple statutory provisions—both generally applicable to Education grantmaking and specific to the Full-Service Community Schools program—make plain the Department's lack of authority to base non-continuation decisions on application language. Congress *requires* applicants to describe the applicant's ability to integrate diverse resources to meet Community School program objectives and potential barriers to equitable participation in their grant activities. (Br. 3–5, 26–27.) Other provisions prohibit the kind of "categorical" or "programmatic" judgments the district court found, which Defendants disclaimed in district court and now defend on appeal. (*Compare* id. 26 (citing Dkt. 51 at 10–11) *with* Resp. Br. 17.) Defendants never explain—nor could they—how cases upholding statutory funding directives permit it to target speech Congress expressly requires in grant applications.

The selective-subsidy cases support Plaintiffs' likelihood of success. The Department's conduct typifies the "leverag[ing of] its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints" that the *Finley* Court called "a different case…[in which] relief could be appropriate." 524 U.S. at 516.

### B. Even if the Department Was Enforcing a Funding Condition Imposed by Congress, Such a Funding Condition Is Viewpoint Discrimination Prohibited Under the Selective-Subsidy Cases.

Like the district court, the Department ignores the overwhelming, undisputed evidence that the administrative policies it sought to enforce discriminate against viewpoints held by ACT Now. (Br. 9–10, 17–18.) The uncontroverted record refutes the notion that ACT Now ever proposed to use grant funds on so-called "DEI-related projects." Instead, the evidence confirms that the Department sought to leverage its funding power to advance a policy targeting entities like ACT

Now that support diversity, equity, and inclusion. The record supports no non-discriminatory basis for non-continuation: the Administration's well-documented anti-DEI policy and Plaintiffs' pro-DEI application statements are the only evidence for why the Department targeted ACT Now's grants. Focusing solely on ACT Now's initial applications—and ignoring reports of its actual grant performance—makes clear that the only basis for the Department's non-continuation decision were the views expressed by ACT Now before any federal funding flowed, describing ideas and activities outside the federal grant program. The Department's denials of reconsideration, which cited Plaintiffs' equity-centric mission statement, further confirm that the grants were cut not for what Plaintiffs did or could do, but because of what they said they believe.

The Department argues that the DEI-related statements in ACT Now's application suggest that it was "ready and able" to use grant funds for DEI-focused projects and that ACT Now "nowhere dispute[s]" this.[8] (Resp. Br. 25.) Not so. The uncontroverted record evidence shows that ACT Now never proposed any such projects and that it twice offered to submit a revised application removing the flagged language, but the Department declined. (*See* Br. 19–20.)

Ultimately, the Department does nothing to explain why the district court's "account of the evidence is plausible in light of the record viewed in its entirety," let alone a "permissible view of the evidence." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985). The inference drawn by the Court about the Department's likely motivation was made of whole cloth. The Department did not argue it or present evidence supporting it below; it does not endorse its truth or accuracy here; and it has since clarified its true motivation in the related District of Columbia action. The Department

[8] Consistent with its mission statement, ACT Now's Executive Director testified that "equity is intentionally and sustainably integrated into all that we do." (PI Hr'g Tr. at 25:13–14.) ACT Now's mission statement is not evidence that ACT Now provided any "DEI-related programming," and furthermore, the Department never identified any such problematic past or future programming in its notices.

targeted ACT Now because of statements made it its applications, and not because of anything it did or proposed to do with federal funds. On this record, Plaintiffs established a likelihood of success on their First Amendment claims and it was entitled to preliminary injunctive relief.

### C. Plaintiffs Did Not Waive Their Argument.

The Department argues that ACT Now waived its argument that the selective-subsidy cases forbid the Department's actions. (Resp. Br. 19.) That is incorrect. ACT Now has argued against the Department's interpretation at every opportunity. In the preliminary injunction briefing, ACT Now advanced its view of the selective-subsidy cases in reply to the Department's reliance on them. (Dkt. 52 at 9–11.) And at argument, ACT Now expressly contested the court's reading of these cases in direct response to the court's questions.[9] (PI Hr'g Tr. at 110–12.) Thus, ACT Now has not waived its argument.

## III. The Court Erred in Failing to Make any Findings of Irreparable Harm.

This is not a case where there was "zero" likelihood of success on the merits. Plaintiffs presented evidence showing that the Department's real motivation for discontinuing the grants was the Administration's displeasure with statements made in ACT Now's grant applications. (*See, e.g.*, Br. 9–12.) The district court rejected that evidence in favor of its own inference that the Department's likely motivation was a concern over the risk of future DEI programming. (Dkt. 62

---

[9] THE COURT: "[W]hat's your response to that principle that goes back to *Rust* and then it's articulated again in *Finley* which . . . allows selective funding in the way that's described there?"

COUNSEL FOR PLAINTIFFS: " . . . the line of cases that the defendants point to here are all speaking about congressional authority to determine funding priorities or funding policy. . . . But if in the implementation of that program, an agency starts to use that discretion over funding . . . to target viewpoints it disfavors, that violates the First Amendment, and *Finley* held that, *Agency for International Development* held that, all the cases that the defendants cite point in the same direction."

THE COURT: "Okay. I don't have any more questions.")

at 15.) Having been presented with evidence to establish some likelihood of success on the merits, the district court was required to consider the overwhelming and undisputed evidence of irreparable harm. Its failure to do so presents an additional basis to vacate the order denying preliminary injunctive relief.

To obtain a preliminary injunction, the plaintiff must show that "(1) without this relief, it will suffer irreparable harm; (2) traditional legal remedies would be inadequate; and (3) it has some likelihood of prevailing on the merits of its claims." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (quoting *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020)). If the plaintiff makes this showing, the court then weighs the harm of denying the preliminary injunction against the harm of granting it. *Id*. What counts as "some" likelihood of success is not fixed. *Id*. ("What amounts to 'some' depends on the facts of the case at hand because of [this Court's] sliding scale approach." (citing *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). Rather, "[h]ow strong a claim on the merits is enough depends on the balance of harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancokc Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009) (citations omitted). Here, the district court assessed the merits and found them wanting—a finding unsupported by the record and clear error as described above—and, as a result, never considered Plaintiffs' undisputed irreparable harm.

The cases cited by the Department in its brief are inapposite. In those cases, this Court agreed with the district court that the moving party had not shown a likelihood of success, and for that reason, had no occasion to weigh irreparable harm. (Resp. Br. 28–31 (citing *Illinois Tamale Co. v. LC Trademarks, Inc.*, 164 F.4th 648, 662 (7th Cir. 2026) and *Ill. Republic Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020)). In contrast, ACT Now has shown a likelihood of success, for

all of the reasons given above and in its Opening Brief. Thus, having been presented with unrebutted evidence establishing some degree of likely success on the merits, the district court was obligated to consider the extent to which ACT Now's immediate, undisputed, and irreparable harm tipped the scales in favor of issuing an injunction. *See Hoosier Energy,* 582 F.3d at 725. The court erred by failing to do so.

## IV. Conclusion

For the reasons set forth above and in their Opening Brief, Plaintiffs respectfully request that this court vacate the denial of preliminary relief, remand for further proceedings, and provide any other relief this Court deems appropriate.

Dated September 24, 2026

*/s/ Scott C. Solberg*
SCOTT C. SOLBERG

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify the following:

This Brief complies with the type-volume limitation of Circuit Rule 29 because it contains 4,229 words, excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(f).

This Brief complies with all typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) and Circuit Rule 32(b), because it has been prepared in a proportionally spaced typeface using Microsoft Word version 2024 in 12-point Times New Roman in the body of the brief and 11-point Century Schoolbook in footnotes.

Dated September 24, 2026

*/s/ Scott C. Solberg*
SCOTT C. SOLBERG

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of September, 2026, I filed the foregoing Brief with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

Pursuant to Circuit Rule 31(b), and upon notice of this Court's acceptance of the electronic brief for filing, I certify that I will cause ten (10) copies of the above-named brief to be transmitted to the Court via Federal Express overnight delivery, delivery charge prepaid, within seven days of that date.

*/s/ Scott C. Solberg*
SCOTT C. SOLBERG